# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATE OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-CR-450-CVE** |
| **RAYMOND LEE GOLDESBERRY,** | |
| **Defendant.** | |

## DEFENDANT'S TRIAL BRIEF

**COMES NOW** Defendant Raymond Lee Goldesberry, by and through Andrea Brown, and respectfully submits this trial brief in the above-styled case.

## STATUS OF THE CASE

A. A jury trial is currently scheduled for March 28, 2022, before the Hon. John Antoon, United States District Judge for the Middle District of Florida.

B. Estimated time for trial (including jury selection) is 3 days.

C. The Defendant is out of custody.

D. The Defendant anticipates less than fifteen minutes for opening statement.

E. An interpreter is not needed.

F. The Defendant has not asserted an affirmative defense.

G. The Government and Defendant have provided reciprocal discovery.

H. The parties have agreed to and filed two stipulations, specifically as to Indian Country and Indian status.

I. The following motions, responses and objections are pending before this Court:

- United States' Notice of Intent to Admit Evidence of Other Crimes, Wrongs or Acts (Dkt. #28)

- Defendant's Response to United States' Notice of Intent to Admit Evidence of Other Crimes, Wrongs or Acts (Dkt. #36)

- Defendant's Motion in Limine (Dkt. #33)

- Government's Response to Defendant's Motion in Limine (Dkt. #43)

- Defendant's Motion to Quash Government's Subpoena (Dkt. #51)

- Government's Motion in Limine (Dkt. #54, responded-to herein)

J. At this time, the Defendant does not anticipate presenting any exhibits, however a total of 29 photographs have been provided to the Government in discovery, which may become relevant and admissible (depending on witness testimony.)

K. Witness List:
   a. Any witnesses listed in the Government's Trial Brief.
   b. Brandon Luna (character witness)
   c. James Manns (character witness)
   d. Carla Barboza (DHS)

## FACTUAL OVERVIEW

On May 25, 2020, a former friend of the Goldesberry family, Meaghan Bartlett, made a Department of Human Services ("DHS") referral, alleging M.V. and F.G. both made a number of concerning disclosures to Ms. Bartlett. The referral prompted a DHS investigation. Ms. Bartlett made a number of allegations against Defendant pertaining to both M.V. and F.G., which are uncharged allegations of other bad acts. Several of Ms. Bartlett's accusations are not included in the United States' Notice of Intent to Admit Evidence of Other Crimes, Wrongs or Acts[1] (Dkt. #28.)

---

[1] United States' 404(b) Notice seeks to introduce evidence of interactions between F.G. and Defendant, but does not include the various and sundry accusations Meagan Bartlett made

As per the usual course of child sexual abuse investigations, M.V. was forensically interviewed. The interview was conducted by Kelsey Hess, a relatively new forensic interviewer at the Child Abuse Network at the time. The interview occurred on May 29, 2020. During the interview, M.V. was asked about an incident wherein she had a nightmare some years prior and as a result had crawled into bed with Defendant, who was asleep. M.V. recounted to the forensic interviewer that Defendant, while still half asleep, touched M.V. "down there" in her vaginal area believing M.V. was actually Defendant's wife. M.V. specifically reported, "He didn't know it was me." M.V. reported her mother was at work at the time. M.V. reported Defendant's eyes were closed and he was snoring at the time. M.V. reported that Defendant "apologized profusely" after he realized his mistake. M.V. relayed to the interviewer that she had told a friend recently, who took it "out of context" and "out of proportion," which made her angry. The friend was the reporting party, Meaghan Bartlett. M.V. did not disclose any further inappropriate contact or sexual abuse. M.V. reported that her mother told her to be honest in the interview, but other than that no one told her what to say.

On the same date as M.V.'s forensic interview, M.V.'s mother ("Michelle") was also interviewed by DHS. M.V.'s mother reported she only became aware of the incident when DHS called her to inform her they were opening an investigation. Neither Defendant nor M.V. had told Michelle about the incident years ago when it happened, nor had M.V. told Michelle (as Ms. Bartlett assumes) prior to DHS becoming involved. Michelle vehemently denies she lied to DHS or told Ms. Bartlett (or anyone else) that she lied to DHS.

