1              UNITED STATES DISTRICT COURT FOR THE

2                  NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                      Plaintiff,     )
                                      )
6    vs.                              )          CASE NO. 21-CR-450-GKF
                                      )
7                                     )
     RAYMOND LEE GOLDESBERRY,         )
8                                     )
                       Defendant.     )
9    _____)

10

11

12              EXCERPT OF JURY TRIAL PROCEEDINGS
                   TESTIMONY OF KELSEY BLEVINS
13            BEFORE THE HONORABLE JOHN ANTOON II
                   UNITED STATES DISTRICT JUDGE
14                      MARCH 29, 2022

15

16

17

18

19

20                  A P P E A R A N C E S

21        MS. CHANTELLE DIAL and MR. KYLE MCWATERS, Assistant United
     States Attorneys, Northern District of Oklahoma, United States
22   Attorney's Office, 110 West 7th Street, Suite 300, Tulsa,
     Oklahoma, 74119, appeared on behalf of the plaintiff.
23
          MS. ANDREA BROWN, Andrea Brown Law Firm, PLLC, 2021 South
24   Lewis Avenue, Suite 520, Tulsa, Oklahoma, 74104, appeared on
     behalf of the defendant.
25

1    PROCEEDINGS:

2    -----------------------------------------------------

3                (Previous proceedings were had but not designated as

4    part of this record.)

5         **CSO:**  All rise.

6                (Jury entered the courtroom.)

7         **THE COURT:**  Please be seated.

8         Good morning, ladies and gentlemen.

9                (Jurors replied, "Good morning.")

10        **THE COURT:**  I hope you had a good break and an easy ride

11    in this morning.

12        Who -- who's the Government's next witness?

13        **MR. MCWATERS:**  Kelsey Blevins, Your Honor.

14        **THE COURT:**  Okay.

15                (The witness approached the bench.)

16        **THE DEPUTY COURT CLERK:**  Miss Blevins, if you'll go ahead

17    and stop right there, I'll swear you in.

18        Do you solemnly swear that the testimony you're about to

19    give in this matter before the Court will be the truth, the

20    whole truth, and nothing but the truth, so help you God?

21        **MS. BLEVINS:**  I do.

22        **THE DEPUTY COURT CLERK:**  Thank you.  Go ahead and have a

23    seat, and you can adjust the microphone if you need to.

24        **THE COURT:**  Before -- before we begin, ladies and

25    gentlemen, I don't think I introduced Mr. Johnny Phorn to you

1    yesterday.  He's the security officer who's working with you in

2    the morning, and then one of his colleagues substitute in the

3    afternoon.

4         But like Miss Butler, his -- he has many responsibilities,

5    and one of those is to make sure that you're secure and

6    comfortable.  So wanted to make sure I introduced him before we

7    begin.

8         What is your name, ma'am?

9         MS. BLEVINS:  It's Kelsey Blevins.

10        THE COURT:  Would you spell your name, please.

11        MS. BLEVINS:  Yes.  K-e-l-s-e-y, B-l-e-v-i-n-s.

12        THE COURT:  You may inquire.

13                          KELSEY BLEVINS,

14   called as a witness herein, having been first duly sworn on

15   oath, was examined and testified as follows:

16                        DIRECT EXAMINATION

17   BY MR. MCWATERS:

18   Q    Good morning, Miss Blevins.  What do you do for a living?

19   A    I'm the manager of forensic services at the Child Abuse

20   Network.

21   Q    Do you have any other titles or responsibilities there?

22   A    I'm also a forensic interviewer there.

23   Q    And how long have you been in that position?

24   A    Since February of 2019.

25   Q    As a manager of forensic services, can you describe some

1  of your responsibilities?

2  A    Yes.  So I conduct forensic interviews on some of the

3  most shocking and heinous cases, and I also supervise the

4  forensic interviewing team.  I also participate in community

5  education.

6  Q    When you say you supervise the team, can you give us a

7  little bit more background on that?

8  A    Yes.  So I supervise a team of four forensic interviewers

9  at the center.  So I participate in trainings with them and do

10  peer review and feedback with them on their interviews.

11  Q    Part of your community outreach education, do you put on

12  various trainings for law enforcement?  Kind of give us a

13  little flavor of what that entails.

14  A    Yes.  We do some trainings for law enforcement on

15  forensic interviewing, and we also do trainings for the

16  community on child abuse and mandated reporting.

17  Q    Can you describe your educational background for the

18  jury?

19  A    Yes.  I have a Masters of Science in Forensic Science

20  with an emphasis in forensic psychology, and I have a Bachelors

21  of Science in Psychology with a minor in sociology.

22  Q    All right.  Do you have any continuing education

23  requirements for your job?

24  A    Yes.  We are required to participate in a minimum of

25  eight hours of continuing education every year.

1    Q    What does that continuing education consist of?

2    A    That consists of online trainings, live-instructor-led

3    trainings, and in-person trainings.

4    Q    What kind of conferences and seminars do you attend to

5    fulfill that requirement?

6    A    So I attend conferences based on child abuse, mandated

7    reporting, forensic interviewing, and other topics in the

8    field, like family dynamics and child sexual abuse.

9    Q    Do you have to do -- fulfill that requirement every year?

10    A    Yes.

11    Q    Do you have to submit your work to peer review?

12    A    Yes.  Forensic interviewers participate in a formal

13    meeting that's called "peer review."  And during peer review,

14    you can present or watch an interview that someone else has

15    conducted so we can receive and give feedback.

16    Q    How often do you -- how often do you have to participate

17    in peer review?

18    A    I believe we have to participate in peer review a minimum

19    of two times per year for our accreditation, but at my center,

20    at our site, we participate in national peer review once a

21    month.

22    Q    So 12 times a year?

23    A    Yes.

24    Q    And for the continuing-education classes that you said

25    that you had to take, you said you had to do eight hours; is

1   that right?

2   A    A minimum of eight hours.

3   Q    And about how many do you do typically per year?

4   A    I probably do well over 60 hours of continuing education

5   every year.

6   Q    Are there any prerequisite trainings or certifications

7   that you have to have to become a forensic interviewer?

8   A    Yes.  You have to go through 40 hours of ChildFirst®

9   Protocol Training, which includes mock interviews that you have

10  to participate and pass, and a written test.

11  Q    How do you pass a mock interview?

12  A    The other interviewers that are going through the

13  training, as well as the instructors, watch your mock

14  interview, and they grade your skill set and your adherence to

15  the protocol, and they give you a pass or fail grade.

16  Q    You said you had to take a class on the ChildFirst®

17  Protocol?

18  A    It's a 40-hour training on ChildFirst® Protocol.

19  Q    What do you learn through that training?

20  A    How to use the ChildFirst® Protocol to interview children

21  that are involved in the child abuse investigation.

22  Q    I believe you said this.  You have to become certified at

23  the end of that program; is that right?

24  A    There's not a certification.  It's just passing the

25  40-hour training, which includes the written test and passing

1    the mock interview.

2    Q    Are there any accreditations that either you or your

3    office have to have to -- to be con- -- to continue doing what

4    you do to keep current?

5    A    The Child Abuse Network is accredited by the National

6    Children's Alliance, so there's a set of standards that the

7    center, as a whole, has to adhere to, to maintain that

8    accreditation.

9    Q    All right.  What is the National Children's Alliance?

10   A    The National Children's Alliance is an accrediting body

11   that accredits most of the children's advocacy centers in the

12   state and in the nation.

13   Q    Do you know what their standards are?

14   A    There's several standards.  Some of them include having a

15   child-friendly setting.  Some of the standards are specific to

16   each partner agency involved in all -- our multidisciplinary

17   team.  And there are standards specific to forensic

18   interviewing.

19   Q    It is, like you said, a -- a nationally recognized

20   institution, though?

21   A    Yes.

22   Q    And they have their own internal standards that are

23   reviewed periodically?

24   A    They have standards that they participate in

25   reaccreditation with our agency, so they do a site visit every

1    three years.  And we have to update our practices to make sure

2    we're adhering to those standards.

3    Q    Let's move in a little bit on your background as a

4    forensic interviewer.  Can you describe for the jury what a

5    forensic interviewer is?

6    A    Yes.  A forensic interviewer is someone who is specially

7    trained to talk to a child or a teenager that is involved in a

8    child-abuse investigation, in a way that's not leading or

9    suggestive and focuses on the child's best interests and their

10    development and trauma level throughout the interview.

11    Q    What is the purpose of a forensic interview?

12    A    The purpose of a forensic interview is to get the child's

13    statement in a way that's not leading or suggestive and

14    elimits -- eliminates the need for multiple interviews and

15    eliminates as much suggestibility as possible.

16    Q    You said it eliminates the need for multiple interviews.

17    Is that important?

18    A    Yes.  The research shows that multiple interviews can

19    cause the child's statement to sound contrived or rehearsed.

20    It's disrespectful to the victim to make them go through

21    multiple interviews.  And it's the most trauma-focused,

22    child-focused way to interview children that are involved in

23    these types of investigations.

24    Q    Where are forensic interviews typically used?

25    A    Forensic interviews are conducted in a forensic

US DISTRICT COURT - NDOK
REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1    interviewing room.  At our center, we have two rooms, and they

2    have two-way glass so the child is on one side with the

3    interviewer, and the investigators are on the other side of

4    that two-way glass, and they're able to see and hear the

5    interview as it's taking place.

6    Q    What's the age range typically for a forensic interview?

7    A    Between three and seventeen.

8    Q    And that would be for the -- for the subject, for the

9    interviewee; is that right?

10   A    Yes.  The ChildFirst® Protocol allows us to interview

11   children between the ages of three and seventeen.

12   Q    What's the goal of a forensic interview?

13   A    The goal of the forensic interview is to allow the child

14   to have a space that is child-friendly and safe for them to

15   talk about what they may or may not have experienced in a way

16   that's not suggestive or leading and that focuses on their

17   development and their trauma level.

18   Q    Is the goal to obtain a disclosure from the child of

19   sexual abuse?

20   A    No.

21   Q    You said that you use this in -- in cases where there

22   have been allegations.  Is there a reason why it's preferred

23   for a forensic interviewer to do this interview as opposed to

24   law enforcement?

25   A    Yes.  So there's a few reasons why.  One of them is that

1    the forensic interviewer is a neutral party.  We don't

2    investigate any of the allegations, so we are a neutral party

3    as compared to law enforcement who does investigate.

4         And also we've gone through extensive training to be able

5    to talk to kids in a way that's developmentally appropriate for

6    them.  And that focuses on their best interest.

7    Q    You said "developmentally appropriate."  So does that

8    imply that there are appropriate and inappropriate ways to

9    interview children?

10   A    Yes.  The protocol is the same regardless of the child's

11   age, but there are certain questions that a three-year-old may

12   not be capable of answering as compared to a 17-year-old.