On June 3, 2020, DHS interviewed F.G., Defendant's adult daughter who resides with Defendant and his wife (F.G.'s mother.) F.G. informed DHS that Meagan Bartlett has a chaotic home life and is jealous of the Goldesberry family's stability.

Defendant was interviewed by DHS on June 12, 2020. Pursuant to the DHS investigation, Defendant and M.V. had no contact from the time DHS contacted Michelle on May 25, 2020 and the time of Defendant's interview. During his interview, Defendant admitted there was one time, years ago, when he was still half asleep and rolled over in bed to manually stimulate his wife, but quickly realized it was not his wife in bed with him when M.V. spoke. He discovered his wife must have gone to work without his realizing. Defendant reported he spoke at length with M.V., explaining he believed it was his wife in bed with him. During that conversation, Defendant discovered M.V. had suffered a nightmare and gotten into his bed, which was not common.

**LEGAL AND EVIDENTIARY ISSUES**

**I.    The Statements the Government Seek to Introduce are Hearsay, and the "Effect on the Listener" Exception Does Not Apply**

The Government intends to elicit testimony from Meagan Bartlett, her father Nathan Bartlett, forensic interview Kelsey Hess, and DHS investigator Brenna Gusman. The statements the Government seeks to introduce allegedly came from declarants M.V., Defendant's adult daughter F.G., and Defendant's wife Michelle Goldesberry. The Government seeks to introduce these various statements "to explain to the jury Meagan and Kelsey's next actions following disclosure." Obviously, it goes without saying, the Government can ask the witnesses whether they were told something that concerned or alarmed them, and then ask the witness what they did in response.

The Government states in its trial brief on page 6, footnote 2 that it "does not intend to elicit testimony about the specifics of the other allegations Meaghan says [F.G.] and [M.V.] told

her about on May 24, 2020; nor does the government intend to elicit testimony about the specific allegations Meaghan reported on May 25, 2020, for which she does not have personal knowledge." (Dkt. #___.)  Nevertheless, with the Government's pending 404(b) motion on file, as well as the Government's response and objection to the Defendant's Motion in Limine, the Defendant seeks a pretrial ruling excluding *any* of Meagan Bartlett's, her father Nathan Bartlett's, forensic interview Kelsey Hess', and DHS investigator Brenna Gusman's hearsay statements.

The Government cites *Smalls, Faulkner* and *Creaghe* in support of its request to admit hearsay as "effect on the listener" (Government's Trial Brief, Dkt. # ____, page 14-15.)  *Smalls* does not apply as it deals with Federal Rule 804(b)(3) and statements against interest, which is an exception that only applied when the declarant is unavailable.  *Faulkner* does not apply as it deals with the "state of mind" exception, not effect on the listener.  And *Creaghe* does not apply, as it does not even discuss the "effect on the listener" exception.

Unfortunately, the government frequently attempts to admit inadmissible hearsay under Federal Rule of Evidence 801(c) by arguing it is not offered for the truth of the matter asserted. Often, before defense counsel or the Court can intervene, the government has put before the jury inadmissible hearsay that is both damning and highly prejudicial, and goes to the heart of the issues in the matter on trial.  In most cases, as previously noted, there is a way to explain a witness' follow-up actions (or "effect on the listener") without going into any of the substance of the hearsay statements. For example, "I talked to M.V. and based on that conversation I called DHS."  To admit *any* of the actual alleged statements themselves in this case would be *highly* prejudicial.  Further, in reality, the risk that the jury could ignore or be unable to follow the Court's limiting instruction renders this an explosively volatile issue in the case at bar.  Finally,

the Government itself admits in its trial brief that "Meagan heard [F.G.'s] and [M.V.'s] disclosures on May 23 and May 24, Meagan called DHS, triggering a chain of events" (Dkt. #___, page 15.) This is all the jury is entitled to hear under the Federal Rules of Evidence.