13   Q    You mentioned the ChildFirst® Protocol that you had

14   training in.  Is that a commonly used protocol by forensic

15   interviewers across the country?

16   A    Yes.

17   Q    Are there others?

18   A    Yes.

19   Q    And what do -- do these protocols have things in common?

20   A    Yes.  All of the protocols are more alike than they are

21   different.  They all have the same general phases or stages.

22   They're just slightly different.

23   Q    Is the ChildFirst® Protocol periodically updated?

24   A    Yes.

25   Q    When -- when I say "updated," does that mean that --

1    well, explain to me what you mean by that, that it's updated.

2    A    The ChildFirst® Protocol, I believe, was last updated in

3    2019, and they just review the steps of the protocol and

4    different ways to use anatomical drawings and things like that.

5    Q    Do you know why they -- why it undergoes that review

6    process?

7    A    In forensic interviewing, there's a lot of science, and

8    there's a lot of art, so a lot of it is about building your

9    skill set as a forensic interviewer.  And it's very important

10    to include current research in the process that we use.  So

11    they go and update the protocol and the process according to

12    what's new research in the field.

13    Q    During your career, how many forensic interviews have you

14    participated in?

15    A    Around 980.

16    Q    And in those interviews, do you always get a disclosure?

17    A    No.

18    Q    Can you describe a little bit about what when I -- when I

19    say "disclosure" and when you say "disclosure," can you

20    describe to the jury what you mean -- what we mean by that

21    term?

22    A    Yeah.  The term "disclosure," it just means if the child

23    is talking about or disclosing some type of abuse or

24    maltreatment.

25    Q    Through your training and experience, have you become

1   familiar with different types of disclosures?

2   A    Yes.

3   Q    Based on your educational background, your training,

4   experience, have you become knowledgable in the process of

5   victimization and disclosure process of child abuse victims as

6   well as the psychological and physical symptoms displayed by

7   child abuse victims?

8   A    Yes.

9   Q    And have you testified as an expert before?

10  A    Yes.

11  Q    On what topics?

12  A    On the process of disclosure and child sexual abuse.

13  Q    About how many times approximately?  Do you know?

14  A    I've testified twice in state criminal court as an

15  expert.

16      MR. MCWATERS:  Your Honor, at this time, the Government

17  would like to move to qualify Ms. Blevins as an expert in child

18  and adolescent forensic interviews, sexual abuse disclosures,

19  and victim behavior in response to child abuse.

20      THE COURT:  The witness is qualified to give testimony

21  pursuant to Rule 702 in those areas.

22      MR. MCWATERS:  Thank you, Your Honor.

23  Q    (By Mr. McWaters) Ms. Blevins, are you being paid any

24  extra to be an expert in this trial today?

25  A    No.

1    Q    Okay.  Just -- this is a normal day at the office for

2    you?

3    A    Yes.  This is just part of my job.

4    Q    Let's talk a little bit about childhood responses to

5    sexual abuse.  Is there a single way that children react or

6    respond to sexual abuse?

7    A    No.

8    Q    Why is that?

9    A    Every child is different, and every case is different.

10   So the reactions can be very widely varied.

11   Q    What are some of the -- the reasons why those can be

12   widely varied, those -- those responses?

13   A    There's a lot of external and internal factors that can

14   influence a child's response.  Some of those can include fear,

15   shame, guilt, having been threatened by the offender, not

16   having a supportive caregiver believe them when they do

17   disclose.  There are many factors that can influence the

18   child's response.

19   Q    I think you already answered this, but when you conduct a

20   forensic interview, are you affirmatively trying to elicit a

21   disclosure in that interview?

22   A    No.

23   Q    And is it possible for a child to react to sexual abuse

24   by not disclosing?

25   A    Yes.

1    Q    Why -- why would that be?

2    A    Again, every child and every case is different.  The

3    process of disclosure is not a one-time event.  It's an

4    evolving process.  So if a child was undergoing a forensic

5    interview, they may or may not disclose.

6    Q    So let's talk a little bit about disclosure.  You already

7    gave the jury a definition of what a disclosure is.  What is

8    the -- the process of disclosures?  Are there different phases?

9    Like, give us a little bit more of a holistic background of

10   what a disclosure is.

11   A    Yes.  So the process of disclosure is an evolving process

12   and not a one-time event.  There are some phases of the

13   disclosure.  There's denial.  There's tentative disclosure,

14   active disclosure, recantation, and reaffirmation.

15   Q    Do all children go through each of those phases?

16   A    Not necessarily.

17   Q    Do they go through them in that order?

18   A    Not necessarily.

19   Q    Do they go -- do they always go through any of those

20   processes?

21   A    Not necessarily.

22   Q    Are there -- so we talked about the phases in the process

23   of disclosure.  Are there different types of disclosures?

24   A    Yes.

25   Q    What are some of those types?

1    A     So the two main types of disclosure are accidental

2    disclosures and purposeful disclosures.  An accidental

3    disclosure, an example would be if the abuse is uncovered

4    inadvertently through perhaps STI testing or a diagnosis of a

5    sexually transmitted disease.

6         And then a purposeful disclosure is where the child is

7    purposefully or actively telling someone that something has

8    happened.

9    Q     When you say -- so another way, I guess, to -- to put a

10   purposeful disclosure is it's -- it's -- comes from the child

11   itself as opposed from some other external factor; is that

12   right?

13   A     Yes.

14   Q     Is there -- are there any other types of disclosures?

15   A     Those are the two main types.  But the phases of

16   disclosure also talk about active disclosures and tentative

17   disclosures.

18        An active disclosure is a lot like purposeful.  The child

19   is actively talking about the details they can remember about

20   what's happened.  They may not remember all of the details, but

21   they're actively giving what they can remember.

22        And a tentative disclosure is where the child's giving

23   vague information or pieces of information to test and see what

24   the reaction is going to be to their disclosure, to see if

25   they're going to be supported or believed.

1    Q    Will different types of disclosures result in -- in

2    different effects on the child?

3    A    It can, yes.

4    Q    How will those manifest?

5    A    So, for example, in a tentative disclosure, if the child

6    is giving vague information to someone and they are not

7    supportive or they are critical of the offender or they don't

8    believe them, it may cause the child to then recant, which is

9    another phase of the process.  And recantation just means the

10   child's taking it back and saying, "It didn't happen."

11   Q    If -- if a child has a tentative disclosure and then --

12   to someone who's not necessarily an authority figure, just a

13   friend, and then that's reported, can that also -- reported to

14   an authority figure, can that have an effect on the child?

15   A    Can you repeat the question?

16   Q    If -- if a child discloses to a friend and then that

17   disclosure's made to an authority figure, like an agency or

18   something, would that have an effect on the child?

19   A    Yes, because in the tentative disclosure phase, they're

20   testing the waters to see what might happen if they do

21   disclose.  So it may not have been their intention for anyone

22   beyond that friends that they were telling to know about it.

23   Q    Can -- can a child react to a potential disclosure by

24   minimizing the conduct?

25   A    Yes.

1    Q    Can you explain what it means for a child to minimize

2    abuse?

3    A    Yes.  So "minimizing," in this field, that term is a

4    characteristic of tentative disclosures.  So minimizing, or an

5    example of minimizing, would be, "It only happened one time,"

6    or "It's not that big of a deal."

7         There's other characteristics of tentative disclosures as

8    well, like forgetting.  Just the child saying they forget.

9    There's also empowerment, or sometimes it's called "superhero,"

10   where the child might make statements such as, "And then I

11   punched him in the face and ran away," and things like that.

12   So there's other characteristics of a tentative disclosure.

13   Q    Okay.  Could possible aspects of -- of minimizing, could

14   it be that it was an accident or -- or taking responsibility

15   for the abuse?

16       **MS. BROWN:**  Objection.  Leading.

17       **THE COURT:**  The counsel's entitled to some degree of

18   leading in questioning an expert.  Overruled.

19       **THE WITNESS:**  Can you repeat the question?

20   Q    (By Mr. McWaters) Sure.  If -- if -- is one aspect of

21   minimizing by a -- by a child, can it be that they are taking

22   responsibility for it or saying that it was an accident?

23   A    Yes, that could be a characteristic.  Saying it was an

24   accident could also be a form of another characteristic of

25   tentative disclosure, which is discounting.

1    Q    When children are sexually abused, do they all disclose

2    in the same way?

3    A    No.

4    Q    In your training and experience, do children sometimes

5    delay disclosing or not disclose sexual abuse?

6    A    Yes.

7    Q    Why are some of the reasons for that?

8    A    So some of the reasons for a delayed disclosure are very

9    similar to the other influences on the process of disclosure.

10   So fear, shame, guilt.  They may have been threatened.  They

11   may not be aware or understand that what happened to them was

12   abusive.  There's a lot of factors that can influence them not

13   telling immediately after it happens.

14        A lot of the research shows that most children delay

15   disclosure.  And most of the time, if they don't delay

16   disclosure, it's because the perpetrator is a total stranger to

17   them, someone that they don't know or love or care about

18   because in 90 percent of cases, the offender is someone that

19   they know and love.

20   Q    So let me -- let's unpack that for the jury a little bit.

21   You're saying that it's actually more common for there to be a

22   delayed disclosure when it's someone that the victim knows?

23   A    Yes.

24   Q    You also mentioned something about a child potentially

25   forgetting or -- or -- about the abuse.  Would -- would that

1    also affect the child's memory of the abuse?

2    A    So when we are talking about forgetting, that's another

3    characteristic of the tentative disclosure.  And remembering

4    that the tentative disclosure is where the child's giving vague

5    information or pieces of information to test the waters.

6        They may say, "I forgot," or they might discount and say,

7    "It's not that big of a deal," or they might minimize and say,

8    "It only happened one time."  So forgetting is a characteristic

9    of the tentative disclosure.

10   Q    Would you expect a child to be able to tell you the exact

11   dates on which an abuse occurred?

12   A    No.

13   Q    And why not?

14   A    That would be an unrealistic expectation even for an

15   adult, especially in cases of long-term abuse.  If it has been

16   going on for a long time, they're not likely to be able to

17   remember much more than the very first time it happened, the

18   last or most recent time it happened, and anything in between

19   that was different.

20       In cases of a one-time event that's not long-term abuse,

21   it's just not realistic to expect a child or an adult to be

22   able to remember every single detail about the day, time, and

23   place because that's just not how memory works.

24   Q    Is there a -- a typical person that a child will disclose

25   to or is it -- is it kind of random?

1    A    Not necessarily.  It just depends on who the child feels

2    safe or comfortable with in telling their disclosure to.

3    Q    You said that disclosures of sexual abuse are influenced

4    by a lot of different factors.  You -- and you said that a lot

5    of them are internal factors; is that right?