## II.    The Statements the Government Seek to Introduce are Hearsay, and Rule 703 Does Not Make Them Admissible

In its trial brief the Government attempts to justify its use of M.V.'s hearsay to forensic interviewer Kelsey Hess using Rule 703. This is an attempt to back-door-in otherwise inadmissible child hearsay by designating the forensic interviewer as a Government's expert. Only after Hess interviewed M.V. has the Government sought to use Hess as an expert. In fact, the United States Attorney's Office for the Northern District of Oklahoma has regularly used *other, more experienced* experts to discuss child sexual abuse and the process of disclosure. The Defendant has no objection to Ms. Hess being called as the Government's "expert," however the Defendant objects to the Government identifying someone as an expert in part to seek to admit otherwise inadmissible hearsay. M.V.'s hearsay statements to Ms. Hess are absolutely not admissible under the "effect on the listener" exception, as Ms. Hess did nothing with regards to M.V. or this case after her forensic interview. So the *only possible* way to attempt to admit M.V.'s completely inadmissible child hearsay is by designating Ms. Hess as the Government's expert and claiming somehow the actual statements M.V. made to Hess themselves are admissible as "facts relied on by the expert." (Government's Trial Brief, Dkt. ____, page 16.) Further, Rule 703 only allows disclosure of the facts relied on by the expert *if* their probative value in helping the jury evaluate the opinion *substantially* outweighs their prejudicial effect.

**III. Meagan Bartlett's Various Uncharged, Uncorroborated, Disputed Accusations are Inadmissible, even under Rule 404(b)**

The Government filed a 404(b) notice regarding *some*, but not all, of the things Meagan Bartlett claims M.V. and F.G. disclosed to her in May 2020. (Dkt. #28.) Defendant has specifically responded to the 404(b) notice. (Dkt. #36.) However, in Government's discovery, Meagan Bartlett makes a number of additional (wild) accusations against Defendant with regard to M.V. M.V. adamantly denies Meagan's various additional (uncharged) accusations. As such, without proper notice and without any legal means of admissibility, Defendant seeks a pretrial ruling excluding *all* of these additional, uncharged, uncorroborated, disputed, and denied other bad acts allegations. Any of them individually are highly prejudicial and not at all probative. Together, Meagan Bartlett's claims are not only completely denied by M.V., but also as prejudicial as evidence gets. The details of Meagan's additional, uncharged claims are as follows:

- Defendant asked M.V. if she was naked when she was sleeping
- Defendant told M.V. if her mom was not in the picture, M.V. would be his next choice
- M.V. did not want Faith involved in this because M.V. does not want Faith to think Defendant is a bad person
- Defendant has asked to see M.V. naked
- Defendant has asked to touch M.V.
- Defendant has made jokes in M.V.'s presence about practicing oral sex
- Defendant would masturbate in his recliner in the living room when M.V. was there
- Defendant has used dildos and vibrators and put his fingers inside of M.V. for years
- This started when M.V. was 3-4 years old and was still happening as of May 2020
- M.V. has attempted suicide
- M.V. has used alcohol and marijuana to cope with the abuse
- Defendant was sexually abused as a child by his biological mother
- Defendant got in bed with M.V. on multiple occasions while M.V. was naked

- After Megan told Michelle that M.V. said all this, Michelle drove M.V. to M.V.'s grandmother's house where M.V. was given marijuana
- M.V. didn't want Meagan Bartlett to tell her father, Nathan Bartlett, because he would report it
- Michelle bought M.V. a vibrator and it's in my bedroom

## IV.     Nathan Bartlett's *Identical Act* Against his Daughter, Meagan Bartlett, is Admissible on Cross-Examination of both Meagan Bartlett and Nathan Bartlett

The Government filed its Motion in Limine as counsel for Defendant was preparing to file this trial brief and, as such, Defendant will address this most recent filing herein (Dkt. #54.) It is undisputed that Nathan Bartlett "awkwardly cuddled Meagan in the middle of the night, mistaking Meagan for her mother." (Dkt. #54.) This is a fact that Meagan Bartlett confided in F.G., who did *not* believe it was necessary to call Nathan Bartlett a rapist nor did F.G. call DHS in response to this disclosure. The Government correctly assumes the Defendant intends to cross-examine Meagan Bartlett and Nathan Bartlett with regard to the undisputed *fact* that Ms. Bartlett's father committed the *exact same act* against Ms. Bartlett as Defendant did M.V. This evidence is <u>*highly*</u> probative on multiple fronts.