6    A    Yes.

7    Q    What do you mean by an internal factor?

8    A    So internal factors could be the child's development, the

9    severity of abu- -- the abuse they experienced and the trauma

10   level that they have following that abuse.  It could be a

11   linguistic barrier.  That would be an internal factor if

12   there's -- they speak a different language or developmentally

13   they don't have the language to talk about what happened.

14   Q    Would the relationship to the abuser affect dis- -- be an

15   internal factor, or would that be something different?

16   A    I would consider relationship to the offender as an

17   external factor, but it is a factor that can influence the

18   disclosure.

19   Q    Well, let me be a little more specific.  When I say "the

20   relationship," not necessarily just the external relationship,

21   but how the -- the victim feels about the abuser.

22   A    Yes.

23   Q    Is that "yes," that would be a factor that would --

24   A    Yes, that would --

25   Q    -- affect disclosure?

1    A    Yes, that would be a factor.

2    Q    So for -- for external factors, what -- what are some of

3    those factors that would affect how a child responds to sexual

4    abuse?

5    A    So external factors would be things like some of the

6    reasons children delay disclosure is because they may be aware

7    of the family dynamics and how they are going to change if they

8    do disclose.  They might be concerned that they're going to be

9    removed from their home by child welfare and placed into the

10   foster care system.

11        They may be ready to disclose because they're concerned

12   something is going to happen to a sibling or a friend.  There's

13   lots of external factors that could influence their disclosure.

14   Q    Would it be unusual for a child to be around the abuser

15   and act like nothing happened?

16   A    No.

17   Q    Do sexually abused children have certain behaviors?

18   A    Not necessarily.

19   Q    How might the relationship a child has with her abuser

20   impact disclosure?

21   A    So most of the time, the child knows and cares about the

22   offender, whether it's a family member or a family friend.

23   They have a relationship where they care about that person, and

24   they like the relationship.  They just don't like what that

25   person is doing to them.  So those things can affect their

1    willingness to disclose.

2         They may be worried that something bad is going to happen
3    to the offender.  They might be concerned that they're going to
4    be hurt or someone else might be hurt as a result of their
5    disclosure.

6         They might feel guilty for talking about it because
7    they've been told by the offender, you know, "Bad things will
8    happen if you talk about it."  There's all kinds of factors
9    that can influence that.

10   Q    Based -- let's talk -- move away from just the initial
11   disclosure to reasons why disclosures can be delayed.  Based on
12   your -- your training and experience, is it common for victims
13   to delay disclosure of sexual abuse?

14   A    Yes.

15   Q    And I believe you already testified earlier that it --
16   it's actually common for a victim who has a close relationship
17   with the abuser to delay disclosure; is that right?

18   A    Yes.

19   Q    Is there a reason for that?

20   A    They may be protecting the offender.  They may be
21   concerned that something bad is going to happen if they do
22   disclose.  They may be in the denial phase of disclosure where
23   they just don't want to admit that it's happened.

24        They could be threatened by that offender.  You know,
25   "You're going to get in trouble if you say anything."  There's

1    a lot of factors that can influence it.

2    Q    How does age play a factor in the process of delayed

3    disclosures?

4    A    So in delayed disclosures, younger kids in particular

5    sometimes may not be aware that's what's happening to them is

6    abuse, and so they don't disclose because they don't know that

7    there's any reason to.  And older kids may have a greater

8    understanding of the family dynamics.

9        They may be more aware that the offender is the primary

10   breadwinner for the home, and therefore, their finances might

11   be affected if that person were to go to jail.  So an older

12   child might have a better understanding of those types of

13   things.

14   Q    Let's move on to discuss internal distress and trauma in

15   children in sexual abuse.  Can the trauma of abuse also impact

16   disclosure?

17   A    Yes.

18   Q    How?

19   A    The child's trauma level can definitely impact

20   disclosure.  They may be in a dissociating phase of the

21   disclosure, the tentative disclosure process, where they might

22   talk about, you know, "when he touches me, I go to the blue

23   forest."

24       It can affect their memory.  Trauma can affect your

25   memory and make it difficult to remember minute details about

1   what happened or be able to explain in detail about what

2   happened.

3        Their trauma level is something that we try to focus on

4   whenever they're participating in a forensic interview because

5   we wouldn't want to create more trauma.  We were trying to --

6   we're trying to minimize the trauma to that child and to that

7   family during the process.

8   Q   So that goes back to something you said earlier that you

9   want to minimize the number of forensic interviews; right?

10  A   Yes.

11  Q   So and I believe you said that the goal is for only there

12  to be one forensic interview?

13  A   Yes, the goal is for there to only be one.  But in some

14  cases, the ChildFirst® Protocol does allow for an extended

15  interview, where it occurs over multiple sessions.

16  Q   And why would -- why would there be a need for multiple

17  interviews?

18  A   The need for that, one of the reasons could be the

19  child's trauma level.  During the forensic interview, if they

20  are disclosing and they become very upset or emotional and

21  that -- the trauma level is affecting their ability to

22  disclose, then the interviewer may choose to end the interview

23  and continue it in a second session so that we're making sure

24  we're still putting the child first and focusing on what's in

25  their best interest.

1    Q    But if there are no issue -- you said if there are issues

2    with disclosure.  If there are no issues with the disclosure,

3    is it common for there to be a second interview?

4    A    No, it's uncommon.  It does happen, but they're -- it

5    happens under extenuating circumstances.

6    Q    How is the disclosure process affected by delayed

7    disclosure if someone is disclosing something that's happened

8    months or even years in the past?

9    A    So again, it can affect memory.  We typically ask

10   children about the first time something happened, the last or

11   most recent time, and anything different in between because

12   those are the moments that are going to stand out the most in

13   their memory, particularly in cases of delayed disclosure where

14   the event may have happened six or seven years ago and you're

15   asking them to recall details of events that occurred many

16   years past.  So we would ask those things to try to mitigate

17   the issues of memory.

18   Q    Are there psychological symptoms of a victim of -- that a

19   victim of child sexual abuse may display?

20   A    In some cases, yes.

21   Q    And what are some of the -- the common symptoms?

22   A    So in my training and experience, I often speak with kids

23   who are experiencing self-harming and suicidal ideation.  I've

24   also seen kids that have had to be institutionalized or

25   hospitalized in psychiatric facilities because they're

1    struggling with PTSD or anxiety.  So there can be a number of

2    psychological effects.

3    Q    Based on your training and experience, when victims of

4    sexual abuse are disclosing or talking about their abuse, do

5    they all respond in the same way?

6    A    No, not necessarily.

7    Q    And why is that?

8    A    Again, because every kid and every case is different.

9    Q    When a child is forced to talk about sexual abuse, are

10    there certain responses you might expect, based on your

11    training and experience?

12    A    I wouldn't -- I wouldn't necessarily expect certain

13    responses because in my training and experience and in my work

14    that I do in the field, I'm not in a position where I would

15    force a child to disclose.  So I'm not familiar with the

16    characteristics that one might see in that situation.

17    Q    All right, Miss Blevins.  Let's talk a little bit about

18    the -- the case today here.  Were you working at -- as a

19    forensic interviewer on May 29th, 2020?

20    A    Yes.

21    Q    And did you conduct a forensic interview of Kaitlyn

22    Goldesberry on that day?

23    A    Yes.

24    Q    How old was she on the -- on that date?

25    A    I believe she was 15, but I may not have that correct.

1    Q    If I said she was 14, does that sound right?

2    A    Yes.

3    Q    How long had you been a forensic interviewer at this

4    point?

5    A    Since February of 2019.

6    Q    So that's a little over a year?

7    A    Yes.

8    Q    Have you reviewed the forensic interview in preparation

9    for your testimony here today?

10   A    Yes.

11   Q    After your re- -- after reviewing that -- that video,

12   that interview, are there things that you might do differently

13   today, sitting here today with -- with additional training and

14   experience?

15   A    Yes.

16   Q    Would some of those changes have affected Kaitlyn's

17   disclosure?

18   A    They may have, and they may not have.

19   Q    Where did the interview take place?

20   A    At the CAC.

21   Q    And just for us who aren't -- might not be familiar with

22   that acronym, can you tell us again what that is?

23   A    Yes.  CAC stands for the Children's Advocacy Center.

24   It's also known as the Child Abuse Network, and that's where

25   I'm employed.

1    Q    And where is that?

2    A    At 31st and Sheridan.

3    Q    And I believe you said earlier that forensic interviews

4    take place in particular rooms.  Can you describe the -- the

5    rooms that you guys use?

6    A    Yes.  The forensic interview takes place in a forensic

7    interview room.  And it's set up to be child-friendly.  There's

8    two-way glass so that the investigators that we're working with

9    can sit behind the glass and observe the forensic interview as

10   it's occurring.

11         Forensic interviewers also wear an earpiece in their ear

12   so that the investigator can ask them to ask questions, and

13   then it's the interviewer's job to ask those questions in a way

14   that's not leading or suggestive.  The forensic interview is

15   also audio and video recorded, and that's standard practice in

16   the field.

17   Q    All right.  You said that you had a chance to -- to go

18   over and look at the video, and you said that there might be

19   some things that you would do differently.  Can you explain to

20   us a little bit, briefly, what some of those things would have

21   been?

22   A    Yes.  There is no such thing as a foren- -- perfect

23   forensic interview.  And part of the process of being a

24   forensic interviewer involves constantly building your skill

25   set.  So in this case, there's a lot of things that I might do

1    differently.

2         I might phrase certain questions differently or try to

3    explore more details about what she was disclosing.  And that's

4    true of a lot of cases that forensic interviewers are a part

5    of.  It's just an evolving process of building your skill set

6    and building your training.

7    Q    You told us what you would have done differently.  Is

8    there a reason why you -- you -- looking back, you realize, oh,

9    I should have done this differently?

10    A    Just that I -- it's been two years since I conducted the

11    interview, and I've been through many, many trainings since

12    then.  And I've conducted many hundreds of interviews since

13    that time.  So my skill set has advanced, and I'm -- I do some

14    things differently than I might have done two years ago.

15    Q    At the time in May of 2020, you were a -- a certified or

16    a registered or whatever forensic interviewer; is that right?

17    A    Yes.  At that time, I had completed the 40-hour

18    ChildFirst® Protocol training.

19    Q    And do you recall about how many forensic interviews you

20    had completed at that point?

21    A    I don't recall how many.

22    Q    Now, you said that you were in the -- that you were in

23    the -- at the -- the CAC in one of these rooms that was audio

24    and video recorded, and that's standard practice; is that

25    right?

1    A    Yes.

2    Q    And you were in one of these rooms for Kaitlyn

3    Goldesberry's interview?

4    A    Yes.

5    Q    Did Kaitlyn know that she was being observed and

6    recorded?

7    A    Yes.

8    Q    Is that also standard practice?

9    A    Yes.

10   Q    Is there a reason why you -- you let the -- the

11   interviewee know those things?