First, it undermines Ms. Bartlett's response (or, as the Government has called it, her "effect on the listener") of calling Defendant "a rapist" and making a DHS referral after M.V. confided in her supposed friend the details of Defendant's mistake in touching M.V. while believing M.V. was actually his wife. Meagan will testify she was concerned for M.V. and believed she had an obligation to report Defendant and/or was specifically instructed by her father Nathan Bartlett to call DHS[2]. This flies in the face of reason when confronted with the

---

[2] Government's discovery production specifically acknowledges that Nathan Bartlett was the person who told Meagan Bartlett to make the DHS referral

fact that the *exact same thing* happened between Meagan Bartlett and her father Nathan Bartlett, and Ms. Bartlett did not feel the need to report her own father.

A witness' credibility is *always* at issue. As such, this evidence is admissible to dispute both Meagan Bartlett's and Nathan Bartlett's credibility. Rule 608(b) allows for counsel to inquire as to specific instances of conduct on cross-examination when the inquiry is probative of the witness' truthfulness. To allow Meagan Bartlett to make claims about M.V., F.G. and Michelle Goldesberry (which each of them deny) that necessitated Ms. Bartlett to make a DHS referral, without allowing defense counsel to inquire as to her lack of concern and failure to make a DHS referral when it happened to her, calls Meagan Bartlett's credibility into question. Since most of what Meagan Bartlett claims happened has been vehemently denied by the other witnesses in this case, Ms. Bartlett's bias, motives, and credibility are a critical issue in tis case.

For Meagan Bartlett, Nathan Bartlett, and (perhaps most importantly) the United States Government to call what happened between Defendant and M.V. "sexual abuse" without allowing the Defendant to inquire as to an identical, intentionally uncharged, scenario between Meagan and Nathan Bartlett on cross-examination would be unconscionable. The Government, in its Motion in Limine, claims that what happened between Meagan and Nathan Bartlett is ***not*** *sexual abuse*, while simultaneously arguing to the jury in our case that the *exact same thing* ***is*** sexual abuse. Perhaps the Government seeks to limit Defendant's cross-examination so as not to embarrass itself for its selective charging practices. Regardless, this line of inquiry regarding undisputed facts is damaging to the Government's case – but that is not a legal means of excluding otherwise admissible inquiry. Rule 608(b) allows for inquiry into witness' specific instances of past misconduct. It is undisputed that Rule 608(b) misconduct inquiry is allowed even when the conduct does not amount to a criminal action. As such, Rule 608(b) opens a wide

door to effective and proper cross-examination even when the subject of said cross-examination is damaging to the Government's intentions.

The Government relies **heavily** on the testimony of Meagan Bartlett ad Nathan Bartlett. In fact, the Government interviewed Meagan Bartlett *twice* before even contacting M.V. for an initial interview. The Government seeks to introduce highly prejudicial hearsay, nearly all of which is disputed by the declarant (M.V.) Yet, when the Defendant seeks to inquire on cross-examination of Meagan and Nathan Bartlett as to an identical, *undisputed* allegation, the Government invokes a posturing position as to cross-examination of its star witnesses. The Court cannot allow the Government to cherry-pick its filings and then double-down its inconsistency by excluding relevant, probative evidence as to its witness' bias and credibility.

## CONCLUSION

The Defendant respectfully submits this Trial Brief in an attempt to anticipate the factual and legal issues that may arise at trial. The Defendant requests that the Court grant leave to submit additional briefing should the same become necessary.

Respectfully Submitted,

*s/ Andrea Brown*
Andrea Brown, OBA #22682
*Attorney for Defendant*
2021 S. Lewis Ave., Suite 520
Tulsa, Oklahoma 74104
(918) 625-1098
abrown@swabstall.com

## CERTIFICATE OF DELIVERY

I do hereby certify that on date of filing, I electronically submitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

AUSA Chantelle Dial, WSBA No. 51736

Northern District of Oklahoma

110 W. Seventh Street, Suite 300

Tulsa, OK 74119

*s/ Andrea Brown*

Andrea Brown