12   A    Yes.  It's meant to be child first and child focused.

13   That's the overriding principle of the forensic interview and

14   the forensic interviewing protocol.  So in keeping with that,

15   we wouldn't want to keep any secrets from the child.

16       We make sure out in the lobby before they ever come into

17   the room that they're aware that they will be video and audio

18   recorded and that the investigators will be watching.

19   Q    What information, if any, did you have before you

20   began -- began the interview?

21   A    Just very little information.  Basic allegations of

22   sexual abuse.

23   Q    Is there a reason for that?

24   A    Yes.  The forensic interviewer is meant to be a neutral

25   party.  So when going into a forensic interview, we don't want

1    to have a whole lot of information about the case because our

2    job is to remain neutral and non-suggestive.  So we typically

3    learn from the investigators what the allegations are and then

4    go into the interview with that information.

5    Q    What method of interviewing did you use to interview

6    Kaitlyn back in 2020?

7    A    ChildFirst® Protocol.

8    Q    And again, I think you've already answered this, but what

9    type of questions did you use during the interview?

10   A    Open-ended, non-leading questions.

11   Q    And you said that you reviewed the interview before your

12   testimony today?

13   A    Yes.

14   Q    In part of the interview, did Kaitlyn make a disclosure

15   of sexual abuse to you?

16   A    Yes.

17   Q    And just to circle back, that's not the purpose of the

18   interview; is that right?

19   A    Correct.

20   Q    But she did make a disclosure to you?

21   A    Yes.

22   Q    And what did she disclose?

23   A    She disclosed that her father touched her on her vagina

24   on her skin outside and inside her body.

25   Q    And how did -- did Kaitlyn act or appear during the

1    interview?

2    A    During the interview, her disclosure was very

3    matter-of-fact, but she was also protective of the alleged

4    offender and a bit defensive.  And she was exhibiting some of

5    those characteristics of tentative disclosure, like minimizing

6    and discounting.

7    Q    Were there any physiological observations that you made

8    of -- of Kaitlyn?

9    A    No.

10    Q    What about her -- her general demeanor?

11    A    Her general demeanor, again, was just matter-of-fact

12    about the disclosure she was making, but she was a bit

13    defensive and was kind of exhibiting some of those

14    characteristics.

15    Q    Did she seem to want to be there?

16    A    She made statements about things having been blown out of

17    proportion and feeling like it wasn't that big of a deal.  I

18    don't recall her explicitly saying she didn't want to be there.

19    Q    Did she ever change what she said?

20    A    No.

21    Q    Did she contradict herself?

22    A    No.

23    Q    Did she use terminology consistent with a 14-year-old?

24    A    Yes.

25    Q    And is it your job to form any type of judgment about the

1    allegations?

2    A    No.

3    Q    In your education, training, and experience, are there

4    any additional impressions of Kaitlyn's demeanor during the

5    interview?

6    A    Just that she was exhibiting those characteristics, and

7    she was making statements about feeling like it wasn't that big

8    of a deal.  But as far as the disclosure piece, as I've seen in

9    many cases that I've been part of, the disclosure itself was

10   just very matter-of-fact about what happened.

11   Q    How did the interview end?

12   A    At the end of the protocol, the last stage is closure.

13   So what we do is assess for safety with the child, who they

14   feel safe with, who they could talk to if they didn't feel

15   safe.  And then we return the child to a neutral state by

16   talking about a neutral topic.  And then we close out the

17   interview.

18   Q    All right.  Thank you, Miss Blevins.  I'm -- I'm finished

19   questioning, but Miss Brown may have some questions for you.

20       MR. MCWATERS:  I pass the witness, Your Honor.

21       THE COURT:  Ms. Brown, you may inquire.

22       MS. BROWN:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24   BY MS. BROWN:

25   Q    Miss Blevins, I believe that there's been multiple

1    references to your last name being Hess for the jury.  You're

2    the same person as Kelsey Hess; correct?

3    A    Yes, ma'am.  I got married.

4    Q    Just to clarify.  Thank you.  And congratulations.

5    A    Thank you.

6    Q    The ChildFirst® 40-hour training that you referenced in

7    direct examination, that's not a training that is limited to or

8    only available to forensic interviewers; correct?

9    A    Correct.

10    Q    Prosecutors go to that training?

11    A    Yes, I believe so.

12    Q    I've been to that training?

13    A    I'm unaware.

14    Q    You're familiar with my background; correct?

15    A    No.

16    Q    Oh, okay.

17         Law enforcement officers go to that training?

18    A    I believe so, yes.

19    Q    So it's not something that's special or unique to

20    forensic interviewers.  It's available to anybody in the area

21    that deals with possibly talking to children about abuse of

22    some kind?

23    A    It's available to individuals that work in the field,

24    yes.

25    Q    Basically did you go to the -- did you go to the one in

1    the Oklahoma City?  Did you go in Tulsa?

2    A    I went to Norman.

3    Q    Norman?  Okay.  So you go up to Norman for a week with a

4    handful of other people.  It could be a dozen.  It could be 20

5    or more people in any given class; correct?

6    A    I don't recall how many people were in my class.

7    Q    And you sit through some lectures and some talks, and

8    then they give you a little bit of homework at night.  And then

9    at the end of the week, somebody pretends to be a child.  You

10   don't really interview a real child for your qualifying

11   interview; correct?

12   A    No.  You do a mock interview with someone who does

13   pretend to be a child, and then we also do an interview on a

14   real child that's limited to the narrative event practice.

15   Q    So for example, a -- a class of children will go to the

16   zoo and have a field trip that's a real, actual field trip for

17   them.  And then you're not interviewing them about sexual

18   abuse.  You're interviewing them about the experiences they

19   have at the zoo; correct?

20   A    In my case, the children were at a school, and someone

21   from a zoo brought animals.  And then we interviewed them about

22   that event and that event only in the narrative event practice

23   format.

24   Q    Okay.  And then at the end, there's a written test;

25   correct?

1    A    Yes.

2    Q    And that's just pass, fail; correct?

3    A    Yes.

4    Q    You have, as you said, only been conducting forensic

5    interviews at the Child Abuse Network since February of 2019.

6    But being a forensic interviewer at CAN is your very first

7    professional job; correct?

8    A    Yes.

9    Q    Prior to doing what you do now, you were just a nanny;

10    correct?

11    A    I was in graduate school.  And while I was in graduate

12    school, I nannied, but I also worked as a research assistant,

13    and I also worked as a teaching assistant for the university.

14    Q    When you interview children at the -- at the Child Abuse

15    Network, you are interviewing children involving topics of a

16    much broader variety than just child sexual abuse; correct?

17    A    When we conduct interviews at the Child Abuse Network,

18    we're interviewing about all possible forms of abuse and

19    maltreatment and family dynamics.

20    Q    The Child Abuse Network forensic interviewers can

21    interview children about physical abuse; correct?

22    A    Yes, that's correct.

23    Q    Exposure to pornography?

24    A    Yes.

25    Q    Exposure to drugs and alcohol abuse?

1    A    Yes.

2    Q    Exposure to domestic violence?

3    A    Yes.

4    Q    If a child witnesses a crime, they can be forensically

5    interviewed; correct?

6    A    Yes.

7    Q    And so in the 900 or so interviews you've conducted to

8    date, not all of those involved interviewing children about

9    allegations of sexual abuse; correct?

10   A    Yes.

11   Q    You are, of course, aware that ChildFirst® Protocol that

12   you've discussed is a relatively new forensic interview

13   protocol, at least for the Child Abuse Network; correct?

14   A    I know that at the Child Abuse Network, the interviewers

15   that have been employed there over the last 15 years have used

16   Child -- the ChildFirst® Protocol.

17   Q    You're not aware that in just a few of the past years,

18   they were using the CornerHouse RATAC method?

19   A    So I am aware of some interviewers there having used the

20   CornerHouse RATAC method.  But, again, the protocols are all

21   much more alike than they are different, and so they still

22   utilize the same general concepts and the same research behind

23   each protocol and the same general phases.

24   Q    And -- and so speaking of the general phases, whether

25   you're talking about ChildFirst® or you're talking about RATAC,

1    you're going to open your interview, like you said, with

2    rapport building, getting to know you; correct?

3    A    Correct.

4    Q    Whether you're talking to a three-year-old or a

5    seventeen-year-old, you want to make sure the child is

6    comfortable talking to you before you get into the nitty-gritty

7    of why they're there; correct?

8    A    It's not necessarily my job to make sure or verify that

9    they're comfortable, but the purpose of rapport is to help

10   build their comfort level and to help us identify their

11   development and their ability to narrate.

12   Q    So for several minutes -- and it -- and it depends on a

13   particular interview, right? -- but for up to, you know,

14   anywhere from 5 to 20 or 30 minutes, you can talk to them about

15   what they like about school, what they do in their free time,

16   what they are doing over summer break or Christmas break,

17   animals that they have in the house, interests that they have.

18   Just before you even start talking about the allegations;

19   correct?

20   A    Correct.  The first phase of the protocol is rapport

21   building.  And during rapport building, we may ask questions

22   about their interests, the last time they went on a trip,

23   things like that.

24        And then in doing that, we're also participating in

25   narrative event practice, which the purpose of narrative event

1    practice is just to identify their ability to narrate an event

2    from beginning to end.

3    Q    Then at some point you transition, and different

4    protocols call it different things, but for lack of a better

5    phrase, into some sort of inquiry as to the reason that they're

6    there; right?  You ask them if they've ever experienced any

7    touches or anything that makes them feel uncomfortable or

8    anything like that, in a sexual abuse case; right?

9    A    We do what's called the transition to topic of concern.

10   Asking about sexual abuse related questions comes a little bit

11   later, and that's called the touch inquiry.

12        But in the transition of topic -- the transition to topic

13   of concern is where we do what's called an open invitation and

14   ask the child something similar to, "What do you know about

15   coming to talk to me today," or "Tell me, like, what's been

16   going on lately," so that we're giving them the opportunity to

17   talk about things in an open-ended way.

18   Q    And it serves a dual purpose as well.  In addition to

19   giving them an opportunity to tell you in their own words, you

20   know, what they know about why they're there, it also allows

21   the investigators on the other side of the mirror, right,

22   and -- and people like myself and the prosecutors who look at

23   the video later, to see if the child discloses any kind of

24   negative influences or, you know, "I was told I was here today

25   because I'm supposed to tell such and such did such and such,"

1    versus, for example, in Kaitlyn's interview, where when you

2    asked her what her -- what she'd been told prior to coming in,

3    she was told to be honest; correct?

4    A    I don't recall the specific part of the interview that

5    you're referencing.  But as far as the investigators and how

6    they're interpreting what the child is saying, that's out of my

7    scope of practice.

8    Q    Because once you're finished with your interview with a

9    child, in most cases when there's not a second interview, you

10    never see or hear from that child again; correct?

11    A    Correct.

12    Q    In this particular situation with Kaitlyn Goldesberry,

13    you interviewed Kaitlyn Goldesberry on May 29th of 2020, and

14    you never saw or talked to her since; correct?

15    A    Correct.

16    Q    You don't follow the case to see if criminal charges are

17    filed or if DHS does anything with the children's family;

18    correct?

19    A    Correct.

20    Q    That's not part of your job?

21    A    Correct.

22    Q    You would agree with me that no matter what protocol

23    you're using, but including ChildFirst®, it is a loosely based

24    guidelines for interviewing a child.  It's not a rigid

25    protocol, you have to step -- follow Step 1, Step 2, Step 3;

1  correct?

2  A    Correct.  The protocol is semi-structured.

3  Q    And by "semi-structured," that means a lot of

4  recommendations; correct?

5  A    To me, "semi-structured" means that you don't have to

6  follow the protocol necessarily in order, step-by-step.  It's

7  meant to be fluid so that if you're in that open invitation

8  during the transition of topic of concern and the child just

9  starts to disclose, you can follow the child because the

10  overriding principle of the protocol is to focus on the child

11  and their best interest.

12  Q    Different interviewers may interpret or implement those

13  recommendations or guidelines in the protocol in different

14  ways.  Would you agree?

15  A    Correct.  Different interviewers may have different -- a

16  different skill set.  They -- their art, so to speak, may be

17  different.  But all interviewers should be following an

18  evidence-based protocol.

19  Q    You, as an interview- -- viewer, get to use your own

20  judgment in a lot of ways; right?

21  A    Yes.

22  Q    In fact, like you said on direct, there are times when

23  the investigators on the other side of the mirror would like

24  you to ask a question.  They tell you in your earpiece.

25      And then you decide in your mind without saying anything

1    out loud that that's not an appropriate question based on your

2    training and experience, and either decide not to ask that

3    question or to try to rephrase it; correct?

4    A    Correct.

5    Q    But you also would admit that, having looked back at your

6    interview two years later, there were several things you would

7    do differently; correct?

8    A    I would admit that there are things that I may have done

9    differently compared to two years ago, and there may be things

10    from six months ago that I might do differently.

11    Q    Because relatively speaking, back in May of 2020, you

12    didn't have a ton of experience, certainly not as much as you

13    have now?

14    A    In May of 2020, I did not have as much experience as I

15    have now.

16    Q    You mentioned in direct examination with Mr. McWaters

17    that, as the current manager at the Child Abuse Network, or the

18    CAC, CAN -- CAN or -- or Child Advocacy Center, that you

19    specifically currently interview a lot of the cases that

20    involve allegations that are shocking and heinous; correct?

21    A    Correct.

22    Q    Shocking and heinous can be a number of things, but those

23    words kind of are self-defining.  Would you agree?

24    A    I agree that those words can mean a lot of different

25    things.  And I interview on the shocking and heinous cases as

1    well as cases that are not shocking or heinous.

2    Q    And you would agree with me that this interview and these

3    allegations that you were talking to Kaitlyn about don't fall

4    under the category of shocking and heinous; correct?

5    A    That's outs- -- outside of my scope of practice.  I don't

6    determine if something is shocking or heinous.

7         But when an interview is scheduled at the center, if it's

8    particularly -- involves particularly advanced skills, like

9    presenting evidence in the interview, or if it involves

10    training -- the need for training on child sex trafficking,

11    things like that, then I would do that interview myself as the

12    most experienced interviewer at the CAC.

13    Q    The current position that you occupy, you took over for

14    Jessica Stombaugh; correct?

15    A    No.  Jessica Stombaugh's position was a program director.

16    My position is a new position at the center.

17    Q    You would agree that previous forensic interviewers prior

18    to your starting, like Jessica Stombaugh, Ali Kern, David

19    Glanz, Amy Howard, Melissa Gantz, they all have more experience

20    than you in this area; correct?

21         **MR. MCWATERS:**  Objection.  Relevance.

22         **THE COURT:**  Sustained.

23    Q    (By Ms. Brown) You've only testified two times in court

24    before today; correct?

25    A    No.

1    Q    Isn't that what you said on direct?

2    A    I've testified twice as an expert witness in court, but

3    I've testified as a fact witness probably ten times.

4    Q    Okay.  And so by fact witness, you're just talking about

5    the interview that you did like in this case, Kaitlyn's

6    interview, and not giving your opinions about the process of

7    disclosure, and educating the jury about tentative disclosures

8    versus active disclosures and a lot of the things that you went

9    over with Mr. McWaters; correct?

10    A    Correct.

11    Q    The amount of time that you spent specifically with

12    Kaitlyn Goldesberry on May 29th of 2020, was about 60

13    minutes; correct?

14    A    I believe it was around 50 to 60 minutes, yes.

15    Q    And in that 50 to 60 minutes, that included the period of

16    time that you talked to her about school, what she likes to do,

17    what she likes to read, all the different animals that she has

18    in her home, her sugar gliders, her dogs, her cat Smokey that

19    died.  You guys discussed *Twilight*, *Harry Potter*, and everybody

20    that lives in the home; correct?

21    A    Yes.

22    Q    And all of that occurred before you ever started talking

23    about what happened between Kaitlyn and her dad in the bed;

24    correct?

25    A    I believe so.

1    Q    And in that 50 to 60 minutes, that also encompassed a

2    period of approximately four minutes when Kaitlyn needed to go

3    to the bathroom, so you gave her an opportunity, because if you

4    put the child first, to be comfortable before resuming the

5    interview; correct?

6    A    I'm unaware of how long it was that she was in the

7    restroom, but yes, she took a break to go use the bathroom.

8    Q    And, of course, for purposes of anybody that's looking at

9    the DVD later, including yourself, you don't stop the

10   recording.  You just -- the recording starts before you ever

11   get in the room.  And then all the coming and going of going to

12   the bathroom and coming back in, the video is continuing to

13   play; correct?

14   A    Yes.

15   Q    Okay.  So basically there's nothing you're hiding.  It's

16   very transparent; correct?

17   A    It's just part of standard practice.  If the child is

18   going to take a break because they need to use the restroom or

19   they just are feeling overwhelmed, whatever the reason is, it's

20   just standard practice to leave the recording going.

21   Q    That 50 to 60 minutes total that you spent with Kaitlyn

22   in May of 2020, also includes the time, like you discussed,

23   where you do closure, as well as returning to a neutral topic

24   to make the child comfortable and make sure the child feels

25   safe before the interview is over; correct?

1    A    Yes.

2    Q    So it would be fair to say that in the 50 to 60 minutes

3    that you took -- talked to her entire -- in its entirety, and

4    including the bathroom break, all the rapport building and --

5    and getting to know you, the closure, and return to neutral,

6    all of that right there in the middle was just the inquiry

7    about what happened in the bedroom with -- with Mr. Goldesberry

8    and Kaitlyn; correct?

9    A    I'm unaware of exactly how much time we spent covering

10    the topic of concern or the disclosure.

11    Q    I'm sorry, my question was probably a bad question.

12        Specifically that 50 to 60 minutes was not exploring the

13    disclosure the entire time.  The 50 to 60 minutes was the

14    entire time you were with Kaitlyn from beginning to end,

15    including the break, rapport, closure, and return to neutral

16    topic; correct?

17    A    Yes, ma'am.

18    Q    Thank you.

19        You discussed with Mr. McWaters the -- the phases that a

20    child can go through when'd -- when disclosing sexual abuse;

21    correct?

22    A    Yes.

23    Q    And you talked about how a child can be in denial or

24    outright deny that abuse has occurred even though it has;

25    correct?

1    A    Yes, that can happen.

2    Q    And it can happen that a child will tentatively disclose,

3    what we call dipping a toe in the water, giving some details

4    but not all the details, or saying it happened one time when it

5    really happened more than one time, but that doesn't always

6    happen; correct?

7    A    Correct.  It can happen in some cases and not in others.

8    Q    You talked about recantation where a child discloses some

9    kind of abuse and then sometimes takes it back.  That also

10   doesn't always happen; correct?

11   A    Correct.  It can happen in some cases and in others not.

12   Q    You talked about accidental versus purposeful

13   disclosures.  Accident or can -- excuse me -- accidental can be

14   anything, like literally the abuse is in the process of

15   happening and Mom comes home and catches them; correct?

16   A    Correct.  An accidental disclosure is where the abuse is

17   uncovered or identified by accident, and that can be a number

18   of scenarios.

19   Q    But you would agree with me that the phases of

20   disclosure, whether a child ever goes through denial or ever

21   tentatively discloses, whether a child actively discloses or

22   possibly recants, that all assumes that sexual abuse or abuse

23   occurred; correct?

24   A    Not necessarily.

25   Q    Let me ask a different question.

1          In order for a child to disclose sexual abuse, that child

2     would have had to have been sexually abused; correct?

3     A     Not necessarily.

4     Q     Okay.  You're saying children can make it up?

5     A     It's unlikely that a child would make up or fabricate.

6     And in this case, there was no motive to fabricate identified

7     in the interview.  But the research does show that that can

8     happen.  But it doesn't always happen.  And it's unlikely for

9     it to happen.

10    Q     I think you're not understanding my question.  What

11    I'm -- what I'm talking about is when we talk about the process

12    of disclosure, this series of things that the research

13    indicates can happen but doesn't always happen, that process of

14    disclosure, if a child is disclosing sexual abuse tentatively,

15    that's because they were sexually abused; correct?  It assumes

16    that abuse occurred.

17    A     Not necessarily.  The process of disclosure is just a set

18    of characteristics or factors that influence or could influence

19    what the child is saying, and it's not always related to sexual

20    abuse.  It might be related to physical abuse.  It -- the

21    process is not a diagnostic tool.  It's not meant to identify

22    whether or not abuse occurred.

23          It's just meant to explain certain characteristics that a

24    child might be showing when they are disclosing, not

25    necessarily that their disclosure is factual or true.  It's

1  just meant to explain those characteristics and those factors

2  that might influence the disclosure that's being made.

3  Q    Okay.  Let me ask you this.  You talked about how

4  children can minimize, but they don't always; correct?

5  A    Correct.

6  Q    For example, a minimization could be saying that it only

7  happened one time; correct?

8  A    Correct.  That could be an example.

9  Q    Alternatively it could actually have only happened one

10  time, so that wouldn't be minimizing.  It would just be the

11  reality that that child experienced; correct?

12  A    That is a possibility.  But that characteristic of

13  minimizing isn't meant to determine whether or not it did

14  happen one time or more than one time.  It's just meant to

15  explain why something like that might occur or a child might

16  make statements like that in an interview or in the process of

17  disclosure.

18  Q    Okay.  Another example would be, as far as possible

19  examples of minimizing, a child saying that it was an accident;

20  correct?

21  A    Correct.  That could be a possible example.

22  Q    For example, a child is showering; right?  And a male

23  that is not an appropriate person to see the child in the nude

24  intentionally comes into the bathroom and pulls the curtain

25  back, but then after, you know, observing the child or what

1    have you, tries to convince the child that he didn't know she

2    was in the shower; right?

3        That could be an example of something appearing to be an

4    accident when we know that it wasn't; correct?

5    A    That will depend on the disclosure that the child is

6    making.

7    Q    Right.  I'm telling you the disclosure that the child's

8    making.  That would be an example of minimizing; correct?

9    A    It could be an example of minimizing.  It could also be

10   an example of discounting.  Those two things are very similar

11   characteristics of a tentative disclosure.  But again, it would

12   depend on their disclosure and what phase of the disclosure

13   process they're in because those characteristics only describe

14   the tentative disclosure phase.

15   Q    Alternatively if a child comes in for a forensic

16   interview and discloses to you that they were on the toilet,

17   completely naked about to get in the shower but hadn't turned

18   the shower on, and a male adult walked into the bathroom and

19   observed them, that could actually be an accident; correct?

20   A    As the interviewer, it wouldn't be my job to determine if

21   it was an accident or not an accident.  It would just be my job

22   to listen to the child's statement and whatever they're

23   disclosing, and it's not my job to confront the child's

24   perception of what happened.

25   Q    Correct.  So when you're here testifying as an expert

1    about the various things that can happen when a child is

2    disclosing sexual abuse, including tentative disclosures,

3    including minimizing, you're not here offering an opinion

4    specifically about Kaitlyn's disclosure, are you?

5    A    Correct.  Because in this case, I conducted the interview

6    for Kaitlyn.  And as a forensic interviewer, we -- it's not our

7    job to have an opinion or to identify if the child's telling

8    the truth or not telling the truth.  It's just our job to ask

9    the questions in a way that's not leading or suggestive and

10   follow the protocol.

11   Q    So you testified on direct examination with Mr. McWaters,

12   you said 90 percent of cases are someone that the child knows

13   and loves; correct?  When talking about sexual abuse; correct?

14   A    Correct.

15   Q    And that's based on research in the field; correct?

16   A    Correct.

17   Q    Not your own personal necessary experience.  You're not

18   tallying each time or anything.  It's just research in the

19   field; correct?

20   A    Correct.  That comes from a large body of research in the

21   field.  And in my training and experience, I'm not tallying

22   each time, but overwhelmingly the number of interviews that

23   I've conducted, most of the time the alleged perpetrator is

24   someone that the child knows and cares about, both in cases of

25   sexual abuse and physical abuse or other forms of abuse or

1    maltreatment.

2    Q    And specifically with that statistic that you gave the

3    jury, the 90 percent of cases where someone the child knows and

4    loves is the perpetrator, that research that you're relying on

5    for that statistic, the research in the field is based on

6    confirmed cases of sexual abuse; correct?

7    A    I believe it's based on what's called substantiated cases

8    of abuse.  I'm unaware if it's based solely on sexual abuse.

9    But it's based on cases that are substantiated, which is just a

10    word that essentially means that they were found to be true or

11    accurate.

12    Q    And when these cases are found to be true or accurate,

13    that's past the time that the child's ever in the Child Abuse

14    Network with you.  It's when DHS makes a finding or a criminal

15    Court or jury makes a finding substantiating or confirming

16    abuse; correct?

17    A    I'm unaware of exactly when the substantiations occur,

18    but it does occur following the interview because the forensic

19    interview is typically the first step in the investigation.

20    Q    You testified with Mr. McWaters on direct that it's

21    unreasonable to expect a child or even an -- an adult to recall

22    a date or time when an event occurred; correct?

23    A    Correct.

24    Q    And that's just, again, based on the research in the

25    field as to trauma, specifically any kind of trauma, and

1    pertaining specifically to sexual abuse; correct?

2    A    Not necessarily pertaining just to sexual abuse, but

3    memory in general.  The example most used would be in term --

4    in cases of long-term sexual abuse where if you were to ask a

5    child to be able to recount every detail of every time it

6    happened, every place it happened, and everything that

7    happened, that's considered unrealistic because, even for an

8    adult in a healthy relationship, like a marriage, for example,

9    it would be unrealistic to ask how many times that adult in

10   their marital relationship had had sexual relations with their

11   partner, where at, when did it happen, how many times, and all

12   the details of what happened.

13        It's just not a realistic expectation for memory in

14   general, whether trauma occurred or not.

15   Q    But you would agree with me that a traumatic event can

16   affect a child's memory?

17   A    Yes.

18   Q    And as well as an adult's?

19   A    Yes.

20   Q    Even if an -- an act or an event occurs that doesn't

21   necessarily rise to the level of a crime, that act or event can

22   still be traumatic for the child; correct?

23   A    Correct.  Every child is different.  Every case is

24   different.  And trauma can affect people differently.  So an

25   act wouldn't necessarily have to be criminal to feel

1  traumatizing to a child.

2  Q    When you were discussing with Mr. McWaters on direct that

3  there might be some differences were you to conduct Kaitlyn

4  Goldesberry's interview today with the additional training and

5  experience that you have versus two years ago in May of 2020,

6  you mentioned that one of the things you might do differently

7  would be explore more details with Kaitlyn; correct?

8  A    Correct.

9  Q    And one of those details potentially might be exploring

10  more of the conversation that occurred after the event that

11  happened in the bed between Kaitlyn and her father; correct?

12  A    It may have been.

13  Q    When you testified on direct examination that going into

14  your interview with Kaitlyn, you only knew the bare bones basic

15  allegations, essentially that there was an allegation of sexual

16  abuse; correct?

17  A    Correct.

18  Q    You didn't have police reports.  They hadn't even been

19  generated yet; correct?

20  A    Correct.

21  Q    Law enforcement wasn't even there.  It was just DHS,

22  Brenna Gusman; correct?

23  A    I'm unaware if law enforcement was involved, but I do

24  know that Brenna Gusman was the DHS worker involved.

25  Q    And Ms. Gusman was on the other side of the mirror

1  talking to you through your earpierce, cor- -- earpiece;

2  correct?

3  A    It would have been either Miss Gusman or any other child

4  welfare investigator because interviews are not conducted

5  without an investigator present.

6  Q    When you reviewed your interview of Kaitlyn, you recall

7  where you asked if Kaitlyn wanted to see the room on the other

8  side of the mirror.  You remember that; correct?

9  A    I don't recall that directly, but I often ask the kids

10  that question.

11  Q    When was the last time you watched your interview with

12  Kaitlyn?

13  A    Yesterday.

14  Q    So you don't remember showing her the room and

15  specifically saying on camera, "This is where Miss Brenna is"?

16  A    I don't recall specifically saying that.

17  Q    You testified on direct with Mr. McWaters that Kaitlyn

18  disclosed that her father touched her on the vagina on the skin

19  outside and inside the body; correct?

20  A    Correct.

21  Q    She also very specifically disclosed to you that her

22  father was sleeping when that happened; correct?

23  A    I believe what she said was that he was half asleep when

24  that happened.

25  Q    That he was half asleep, that he was snoring, and his

1    eyes were closed; correct?

2    A    I don't recall what she said about snoring or eyes

3    closed.  Just that she said that she -- he was half asleep when

4    that happened.

5    Q    You watched this interview yesterday, and you don't

6    remember her saying, "He was half asleep.  I crawled in his

7    bed.  He thought I was my mom.  He woke up.  He was like, 'I'm

8    sorry'"?

9         You don't remember that?

10    A    I do remember that.  I just don't have a transcript in

11    front of me or have every word of the interview memorized.

12    Q    Sure.  And I'm not asking that.  I'm just asking if you

13    remember the fact that she specifically mentioned he was

14    snoring and that his eyes were closed.

15         **MR. MCWATERS:**  Objection.

16    Q    (By Ms. Brown) Do you remember --

17         **MR. MCWATERS:**  Asked and answered.

18         **THE COURT:**  Sustained.

19    Q    (By Ms. Brown) Kaitlyn told you during the course of the

20    interview that she feels safe in her home; correct?

21    A    Yes.

22    Q    She told you that if there was anything going on that

23    made her feel not safe, she would absolutely tell you; correct?

24    A    Yes.

25    Q    She also told you she would consider running away or

1    pulling a knife on her dad if he tried anything like that;

2    correct?

3    A    Yes.

4    Q    Would you agree with me that teenagers can be

5    particularly difficult to forensically interview regard --

6    regarding allegations of sexual abuse?

7    A    No, not necessarily.

8    Q    You don't think that just generally teenagers are more

9    difficult to talk to?

10    A    No, not necessarily.

11    Q    You testified that Kaitlyn was very matter-of-fact;

12    correct?

13    A    Correct.

14    Q    In other words, she didn't get emotional; right?

15    A    She appeared to be irritated or defensive.  But when I

16    think of the word "emotional" or when I see kids get emotional

17    in interviews, typically that involves crying or getting upset,

18    and that is not something that occurred in her forensic

19    interview.

20    Q    Yeah.  "Irritated" is definitely the word to use for the

21    way that she was acting.  Would you agree?

22    A    My interpretation of her demeanor in the forensic

23    interview was that she was a bit defensive, maybe irritated,

24    but it's not my job to assign feelings or emotions to her or

25    her behavior.  During the disclosure piece, she was

1    matter-of-fact.

2    Q    Well, you -- you assigned the words "protective" and

3    "defensive" to her; correct?

4    A    She --

5    Q    That's your opinion?

6    A    That's not my opinion.  She made statements that her

7    father was a good man, and she made statements about feeling

8    safe with him.

9    Q    As far as interviewing child sexual abuse -- or -- or

10    children pertaining to allegations of child sexual abuse in the

11    process of disclosure, that area is not a predictive science,

12    is it?

13    A    I don't understand the question.

14    Q    Sure.  You can't look at research in your field and

15    predict outcomes or future events; correct?

16    A    Correct.

17    Q    Your area of expertise, this area that you're here

18    testifying as an expert to, it isn't a hard science; correct?

19    A    I don't know that I would necessarily, it's not a hard --

20    say it's not a hard science because there is a large body of

21    different types of research that has been conducted.  But it --

22    I would say that it's a social science.

23    Q    It doesn't use math, like scientists and hard science do

24    where they have control over variables and conclusions, like

25    chemistry or physics; correct?

1    A    Correct.

2    Q    Soft sciences, or what was the word that you used?  Did

3    you use soft science?

4    A    No, ma'am.  I said it's a social science.

5    Q    Social sciences.  Social sciences or soft sci- -- or soft

6    sciences use a process of collecting empirical data and then

7    use the best methods possible to analyze that information, but

8    the results can be difficult to predict.  Would you agree?

9    A    I would say that there's a lot of debate about the

10   differences between a, quote, unquote, hard science or soft

11   science.  But even in the social sciences, even if they're

12   considered a soft science, they do use statistical data and

13   statistical information to analyze the empirical data that

14   they're collecting.

15   Q    And that statistical data you're using is that

16   substant- -- is all those substantiated cases of sexual abuse;

17   correct?

18   A    I'm unaware of what statistical data you're referring to,

19   but I myself am not a researcher, so I can't testify to what

20   they're using in their research.

21   Q    So you're relying on the research without understanding

22   the research?

23   A    I am relying on a large body of research that has

24   informed the development of the ChildFirst® Protocol.  And that

25   research includes topics like suggestibility, trauma, child

1    development, family dynamics, and a number of other things.

2    That research is a large body of research that informs the

3    entire process.

4    Q    But you did testify earlier that the research is based on

5    substantiated cases in the area of child sexual abuse; correct?

6    A    I testified that there is some research that is based on

7    substantiated cases of child sexual abuse.

8    Q    Your field doesn't use the scientific method; correct?

9    A    Correct.

10   Q    There's no divining rod for intent of suspected cases of

11   sexual abuse; correct?

12   A    I don't understand the question.

13   Q    The research and -- and your training in this field

14   pertaining to the process of disclosure and the characteristics

15   of disclosure that you have testified to today, both on direct

16   and then with me, those are based on confirmed or, as you said,

17   substantiated cases of abuse or molestation; correct?

18   A    Correct.

19   Q    The process of disclosure itself, by definition only,

20   applies to cases where the child was, in fact, sexually abused;

21   correct?

22   A    No, not necessarily.

23   Q    Explain.

24   A    Because the process of disclosure doesn't just

25   necessarily pertain to child sexual abuse cases.  It often

1    does.

2        But it can also pertain to child physical abuse cases,

3    cases where children have been exposed to violence, whether

4    that's domestic violence or witnessing of a crime.  The process

5    of disclosure is just a set of phases and factors that

6    influence the child's disclosure.

7    Q    Obviously we're just here talking about child sexual

8    abuse today, though, so I'm limiting my question to -- to cases

9    or instances and research pertaining to child sexual abuse.

10   You would agree that when there has been no sexual abuse,

11   there's nothing to process; correct?

12   A    Not necessarily.

13   Q    You have no idea how accurate you are specifically in

14   distinguishing children who have been exposed to sexual abuse

15   from non-abused kids, correct, 'cause that's not part of your

16   job?

17   A    Correct.  That's not part of my job.

18   Q    And you have no idea how accurate or inaccurate the FBI

19   is in distinguishing abused kids from non-abused kids; correct?

20   A    Correct.  I'm unaware of what the FBI does.

21   Q    And you have no idea how accurate or inaccurate the

22   United States Government is in distinguishing abused kids

23   versus non-abused kids, do you?

24       **MR. MCWATERS:**  Objection.  Foundation.

25       **THE COURT:**  Overruled.

1       **THE WITNESS:**  I'm unaware.

2    Q    (By Ms. Brown) Sometimes children don't tell because

3    there's nothing to tell; right?

4    A    In some cases, that's possible, yes.

5    Q    Alternatively some children don't disclose ever, and they

6    have been abused; correct?

7    A    That can happen as well, yes.

8    Q    But if a child never discloses abuse, it is also possible

9    that it's because they haven't been abused; correct?

10   A    That is possible, yes.

11   Q    Some children only disclose some of what happened to

12   them; agreed?

13   A    Yes.

14   Q    But you have no way of knowing whether that's the case in

15   any given interview or any given situation with a child;

16   correct?

17   A    Correct.  My job is just to explore details of the

18   child's statement.

19   Q    And that includes your interview with Kaitlyn; correct?

20   A    Correct.

21   Q    You aren't here saying under oath that you think Kaitlyn

22   lied or minimized or anything like that, are you?

23   A    Correct.  That's not part of my job.

24   Q    You aren't saying here under oath that Kaitlyn withheld

25   information for you -- from you, are you?

1    A    Correct.  It's not my job to determine if information is
2    being withheld.  It's just my job to explore details of the
3    statements being made.
4    Q    Have you studied the psychological and behavioral
5    characteristics of sexually abused kids?
6    A    Only in the scope of the process of disclosure and
7    forensic interviewing.
8    Q    Excuse me.  The research that you rely on is based at
9    least largely -- this large body of research that you've been
10   talking about in this social science is based on kids you've
11   never met or talked to yourself; correct?
12   A    Correct.
13   Q    Those children are cases that you've studied in the
14   research that you rely on -- essentially you were told in the
15   materials that you reviewed, studied, or -- or went to a
16   lecture about that those were, in fact, substantiated cases, as
17   you said before?
18   A    Correct.
19   Q    Essentially, to be clear, you've been told that these
20   kids in the research that you were relying on were sexually
21   abused, but you don't have any personal basis of knowledge for
22   that; correct?
23   A    So my knowledge for that comes from the many trainings
24   that I've been to, including the ChildFirst® Protocol training.
25   And in that protocol training, they talk about all of the

1    different hundreds of studies that have been conducted on

2    children who have experienced sexual abuse, children who have

3    experienced physical abuse and other types of abuse and

4    maltreatment.

5        They also include several studies that have been

6    conducted on suggestibility and child development and a number

7    of other things.

8    Q    But you would agree that you are here saying that, you

9    know, one, abused children can have certain characteristics or

10   go through certain processes; correct?

11   A    Correct.

12   Q    And two, that if a child appears to have some or all of

13   those characteristics, based on your experience, that can mean

14   that the child could have been or might not have been sexually

15   abused; correct?

16   A    Correct.

17   Q    You would agree that the research in the field indicates

18   that children react in a lot of different ways to sexual abuse.

19   Yes?

20   A    Correct.

21   Q    And some children are severely traumatized; correct?

22   A    Correct.

23   Q    The research indicates that some peo- -- some children

24   appear to take it in stride; correct?

25   A    The research indicates that children can react in a

1    number of different ways, and that it's not the same in every

2    case or for every child.

3    Q    Each case and each child is different; right?

4    A    Correct.

5    Q    Some children can act out; right?

6    A    I don't understand the question.

7    Q    It's a bad question.

8         Some children who've experienced sexual abuse can react

9    by acting out physically or sexually; correct?

10   A    Yes.  Some children who have experienced any form of

11   abuse or maltreatment or trauma may exhibit signs or symptoms

12   of that through acting out, but that can apply to some cases

13   and not to others.

14   Q    Some children can become withdrawn if they've been

15   abused; correct?

16   A    Correct.

17   Q    Some children tell right away; right?

18   A    Correct.

19   Q    And some people -- and some children never tell; right?

20   A    Correct.

21   Q    Some children may have very accurate memories of the

22   traumatic event, but some may not have very clear memories;

23   correct?

24   A    Correct.

25   Q    It's also indicated in the research that some children

1    have false memories during abuse.  Like you mentioned, that

2    they say that they went to the blue forest, and that's just a

3    coping mechanism; correct?

4    A    The example I used for that is an example of dissociating

5    as a characteristic of tentative disclosure.

6    Q    Some children can even display psychological symptoms of

7    abuse.  Would you agree?

8    A    Yes.

9    Q    But alternatively some children can act perfectly normal

10   despite being subjected to years of sexual abuse; correct?

11   A    Yes.

12   Q    Children can also be traumatized by a number of other

13   things that don't involve sexual abuse; correct?

14   A    Yes.

15   Q    There have been no studies or no research in your field

16   that indicate that just because a child acts in a certain way,

17   that means the child has been sexually abused; correct?

18   A    I'm unaware.

19   Q    You're not aware of any studies or -- or results

20   indicating that, are you?

21   A    Correct.

22   Q    Would you agree with me that because there's no reliable

23   way to know that a child is acting a certain way and thus that

24   means there's sexual ab- -- that's a bad question.  Let me --

25   let me start over.

1    You would agree with me that because there's no reliable

2  way to say a child acts a certain way when they've been

3  sexually abused, we cannot conclude that a child has been

4  sexually abused just because he or she is acting a certain way?

5  A    That's not part of my job, and that would be outside of

6  my scope of practice.

7  Q    Some children who have been sexually abused wet the bed;

8  correct?

9  A    In my training and experience, I have had a few cases

10  where the child involved in the investigation does wet the bed,

11  but I couldn't say if it was because or not because of their

12  experience with childhood sexual abuse.

13  Q    And you just answered, I believe, most of my next

14  question because you're -- you cannot say that just because a

15  child wets the bed, that means that he or she were sexually

16  abused; correct?

17  A    Correct.  Determining whether abuse did or did not occur

18  is not part of my job, and that's outside of my scope of

19  practice.

20  Q    Some children who have experienced sexually abu- --

21  sexual abuse, like you said in direct examination with

22  Mr. McWaters, can experience PTSD or depression, things like

23  that?

24  A    Yes.

25  Q    But it is also true that some children who have

1  experienced any other kind of trauma, such as watching a -- a

2  person die before their eyes, that can also cause PTSD,

3  depression, anxiety, any number of -- of those diagnoses;

4  correct?

5  A    I'm not a psychiatrist or a psychologist, so I can't

6  testify to what could potentially cause PTSD or anxiety.  Just

7  that in my training and experience, I have interviewed kids who

8  have been diagnosed with those disorders, potentially as a

9  result of experiencing abuse.

10  Q    But not confirmed, not anything that -- it -- it's just

11  all potential; correct?

12  A    I don't understand the question.

13  Q    I'll ask another one.

14      Some children, for example, who have been bullied in

15  school or experienced body shaming can also experience PTSD or

16  depression; correct?

17  A    Again, I -- I can't diagnose someone with PTSD or

18  depression or anxiety.  But in my training and experience, I

19  have interviewed kids who have expressed that they have been

20  diagnosed with those disorders and who have also expressed

21  suicidal ideation and self-harming tendencies.

22      But that's really just outside of my scope of practice

23  and my qualifications.

24  Q    Kaitlyn specifically disclosed to you in your interview

25  with her school -- bullying by schoolmates and body shaming by

1  peers; correct?

2      A    Yes.

3      Q    In fact, during the course of your interview, like you've

4  said earlier in your testimony, you weren't just exploring, and

5  you don't ever just explore the one specific allegation that,

6  you know, you're told about going into the interview.  Do you

7  understand my question?

8      A    Yes.

9      Q    Is that true?

10     A    Yes, that's correct.

11     Q    So, for example, while you were interviewing Kaitlyn,

12  even though you didn't have any reason to believe there was

13  anybody abusing drugs or alcohol in the home, you still

14  explored that because you always explore that when you're

15  interviewing a child; correct?

16     A    We always explore other possible forms of abuse or

17  maltreatment, and that can sometimes in- -- include exploring

18  alcohol or drug use in the home.

19     Q    Another example is, going into this interview, you

20  weren't given any information and Kaitlyn didn't bring up

21  anything that caused you to believe that she had been exposed

22  to pornography, but you asked questions about that like you

23  would typically with a child that you're interviewing; correct?

24     A    Yes.  Again, it's just a form of continuing to explore

25  any other possible abuse or maltreatment.

1    Q    And -- and in Kaitlyn's instance, she disclosed that the

2    only pornography she'd been exposed to was by her peers at

3    school; correct?

4    A    I believe so.

5    Q    You have not reviewed Kaitlyn's medical records, school

6    records, or counseling records prior to interviewing her or

7    coming in here to testify today; is that true?

8    A    Correct; I have not.

9    Q    Are you aware that Kaitlyn has seen a therapist for over

10    four years?

11    A    No, I'm unaware of her having seen a therapist for over

12    four years.  But in her interview, she does say that she has a

13    counselor.

14    Q    Professional standards in your area indicate that

15    interviewers, such as yourself, should avoid bias; right?

16    A    Correct.

17    Q    And to alleviate bias, interviewers should address

18    multiple hypotheses in their interviews for a child, at minimum

19    both possibilities that a child could have been sexually abused

20    and the possibility that the child wasn't sexually abused;

21    correct?

22    A    Correct.

23    Q    To remain neutral because that's your job; right?

24    A    Yes.

25         **THE COURT:**  Okay.  Excuse me, Miss Brown.

1    Ladies and gentlemen, you've been in your chairs for 90

2    minutes and so has the court reporter, so it's a good time to

3    take a break.  This is a midmorning break.  It'll be 15

4    minutes.

5        **CSO:**  All rise.

6            (A brief recess was had.)

7        **THE COURT:**  Please return the jury.

8        **CSO:**  All rise.

9            (Jury entered the courtroom.)

10       **THE COURT:**  Please be seated.

11       Miss Brown, you may continue.

12       **MS. BROWN:**  Thank you, Your Honor.

13   Q    (By Ms. Brown) Miss Blevins, right before we took our

14   morning break, we were discussing bias and how your job as a

15   forensic interviewer is to remain neutral and avoid bias to the

16   extent possible; correct?

17   A    Correct.

18   Q    Okay.  So assuming sexual abuse or assuming that a child

19   has not been exposed to sexual abuse, one or the other, whether

20   your assumption is -- is on one end of the spectrum or the

21   another, would inherently invite bias.  You would agree?

22   A    I would agree.  We go into the interview without

23   assumptions and as neutral and unbiased as possible.

24   Q    And you as a forensic interviewer should never assume a

25   child has been sexually abused just because DHS or law

1  enforcement wanted the child to be forensically interviewed;
2  correct?

3  A    Correct.  We don't make assumptions.

4  Q    Just to be real clear, when a child comes in for a
5  forensic interview with you, and you've already testified that
6  you don't follow up with them or check in on them or -- or --
7  or follow their -- what happens to them unless they end up
8  having to come back in for another forensic interview, but you
9  also don't follow through to see if criminal charges are ever
10  filed or DHS takes action in the case or anything like that.
11  That's also not part of your job; correct?

12  A    Correct.

13  Q    And it's not part of your job to determine whether a
14  crime happened; correct?

15  A    Correct.

16  Q    And it's not your job to issue an opinion as to whether
17  you believe the child that you forensically interviewed;
18  correct?

19  A    Correct.

20  Q    Pursuant to your previous testimony, since it's fairly
21  common for a child or even an adult -- but in this case
22  obviously we're talking about a child -- to not be able to
23  recall when, as far as dates, or how old, as far as ages, they
24  were if they were sexually abused; correct?

25  A    Can you repeat the question?

1    Q    Hmm, it was a bad one.

2         You would agree with me that it's not uncommon for a

3    child to not be able to recall when, as far as a date, or how

4    old they may have been, as far as an age, when they're

5    discussing an incident with you; correct?

6    A    Correct.

7    Q    You would also agree, though, that it's often helpful to

8    probe with additional non-leading, non-suggestive questions in

9    an attempt to narrow down a date or an age if that's at issue?

10   A    Correct.  What we would do is ask additional questions in

11   a non-leading or non-suggestive way to try to identify a

12   timeline, and we do that by asking about significant --

13   possible significant events in the child's life, like what

14   grade were you in, what season it might have been.  But

15   children are not always able to answer those questions.

16   Q    Again, anticipating some of my next questions, questions

17   such as, "Do you recall whether it was hot or cold outside," or

18   "Do you remember whether something important like a birthday or

19   a holiday happened near in time," can sometimes assist a child

20   articulating a more specific date or age; correct?

21   A    Sometimes it can, yes.

22   Q    And there are times when something tangible, like an

23   object or a picture or even sometimes a smell, can trigger a

24   child's memory and help the child recall, or at least narrow

25   down things like dates and ages that are difficult for them to

1    pinpoint?

2    A    Yes.

3    Q    Kaitlyn consis- -- well, when -- when Mr. McWaters was

4    asking you questions -- I want to make sure I'm remembering

5    your phrasing as best as I can.  You said on direct examination

6    that Kaitlyn did not change or contradict herself; correct?

7    A    Correct.

8    Q    And she used terminology that was typical in your

9    experience of a 14-year-old girl?

10   A    Yes.

11   Q    And that can at least help identify, you know -- when a

12   child is not using age-appropriate terminology or is not

13   consistent, that can suggest a motive to fabricate; correct?

14   A    Not necessarily.

15   Q    But it can?

16   A    Yes, it can.

17   Q    But Kaitlyn not only was consistent and didn't contradict

18   herself, she consistently maintained throughout her interview

19   with you that when she crawled into bed with her dad,

20   unbeknownst to him, while he was asleep and snoring, his eyes

21   were closed; correct?

22       MR. MCWATERS:  Objection.  Mis- -- mischaracterizes.

23       THE COURT:  The -- overruled.  The witness may answer the

24   question.

25       THE WITNESS:  I do not recall specifically if she made

1    mention of his eyes being closed.  What I recall about her

2    forensic interview at this time is that she crawled into bed

3    with her dad, and she told me he was half asleep.

4    Q    (By Ms. Brown) And she wasn't inconsistent about that

5    fact at all, was she?

6    A    No, she was not.

7    Q    And, in fact, that particular part where you were

8    discussing the incident in the bed, you did attempt to rehash

9    it a number of times, such that Kaitlyn was rolling her eyes;

10   correct?

11   A    I can't testify to why she's rolling her eyes, but in the

12   forensic interviewing protocol, sometimes we will ask repeated

13   questions in different ways so that we can try to explore

14   details about the statements that are being made and make sure

15   that we're not just focusing on one event but trying to get as

16   many details as possible about the statements that the child is

17   making.

18   Q    And regardless of why Kaitlyn was rolling her eyes, you

19   would agree that when you were doing that very important tactic

20   during the forensic interview of asking the same thing in

21   different ways, that was during the time that she was -- it was

22   caught -- she was rolling her eyes during that period of time?

23   A    I don't recall during which part of the forensic

24   interview or what time she rolled her eyes, but I do recall her

25   rolling her eyes.

1    Q    You have no information either from Kaitlyn or the

2    research or your training and experience that allows you to

3    tell this jury under oath that Kaitlyn was not being a hundred

4    percent truthful in May of 2020, do you?

5    A    Correct.  That is not part of my job.

6         **MS. BROWN:**  Pass the witness, Your Honor.

7         **MR. MCWATERS:**  Very brief redirect, Your Honor.

8                      **REDIRECT EXAMINATION**

9    BY MR. MCWATERS:

10   Q    Miss Blevins, you are here today to testify as an expert

11   on the ChildFirst® Protocol, disclosures of sexual abuse,

12   disclosing, and partial disclosures and forced disclosures; is

13   that right?

14   A    Correct.

15   Q    And as part of that testimony, you can, and in fact you

16   did, give opinions, based on your training and experience, of

17   Kaitlyn's demeanor during the forensic interview; is that

18   right?

19   A    As an expert witness, I can give opinions.  But as the

20   forensic interviewer who conducted her interview, I cannot.

21   Q    But today, you earl- -- on direct, we did talk about that

22   you saw certain demeanors and -- and certain signs of -- of

23   different types of -- of a disclosure; is that right?

24   A    Yes.  We talked about different characteristics of a

25   tentative disclosure.

1   Q    And you said that one of those characteristics is

2   minimization; is that right?

3   A    Yes.

4   Q    And you said that you saw some signs of minimizing in the

5   forensic interview; is that right?

6   A    Yes.

7   Q    And you also talked about something called a "superhero?"

8   And what -- what -- can you refresh my memory on that?  What

9   exactly is that?

10  A    Yes.

11       **MS. BROWN:**  Objection.  Outside the scope of cross.

12       **THE COURT:**  Overruled.

13       **THE WITNESS:**  Yes.  Another one of the characteristics of

14  a tentative disclosure is called empowerment, and it's also

15  known as superhero.  And this is something that we see kids

16  sometimes do in their disclosure where they'll make statements

17  like, "And then I punched him in the face and I flew out the

18  door," or "And then I beat him up and I ran away and flew to

19  another country."

20       It's statements that are improbable, but they're

21  empowering statements that the child is making during the

22  disclosure.

23  Q    (By Mr. McWaters) And during cross-examination,

24  Miss Brown asked you about a statement that Kaitlyn made that

25  if she felt unsafe or that if her dad did anything to her, she

1  would pull a knife out on him; is that right?

2   A    Yes.

3   Q    And Miss Brown also asked you on cross-examination if she

4  felt safe at home; is that right?

5   A    Yes.

6   Q    Can -- is -- is it possible for an abused child to still

7  feel safe at home?

8   A    Yes.

9   Q    And then also is it common for kids who often cry in

10  forensic interviews?

11   A    I wouldn't necessarily say it's common.  It just depends

12  on the child and their reaction to the abuse they've

13  experienced.  In my training and experience, I've seen kids

14  cry.  I've seen kids be angry.  I've seen kids act very

15  matter-of-fact and have no visible reaction at all.

16      **MR. MCWATERS:**  That's all the questions I have, Your

17  Honor.  Thank you.

18      **THE COURT:**  You may step down, ma'am.

19          (Further proceedings were had but not designated as

20  part of this record.)

21

22                    **REPORTER'S CERTIFICATION**

23          I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

24  TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

25

                        US DISTRICT COURT - NDOK
                REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1          CERTIFIED:        *s/Leslie K. Ruiz*
                              Leslie K. Ruiz, CSR, RPR, RMR
2                             United States Court Reporter
                              333 W. 4th Street, RM 411
3                             Tulsa, OK  74103
                              (918)699-4794
4                             leslie_ruiz@oknd.uscourts.gov