1          UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,      )
                                   )
5                   Plaintiff,     )
                                   )
6   vs.                            )        CASE NO. 21-CR-450-GKF
                                   )
7                                  )
    RAYMOND LEE GOLDESBERRY,       )
8                                  )
                    Defendant.     )
9   _____)

10

11

12              TRANSCRIPT OF PROCEEDINGS
                    MARCH 28, 2022
13        BEFORE THE HONORABLE JOHN ANTOON II
              UNITED STATES DISTRICT JUDGE
14           JURY TRIAL - VOLUME I OF III

15

16

17

18

19

20              A P P E A R A N C E S

21      MS. CHANTELLE DIAL and MR. KYLE MCWATERS, Assistant United
    States Attorneys, Northern District of Oklahoma, United States
22  Attorney's Office, 110 West 7th Street, Suite 300, Tulsa,
    Oklahoma, 74119, appeared on behalf of the plaintiff.
23
        MS. ANDREA BROWN, Andrea Brown Law Firm, PLLC, 2021 South
24  Lewis Avenue, Suite 520, Tulsa, Oklahoma, 74104, appeared on
    behalf of the defendant.
25

1                              **INDEX**

2                          VOLUME I OF III

3     Pretrial Motions.........................................    5

4     Opening Instructions.....................................   46
      Opening Statement by Ms. Dial............................   53
5     Opening Statement by Ms. Brown...........................   58

6     WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:
      Kaitlyn Marie Goldesberry
7             Direct By Ms. Dial...............................   70
              Cross By Ms. Brown...............................  113
8             Redirect By Ms. Dial.............................  139

9     Meagan Bartlett
              Direct By Ms. Dial...............................  142
10            Cross By Ms. Brown...............................  151
              Redirect By Ms. Dial.............................  167
11
      Nathan Andrew Bartlett
12            Direct By Mr. McWaters...........................  172
              Cross By Ms. Brown...............................  179
13            Redirect By Mr. McWaters.........................  190

14

15

16

17

18

19

20

21

22

23

24

25

                          US DISTRICT COURT – NDOK
                REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1  PROCEEDINGS:

2  ---------------------------------------------------------------

3      **THE COURT:**  We're here in the case of United States of

4  America versus Raymond Lee Goldesberry.  The clerk will

5  announce the case later in the presence of the jury.  But I

6  thought it would be a good idea for me to come in here and

7  introduce myself and meet you before we get started and maybe

8  give you some ground rules since we haven't worked together

9  before.

10      My name is John Antoon.  I'm from Middle District of

11  Florida.  I've been a judge a long time, 38 years now.  A lot

12  of time in state court, and I thought I was sort of away from

13  these kind of cases, but I see that I'm not.

14      So let me ask:  Where's the Government?

15      **MS. DIAL:**  Right here, Your Honor.

16      **THE COURT:**  And what is your name?

17      **MS. DIAL:**  Chantelle Dial.

18      **THE COURT:**  Chianne?

19      **MS. DIAL:**  Chantelle, C-h-a-n-t-e-l-l-e; Dial, D-i-a-l.

20          (Discussion held off the record.)

21      **THE COURT:**  Oh, yeah, right there.  Chantelle.  Okay.

22  And?

23      **MR. MCWATERS:**  Kyle McWaters.

24      **THE COURT:**  Okay.

25      And where are you from, Miss Dial?

1    **MR. MCWATERS:**  Originally, I'm from Louisiana, actually.

2    **THE COURT:**  Louisiana?

3    **MR. MCWATERS:**  Uh-huh.

4    **THE COURT:**  How'd you wind up here?

5    **MR. MCWATERS:**  There -- kind of similar to you, just came

6    here for the *McGirt* decision.  Came here on a term position to

7    help out the office.

8    **THE COURT:**  Oh, okay.

9    **MR. MCWATERS:**  Uh-huh.

10   **THE COURT:**  Great.  You in New Orleans?

11   **MR. MCWATERS:**  Just -- just outside New Orleans.

12   **THE COURT:**  So you missed the tornado the other day?

13   **MR. MCWATERS:**  Yes.  My family did, yeah.

14   **THE COURT:**  Good.

15   **MR. MCWATERS:**  Yeah.  No, it was pretty good.  But, yeah,

16   heard about it.

17   **THE COURT:**  You don't sound like you're from New Orleans.

18   **MR. MCWATERS:**  Get that a lot.

19   **THE COURT:**  And, Ms. Dial, where are you from?

20   **MS. DIAL:**  I'm from Washington state, Your Honor.  And I

21   came out as a detail when *McGirt* first happened and then ended

22   up staying.

23   **THE COURT:**  Oh, okay.

24   And who's at counsel table with you?

25   **MR. YOUNG:**  Good morning, Your Honor.  My name is David

1    Young.  I'm a special agent with the FBI.

2        THE COURT:  Okay.

3        And for the defendant?

4        MS. BROWN:  Good morning.  Andrea Brown.

5        THE COURT:  Okay.

6        MS. BROWN:  This is my client, Raymond Goldesberry.

7        THE DEFENDANT:  Your Honor.

8        THE COURT:  Okay.  And where -- where are you from,

9    Miss Brown?

10        MS. BROWN:  I was born and raised right here in Tulsa.

11        THE COURT:  Okay.

12        MS. BROWN:  Spent a -- quite a bit of my childhood in this

13    very building.  My mother worked for Judge H. Dale Cook for 27

14    years.

15        THE COURT:  Wow.  Okay.

16        MS. BROWN:  And she and he did what you're so gracious to

17    do for us, which is go to Tampa every year for the month of

18    October to relieve the trial docket there.

19        THE COURT:  Yeah.  We used to -- really, before I got on

20    the Court, it was so -- so backlogged that the judges never got

21    to the civil cases.

22        MS. BROWN:  Right.

23        THE COURT:  So they relied on visiting judges to do the

24    civil docket.  It's not like that now.

25        Well, let me tell you what I -- what I expect.  I don't

US DISTRICT COURT - NDOK
REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1    like sidebars.  I try to avoid them.  I know I can't.  You will
2    be up here for your peremptory challenges.  But I think
3    they're -- they're rude to the -- to the jury for one thing.  I
4    think it -- it diminishes the transparency we try to -- we
5    strive for in the judicial system.

6        And a lot of times, the jury can figure out what you're
7    saying anyway.  So if there's a matter that you need to speak
8    to me about, it likely will be outside the presence of the
9    jury.  I'll let them go, and I'll hear from you.  And that
10   includes objections.  I don't want any speaking objections.

11       You state the basis for the objection.  If I need to, I'll
12   hear from the other side.  And if it's more than a several-word
13   response, then I'll send the jury out and take care of it.
14   You're at a little bit of a disadvantage because of the
15   situation here and my late arrival.  Maybe some of these things
16   we would have had a more full hearing on if -- if I had been
17   here.

18       But be that as it may, I do not want -- I do not want the
19   jury to hear your -- your arguments on objections.  The -- I
20   expect a fair degree of formality.  I don't like first names to
21   be used; the exception is children.  If there's a child and
22   I -- there may be in this case, you could refer to the child by
23   their first name.  But any adult, please use the surname.

24       All comments are directed to me.  I think there was a
25   little bit of hyperbole in the -- in the papers.  I don't like

1    that.  And I think it comes from talking more to one another

2    than talking to me.  I think you're less likely to do that if

3    you're speaking to the Court.  I run a -- what I like to think

4    is a civilized proceeding.

5        I don't expect people to be here exceptionally early in

6    the morning.  Today's the exception because of the pending

7    matters and wanting to have you familiar with my practices.

8    But ordinarily, we'll start at 9:00; we won't work past 5:00;

9    and we will break for lunch.  I think that's important for

10   anybody in trial.

11       I'm old, but I'm not so old that I don't remember what

12   it's like to be a trial lawyer, and it's stressful business.

13   And you need a break and the jury needs a break and the court

14   reporter needs a break.  I will tell the jury that I try to

15   break every 90 minutes after we pick the jury for the benefit

16   of the court reporter because of the incredible discipline and

17   that -- that is required to do her work.

18       I will give you, no later than our -- our noon break,

19   proposed jury instructions.  They're a little bit different

20   from what you gave me.  We, in the Eleventh Circuit and in

21   Florida state court, typically tell the jury to accept the

22   facts as proven when there's a stipulation.

23       Think in the Eighth Circuit, it's a little bit different,

24   so they're included as elements, although I will tell them

25   you-all agreed to it.  And they're -- so once you have these --

1    the proposed instructions, at your leisure, to the extent you

2    have leisure when you're in trial, please go over them and make

3    sure that they're okay and raise any issues with me.

4        In speaking of that, I'm -- it's never my intention to

5    deprive anybody of making a record.  But again, I try to use

6    the jury while they're here.  And if there's a proffer or

7    something that can be taken up at lunch or after the jury's

8    excused or early the next morning, that's when I want to do it.

9        I don't want to be doing those kinds of things while the

10   jury's waiting unless it's absolutely necessary.  There was a

11   request for 15 minutes for opening statement.  That's fine.

12   There was an issue raised by the Government about Mr. Young

13   being permitted to sit at counsel table.  That motion is

14   granted.

15       There was a request for the Rule -- implication of the

16   Rule of Sequestration.  That motion's granted.  Counsel's

17   responsible for explaining the Rule and assisting the Court in

18   enforcing it.

19       Is it M. G. or M. V?  Are that -- is that the same person?

20       **MS. DIAL:**  It is, Your Honor.  For a little while, the

21   U.S. Attorney's Office was charging children who were related

22   to the defendant with M. V. for minor victim.

23       **THE COURT:**  Oh, okay.

24       **MS. DIAL:**  But M. V. is K. G., Kaitlyn Goldesberry.  It's

25   all the same child.

1          THE COURT:  Yes.  Okay.  Well, how are we going to refer

2     to M. V., M. G. [sic] here?

3          MS. DIAL:  I intend to refer to her as Kaitlyn.

4          MS. BROWN:  I do as well.

5          THE COURT:  Okay.  Now, there are statements that were

6     made -- allegedly made by Ms. Bartlett attributing the --

7     attributing those statements to Kaitlyn; right?  The defendant

8     asserts in papers filed that the Government did not give the

9     required 404 notice to use those statements.

10         And I understand the Government's position as being that

11    you're not going to use those statements; is that correct?

12         MS. DIAL:  That's correct, Your Honor.

13         THE COURT:  Okay.

14         MS. DIAL:  The only statements are the three that are in

15    the 404(b) notice.

16         THE COURT:  Okay.  The Government has a motion in limine

17    regarding 608(b) evidence, and they give examples of what they

18    think character witnesses might say.

19         Is -- are you offering character evidence, Ms. Brown?

20         MS. BROWN:  Your Honor, I do anticipate that we would have

21    no more than two character witnesses.

22         THE COURT:  What are you going to ask?

23         MS. BROWN:  Only opinion and reputation questions.

24         THE COURT:  Opinion and reputation questions.

25         MS. BROWN:  Well, opinion or reputation, as opposed to

1    specific instances of conduct.

2          **THE COURT:**  Tell me what the questions are.

3          **MS. BROWN:**  You know, a -- one of them is a coworker -- a

4    supervisor -- and the other is a longtime friend.

5          And, "Do you know Raymond Goldesberry?  How do you know

6    him?  How long have you known him?  Have you had an opportunity

7    to observe him, you know, out in the community, his -- his

8    character?  Have you had an opportunity to observe him at the

9    workplace and his character?  Have you had an opportunity to

10   observe him in the presence of one or more of his family

11   members, including his wife or either one or both of his

12   daughters?  And do you have an opinion as to his reputation or

13   character as far as any potential character issue that were to

14   come into play?  In this particular case, his character to be

15   prone to molest one or both of his daughters?"

16         **THE COURT:**  So you don't -- you're not really talking

17   about reputation.  You're talking about opinion.

18         **MS. BROWN:**  Yes, both.  "Are you aware of his rep" --

19         **THE COURT:**  Oh, no.

20         **MS. BROWN:**  Are --

21         **THE COURT:**  Well, go ahead with your reputation testimony.

22   I didn't hear that.

23         **MS. BROWN:**  "Are you familiar with his reputation in the

24   community?  Are you" --

25         **THE COURT:**  For what?

1      **MS. BROWN:**  Whether or not he has a -- a propensity to be

2  interested or overly interested in children, particularly his

3  own, in some kind of sexual way.

4      **THE COURT:**  And the answer to that would be "yes?"

5      **MS. BROWN:**  The answer to that would be that he -- they

6  don't have any reason to believe or have never had any --

7      **THE COURT:**  So he doesn't have a reputation either way?

8      **MS. BROWN:**  I believe that -- that they would testify

9  that, in their opinion, and based on his reputation in --

10     **THE COURT:**  Well, you know, you keep going back to

11  opinion.  I -- can a witness come in and just give an opinion

12  about somebody?

13     **MS. BROWN:**  I believe based on their character and

14  reputation but --

15     **THE COURT:**  On reputation, yes.  But you're not going to

16  reputation.

17     **MS. BROWN:**  Okay.  And honestly, Your Honor, the -- our

18  defense in particular is not heavily loaded on character

19  evidence.  We're not relying very heavily on that.

20     **THE COURT:**  Well, that's a good point, so I don't -- I'll

21  hear from the Government on that.  But I want to talk about

22  what this case is real -- my understanding of what this case is

23  really about and see if I've got it right.

24     **MS. BROWN:**  Okay.

25     **THE COURT:**  What do you say about what defense is

1  intending to do with character witnesses?

2      **MS. DIAL:**  I just want to clarify quickly, Your Honor,

3  because the Court referenced the Government's motion in limine.

4  Our motion in limine was concerns that defense counsel would

5  attack Government's witnesses with irrelevant --

6      **THE COURT:**  Yes, I'm sorry.

7      **MS. DIAL:**  -- and extrinsic -- okay.

8      **THE COURT:**  But this is another --

9      **MS. DIAL:**  But now we're talking about the defendant's --

10      **THE COURT:**  This is not -- this is reputation.

11      **MS. DIAL:**  Yes.

12      **THE COURT:**  You're right.  I'm going to come back to that.

13      **MS. DIAL:**  Our response to that, Your Honor, is similar to

14  what we had in our trial brief.  The character witnesses, if

15  they're going to come and talk about Raymond Goldesberry is a

16  good person, frankly, that's not a relevant character trait.

17  And the rules require some relevancy rather than just filing in

18  witnesses that know him, but don't know his family.

19      The Government actually called and talked to both and

20  provided an update to defense counsel after talking to both of

21  their character witnesses.  Asked them what they'd intended to

22  testify to.  And both character witnesses said they really

23  didn't even know the defendant's daughters and -- and we

24  notified defense counsel of that.

25      So these are just men that know the defendant, that don't

1  know his daughters, don't know what happens in private, don't

2  know his reputation with children.  They frankly don't even

3  know his children.  And they're just coming in to improperly

4  say that he's a good guy who works on cars with them.

5      **THE COURT:**  I didn't hear anything in what Ms. Brown said

6  that would indicate reputation for a pertinent, relevant

7  character trait.  I -- I'll allow her to proffer it if she

8  thinks it's appropriate.

9      But I'm going to limit it until such time as there is a

10  proffer, if you want to go forward with that.  But I think

11  that's an uphill battle, Ms. Brown.

12      **MS. BROWN:**  Thank you, Your Honor.

13      **THE COURT:**  Now, getting to the other issue, which was the

14  motion in limine, does the Government wish to be heard on that?

15      **MR. MCWATERS:**  Briefly, Your Honor.  Basically just in --

16      **THE COURT:**  What -- what document number is that?  Mine

17  came out -- came without a document number.

18      **MS. DIAL:**  Fifty-four.

19      **MR. MCWATERS:**  Fifty-four.

20      **THE COURT:**  Okay.  This is about a man named Nathan;

21  right?

22      **MR. MCWATERS:**  Nathan Bartlett, yes, Your Honor.

23      **THE COURT:**  Yeah.

24      **MR. MCWATERS:**  Very briefly, Your Honor, just to reply to

25  the defense response in their trial brief.  Two issues.  The

1   first is that the defendant did not really address the issue

2   that the Government brought up of child pornography materials

3   found on an apartment computer after Nathan Bartlett left the

4   Du- -- or Oklahoma Police Department.

5       So as far as the Government concern -- is concerned, this

6   unrelated, irrelevant, you know, information does not go to our

7   witness's character, and considers that issue resolved.  The

8   specific instance of Mr. Bartlett cuddling his daughter, Miss

9   Bartlett, to respond to -- to that response by the defense, the

10  first one is that they are clearly not identical acts.

11      The -- the issue in this case deals with a touching of a

12  sexual nature and penetration.  The -- what happened between

13  Mr. Bartlett and his daughter, Meagan, is -- is not at all

14  that.  It's -- it's a simple cuddling in the middle of the

15  night.  He was asleep and threw his arm around her.

16      The only reason why the Government even wanted to bring

17  this up was because, in an interview, two of -- two of the

18  witnesses, Michelle and -- and Faith, mentioned that they had

19  known about these allegations.  So we asked our witnesses about

20  them.  And to their credit, they let us know exactly what

21  happened.

22      But in the Government's view, they're -- they're certainly

23  not identical acts and --

24      **THE COURT:**  If they were identical acts, would it be

25  relevant?

1    **MR. MCWATERS:**  Well, that's my second point, Your Honor,

2    is that it doesn't really matter what they are because the acts

3    themselves do not go to the witness's character for

4    truthfulness.  So if anything, in this instance, they were

5    forthright with the Government when we talked to them about it.

6         And then we -- we just think that there's a significant

7    chance here for this testimony, if it were to come in, would

8    mislead the jury.  The Government doesn't see the necessity for

9    a mini trial on Mr. Bartlett's character for truthfulness when

10   none of the things that would even come up would go to his

11   character for truthfulness.

12       **THE COURT:**  Ms. Brown, do you wish to respond?

13       **MS. BROWN:**  Yes, Your Honor.  Thank you.  Briefly.  The

14   Government is correct.  I don't believe that anything that was

15   found on a work computer after the fact and -- and before this

16   case was involved is anything that we're going to go into.

17       It's nothing that I ever articulated in -- in any

18   discovery or anything that I was planning on going into.  So

19   that -- that issue is resolved.

20       The issue that is -- and, by the way, Your Honor, when

21   we're arguing, do you want me to approach the podium each time?

22   Do you have a strong preference?

23       **THE COURT:**  No.

24       **MS. BROWN:**  Okay.

25       **THE COURT:**  I can hear you fine here.

1    **MS. BROWN:**  I just -- our local custom is, is lots and

2  lots of back and forth.  I just wanted to make sure I was

3  not --

4    **THE COURT:**  Yeah.

5    **MS. BROWN:**  -- offending the Court now, since we don't

6  have the -- the jury in here yet.

7    Your Honor, so Mr. Goldesberry has two daughters.  The

8  child at issue is Kaitlyn, and then his adult daughter is

9  Faith.

10    **THE COURT:**  How many years between them?

11    **MS. BROWN:**  Four.

12    **THE COURT:**  Okay.

13    **MS. BROWN:**  Faith had conveyed to both her mother,

14  Michelle, Mr. Goldesberry's wife, and myself in pretrial

15  interview, that at some point in the past, Meagan Bartlett had

16  conveyed to Faith Goldesberry that her father had grabbed or

17  fondled her breasts while she was in his bed with him.

18    That, very much like Kaitlyn crawled into bed with her dad

19  when Kaitlyn had a nightmare and that brings us to court today;

20  that Meagan Bartlett had crawled into her father Nathan

21  Bartlett's bed at some point in the past, and that he had

22  grabbed and -- and touched and fondled her breast.

23    This, I believe, is very, very relevant for

24  cross-examination, specifically with Meagan Bartlett,

25  specifically because of the reaction that she had when she

1    found out about this incident involving Kaitlyn and Raymond

2    Goldesberry, mother and -- or father and daughter in the bed,

3    and that both Kaitlyn and Mr. Goldesberry have both con- -- and

4    continue to say from the beginning to now that it was an

5    accident and that he believed that he was touching his wife.

6    And thus wasn't in any way an intent to sexually manipulate

7    or -- or fondle his -- his daughter.

8        I believe that the testimony when Miss Bartlett, Meagan

9    Bartlett, testifies, is she's going to say that she was so

10   concerned out of -- to protect Kaitlyn, that she not only

11   called Mr. Goldesberry a rapist, but she felt like she needed

12   to tell Mrs. Goldesberry, Michelle Goldesberry, and then

13   ultimately felt like she needed to call DHS and get the

14   authorities involved in this situation when, in reality, it was

15   a big accident.

16       I believe that for Meagan to be -- Miss Bartlett to be

17   able to articulate on direct what she did and why, I think

18   calls into question why she didn't believe it was a situation

19   that was alarming when it happened to her.  I think that it --

20       **THE COURT:**  Are you trying to show that she didn't really

21   call?

22       **MS. BROWN:**  No.  I --

23       **THE COURT:**  What are you trying to prove by that?

24       **MS. BROWN:**  Well, I don't believe that -- I -- I believe

25   that the testimony and evidence is going to show that Meagan

1    overreacted and that Miss Bartlett --

2        **THE COURT:**  Well, if it -- if it's -- that brings me to

3    the point of this case.  I mean, to me, it -- we're going off

4    in a lot of different directions, but there seems to be no

5    issue that what happened happened.

6        **MS. BROWN:**  Correct.

7        **THE COURT:**  The question is whether it's an accident.  So

8    why -- what does this have to do with any of that?

9        **MS. BROWN:**  Well, the larger issue, I believe, it --

10       **THE COURT:**  I would see it -- excuse me -- but I would see

11    the point if -- if maybe -- maybe I would see it, if it didn't

12    happen.  But everybody agrees it happened.

13       **MS. BROWN:**  Yes, Your Honor.  The -- the thing that

14    everybody doesn't agree on is that -- is everything else that

15    Meagan said.  So Meag- --

16       **THE COURT:**  Well, that's not coming in.

17       **MS. BROWN:**  Well, okay.

18       **THE COURT:**  All that list of -- the list of other things,

19    that's not coming in.

20       **MS. BROWN:**  Okay.  And -- and as -- as long as none of

21    that's coming in, then I think that the central issue here is

22    why Meagan reacted the way that she did -- why Miss Bartlett

23    reacted the way that she did and -- and...

24       **THE COURT:**  And reported it?

25       **MS. BROWN:**  Uh-huh, yes.

1     THE COURT:  Well, wouldn't any -- wouldn't any rational

2  person who heard that -- I mean, if -- in Florida, if I heard

3  that, I would have a duty under the -- under Florida law to

4  report it.  Wouldn't any rational citizen report that?

5     MS. BROWN:  I don't believe so, no, when it was an

6  accident.  And that's why I believe that when it's an -- when

7  it's an accident because I don't believe that --

8     THE COURT:  Well, you know, I -- that -- that goes to

9  intent, I guess.  But the fact is that it did happen.  And I

10  just don't understand why you're saying she overreacted.  So

11  what if she overreacted?  That has nothing to do with what

12  happened between her and her father.

13     MS. BROWN:  Well, except that I believe that if the exact

14  same thing happened between her and her father and it was an

15  accident -- and by "exact same thing," I mean the touching of

16  the breast instead of the touching of the vagina, but touching

17  a private area of a minor child -- then if it wasn't alarming

18  or concerning or something that -- that needed to be reported

19  when it happened to her, why did she have --

20     THE COURT:  How --

21     MS. BROWN:  -- a different --

22     THE COURT:  How -- how old was she when that allegedly

23  happened?

24     MS. BROWN:  I don't believe that she told that to Faith.

25     THE COURT:  Well, this child didn't either.  It's

1    consistent.

2         I don't -- let me hear from the Government.

3         **MR. MCWATERS:**  Your Honor, I don't have very much to add.

4    A couple of things.  One, as you pointed out, the defendant's

5    act is not at issue here, whether or not it happened.  So we're

6    not trying to impeach Meagan's -- the testimony as to what

7    she -- wheth- -- whether or not she reported it.  There's no

8    issue here as to Nathan Bartlett's testimony either.  So those

9    things are not at issue.

10        And then the other thing is that Mr. Bartlett was, at the

11   time, working as a law enforcement officer, and so he was a

12   mandatory reporter, as you brought up.  So anything that was --

13   that -- that he heard, he had a -- a duty to -- to tell his

14   daughter that that needed to be reported.  So that -- that's

15   all the Government would add, Your Honor.

16        **THE COURT:**  Government's motion is -- objection is

17   sustained.

18        Okay.  That brings us to the 404 -- or 414; are you just

19   offering this under 404, or is it a 414 issue?

20        **MS. DIAL:**  Actually, Your Honor, the Court goes to the

21   heart of what part of my oral argument was going to be.  The

22   only reason this is not 414 evidence, the two acts -- there's

23   the tampon removal and the -- and then Mr. Goldesberry, the

24   defendant, being caught by his wife apparently shaving Faith's

25   genitals.

1    The only reason it's not 414 is because the defendant and

2    his family insist on innocent intent.  And actually, Your

3    Honor, I meant to bring this up.  I'm not sure if the Court

4    prefers -- I know the Rule of Sequestration is for when

5    witnesses are testifying.  I believe both of us are going to be

6    discussing anticipated testimony of Michelle Goldesberry, in

7    particular, who is in the courtroom right now.

8        **THE COURT:**  Miss Goldesberry, please remove yourself from

9    the courtroom, and don't come back until counsel calls.

10       **MRS. GOLDESBERRY:**  Yes, Your Honor.

11       **THE COURT:**  Thank you.  Counsel has not had an opportunity

12   to explain to you, Miss Goldesberry, the ramifications of

13   invoking the Rule of Sequestration as it applies to witnesses,

14   but that means you're not to discuss your testimony with

15   anybody.

16       You're not to ask anybody about the testimony they've

17   given in court when they leave.  And you can talk to counsel;

18   but, otherwise, until you're called to testify, you should

19   remain outside the courtroom.

20       **MRS. GOLDESBERRY:**  Yes, Your Honor.

21       **THE COURT:**  Okay?  Thank you, ma'am.

22           (Discussion held off the record.)

23       **THE COURT:**  We'll make sure she's comfortable.

24       **MS. BROWN:**  Thank you.

25       **THE DEPUTY COURT CLERK:**  Take her to a witness room --

1    **MS. BROWN:**  Thank you.

2    **THE DEPUTY COURT CLERK:**  -- across -- yeah.

3    **THE COURT:**  Okay.

4    Go ahead.

5    **MS. DIAL:**  Thank you, Your Honor.

6    The crux of this case is the defendant's intent, as the

7    Court has laid out.  There's no question that it happened.  He

8    admitted that it happened.  Ultimately, the Government

9    anticipates there are going to be -- there will be two

10   questions for the jury to decide: first, the child's age

11   because her statements about that have changed recently, but

12   mostly what the defendant intended to do.

13   In the defendant's res- -- response to the Government's

14   404(b) notice, the defendant lays out that these three acts

15   aren't related at all and relies on the reasoning being that

16   because for the two with Faith, the defendant was fully awake,

17   and his intent wasn't sexual.  But that accepts his

18   explanation, his -- his intent, the explanation he's given for

19   his intent for all three of these.

20   And that's why all three are relevant for the jury to hear

21   and are necessary for the jury to hear.  He says that he was

22   asleep.  He was half-asleep and that he thought it was his wife

23   and it was a mistake.  That's why we're here today.  In the

24   other two, he says Faith asked him for help removing the

25   tampons.  Faith told a counselor that she was about 14.

1    Relevantly, we're talking about actions that all likely

2    occurred within the same year because the defendant, when he's

3    interviewed by Child Protective Services, said that he

4    digitally penetrated Kaitlyn three -- and then in a later

5    meeting, he says three or four years later [sic], so when

6    Kaitlyn was 10 or 11.

7    Faith is four years and two months older than Kaitlyn.

8    Kaitlyn told her counselor -- or, excuse me, Faith told her

9    counselor that when she was 14, her dad helped her remove

10    tampons, plural, and helped her shave her genitals at her

11    request.  This all didn't come out until CPS's investigation

12    three or four years later.

13    So at that point, the defendant is already faced with this

14    allegation.  Kaitlyn's already gone to the forensic interview.

15    She's already said there was a digital penetration.  And then

16    these other acts all come out at the same time.  And as he

17    explains all three and as the family backs him up on all three,

18    in each, they determine and they assign what his intent was:

19    medical, just assistance, or asleep and mistake.

20    And that's the question for the jury.  That's the question

21    that the jury has to understand, or has to decide.  And to do

22    that, the jury should be allowed to hear about each of these

23    acts occurring within the same general window, and then

24    determine the defendant's intent for themselves.  He said he

25    had no sexual intent or motive in any of the three.

1    Kaitlyn, Faith, and Michelle all say he had no sexual

2    intent or motive, but that's why the jury's here.  And so to

3    narrow in on just the one digital penetration because that's

4    the one that he's -- that his intent, he says, was different

5    because he can justify the others, it's -- it's accepting his

6    explanation for the intent.

7    And -- and as I started with and as the Court asked,

8    notably, if the defendant and his daughter, Faith, hadn't

9    justified his intent and motive, those other two acts likely

10   would have been admissible as 414 evidence, similar crimes in

11   child molestation.  But by the time DHS investigated in 2020,

12   Faith was then 18.  She was still living at home, financially

13   dependent.

14   And she and the family agreed with this version of events

15   that negated any sexual intent or motive by the defendant in

16   any of the three.  The only reason that the tampon removal and

17   the genital shaving aren't 414 is because the defendant and his

18   dependent, but young adult, child maintain that there was no

19   sexual intent or motive.

20   And frankly, in charging the case, those were the two

21   that, because of their explanations, because they buckled down

22   so hard on the intent, that wasn't -- those weren't viable

23   charges in the Government's view.  But to have both of those

24   and then to be escalating, to take the conduct a step further

25   and now have actual denit -- digital penetration and, like the

1    other two, explain it away with no sexual intent, is

2    concerning.  It's relevant.

3        His intent, his lack of accident, his motive, are central

4    to this trial and the key issue that the jury has to decide.

5    And to determine if his motive when he digitally penetrated

6    Kaitlyn was to derive sexual gratification by touching his

7    jon -- by touching his daughter's genitals, the jury must know

8    his other acts and his other justifications.

9        **THE COURT:**  So do you maintain that Faith was below 14?

10   Under 14 when that happened?

11       **MS. DIAL:**  She told a counselor that she was 14.

12       **THE COURT:**  She was 14.

13       **MS. DIAL:**  Yes.

14       **THE COURT:**  Does that take it out of the purview of Rule

15   414?

16       **MS. DIAL:**  My reading of the rule did -- if I could have

17   just a moment to get there -- because of the way child

18   molestation was described for the deriving sexual pleasure or

19   gratification.  When looking at this case, the defendant, in

20   his admission for the digital penetration, clearly said his

21   intent was to stimulate and arouse.

22       He just rests on, he thought it was his wife.  So the

23   tampon removal and the genital shaving where he's caught by his

24   wife and says that's what he's doing, those -- beyond being

25   very similar in him -- him touching his daughter's genitals,

1  there wasn't other evidence that, in my view to charge, I could

2  have shown deriving sexual pleasure.

3      The three together, though, and the three instances of

4  justification for his actions and a family that supports and

5  buys into that justification is what makes those so relevant,

6  which is why I had labeled them as 404(b).  In the context of

7  all of it, in the context of he says his intent with Kaitlyn

8  was sexual gratification, albeit his excuse is that he thought

9  it was his wife, within that context, then, yes, touching his

10  other jon -- daughter's genitals at the same time could be

11  presumed for also sexual gratification.

12      **THE COURT:**  Well, I guess if the child is 14, then this

13  rule doesn't apply -- 414 doesn't apply; is that correct?

14      **MS. DIAL:**  Yes, Your Honor.

15      **THE COURT:**  So then you're left with 404, and you've got

16  kind of an uphill battle there, don't you?

17      **MS. DIAL:**  It is not the clearest 404(b).  I --

18      **THE COURT:**  You know why is because this rule has gone

19  through so many changes.  The concept has gone through so many

20  changes over the years largely, I think, because of child sex

21  crimes.  And it's been relaxed and massaged as 414.  I mean,

22  that's evidence of what I'm talking about.

23      But what you're getting at here is really a propensity to

24  engage in touching, but it's not similar.  It's not the same

25  child.  And the question is whether it shows lack of mistake or

1    intent.

2        **MS. DIAL:**  I understand what the Court's saying.  The

3    difference, I think, is that it's not his propensity to touch

4    his daughters.  It is this family dynamic of the defendant does

5    something for sexual gratification involving his daughters'

6    genitals, and then the family justifies and accepts his stated

7    motive.

8        That's what's so concerning and what links them because,

9    otherwise, I would agree.  But what we have here is the same

10    scenario.  The adult daughter, Faith, when she's 14, her mom

11    walks in and the def- -- and catches the defendant down near

12    his daughter's genitals, and he says, "I was helping her

13    shave."

14        And the child backs him up.  She backs up his intent and

15    says -- well, this is what she says, then, three years later,

16    that she backed up his intent and she said, "Yes, Dad was just

17    helping me shave."

18        And that's what the jury's going to hear again today from

19    the next daughter is she's in bed with him.  He digitally

20    penetrates her.  She doesn't know if he's awake or asleep.  She

21    can't know entirely.  He says, "I was half-asleep.  This was a

22    mistake."

23        And she parrots that.  And so it's the motive within each

24    of these three, not that he likes to go and touch children.  In

25    fact, if he had -- well, it's his motive with all three, and

1    then more importantly his justification.  He explains away his

2    intent in each of the three -- in each of the other two, just

3    as he's done to- -- as he's doing today and just as --

4        **THE COURT:**  Not really.  He says --

5        **MS. DIAL:**  -- his child will do.

6        **THE COURT:**  He says that Faith asked him for help on the

7    other two occasions, so it's different in that respect.

8        **MS. DIAL:**  It is.  It's similar in that the child agrees

9    with what he says the intent and purpose was.  If the Court

10   doesn't allow direct examination on these two acts, I -- just

11   to be as transparent as possible, the Government does

12   anticipate that the defendant would open that door through --

13   possibly through cross-exam, but much more likely through

14   testimony, including the opinion testimony that's already

15   happened.

16       If there's opinion testimony of the defendant being a good

17   father who's appropriate with his children, the Government

18   would see that as opening the door.  The anticipated testimony

19   of the counselor -- the family counselor who apparently didn't

20   know about any of this and who also is expected to say that she

21   saw no issues with the family.  There were no concerns.

22       And the Government believes that, at that point, evidence

23   of these two acts, if the defendant's -- if the defense is

24   going to be that this was all a mistake and he had absolutely

25   no intent and he is not inappropriate with his daughters, then

1    the Government would consider these other two to be relevant
2    extrinsic acts that could come in on cross in the defendant's
3    case.
4        **THE COURT:** Okay.  Okay.  Thank you.
5        Ms. Brown?
6        **MS. BROWN:** Your Honor, despite what the Government is
7    asserting orally, Your Honor is correct, that they are
8    attempting to admit these two acts to establish, whether they
9    say so or not, that the defendant has a propensity to want to
10   be around or engage in the touching of his daughters' genitals.
11       First of all, it's been undisputed from the very beginning
12   of this investigation all the way until today, that both
13   Raymond -- Mr. Goldesberry and Faith Goldesberry, his adult
14   daughter, the not-victim, both of them have maintained from the
15   very beginning that Faith asked for assistance in removing her
16   tampons on more than one occasion.  That Faith asked her father
17   for help shaving her bikini line.
18       Interestingly, it needs to be noted that when Faith and
19   Mr. Goldesberry were in the bathroom for the shaving incident,
20   Faith was wearing a swimming suit, so her genitals weren't even
21   exposed.  And even if Mr. Goldesberry were -- was actually
22   shaving her bikini line, it was covered, much like it would be
23   if you were out in a public pool.  Furthermore, the door to the
24   bathroom was open.
25       So this is not something that was -- you know, that he was

1   trying to do surreptitiously behind closed, locked doors.  It

2   just so happened that when Faith needed the assistance, Mr.

3   Goldesberry was up, and Mrs. Goldesberry was asleep.  Prior to

4   even beginning to shave the bikini area, he just had the razor

5   in his hand and the bathroom door was open, and I believe the

6   testimony will be that Faith had her leg propped up on the

7   kitchen sink or kitchen --

8       THE COURT:  You're better arguing the 404 issue rather

9   than the facts.  You know, the facts are not really helpful to

10  your client --

11      MS. BROWN:  Okay.

12      THE COURT:  -- in my view.

13      MS. BROWN:  Well, a -- a major portion of the reason that

14  it is not 404 is that Faith, in this particular situation --

15  obviously, it's a different child.  It's a different time.

16  It's a different -- it's a -- it -- it's an act that was done

17  consensually with it being instigated by the child.

18      That said, it doesn't go to his lack of mistake or

19  accident in -- in digitally penetrating Kaitlyn because all

20  it -- this does is this highly, highly prejudicial evidence

21  comes in for them to attempt to establish -- for the Government

22  to attempt to establish for the jury --

23      THE COURT:  Well --

24      MS. BROWN:  -- the defendant's propensity.

25      THE COURT:  -- is it highly prejudicial because you argue

1    that it's not; that it's just -- there's nothing wrong with it?

2        MS. BROWN:  Well, I believe that in the context of if --

3    if --

4        THE COURT:  I mean, and to a lot of people, it would

5    sound, like, pretty extraordinary.  But your position is kind

6    of inconsistent because you say this is just okay.

7        MS. BROWN:  Well, I believe in the context of the fact

8    that my client, Mr. Goldesberry, the biological father of the

9    child in question, was an EMT and has medical training and

10   experience; that -- that in the confines of this family, that

11   she felt comfortable asking her father for medical assistance,

12   I don't think is inappropriate.  That said, I agree with --

13       THE COURT:  So it's not a bad act, then.

14       MS. BROWN:  Well, and I would agree with Your Honor that

15   there are many potential jurors out there that would find it

16   concerning and -- and not appropriate.

17       THE COURT:  Yeah.

18       MS. BROWN:  And -- and I believe that Michelle

19   Goldesberry -- Mrs. Goldesberry will say that when she walked

20   by and saw the shaving about to happen, that she took over

21   because she believed that it was inappropriate as well.

22       So if the -- the Government's going to get into this with

23   either Faith Goldesberry or Mrs. Goldesberry or potentially the

24   defendant, it would be potentially highly prejudicial for any

25   juror who believed, as this Court does and as Michelle

1  Goldesberry does, that this wasn't an appropriate --

2        **THE COURT:**  I didn't say what I believed.

3        **MS. BROWN:**  Oh.

4        **THE COURT:**  I'm just saying I think a lot of people

5  would --

6        **MS. BROWN:**  Okay.  And I --

7        **THE COURT:**  -- think that way.

8        **MS. BROWN:**  -- do think a lot of people would.

9        I think for Mr. Goldesberry and for Faith, considering the

10  circumstances of their family dynamic, I don't believe that

11  it's necessarily inappropriate, at least from their

12  perspective.  That said, the reality of the situation is that

13  it was a medical slash hygiene issue, and these incidents are

14  being offered to prove character and -- and conformity on a

15  particular occasion with the trait that obviously is propensity

16  to either be interested or explore or touch his daughters.

17        Neither of -- of the incidents involving Faith prove in

18  any way Mr. Goldesberry's knowledge or absence of mistake or

19  accident, as it would be necessary for the Government to be

20  able to go into these other acts.  I -- I just -- I -- there's

21  no way around the fact that it's not res gestae.

22        It is 404(b).  And really they're trying to get it in

23  front of the jury as propensity evidence.

24        **THE COURT:**  I agree with you, it's not res gestae.

25        **MS. BROWN:**  And so it's not admissible as propensity

1    evidence, and I believe that it's not admissible as 404 --

2    404(b) evidence because I don't believe that it -- it goes in

3    any way to help the jury understand one way or the other what

4    the defendant's motive was in the bed with Kaitlyn on a

5    completely different occasion.

6         **THE COURT:**  Okay.  Thank you.

7         Ms. Dial, I -- I understand the Government's argument, but

8    I don't -- I understand it and I'm -- agonize over the -- this

9    issue because, as I've said, I've seen this rule change over my

10   career.  And I think, you know, who knows?  It -- allowing it

11   may pass muster with the appellate court.  But I don't think

12   it's a correct application of the 404, and so I'm going to -- I

13   will tell you what.

14        I will reserve ruling on it, giving you an opportunity to

15   find persuasive authority.  I didn't find any.  I found some

16   good cases explaining the rule and the evolution of the rule

17   and where it's appropriate to show intent and lack of mistake

18   and motive, and it's not close to this.  But there may -- I'm

19   not familiar with case law in the Eighth Circuit.

20        So if you find something, I'll reconsider; but for right

21   now, I'm going to limit reference to it.  And we'll see if you

22   can find something that -- and the same is true for you,

23   Ms. Brown.  You can find cases.  You presented your arguments

24   well, but I know you're slammed here, and it wasn't much in the

25   way of helpful authority.

1          Is there anything else I can do for you before we see the

2     jury?

3          **MS. DIAL:**  Your Honor, the Court -- or the Government has

4     a couple of things to bring up.  I believe that -- yes, if I

5     could just bring up a few other things.

6          **THE COURT:**  Hmm?

7          **MS. DIAL:**  Could I approach and bring up just a few other

8     matters?

9          **THE COURT:**  Sure.  I reviewed your questions, proposed

10    voir dire questions, and I have to tell you, I don't think I've

11    ever thought as many as great a percentage of questions

12    proposed by counsel were appropriate as yours are.

13         So you're going to get, if not all, most all.  If I miss

14    something and you think it's important that I cover it, you can

15    ask to -- to bring it -- you can bring it to my attention.

16         **MS. DIAL:**  Thank you, Your Honor.  The first thing, we

17    have some updated stipulations.  The prior stipulation --

18         **THE COURT:**  Okay.

19         **MS. DIAL:**  -- that was filed was for the indictment, and

20    then the superseding needed to change that.

21         So the parties have already signed those.  I'll hand those

22    to Christy, if I may approach?

23         **THE COURT:**  Yes, ma'am.

24         **MS. DIAL:**  Christy?

25         **THE COURT:**  I've got stipulation, Defendant Goldesberry's

1    Indian status, and stipulation, Indian Country.

2        **MS. DIAL:**  Yes, Your Honor.

3        **THE COURT:**  These are new.  Hmm.  Are these the same ones

4    I have at Document 30 and 31?

5        **MS. DIAL:**  They're the same in substance, Your Honor.

6    There was a reference to just Count 1, and now there's a

7    superseding.

8        **THE COURT:**  Oh, okay.  Okay.

9        **MS. DIAL:**  And then the date is updated.  But the

10   substance remains the same.

11       **THE COURT:**  Now, I will read these to the jury when

12   requested by counsel.  And then I'll send them back to -- with

13   the exhibits.

14       **MS. DIAL:**  Thank you, Your Honor.  And the Government

15   doesn't have any preference on if we begin with those or if the

16   Court wants to read them at the end.  It doesn't really matter

17   to us when they're read in, if the Court has a preference.

18       **THE COURT:**  Ms. Brown, do you have a preference?

19       **MS. BROWN:**  I don't.

20       **THE COURT:**  Okay.  Well, I'll try to remember to do it

21   upfront.

22       **MS. DIAL:**  And we'll keep it on our to-do list as well,

23   Your Honor.

24       The other thing, if I could, just for the record, the

25   Government did make a final offer in this case.  And if I'm

1    permitted, I'd like to just make a record of that and record

2    that the defendant did decline that offer.

3        The Government, on March 17th, after learning of the --

4    of Kaitlyn's change in testimony that she was over 12, or her

5    anticipated testimony that she will say she was over 12 when

6    this occurred, the Government sent on March 17th, a final

7    offer to sexual abuse of a minor in Indian Country, 2243(a) --

8    18 U.S.C. 2243(a).

9        And as part of that offer, the Government offered to agree

10   to recommend a term of imprisonment of up to two years, or 24

11   months, and noted that that sentence falls below the

12   anticipated guideline range of 30 to 37 months, if the jury

13   finds him guilty of the over 12.  The Government believes that

14   there still will be sufficient evidence for the jury to

15   consider the under 12.  That carries a 30-year mandatory

16   minimum.

17       The Government's offer included that the defendant could

18   file variance or departure waivers and ask for any term of

19   imprisonment or none at all.  There was registration -- or sex

20   offender registration, but that was the limit of the jail time.

21   And then the Government also stated that supervision would just

22   be determined by the Court.  Previously, it had been a request

23   for lifetime supervision.

24       So that was the Government's final offer.  We did not

25   leave much time because filings were due.  It was essentially

1   about a day to decide.  And I believe the defendant did receive

2   that from his counsel and did reject that offer.  But we'd like

3   to put that on the record, if we could.

4        **THE COURT:**  Is that correct?

5        **MS. BROWN:**  That is accurate, and if Your Honor would like

6   to inquire of my client.

7        **THE COURT:**  I do.

8        Mr. Goldesberry, did you receive that offer?

9        **THE DEFENDANT:**  Yes, Your Honor, I did.

10       **THE COURT:**  You elected to decline it?

11       **THE DEFENDANT:**  Yes, Your Honor, I did.

12       **THE COURT:**  Anyone force you or threaten you or coerce you

13  in any way to do that?

14       **THE DEFENDANT:**  No, Your Honor.

15       **THE COURT:**  That was your decision and you -- and you made

16  it exercising your own free will?

17       **THE DEFENDANT:**  Yes, Your Honor.

18       **THE COURT:**  With the advice of counsel?

19       **THE DEFENDANT:**  Yes, Your Honor.

20       **THE COURT:**  Okay.

21       **MS. DIAL:**  Thank you, Your Honor.

22       The Government also wanted to give counsel and the Court a

23  heads-up.  The Government sent a number of e-mails.  We believe

24  that the defendant's expert, Stacia Alsabrook, lacks proper

25  notice and proper foundation.  We haven't received the basis of

1  her opinion.  We received a summary, but we have not received

2  her counseling notes.

3      She's been the family's counselor since January 2018.  And

4  the Government requested clarification on whether she would be

5  an expert after receiving the discovery.

6      We then requested two other times on March 14th and

7  March 25th, that if there were any records or reports in

8  support of her expert testimony, since at that point we'd just

9  received a summary of her -- a summary of that she had treated

10 the family and that she didn't believe there was anything bad

11 happening in the family, and her CV, we requested on

12 March 14th and March 24th that if the intent was to call

13 her as an expert, that the Government be -- be provided records

14 or reports in support of her expert testimony, including

15 therapy notes or treatment notes from the counseling sessions

16 which form the basis of and reasons for her opinion.

17     We've not received those.  So I anticipate the Government

18 will be objecting if she is presented as an expert, at the

19 proper time.

20     **THE COURT:**  What's her name?

21     **MS. DIAL:**  Stacia, S-t-a-c-i-a; Alsabrook,

22 A-l-s-a-b-r-o-o-k.

23     **THE COURT:**  Alsabrook.

24     **MS. BROWN:**  May I?  Your Honor, at this point, we do not

25 anticipate calling Stacia as an expert -- Miss Alsabrook as an

1    expert.  Initially, I had intended to.  And after conversations

2    with Miss Alsabrook, including after the Government requested

3    additional documentation, Miss Alsabrook's very firmly held

4    opinion and belief, based on her licensure guidelines, she

5    firmly believes that she is not entitled to testify as an

6    expert.

7        While I believe there are certainly legal mechanisms

8    through which I could actually establish her expertise, it

9    became challenging to get the records and notes that the

10   Government would be entitled to, were she to be an expert

11   witness.

12       My understanding from speaking at length with her and

13   Mrs. Goldesberry, the custodial parent of the minor child,

14   Kaitlyn, that Kaitlyn was uncomfortable with quite a bit of the

15   idea of the Government having access to her therapy records and

16   notes, which largely have nothing to do with the case at bar or

17   the issue before this Court, as the child as well as the rest

18   of the family began their therapy with Miss Alsabrook

19   significantly prior to the initiation of this case.

20       That said, actually as we've been in court this morning, I

21   received word from my office that Miss Alsabrook has suffered a

22   loss of a very close family member as of either late last night

23   or this morning.  I don't have details about that.  But I will

24   update the Court if there is some availability issue because I

25   don't really know details right now.

1          But it -- it sounds like there has been a loss in her

2    family.  I don't know if it's a -- a mother or a parent or a

3    child.  I really don't know.  But if we call Miss Alsabrook, it

4    would be as a fact witness to testify just with regard to the

5    confines of the statement that we turned over.

6          **MS. DIAL:**  If that's the case, Your Honor, and she's not

7    called as an expert, then her testimony becomes, again, more

8    like the character witnesses.  There were no disclosures made

9    to this counselor.

10         She, I anticipate, would just come and say that she's met

11   with the family for multiple years, and she has no concerns and

12   nobody ever told her about these allegations until DHS got

13   involved.  And she will come in and say what a great family

14   they are.

15         **THE COURT:**  Well, yeah.  I would be -- would it be

16   problematic if she said no one told her about these concerns,

17   and you didn't have access to her records?

18         **MS. DIAL:**  That would be problematic and --

19         **THE COURT:**  Would that be problematic, Ms. Brown?

20         **MS. BROWN:**  I don't believe so.  I -- I believe that if

21   she comes in and testifies like any other witness about when

22   she found out about these allegations and the circumstances

23   surrounding her finding out about the allegations, obviously

24   Kaitlyn had access to a counselor who I believe both Kaitlyn

25   and -- and Miss Alsabrook will say she trusted and confided in

1  and discussed various topics, including the loss and -- and

2  grieving that she was --

3       THE COURT:  If she comes, tell her to bring her records.

4       MS. BROWN:  I -- I'm sorry?

5       THE COURT:  If she comes, you tell her to bring her

6  complete file on this family.

7       MS. BROWN:  I will.  Thank you.

8       THE COURT:  I don't think she's going to come.  Sounds

9  like she's out of pocket.  But if she does, I'll hear your

10  argument on the notes.

11       MS. DIAL:  Thank you, Your Honor.  And the final thing --

12  and I apologize for having so many.  But the final thing is the

13  exhibits attached to motion -- the Defendant's Motion 51.  I

14  believe defense counsel was working to have those sealed.

15  Those were improperly filed publicly.  They're in violation of

16  the discovery order.

17       I did e-mail defense counsel.  She did respond saying that

18  she would get them sealed.  I don't believe they are yet.  And

19  those are the minor statements -- the minor's statements from

20  her forensic interview and from other meetings.  So if those

21  could be sealed per the discovery order, please.

22       MS. BROWN:  My office contacted the Court, and we were

23  advised that it was taken care of, this same day that -- that

24  Ms. Dial e-mailed me.

25       THE COURT:  Is Document 51 sealed?

1       **THE DEPUTY COURT CLERK:**  It appears to be sealed.

2       **MS. DIAL:**  The attachments are sealed?

3       **THE COURT:**  It is?

4       **MS. BROWN:**  Uh-huh.

5       **THE DEPUTY COURT CLERK:**  Yes.

6       **MS. BROWN:**  Thank you.

7       **THE DEPUTY COURT CLERK:**  Yes.

8       **THE COURT:**  Thank you, Miss Butler.

9       Anything else I can help you with?

10      **MS. BROWN:**  Yes, Your Honor.  In keeping in line with

11  that, the -- one of the proposed exhibits from the Government

12  is the affidavit that Kaitlyn signed.  The bulk of that

13  affidavit is specific hearsay that the Government has already

14  told the Court and defense today here in court that they are

15  not going to seek to admit.

16      So putting the affidavit into evidence at all would then

17  reopen that issue that we would need to argue about.  I

18  understand that when Kaitlyn's on the stand, the Government can

19  ask her did she sign an affidavit and, you know, what the

20  circumstances were, but if the affidavit itself is offered, we

21  object based on the fact that the purpose of the affidavit was

22  that nobody had bothered to ask Kaitlyn about all of these

23  other claims that Meagan had made.

24      DHS never asked.  The Government hadn't asked until I -- I

25  asked her about each and every claim that Meagan Bartlett had

1    made individually.  And then the ones that Kaitlyn expressly

2    denied saying or ever happening are outlined in the affidavit.

3    And so the affidavit itself is the crux of our objection.

4        Things that Meagan reported -- mar -- Meagan Bartlett

5    reported to DHS in her referral and in her interviews and then

6    continued to report to the Government later, these things that

7    the Government claims that they're not going to get into not

8    only because they're hearsay, but because they're 404(b) that

9    was not included in the notice, they -- then the affidavit

10   itself is inadmissible.

11       And I'm specifically referring to on Page 1 of the

12   two-page affidavit, "My dad asked me if I was naked when I'm

13   sleeping.  My dad told me if my mom wasn't in the picture, I'd

14   be his next choice.  My dad asked to touch me."  And so on and

15   so forth.

16       These are claims that Meagan Bartlett made that she --

17   Meagan Bartlett claims were disclosures from Kaitlyn that

18   Kaitlyn specifically denies and that the Government has

19   acknowledged are not admissible in this trial.

20       **MS. DIAL:**  First off, Your Honor, DHS did ask Kaitlyn

21   about the others.  I'm not sure if they asked specifically.

22   But the Government's known the whole time that Kaitlyn denies

23   all of these other allegations that Meagan -- that Miss

24   Bartlett says she did hear and that she did report.  We've

25   already narrowed down to what's most important.

1    The Government has no intention of sliding that document

2    in to get around the Court's ruling or our own stated

3    intention.  We're not getting into those.  It probably should

4    have been more properly marked as a prior statement.  There's a

5    number of statements on here that the Government isn't planning

6    to admit as evidence.

7    Notably, this is the defendant's affidavit that is

8    notarized by the defendant's -- or by defense counsel's legal

9    assistant, so it's ironic that the defense is trying to keep

10    out their own affidavit that I think was intended --

11    **THE COURT:**  Oh, I thought this was Kaitlyn's affidavit.

12    **MS. DIAL:**  It is, prepared by defense counsel and

13    notarized by defense counsel's legal assistant, Your Honor.

14    **THE COURT:**  Oh.

15    **MS. DIAL:**  When the minor had a meeting with defense

16    counsel --

17    **THE COURT:**  Well, doesn't matter.

18    **MS. DIAL:**  -- then that happened.

19    So if it becomes necessary to admit based on the

20    Government's view, I don't anticipate that.  If it did, we

21    would move to have it redacted.  I expect that Kaitlyn is going

22    to testify about the content, and it's more properly a prior

23    statement.

24    **THE COURT:**  Thank you, Miss Dial.

25    **MS. BROWN:**  Lastly, there are a couple of other incidents

1    that are peppered throughout Government's disclosures.  And

2    pursuant to their continuing duty to disclose, we have

3    continued to exchange production of discovery throughout last

4    week.

5         The defense just wants to ensure that either we need to

6    get a pretrial ruling or that there's an agreement by the

7    governor [sic] that the following is not admissible in this

8    case:  Any claim that Faith was sexually abused.  Any claim

9    that Raymond was sexually abused by his mother, so that would

10   be the defendant.  And any claims that Raymond and his sister

11   allegedly had a sexual relationship with each other at some

12   point in the past.  I -- are -- believe are not admissible.

13        **THE COURT:**  Okay.

14        You're not getting into any of that, are you?

15        **MS. DIAL:**  No, Your Honor.

16        **THE COURT:**  Okay.

17        **MS. BROWN:**  Great.

18        **THE COURT:**  Anything else?

19        **MS. BROWN:**  Not that I can think of at the moment, Judge.

20        **THE COURT:**  Okay.  Well, why don't you take a break, and

21   we'll get the jury seated and we'll begin.

22        **CSO:**  All rise.

23             (A recess was taken.)

24             (At this point in the trial, voir dire was conducted

25   and is filed under separate cover.)

1      **MS. DIAL:**  We had an issue with a witness.

2      **THE COURT:**  Oh.

3      **MS. DIAL:**  I'm fine beginning if the Court's all right

4  with him just coming in a little delayed.

5      **THE COURT:**  Tell me what you're saying again.

6      **MS. DIAL:**  My co-counsel stepped out for just a minute.

7  There was a problem with a witness, I believe.  So as long as

8  the Court's okay with him coming in quietly with the jury in.

9      **THE COURT:**  Yeah, that's fine.

10      **MS. DIAL:**  Okay.  Thank you.

11      **CSO:**  All right.

12      **THE COURT:**  Thank you.

13      **MS. DIAL:**  Uh-huh.

14          (Jury present.)

15      **THE COURT:**  Welcome back, ladies and gentlemen.  I hope

16  you had a comfortable lunch.  Were you able to find a place

17  nearby and --

18      **JUROR:**  Yes.

19      **THE COURT:**  I don't see heads shaking or nodding, but I

20  see smiles, so I guess you got lunch.

21      **JUROR:**  Yes.

22      **THE COURT:**  Okay.  Well, if my -- if the time wasn't

23  adequate, let me know and I'll try to -- I'll give you more

24  time next time.  But did anybod- -- have any of you heard

25  anything or talked to anybody about this case since you were

1  last in the courtroom?  If so, raise your hand.

2       Okay.  Now that you've been sworn, I'll give you

3  preliminary instructions to guide you in your participation in

4  the trial.

5       It will be your duty to find from the evidence what the

6  facts are.  You, and you alone, are the judges of the facts.

7  You will then have to apply those facts -- the law to those --

8  you'll -- then you will have to apply to those facts the law

9  the Court will give you.  You must follow that law whether you

10  agree with it or not.

11       Nothing the Court may say or do during the course of the

12  trial is intended to indicate, nor should be taken by you as

13  indicating, what your verdict should be.

14       The evidence from which you will find the facts will

15  consist of the testimony of witnesses, documents and other

16  things received into the record as exhibits, and any facts the

17  lawyers agree or stipulate to, or that the Court may instruct

18  you to find.

19       Certain things are not evidence and must not be considered

20  by you as evidence.  I'll list some of them for you now:

21       Statements and arguments and questions by lawyers are not

22  evidence.

23       Objections to questions are not evidence.  Lawyers have an

24  obligation to their client to make an objection when they

25  believe the evidence being offered is improper under the Rules

1    of Evidence.  You should not be influenced by the objection or

2    by the Court's ruling on it.  If the objection is sustained,

3    ignore the question.  If it is overruled, treat the answer like

4    any other.  If you are instructed that some item of evidence is

5    received for a limited purpose only, you must follow that

6    instruction.

7        Testimony that the Court has excluded or told you to

8    disregard is not evidence and must be -- and must not be

9    considered.

10       Anything you may have seen or heard outside the courtroom

11   is not evidence and must be disregarded.  You are to decide the

12   case solely on the evidence presented to you here in the

13   courtroom.

14       There are two kinds of evidence: direct and

15   circumstantial.  Direct evidence is direct proof of a fact,

16   such as testimony of an eyewitness.  Circumstantial evidence is

17   proof of facts from which you will -- you may infer or conclude

18   that other facts exist.  I'll give you further instructions on

19   these as well as other matters at the end of the case, but have

20   in mind that you may consider both kinds of evidence.

21       It will be up to you to decide which witnesses to believe,

22   which witnesses not to believe, and how much of any witness'

23   testimony to accept or reject.  I will give you some guidelines

24   for determining credibility of witnesses at the end of the

25   case.

1        Transcripts of witness' -- of witness testimony during

2   trial will not be available to you during your deliberations,

3   and you must rely on your own recollection of a witness'

4   testimony.  If any reference by the Court or counsel to the

5   witness' testimony conflicts with your own recollection, it is

6   your own recollection that should control during your

7   deliberations and not the statement of Court or counsel.

8        As you know, this is a criminal case.  There are three

9   basic rules about a criminal case that you must keep in mind.

10       First, the defendant is presumed innocent.  The indictment

11   against the defendant brought by the Government is only an

12   accusation, nothing more.  It's not proof of guilt or anything

13   else.  The defendant therefore starts out with a clean slate.

14       Second, the burden of proof is on the Government.  The

15   defendant has no burden to prove his innocence or to present

16   any evidence or to testify.  Since the defendant has the right

17   to remain silent, the law prohibits you in arriving at your

18   verdict from considering that the defendant may not have

19   testified.

20       Third, the Government must prove the defendant's guilt

21   beyond a reasonable doubt.  I will give you further instruction

22   on this point later, but bear in mind that, in this respect, a

23   criminal case is different from a civil case.

24       Now, a few words about your conduct as jurors.

25       First, I instruct you that during the trial, you're not to

discuss the case with anyone or permit anyone to discuss it

with you or remain within hearing of anyone discussing it.  If

anyone should try to talk to you about the case, bring it to

the Court's attention promptly.  If I'm not available, bring it

to the attention of one of the security officers.  Until you

retire to the jury room at the end of the case to deliberate on

your verdict, you're simply not to talk about this case.

Second, during the trial, you should not talk with or

speak to any of the parties, lawyers, or witnesses involved in

this case.  You should not even pass the time of day with any

of them.  It's important not only that you do justice in this

case, but you also give the appearance of doing justice.  If a

person from one side of the law sees you talking to a person

from the other side, even if it's simply to pass the time of

day, an unwarranted and unnecessary suspicion about your

fairness might be aroused.  If any lawyer, party, or witness

does not speak to you when you pass in the hall, ride the

elevator, and the like, it's because they're not supposed to

talk or visit with you.  Do not be offended.

Third, do not read or listen to anything touching on this

case in any way.  Do not read any newspaper article, listen to

any radio broadcast, or view any television program which

discusses the case.

Fourth, do not try to reach -- or make any investigation

about the case on your own.  You as jurors must decide this

1    case based solely on the evidence presented here within the

2    four walls of this courtroom.  This means that during the

3    trial, you must not conduct any independent research about this

4    case, the matters in the case, and the individuals or

5    corporations involved in the case.  In other words, you should

6    not consult dictionaries or reference materials, search the

7    Internet, websites, blogs, or any other electronic tools to

8    obtain information about this case or help you decide the case.

9    Please do not try to find out information from any source

10   outside the confines of this courtroom.

11       Until you retire to deliberate, you may not discuss this

12   case with anyone, even your fellow jurors.  After you retire to

13   deliberate, you may begin discussing the case with your fellow

14   jurors, but you cannot discuss the case with anyone else until

15   you've returned a verdict and the case is at an end.

16       I know that many of you use cellphones, the Internet,

17   laptops, and other tools of technology.  You also must not talk

18   to anyone at any time about this case or use those tools to

19   communicate electronic -- electronically with anyone about the

20   case.  This includes your family and friends.

21       You may not communicate with anyone about the case through

22   e-mail, cellphone, text messaging, or through any blog,

23   website, social media sites, or apps.  You may not use any

24   technology related to communication, even if I have not

25   specifically mentioned it here.  I expect you will inform me as

1  soon as you become aware of another juror's violation of these
2  instructions.

3       Finally, do not form any opinion until the evidence is in.
4  Keep an open mind until you start your deliberations at the end
5  of the case.

6       A question sometimes arises as to whether individual
7  jurors will be permitted to take notes during the trial.  If
8  you would like to take notes, you may.  On the other hand, of
9  course, you're not required to take notes if you don't want to.
10 That'll be left up to you individually.  If you do not take --
11 I'm sorry.  If you do take notes, leave them in the jury room
12 when you leave at night.

13      Take notes sparingly.  Do not try to write down all the
14 testimony.  The notes will be used only for the purpose of
15 refreshing your memory.  They are helpful when dealing with
16 measurements and times, distances, identities, and
17 relationships.  And remember they're for your own personal use.
18 They're not to be given or read to anyone else.

19      Be brief in your note taking.  You must pass on the
20 credibility of the witnesses and do not -- and to do so, you
21 must observe them.  Be careful not to get so involved in note
22 taking that you become distracted from the ongoing proceedings.

23      Also, your notes should be used only as aids to your
24 memory, and if your memory should later differ from your notes,
25 you should rely on your memory and not your notes.  If you do

1    not take notes, you should rely on your own independent

2    recollection or memory of what the testimony was, and you

3    should not be unduly influenced by the notes of other jurors.

4         Notes are not entitled to any greater weight than the

5    recollection or impression of each juror as to what the

6    testimony was.

7         In a few minutes, the trial will begin.  The Government

8    will make an opening statement, which is simply an outline to

9    help you understand the evidence as it comes in.  Next, the

10   defendant may but does not have to make an opening statement.

11   Opening statements are neither evidence nor arguments.

12        The Government will then present its witnesses, and

13   counsel for the defendant may cross-examine him -- -examine

14   them.  Following the Government's case, the defendant may, if

15   he wishes, present witnesses who the Government may

16   cross-examine.

17        After all the evidence is in, I will instruct you on the

18   law, and then the attorneys will present their closing

19   arguments to summarize and interpret the evidence for you.

20        After that you'll retire to deliberate on your verdict.

21        Ms. Dial, you ready to proceed?

22        **MS. DIAL:**  Yes, Your Honor.

23        "Dad."  Kaitlyn was just a kid, 11, maybe 12.  She was in

24   her parents' bedroom in her parents' bed because she'd had a

25   nightmare.  Mom wasn't there.  Just Dad.  And her dad's fingers

1    were inside of her vagina, moving, stimulating, touching her
2    until she reacted, "Dad."

3        When Kaitlyn reacted, he stopped.  Kaitlyn kept this
4    secret for years.  She didn't tell her mom, her sister, her
5    counselor, for years.  When Kaitlyn was 14, she let the secret
6    out, and she confided in a young adult friend, Meagan Bartlett.
7    Meagan asked Meagan's dad, a former police officer, what to do.
8    He said she had to report it to Child Protective Services.  So
9    Meagan did.

10       After Meagan reported what Kaitlyn had said, a forensic
11   interviewer talked to Kaitlyn.  In her forensic interview,
12   Kaitlyn told the secret again.  One time, some years ago, she'd
13   climbed into her parents' bed because she'd had a nightmare.
14   Mom wasn't there, but Dad was.  And Dad was touching her
15   with -- with his hands underneath her underwear.

16       The evidence in this case will show that when Kaitlyn was
17   11 or 12, the defendant touched her and put his fingers inside
18   her genitals with sexual intent.  Kaitlyn reacted to her father
19   putting his fingers inside of her, "Dad."

20       When Kaitlyn reacted, the defendant stopped.  In this
21   trial, you're going to hear from Kaitlyn.  Kaitlyn is now 16
22   years old, and she's very angry.  But not at her father.  She
23   doesn't want to be here today.  She didn't want her dad to get
24   into trouble.  She doesn't want any of this.  Angry or sad or
25   furious, Kaitlyn is going to tell you what happened.

1    But the evidence doesn't stop with Kaitlyn.  You won't

2   have to just rely on Kaitlyn's statements because you're also

3   going to hear from Brenna Gusman, the Child Protective Services

4   worker that investigated this matter two years ago when Kaitlyn

5   was 14.

6    Brenna is going to tell you about her interview with the

7   defendant back in 2020, and Brenna Gusman, the CPS worker, is

8   going to tell you about the defendant's admission.  You will

9   hear that in 2020, when Kaitlyn was 14, the defendant was

10  confronted with what Kaitlyn said he'd done to her years prior.

11    Confronted with this allegation, you'll hear the defendant

12  admitted he had put his fingers inside Kaitlyn.  But you'll

13  hear he told CPS investigator, Brenna Gusman, it was all just

14  an accident.  You'll hear that the defendant described to

15  Brenna Gusman, those many years later, this accident.

16    You're going to hear he told Brenna, the CPS investigator,

17  that he made it past Kaitlyn's shorts and panties and began to

18  stimulate and got his fingers past her labia majora.  You'll

19  hear he asked Brenna Gusman, the CPS worker, if it counted as

20  penetration if his fingers only made it past Kaitlyn's labia

21  majora.

22    You'll hear he admitted to Brenna Gusman he kept going,

23  touching Kaitlyn.  That when his hand was inside of Kaitlyn, he

24  heard her say, "Dad."

25    Brenna Gusman will tell you that the defendant explained

1  that it was just an accident.  That he'd been half-asleep.

2  That he thought Kaitlyn was his wife, only -- that he'd only

3  realized his mistake when Kaitlyn exclaimed, "Dad."

4      Only then, he told Brenna, did he fully wake up.  You'll

5  hear he talked to -- that he admitted to Brenna Gusman that he

6  talked to Kaitlyn after that incident.  He told Kaitlyn he'd

7  been half-asleep.  He'd told Kaitlyn it was a mistake.  And

8  they never spoke of it again, and he never told his wife of

9  more than 20 years.  He never told anyone until Child

10  Protective Services showed up at the door years later.

11      In this trial, there really are only two questions at

12  issue that you're going to have to answer.

13      First, how old was Kaitlyn when this happened?  You'll

14  hear when Kaitlyn was 14, that, in her forensic interview, she

15  said it happened some years before.  You'll hear that the

16  defendant told CPS workers it happened about three years prior

17  to Kaitlyn being 14, about when she was 11.  But you'll also

18  hear that recently, Kaitlyn determined this all happened when

19  she was 12.  When you hear from Kaitlyn today, listen for when

20  and why she suddenly remembered she was actually 12 when her

21  dad put his fingers inside her -- put his fingers inside her

22  vagina.

23      The second question at issue for you to decide during this

24  trial is what was the defendant's intent?  What was his motive?

25  Was it all just an accident, or did the defendant intend to

1    sexually abuse Kaitlyn when she was in the bed alone with him?
2    As you consider this question and listen to the evidence, focus
3    on the defendant.  The defendant put his fingers inside
4    Kaitlyn.  The defendant didn't stop until Kaitlyn exclaimed,
5    "Dad."

6        The defendant told Brenna Gusman that he talked to Kaitlyn
7    for 45 minutes afterwards but never told his wife.  When it all
8    came out years later, it was the defendant when confronted with
9    this allegation that said, "Yes, but it was a mistake."

10       Listen to the evidence and focus on the defendant.  At the
11   end of this trial, you'll be asked to decide if the defendant
12   knowingly touched Kaitlyn's genitals with the intent to abuse,
13   arouse, or gratify sexual desire.  When you hear from Kaitlyn
14   today, pay attention to her body language.  Consider why she is
15   angry.

16       You're going to hear from others: former friends, family,
17   CPS workers, the forensic interviewer.  Of course, listen to
18   all of the evidence.  Weigh all of the evidence.  But focus on
19   the defendant.  All of the witnesses will give you a picture of
20   what happened after Kaitlyn disclosed what her father had done
21   to her.

22       All of the witness' testimony is for you to consider and
23   weigh.  But don't be distracted by diversions or sidepaths
24   in none -- in this trial.  None of those other witnesses were
25   there.  Only Kaitlyn and the defendant were in that room, in

1  that bed alone, when the defendant made it past Kaitlyn's

2  shorts and panties and began to stimulate and got his fingers

3  past her labia majora.

4      And at the heart of it all, Kaitlyn says her dad put his

5  fingers inside her vagina.  The defendant says he put his

6  fingers inside his daughter's genitals.  And the defendant is

7  the one that told Kaitlyn it was an accident.  Focus on his

8  actions afterwards to understand and determine his intent.

9      At the end of the trial, after you've seen and heard all

10  of the evidence, we'll talk to you again.  We'll ask you to see

11  through the defendant's excuses.  This was not a half-asleep

12  accident.  The defendant seized an opportunity and knowingly

13  touched his young daughter's vagina.

14      We'll ask you to find that Raymond Goldesberry is guilty

15  of sexually abusing Kaitlyn.  That when he put his fingers into

16  his daughter's genitals, it was no mistake.

17      **MS. BROWN:**  Memorial Day weekend, 2020, this is May, right

18  after COVID lockdown really hit.  Schools were out.  Most

19  people were home from work.  It was a different time than we

20  were used to.  So Kaitlyn Goldesberry goes with her friend,

21  Meagan Bartlett, who is an adult, to Miami to get away.

22      When they went to Miami, Oklahoma, Kaitlyn's going to tell

23  you that what was on her mind at the time was all the things

24  that were going wrong in her life.  She has been bullied at

25  school extensively.  It wasn't something that was new.  She'll

1    tell you it's happened at every single school she's been to,

2    and she thinks her classmates are evil little pricks.

3         She'll tell you that her classmates body shame her, and

4    that the only friend she had at school was turned against her

5    by the bullies.  That was weighing heavily on her mind that

6    weekend that she was with Meagan.

7         Kaitlyn Goldesberry has been in therapy with a woman by

8    the name of Stacia Alsabrook for many years.  The reason that

9    Kaitlyn started therapy has nothing to do with what brings us

10   to court today.

11        Kaitlyn was not only suffering from the bullying and the

12   body shaming from her peers and classmates.  She had lost her

13   grandmother and her grandfather close in time, and she was

14   extraordinarily close to both of them.  That was also something

15   that was weighing heavily on Kaitlyn's mind when she was in

16   Miami on Memorial Day weekend with Meagan Bartlett.

17        And so while the girls were in Miami, Kaitlyn tells Meagan

18   about one incident that happened a couple years back with her

19   dad.  Kaitlyn will tell you that it was the most embarrassing

20   thing that ever happened to her, and that she never wanted to

21   talk about it.  And she tried not to think about it because,

22   let's be honest, no matter what age a little girl is, if her

23   vagina is touched in what appears to be a sexual manner by her

24   father, that's going to be upsetting.  That's going to be

25   either traumatizing or embarrassing or upsetting.

1    And what Kaitlyn's going to tell you is that when she

2    talked to her friend, Meagan Bartlett, about this one incident

3    that happened, that she hadn't told anyone before.  But the

4    very first time she told someone, which was Meagan Bartlett, in

5    May of 2020, she said that it -- it had been an accident or a

6    mistake.

7    She explained that she had crawled into bed with her dad

8    in the middle of the night because she'd had a nightmare.  She

9    didn't wake her dad up to tell her dad she was in bed with him.

10    She didn't, in any way, let him know that during the course of

11    the time that he was sleeping, his wife, Michelle, had gotten

12    out of bed and left the house, and in her place, his daughter,

13    Kaitlyn, was laying where Mr. Goldber- -- Goldesberry's wife is

14    always in bed with him.

15    You're going to hear from Mrs. Goldesberry, Michelle,

16    Raymond's wife.  And she's going to tell you that throughout

17    the course of the 20 years that they've been married, it's not

18    at all uncommon for Raymond to wake up -- or wake her up by

19    stimulating her manually, whether it's vaginally or on her

20    breasts, in an effort to initiate a sexual encounter with his

21    wife.

22    Mrs. Goldesberry's going to tell you that there's times

23    when she, you know, consented or acquiesced, and they had a

24    sexual encounter as husband and wife.  She's going to tell you

25    there's times when she wasn't in the mood or just wanted to

1   sleep, and Mr. Goldesberry respected her wishes and left her

2   alone.

3        You're going to see when you see these two women -- or

4   Kaitlyn's a young lady, and her mother, Michelle, they are not

5   currently the same size weight-wise.  But back in 2017, the

6   year thereabouts that this is alleged to have occurred, they

7   were the same size.  Michelle has lost some weight, and Kaitlyn

8   has gained some weight.

9        They were approximately the same height at the time, and

10  their hair was approximately the same length and style.  You're

11  going to hear that in Mr. and Mrs. Goldesberry's bedroom, there

12  are blackout curtains that make it extraordinarily dark in that

13  room, and that whether it's midnight or noon, it's dark in that

14  room when the curtains are drawn and the lights are off.

15       When Kaitlyn Goldesberry told Meagan Bartlett about this

16  incident that occurred, Meagan flipped out, and she called Mr.

17  Goldesberry a rapist and she got really upset.  This was not

18  the reaction that Kaitlyn was expecting, and she was shocked to

19  find out later that Meagan Bartlett had not only told Meagan

20  Bartlett's father, Nathan Bartlett, but had also called Child

21  Protective Services and reported the family, which opened an

22  investigation that brings us here today.

23       Kaitlyn's going to tell you that she never told Meagan or

24  anybody else that this was something that was intentionally

25  sexually directed at her, but rather that she knew from the

1   very beginning that this was a mistaken-identity situation.  I

2   agree with the Government that the -- the testimony and the

3   evidence is going to be that Raymond realized that it was his

4   daughter and not his wife in bed when he heard his daughter

5   say, "Dad."

6       That's what caused him to be aware that he was, in fact,

7   in bed with his daughter and not his wife, and the horror that

8   he discovered that he had been touching his daughter and not

9   his wife.  Obviously, Mr. Goldesberry was also ashamed and

10  embarrassed and upset about this incident, and naturally, he

11  talked to his daughter about it.

12      He did say that, by his recollection, they probably talked

13  about it for 45 minutes.  But what everyone is going to tell

14  you, both Kaitlyn and I believe you're going to hear that Mr.

15  Goldesberry told Miss Gusman, that it was Kaitlyn who didn't

16  want anybody to know.  Raymond Goldesberry never told his

17  daughter to keep this a secret.

18      He never told his daughter not to tell her therapist,

19  Stacia, or not to tell her mother, Michelle, or her older

20  sister, Faith, or any of her friends.  Mr. Goldesberry never

21  asked Kaitlyn to keep this a secret.  Kaitlyn begged her father

22  to keep it a secret, never speak of it again.  Never tell

23  anybody about it.

24      Just pretend it didn't happen, and Kaitlyn tried to do

25  that.  Just pretend it never happened.  That is why nobody

1    found out about it until Meagan called CPS in May of 2020.

2    That Sunday of the Memorial Day weekend, May 24th, 2020,

3    Kaitlyn brings Meagan back to Tulsa from their trip to Miami.

4         That night, Meagan Bartlett had brought her boyfriend,

5    John Mahan, along with her.  And the Goldesberrys, Mr. and

6    Mrs. Goldesberry, along with both of their daughters, Kaitlyn

7    the youngest, and Faith the older, along with Meagan and her

8    boyfriend, were all at the Goldesberry home that Sunday night

9    before Memorial Day.  They were playing a game.

10        Meagan and Kaitlyn were both acting a little strange.  I

11   believe the testimony and evidence will show that Faith knew

12   something weird was going on.  And at some point, Kaitlyn and

13   her mother go back into a bedroom and have a private

14   conversation.  Meagan Bartlett and Faith Goldesberry, the

15   friend and older sister, were not privy to that conversation.

16        They don't have any idea what Michelle and Kaitlyn talked

17   about as mother and daughter in that bedroom.  But they will

18   both tell you, when they testify, that Kaitlyn was talking to

19   her mom about the fact that she's been cutting.  Kaitlyn had

20   been cutting her ankles and cutting her legs, largely due to

21   the bullying that she'd been suffering.

22        That was something that she hadn't been comfortable

23   telling her mother before, but her mother could see the cuts on

24   her ankle as she disclosed this to her mother back in the

25   bedroom that night.  Prior to that private conversation between

1    Kaitlyn and her mother, the group had decided to order pizza.

2        And while Kaitlyn and Michelle were in the back bedroom

3    talking, Mrs. Goldesberry, Michelle, got an alert that the

4    pizza was ready.  So she said she needed to go pick it up, and

5    Kaitlyn wanted to go with her.  So the two of them continued

6    their private mother/daughter conversation as they left to go

7    to Domino's and get pizza and bring the food back to the family

8    and friends.

9        Ultimately, Faith, the older sister, pulled Meagan

10    Bartlett, the friend, aside and said, "I know something's going

11    on.  You know, please disclose to me, please tell me what's

12    going on."

13        And Meagan wouldn't tell her.  Faith will tell you that

14    she felt like something was wrong, and she couldn't figure out

15    what it was.  And that by the end of that night into the next

16    day, she still didn't know anything about what had happened

17    between her little sister and her father.

18        Meagan Bartlett invited both Goldesberry girls that night

19    to return to Miami with her and go to her dad's house, Nathan

20    Bartlett's house.  Faith, not knowing what was going on in the

21    home or with her sister and her father, went ahead and -- and

22    took her friend up on the offer, and Kaitlyn declined to go.

23        She didn't want to go back to Miami and be with Meagan.

24    She wanted to stay at home with her mom and her dad.  And so on

25    Sunday night, the night before Memorial Day, this time Kait- --

1    Faith and Meagan go to Miami.

2         Unbeknownst to anyone in the Goldesberry family, including

3    Kaitlyn and Faith who was in -- with Mia- -- Meagan in Miami,

4    Meagan Bartlett went to her father's office where he was a

5    campus resource officer for NEO, and she called CPS and

6    reported the information that she believed she needed to report

7    to CPS.

8         Meagan doesn't tell Faith or anybody else in the

9    Goldesberry family that she's done this, and so everything goes

10    on in that week, business as usual.  Raymond and Michelle go to

11    work.  Kaitlyn is at home in Tulsa.  Faith is with Meagan in

12    Miami.

13         And Faith will tell you that it was largely just a

14    decompressing weekend, that Meagan didn't attempt to talk to

15    Faith about either her little sister, Kaitlyn, or their dad,

16    Raymond.  And that Faith and Meagan returned from Miami,

17    Oklahoma, back to Tulsa, on Thursday, May 28th, 2020.

18         On the way back -- because it wasn't just Kaitlyn who'd

19    been going through some stuff in her life at that time, Meagan

20    was as well -- Nathan Bartlett and Meagan Bartlett had Faith,

21    Mr. Goldesberry's older daughter, in the car with them, and

22    they stopped at the hospital on their way back into town to

23    visit Meagan Bartlett's mother, Nathan Bartlett's ex-wife,

24    because she had attempted suicide and was in the hospital.

25         So Meagan also had stuff going on.  And for that couple of

1    hours where they were visiting Nikkie Bartlett in the hospital,

2    Faith was left alone in the hot car.  Remember it's May in

3    Oklahoma.  Because of COVID protocols and the fact that she

4    wasn't family, she wasn't allowed into the hospital.

5        While Faith is waiting for Meagan and Nathan Bartlett to

6    come back out of the hospital so they can take her home, she

7    gets a call from her mother, Michelle Goldesberry, who has just

8    been contacted by phone by DHS, Brenna Gusman, and informed

9    about this incident that happened between Kaitlyn and Raymond a

10   couple of years prior.

11       Understandably, Michelle is confused about what's going on

12   and why DHS or CPS is in her life.  Of course, she's confused

13   and doesn't understand why this is something she didn't know

14   anything about.  And she wants Faith to come on home so that

15   they can all figure out what the heck is going on.

16       Michelle had been at work when she got that call, so she

17   starts heading back to the house.  At this point, Faith starts

18   frantically trying to get ahold of Meagan Bartlett so that they

19   can come down out of the hospital and take her back to her

20   house so she can find out what's going on with her family.  And

21   everybody arrives at the house about the same time.

22       Raymond was there.  Michelle came home from work.  Kaitlyn

23   was there.  Faith, Meagan, and Nathan joined the Goldesberry

24   family, and a confrontation occurred.  Mr. Goldesberry,

25   Raymond, my client, was out in his shop, which is detached from

1    the -- the home itself where he works on his cars.  And Nathan

2    Bartlett went to confront Raymond.

3         **THE COURT:**  Please use surnames.

4         **MS. BROWN:**  I'm sorry.  Thank you.

5         Mr. Bartlett went to confront Mr. Goldesberry.  And Mr.

6    Goldesberry was crying because he was being confron- --

7    confronted by his long-time --

8         **THE COURT:**  Miss Brown, your time is up.

9         **MS. BROWN:**  -- friend.

10        Thank you.

11        **THE COURT:**  Who's your first -- oh, let me get -- let me

12   first, ladies and gentlemen, read stipulations that have been

13   reached by the parties.

14        The first stipulation:  Indian Country.  United States of

15   America, represented by Chantelle Dial, Assistant United States

16   Attorney, and Defendant, Raymond Lee Goldesberry, represented

17   by Andrea Brown, hereby stipulate and agree that at all times

18   relevant to the charges in this case, the location of the crime

19   alleged in the superseding indictment, 1335 South 119th East

20   Avenue, Tulsa, Oklahoma, was within the Northern District of

21   Oklahoma and within the Muscogee (Creek) Nation Indian

22   reservation and thus in Indian Country, pursuant to 18 U.S.C.,

23   Section 1151.

24        Therefore, because all parties agree that 1335 South

25   119th East Avenue, Tulsa, Oklahoma, is within Indian Country,

1  this element is proven beyond a reasonable doubt, and the

2  Government need not present additional evidence that this

3  location is within Indian Country in the Northern District of

4  Oklahoma.

5       And that's signed by Chantelle Dial, Raymond Lee

6  Goldesberry, and Andrea Brown.

7       Stipulation:  Defendant Goldesberry's Indian Status.  The

8  United States of America, represented by Chantelle Dial,

9  Assistant United States Attorney, and Defendant, Raymond Lee

10 Goldesberry, represented by Andrea Brown, hereby stipulate and

11 agree that at all times relevant to the charges in this case,

12 Raymond Lee Goldesberry was -- was and is a member of the

13 Cherokee Nation, a federally recognized Indian tribe, with some

14 quantum of Indian blood and therefore is an Indian person.

15      Therefore, because the parties agree that the defendant,

16 Goldesberry, is Indian, this element is proven beyond a

17 reasonable doubt, and the Government need not present

18 additional evidence that Defendant Goldesberry is Indian.

19      It's dated 28th of March 19 -- 2022.  Signed Chantelle

20 Dial, Assistant United States Attorney; Raymond Lee

21 Goldesberry, Defendant; and Andrea Brown, attorney for

22 Defendant Goldesberry.

23      You may proceed.

24      **MS. DIAL:**  Thank you, Your Honor.  The Gov- --

25      **THE COURT:**  Who's your first witness?

1    **MS. DIAL:**  The Government calls Kaitlyn Goldesberry.

2    Christy?

3    **THE DEPUTY COURT CLERK:**  Ma'am, if you'll come forward

4    right here, I'll swear you in, please.

5    **MISS GOLDESBERRY:**  Oh, in here?

6    **THE DEPUTY COURT CLERK:**  Right here.

7    **MISS GOLDESBERRY:**  Okay.

8    **THE DEPUTY COURT CLERK:**  That'll be great.  Thank you.

9    Please raise your right hand.

10          (Witness sworn.)

11    **THE WITNESS:**  I swear.

12    **THE DEPUTY COURT CLERK:**  Thank you.

13    **THE WITNESS:**  Okay.

14    **THE DEPUTY COURT CLERK:**  You may sit in the witness stand,

15    and then adjust the mic as you need to.

16    **THE WITNESS:**  Okay.

17    **THE COURT:**  What is your full name?

18    **THE WITNESS:**  Kaitlyn Marie Goldesberry.

19    **THE COURT:**  How do you spell your first name?

20    **THE WITNESS:**  K-a-i-t-l-y-n.

21    **THE COURT:**  And your last name?

22    **THE WITNESS:**  G-o-l-d-e-s-b-e-r-r-y.

23    **THE COURT:**  Okay.

24    You may inquire.

25    **MS. DIAL:**  Thank you, Your Honor.

1    　　　　　　KAITLYN MARIE GOLDESBERRY, called as a witness

2    herein, having been first duly sworn on oath, was examined and

3    testified as follows:

4    　　　　　　　　　　　　DIRECT EXAMINATION

5    BY MS. DIAL:

6    Q    Kaitlyn, where do you live?

7    A    At 1335 South 119th East Avenue.

8    Q    Is that in Tulsa?

9    A    Yes.

10   Q    How long have you lived there?

11   A    Around 16 years.

12   Q    Basically your whole life?

13   A    Took my first steps there.

14   Q    So how old are you right now?

15   A    Sixteen.

16   Q    When's your date of birth?

17   A    9/14/05.

18   Q    Are you in high school?

19   A    Yes.

20   Q    Where at?

21   A    Catoosa High School.

22   Q    And what grade?

23   A    Tenth.

24   Q    Do you have a favorite subject?

25   A    Math.

```
 1    Q    Do you have a least favorite subject?

 2    A    English.

 3    Q    Let's talk about your immediate family for a minute.  Do

 4  you have any siblings?

 5    A    Yes.

 6    Q    Who are your siblings?

 7    A    Faith Goldesberry.

 8    Q    Do you know how old Faith is?

 9    A    Yes.  She's about to be 21.

10    Q    Do you know Faith's date of birth?

11    A    Yes.  7/26/01.

12    Q    And who's your mom?

13    A    Michelle Goldesberry.

14    Q    Do you know how old your mom is?

15    A    Thirty-four, I believe?

16    Q    Who's your dad?

17    A    Raymond Goldesberry.

18    Q    Do you know how old your dad is?

19    A    No, not 34 -- my mom.  I think my mom is like 42, 40, 41?

20  I don't keep up with it.

21    Q    That's okay.  So you think -- do you think both your

22  parents are in their forties?

23    A    Yes.

24    Q    Do you see your dad here today?

25    A    Yes.
```

```
 1   Q    Where is he at?

 2   A    Behind you, I believe.

 3   Q    Can you describe something he's wearing?

 4   A    He is wearing a suit jacket, and I can't really see the

 5   rest.

 6   Q    Is he at counsel table with Andrea?

 7   A    Yes.

 8   Q    Or Miss Brown?

 9        MS. BROWN:  We'll stipulate --

10        THE WITNESS:  Uh-huh.

11        MS. BROWN:  -- to identity.

12        MS. DIAL:  Pardon?

13        MS. BROWN:  We --

14        THE COURT:  I'm sorry?

15        MS. BROWN:  We have no issue with the identification.

16   Q    (By Ms. Dial) Are your parents married?

17   A    Yes.

18   Q    How long have they been married?

19   A    Almost 21 -- 22 years?

20   Q    Do you live with anybody else?

21   A    Not currently.

22   Q    How do you feel about your family, Kaitlyn?

23   A    I love them dearly.

24   Q    Would you describe -- how would you describe your family?

25   A    As -- I don't know.  Basically just happy family, just --
```

1    I love them.

2    Q    Do you want to be here today?

3    A    Absolutely not.

4    Q    Why not?

5    A    Because I believe this whole situation is absolutely

6    ridiculous.

7    Q    We're going to get to that.

8         Have you and I met before today?

9    A    Yes.

10   Q    Do you remember when we first met?

11   A    I believe it was 16th.

12   Q    Of this month?

13   A    Uh-huh.

14   Q    And when we met, do you remember who else was there?

15   A    David Young and Shena and there was someone else that --

16   Q    Was it my co-counsel, Kyle?

17   A    Yes.

18   Q    Who's Shena?

19   A    Shena is my guardian ad litem.

20   Q    She's like your own attorney; right?

21   A    Yes.

22   Q    And did we meet after the March 16th time?

23   A    Yes.

24   Q    How many times?

25   A    Once.

1    Q    Do you remember when Shena became your attorney?

2    A    Yes.  We met on the 16th before I met you.

3    Q    Kaitlyn, do you know your dad's defense attorney?

4    A    Yes.

5    Q    What's her name?

6    A    Andrea Brown.

7    Q    Have you met with her before today?

8    A    Yes.

9    Q    How many times?

10    A    One occasion.

11    Q    And how long did that time last?

12    A    Anywhere from three to four hours, I presume?

13    Q    Was that before Shena was your attorney?

14    A    Yes.

15    Q    Do you remember who was at that meeting with Miss Brown?

16    A    My mom and my sister.

17    Q    And did An- -- did Miss Brown show you and your family

18    the evidence the Government had sent to her in this case?

19    A    Yes.

20    Q    Did she show you family photos?

21    A    A few.

22    Q    All right.  Let --

23    A    I glanced at them.

24    Q    You glanced at them?

25    A    Uh-huh.

1   Q   Let's look at some of those.  So I believe there is a

2   white notebook to the side of you.  If you can open it up to

3   the first tab, No. 1.

4   A   Yes.

5   Q   Do you recognize the people in this photo?

6   A   Yes.  It is my mom, my sister, and myself.

7        **MS. BROWN:**  Your Honor, I don't have a copy of what

8   they're looking at in front of me.

9        **MS. DIAL:**  Did you give her --

10        **MS. BROWN:**  I didn't get a binder from the Government.

11            (Discussion held off the record.)

12        **MS. BROWN:**  Thanks.

13        **MS. DIAL:**  Uh-huh.

14        I apologize for that, Your Honor.

15   Q   (By Ms. Dial) Government's Exhibit 1.

16   A   Okay.

17        **THE WITNESS:**  Your Honor, is there any way I could have

18   water?  I just had an oral surgery.

19        Thank you.

20        **THE DEPUTY COURT CLERK:**  Uh-huh.

21   Q   (By Ms. Dial) Are you ready, Kaitlyn?

22   A   Uh-huh.

23   Q   Okay.  So looking at Government's Exhibit 1, do you

24   recognize the people in this photo?

25   A   Yes.

1    Q    Who are the people?

2    A    Myself, my mom, and my sister --

3    Q    Do you know --

4    A    -- and --

5    Q    -- what day or what event this was?

6    A    I do not.

7    Q    Looking at the photo, can you determine what day or event

8    it was?

9    A    No.

10    Q    At the top of the photo, is there a date?

11    A    Yes.

12    Q    What's the date?

13    A    July 4th, 2 -- 2016.

14    Q    So how old were you in July 2016?  Do you know?

15    A    I would be 10, almost 11.

16    Q    'Cause your birthday's in September?

17    A    Yes.

18    Q    Is this photo a fair depiction of you and your mom and

19    sister in July 2016?  Is that what you guys looked like in

20    2016?

21    A    Not exactly.

22    Q    Okay.  How is it different?

23    A    Oh, I'm sorry; I misunderstood.

24    Q    That's okay.  I can ask it again.

25         How -- is this photo a fair representation, does it look

1    like what you guys looked like in 20 -- July 2016?

2    A    I mean, yes.  I had my hair up.

3    Q    Your hair's up in the photo?

4    A    Yeah.  So you have no --

5    Q    Okay.

6    A    -- idea how long it is.

7         MS. DIAL:  Your Honor, the Government would move to admit

8    Government's Exhibit No. 1.

9         THE COURT:  One's receive -- 1 for identification is

10   received as Government's Exhibit 1 in evidence.

11        MS. DIAL:  May I publish to the jury?

12        THE COURT:  The motion is granted.

13             (Government's Exhibit No. 1 published to the jury.)

14   Q    (By Ms. Dial) So, Kaitlyn, I think -- oops, let me zoom

15   out a little bit more.

16        You said that you were about 10, almost 11 in this photo?

17   A    Yes.

18   Q    What color shirt are you wearing in the photo?

19   A    Blue.

20   Q    And your mom is wearing what color?

21   A    White.

22   Q    And your sister?

23   A    Red.

24   Q    All right.  Now, if you could turn to Government's

25   Exhibit No. 2.

1    A    Oop.

2    Q    Do you recognize the people in this photo?

3    A    Yes.

4    Q    Who is it?

5    A    My sister and I.

6    Q    And looking at the photo, can you tell what date?

7    A    Yes.

8    Q    It --

9    A    August 18th, 2016.

10    Q    How old were you in August 18, 2016?

11    A    Still ten.

12    Q    Is this about a month before your birthday?

13    A    Yes.

14    Q    And again, like before, is this picture -- does it look

15    like what you guys looked like when you were that age?

16    A    Yes.

17    Q    Yes?

18    A    Uh-huh.

19        **MS. DIAL:**  Your Honor, the Government moves to admit and

20    offer Government's Exhibit No. 2.

21        **THE COURT:**  Exhibit 2 for identification is received as

22    Government's Exhibit 2 and in evidence.

23        **MS. DIAL:**  And may I publish to the jury?

24        **THE COURT:**  The motion's granted.

25        **MS. DIAL:**  Thank you.

```
 1                (Government's Exhibit No. 2 published to the jury.)
 2    Q    (By Ms. Dial) So, Kaitlyn, looking at No. 2, who's the
 3    person with the longer hair?
 4    A    My sister.
 5    Q    And that's Faith; right?
 6    A    Yes.
 7    Q    And so you've got the shorter hair.  And this is, again,
 8    you said about a month before you turned 11?
 9    A    Uh-huh.
10    Q    All right.  Now, if you would look at Government's
11    Exhibit 3 in your binder.  Do you recognize the people in this
12    photo?
13    A    Yes.
14    Q    Who are they?
15    A    Myself, my mom, and my sister.
16    Q    And is there a date on that photo too?
17    A    Yes.  November 4$^{th}$, 2016.
18    Q    How old were you on November 4, 2016?
19    A    Twelve -- or, no, 11.  Excuse me.
20    Q    Had you just turned 11?
21    A    Yes.
22    Q    In September, I guess.  So month and a half prior?
23    A    Yes.
24    Q    And is -- if you'll look at Government's Exhibit 5 -- or,
25    excuse me; Government's Exhibit 3 and 4.  Look at 4 now.  Do
```

1  you recognize the people in Government's Exhibit 4?

2  A    Yes.  It is me and my sister.

3  Q    And is this from the same date as the previous one?

4  A    Yes.

5  Q    And so are those two photos of you and your sister and

6  then the one with your mom, are those fair representations of

7  what you-all looked like in November 4th, 2016?

8  A    Yes.

9     MS. DIAL:  The Government would move to admit Govern- --

10  Government's Exhibit 3 and 4.

11     THE COURT:  Exhibits 3 and 4 for identification are

12  received in evidence as 3 and 4 for the Government.

13     MS. DIAL:  And may I publish to the jury?

14     THE COURT:  The motion's granted.

15     MS. DIAL:  Thank you.

16        (Government's Exhibit Nos. 3 and 4 published to the

17  jury.)

18  Q    (By Ms. Dial) Let's look at No. 3 first.  What color

19  shirt are you wearing in Government's Exhibit 3?

20  A    A cream colored.

21  Q    So you're the one to the left?

22  A    Yes.

23  Q    And where's your mom?

24  A    Beside me.

25  Q    And who's holding your mom's arm in that photo?

1    A    My sister.

2    Q    And how old did you say you were here?

3    A    Eleven.

4    Q    And now, Government's Exhibit 4.  I believe you

5    previously said this is you and your sister.  Still the same

6    clothes; right?

7    A    Yes.

8    Q    So you're the one in the cream, and now you're on the

9    right?

10    A    Uh-huh.

11    Q    And still -- I'm sorry; if you can say "yes" or "no" for

12    the court reporter, that would help her out.

13    A    No "uh-huh," like --

14    Q    Right.  No "uh-huhs."

15    A    Okay.

16    Q    Just --

17    A    Yes.

18    Q    -- verbal yes or no.

19        Okay.  So --

20    A    Just having issues.

21    Q    Are you okay?

22    A    I'm just in pain because my wisdom teeth, my dry socket.

23    So it kind of hurts to talk.

24    Q    When did you have your wisdom teeth out?

25    A    I think -- I believe two -- no, one week ago.  I'd have

```
 1   to look at a calendar.

 2   Q    And your -- the back hurts?

 3   A    Dry socket.

 4   Q    Okay.  Are you okay to keep going, or do you need a

 5   break?

 6   A    I -- I'll let you know if I need a break.

 7   Q    Okay.  And just let us know if you run out of any water.

 8   Okay?

 9   A    Okay.  Thank you.

10   Q    Just a couple more photos.  If you could look at

11   Government's Exhibit No. 5 in the book.

12   A    Uh-huh.

13   Q    Do you recognize the people in this photo?

14   A    Yes.

15   Q    Who is it?

16   A    Myself, my mom, and my sister.

17   Q    And what's the date of this photo?

18   A    October 7$^{th}$, 2017.

19   Q    So how old would you have been on October 7$^{th}$, 2017?

20   A    Twelve.

21   Q    And let's see, does this picture show you, your mom, and

22   your sister about how you -- how you-all looked in October

23   2017?

24   A    Yes.

25   Q    All right.
```

1    **MS. DIAL:**  Government would move to admit and publish

2    Government's Exhibit 5.

3         **THE COURT:**  Five for identification is received as

4    Government's Exhibit 5 in evidence.

5         **MS. DIAL:**  And may I publish to the jury?

6         **THE COURT:**  The motion's granted.

7              (Government's Exhibit No. 5 published to the jury.)

8    Q    (By Ms. Dial) So, Kaitlyn, are you -- which one are you,

9    right or left?

10   A    I am on the far left.

11   Q    And who's in the middle?

12   A    My mom.

13   Q    And on the far right?

14   A    My sister.

15   Q    Okay.  If you could look at Government's Exhibit 6 and 7.

16   Let's start with 6.  Do you recognize the people in that photo?

17   A    Yes.

18   Q    Who is it?

19   A    Myself and my sister.

20   Q    And Government's Exhibit 7, who are the people in that

21   photo?

22   A    Hang on.  Myself, my sister, and my dad.

23   Q    And these photos don't have a date on them.  Do you

24   recall where these were taken?

25   A    I believe in Galveston, Texas.

1    Q    Was there a particular event your family was celebrating?

2    A    It was a vacation, and my sister's birthday fell on our

3    vacation dates.  So we kind of put -- put them together.

4    Q    Any particular birthday?  Was it --

5    A    Her 16th, I believe?

6    Q    I think you said earlier that Faith's birthday was

7    July 26th, 2001; is that correct?

8    A    Yes.

9    Q    So her 16th birthday would be July 26th, 2017; right?

10    A    Yes.

11    Q    So the photos that you're looking at for Government's

12    Exhibit 6 and 7, to the best of your knowledge, those are from

13    July 2017?

14    A    Yeah.

15    Q    How old were you in July 2017?

16    A    Eleven.

17    Q    And the -- these two photos, do they show you and your

18    sister and your dad about how you-all looked in 2017, when you

19    were 11?

20    A    Yes.

21       MS. DIAL:  The Government would move to admit and publish

22    Government's Exhibit 6 and 7.

23       THE COURT:  Six and 7 are received in evidence for the

24    Government.

25       MS. DIAL:  And may I publish both to the jury?

1    **THE COURT:**  The motion's granted.

2            (Government's Exhibit Nos. 6 and 7 published to the

3    jury.)

4    Q    (By Ms. Dial) So, Kaitlyn, starting with Government's

5    Exhibit 6, what color is the shirt that you're wearing?

6    A    Like a peach color.

7    Q    And this is -- I believe you said you were 11; right?

8    A    Yes.

9    Q    And then looking at Government's Exhibit 7, you're still

10   in the pink or peach shirt; right?

11   A    Yes.

12   Q    And the girl in the middle is who?

13   A    My sister.

14   Q    And who's the person on the far left?

15   A    My father.

16   Q    And you are how old in this photo?

17   A    Eleven.

18   Q    Do you remember seeing all of these photos when you met

19   with Miss Brown?

20   A    Yes.  But I didn't -- didn't spend much time looking at

21   them.

22   Q    Did you talk to Miss Brown about the photos?

23   A    Not -- not too much, just briefly.

24   Q    Did you -- you said you only met with her the one time.

25   Did you ever go back to Miss Brown's office?

1    A    Yes, to sign a document.

2    Q    Was Miss Brown there?

3    A    No.

4    Q    What document did you go and sign?

5    A    I believe it was an affidavit?

6    Q    So what happened?  You showed up to sign an affidavit?

7    A    Uh-huh.

8    Q    Did you write the affidavit?

9    A    No.

10   Q    If you'll look at Government's Exhibit 10 to make sure

11   we're talking about the same thing, do you recognize

12   Government's Exhibit 10?

13   A    Yes.

14   Q    What is that exhibit?

15   A    The affidavit that I signed.

16   Q    Okay.  And did you have to raise your hand and swear or

17   do anything when you signed this affidavit?

18   A    I do not believe so.

19   Q    Okay.  Looking at the second page, there was somebody

20   that -- that you had to sign in front of; right?

21   A    Yes.

22   Q    Who was that?

23   A    Jessica McMillan, I believe.  Is that how you say it?

24   Q    Do you know who she is?

25   A    She is an associate of Andrea's?

```
 1    Q    Of Miss Brown?

 2    A    Yes.

 3    Q    So do you believe she works for Miss Brown?

 4    A    Yes.

 5    Q    Who was there when you signed this affidavit?

 6    A    My mother, myself, and Miss Jessica.

 7    Q    Whose idea was it for you to sign the affidavit?

 8    A    It was something that we all talked about and agreed

 9    upon.

10    Q    Did you write this statement?

11    A    No.

12    Q    Who wrote it?

13    A    Miss Brown.

14    Q    Your dad's defense attorney --

15    A    Uh-huh.

16    Q    -- wrote --

17    A    Right after we spoke for three to four hours.  And --

18    Q    She --

19    A    -- she took notes and collected them and put them in this

20    affidavit.

21    Q    How did you know that it was ready for you to sign?

22    A    Because whenever I got the -- I believe it was whenever

23    she texted me that I would need to sign paperwork.

24         THE COURT:  I'm sorry; I couldn't hear you.

25         THE WITNESS:  I said, I believe it was whenever she texted
```

1    me that I need to sign paperwork.  She told me that she took

2    all of the notes from us talking and what I said and

3    collectively put them in this affidavit, and if there was

4    anything that was incorrect, that we would go over it and she

5    would make any -- any edits or changes.

6    Q    (By Ms. Dial) Who texted you?

7    A    Andrea.

8    Q    The defense attorney texted you --

9    A    Uh-huh.

10   Q    -- that there was a statement ready for you to come sign?

11   A    Yes.

12   Q    Among other things, does this statement say you don't

13   want your dad to be prosecuted?

14   A    Yes.

15   Q    Why did you sign this statement, Kaitlyn?

16   A    Because I agree with the contents --

17   Q    Who --

18   A    -- of this affidavit.

19   Q    Who was there when you signed it?

20   A    My mom, myself, and Jessica.

21   Q    Did you feel like you had to sign it?

22   A    No.  Throughout the whole process, I was told many times,

23   if I don't want to, I don't have to.

24   Q    What did you hope would happen if you signed that

25   affidavit?

1    A    I hoped that it would help the progression of this case.

2    Q    What does that mean?

3    A    It means that I hoped that me signing this document would

4    aid in my father not being prosecuted.

5    Q    Let's talk about why we're here today.  Kaitlyn, a few

6    years ago, did something happen with your dad that was

7    inappropriate?

8    A    Yes.

9    Q    Did you have nightmares as a child?

10    A    Yes.

11    Q    How often?

12    A    It wasn't really an exact estimate.  It -- they just kind

13    of happened when they did.  There were times whenever they were

14    bad, and there were times whenever I barely had any.  And I'm

15    pretty sure around that time, I didn't have many.

16    Q    Okay.  When you say "around that time," what time are you

17    talking about?

18    A    I'm talking about around the later portion of 2017.

19    Q    When you would wake up from nightmares, what would you do

20    as a kid?

21    A    I would crawl into my mom and dad's bed because I was

22    scared.

23    Q    And why would you go into your mom and dad's bed?

24    A    Because they made me feel safe.

25    Q    So you said that a few years ago something inappropriate

1    did happen with your dad.

2    A    Uh-huh.

3    Q    Let's talk about that time.  Was there a time that you

4    had a nightmare and crawled into bed and just your dad was

5    there?

6    A    Yes.

7    Q    Was your mom in bed?

8    A    No.

9    Q    Was this in the same house that you're living in now, the

10   one -- the address you just gave a few minutes ago?

11   A    Yes.

12   Q    After you got into bed with your dad, did you feel safe?

13   A    Yes.

14   Q    You felt comfortable with him?

15   A    Yes.

16   Q    Do you think your dad was asleep when you got into bed

17   with him?

18   A    Yes.

19   Q    Why do you think that?

20   A    Because he was snoring.

21   Q    Okay.  And did you fall back to sleep once you were

22   safely in bed with him?

23   A    Yes.

24   Q    What made you wake up?

25   A    Whenever I felt his hand where it shouldn't have been.

1    Q    Sorry; what was that?

2    A    Said when I felt his hand where it shouldn't have been.

3    Q    Where was that?

4    A    Under my underwear.

5    Q    Did you feel his hand before it got to your underwear?

6    A    (Witness shook head from side to side.)

7    Q    Sorry, she's taking --

8    A    No.

9    Q    Thank you.

10   A    I'm just in pain.

11   Q    So your first feeling when you woke up was your dad's

12   hand where it shouldn't have been?

13   A    Yes.

14   Q    You said under your underwear?

15   A    Uh-huh.

16   Q    What was his hand doing?

17   A    It was placed there.

18   Q    Was it moving?

19   A    Barely.

20   Q    What do you mean "barely?"

21   A    "Barely" meaning he was still very much out of it.

22   Q    Okay.  I understand that's what you believe was

23   happening.  I'm asking you to describe what his hand was doing.

24   So I think you said his hand was barely moving.  Where was his

25   hand barely moving?

1    A    You must understand that this is a very embarrassing

2    moment for me and I would -- I was hoping I could just move on

3    and not have to discuss this ever again.  So please excuse me

4    being uncomfortable.

5    Q    You're okay.  I need you to answer where his hand was,

6    though.

7    A    I'm not exactly sure how I should answer, like,

8    phrase-wise.  He was touching my vagina point unblank [sic].

9    Q    The outside or inside?

10    A    Barely.

11    Q    Barely what?

12    A    Part of the outside, barely the inside.

13    Q    So you could feel his fingers on the inside?

14    A    Barely.

15    Q    Which way were you facing?

16    A    The wall.

17    Q    Was --

18    A    Like, my back was to him.

19    Q    And do you know which hand he was touching you with?

20    A    I believe his right --

21    Q    Did -- was his --

22    A    -- because --

23    Q    -- arm draped across the top of you?

24    A    Yes.

25    Q    What was his other hand doing?

```
 1    A    I'm not sure.  Probably at his side.

 2    Q    You didn't see it?

 3    A    I believe he was laying on his side, so his arm most

 4    likely was right -- I don't know.

 5    Q    Okay.  You couldn't see him?

 6    A    No.

 7    Q    Were any parts of his body besides his hand and his arm

 8    touching your body?

 9    A    I don't -- just his hand.

10    Q    And his arm that --

11    A    Yes.

12    Q    -- was over you?

13         So his chest and the rest of his body, you don't remember

14    any of that touching you?

15    A    I don't remember that.

16    Q    Could you hear anything when he was touching you?

17    A    Him snoring, like, going in and out of sleep.

18    Q    What did that sound like?

19    A    Like him snoring and then stop breathing for a little bit

20    and snoring again.

21    Q    Was it heavy breathing?

22    A    No, it was snoring.

23    Q    Deep snoring?

24    A    Yes.

25    Q    So what did you do?
```

1    A    I was freaked out, and I jumped up and I'm like, "What

2    are you doing," as any sane person would do.

3    Q    Did you say his name?

4    A    I said, "Dad, what are you doing?"

5         And I woke him up.

6    Q    How do you know you woke him up?

7    A    Because he stopped snoring and he opened his eyes and he

8    breathed regularly.

9    Q    Would it surprise you to know that your dad said later

10   that he was half-awake?

11   A    Well, he can be half-awake when he's still snoring

12   because I have had conversations with him whenever he would

13   talk and then snore and then he would talk and then snore.

14   Q    So you said you jumped up and said, "Dad, what are you

15   doing?"

16   A    Uh-huh.

17   Q    What did he do?

18   A    He was very confused, and I had to explain to him what

19   just happened.  And he apologized profusely, and he said, "I

20   thought you were your mother; I'm sorry."

21   Q    Do you know how long you guys talked?

22   A    I have no clue how long we talked.  I know we talked

23   after it was over, and he told me that, "If you ever come into

24   our bed because you have a nightmare, you have to wake me up

25   and tell me because I didn't know it was you."

1    Q    How do you know he didn't know?

2    A    Because he was half-asleep.  And at that time, my mother

3    and I were the -- close to the same height, close to the same

4    build, and had similar hair.

5    Q    We're going to get to that in a minute.  But do you

6    recall anything else from that night with your dad?

7    A    I recall saying, "I don't want you to tell my mom because

8    I'm embarrassed," because I should have woke him up and told

9    him I was there.

10   Q    Why do you think you should have woke him up?

11   A    Because he told me that I should have woke him up, and I

12   feel like I should have.

13   Q    And he said all of that after you had freaked out; right?

14   A    Yes.

15   Q    Was the room dark?

16   A    Yes.  My mom, she worked night shifts and had a varying

17   schedule, so she had the window in her room plastic, like it

18   was black plastic.  It was stapled.

19   Q    What kind of -- do you remember what type of clothes you

20   were wearing?

21   A    No.

22   Q    Do you know what type of -- were this -- was there any

23   particular pajamas you wore at that age?

24   A    (Witness shook head from side to side.)

25   Q    Is that a "no?"

1    A    No.  Sorry.

2    Q    So you said that after this happened, you were

3    embarrassed.  Who did you tell?  Did you tell anyone right

4    after it happened?

5    A    Not right after it happened.  It --

6    Q    Did you tell your mom?

7    A    Excuse me.  No.

8    Q    Your sister?

9    A    No.

10   Q    Why not?

11   A    Because I was embarrassed.

12   Q    Did it make you sad?

13   A    It was something that was a mistake, and it was an

14   accident.  And I wanted to move on because I was embarrassed.

15   Q    You say it was a mistake and an accident.

16   A    Uh-huh.

17   Q    You believe that because that's what your dad told you;

18   right?

19   A    I believe that because he was asleep, and I woke him up.

20   Q    Did your dad ever check in on you?  Did he follow up

21   after this happened to make sure you were okay?

22   A    No, because I told him I didn't want to talk about it.  I

23   wanted to move on.

24   Q    Did your dad ever suggest that you could tell your

25   counselor or try and work through what had happened?

1    A    No.  It was one of those things, as I said before, that I
2    wanted to move on and forget that happened.
3    Q    Did he do anything at all to check in and make sure you
4    were okay after that incident?
5    A    He made sure I was at -- okay whenever I talked to him
6    after the incident, right after the incident.
7    Q    At some point, you started counseling; right?
8    A    Yes.
9    Q    And do you remember when you started counseling?
10   A    I don't remember the year.
11   Q    Did you go to counseling because of this incident with
12   your dad?
13   A    No.
14   Q    Kaitlyn, why was this embarrassing?
15   A    Because I feel like it should have been my responsibility
16   to wake him up.
17   Q    Do you blame yourself?
18   A    Yes.
19   Q    Who was the first person you told?
20   A    Meagan.
21   Q    What's Meagan's last name?
22   A    Bartlett.
23   Q    Do you know how to spell that?
24   A    No.
25   Q    Why did you -- so do you remember when you told Meagan?

1    A    Not the exact date.

2    Q    Do you remember what year?

3    A    I'm not good with dates.

4    Q    That's okay.  Does 2020 sound about right?

5    A    I'm pretty sure, yeah.

6    Q    Why did you decide to tell Miss Bartlett?

7    A    Because my sister and I have not had the best

8    relationship because we are quite opposites.  And she was

9    almost filling that role, like we were talking and she was

10   listening to me.  And I guess I just kind of felt like I just

11   wanted to unload all my stuff.

12         Like, I was talking about how I had a hard time in school

13   bullying and how I was there -- witnessed my great-grandmother

14   on my mom's side dying, and then six months later, my grandpa

15   on my father's side dying, and how it really affected me.  And

16   I was basically just listing all of the things that I was

17   embarrassed about or have made me sad and that have just been

18   low points in my life.

19         And it was not the only thing I told her.  I was talking

20   about bullying and stuff.  It got grouped into all of that.

21   Q    And by this got grouped in, you're talking about the

22   time --

23   A    Yes.

24   Q    -- in bed with your dad?

25         You said you were telling her things that you were

1   embarrassed about.  Were you -- but then I think you also said

2   things you were sad about.  You were talking to her about the

3   hard things in your life?

4   A   Uh-huh.

5   Q   Is that a "yes?"

6   A   Yes.

7   Q   Did you tell Meagan how long ago the time in bed with

8   your dad had happened?

9   A   Yes.  I believe I said two to three years ago.  I wasn't

10  sure on the date 'cause, as I stated before, I am horrible with

11  dates.

12  Q   Without telling me what she said, how did Meagan react?

13  In other words, how did she seem to you?

14  A   She seemed very concerned, even though I stated it was an

15  accident.

16  Q   What did she do right after that, that night?

17  A   I'm not sure.

18  Q   Did she encourage you to tell anyone else?

19  A   I'm not sure about that night if she...

20  Q   After that night, did she ever encourage you to tell

21  anybody else what your dad had done?

22  A   Yes.

23  Q   Who else did she encourage you to tell?

24  A   My mom.

25  Q   At some point, did you find out that Meagan had reported

1    what you told her to Child Protective Services?

2    A    Yes.

3    Q    How did you find out?

4    A    I found out by calling her and asking her.

5    Q    How did you know to call and ask her that?

6    A    Because I was the one -- the only one that said anything

7    to her.

8    Q    Did Child Protective Services contact your family?

9    A    Yes.

10    Q    And then you called Meagan?

11    A    Yes.

12    Q    Do you remember who the Child Protective Services worker

13    was that you met with early on?

14    A    Like the worker, like the --

15    Q    Yeah.

16    A    Okay.  'Cause there is, like, a worker and then, like,

17    the interviewer.  I believe it was Breanna [sic] Gusman.

18    Q    Where were you when you found out that Brenna Gusman had

19    contacted your family?

20    A    At a Starbucks® with my dad.

21    Q    What did your dad tell you?

22    A    I'm -- don't do verbatim.  But he was wondering what it

23    was about because, as I said before, after it happened, I told

24    him, "I want to forget about it, and I don't want to talk about

25    it ever again."

1    Q    When you were at the Starbucks® with your dad, did you

2    tell him what you'd told Meagan?

3    A    Yes.  Whenever he was concerned about -- like, we talked

4    about it.  I'm not nec- -- a hundred percent sure that I told

5    him, but it was discussed.

6    Q    What -- what's "it" that was discussed?

7    A    This whole event.

8    Q    So you and your dad then -- at Starbucks® when DHS

9    contacts your family in 2020, you and your dad talk about this

10   event again?

11   A    Yes.

12   Q    What did he say?

13   A    I don't do verbatim.

14   Q    All right.  Tell us what you do remember.

15   A    I remember getting the call, us being very confused.  And

16   then I remembered what I told Meagan Bartlett not too long ago.

17   Don't know the date.  And I called her, and I was yelling at

18   her because I told her I didn't want anyone -- I didn't want

19   her to call anyone.  I didn't want her to tell anyone.

20   Q    I want to focus, before you get into talking to Miss

21   Bartlett, about the conversation with your dad at Starbucks®.

22   So when your dad found out that you had told Miss Bartlett

23   about this, how did he react?

24   A    He was very shocked.

25   Q    What did he say to you?

 1   A    I don't remember.

 2   Q    Did he talk to you about what you needed to say?

 3   A    No.

 4   Q    Did he talk about what this might mean or what the

 5   consequences might be?

 6   A    No.  He talked to me, I believe, about -- he'd said that

 7   I had to not be with him, like we had to separate.  That's

 8   about it.

 9   Q    So where did you go after Starbucks®?

10   A    We went back to my house, and he started packing his

11   bags.

12   Q    And at some point, who else came back home?

13        Was your mom there when you got home?

14   A    No.  I -- I believe my sister was with Meagan, and

15   eventually she came back.  I don't remember when.

16   Q    And did your mom eventually come back?

17   A    Yes.

18   Q    And when your sister, Faith, come back, did Meagan -- did

19   Miss Bartlett and her dad, Mr. Bartlett, come with her?

20   A    Uh-huh.

21   Q    And what did you do when they arrived?

22   A    We were yelling about the whole situation, saying that,

23   "I told you not to tell anyone.  I trusted you," sort of deal.

24   Q    Who was we?  You said, "We were yelling."

25   A    Well, correction, I was yelling.  Everyone else was

1   talking.

2   Q   Was your dad there when you were yelling at Meagan?

3   A   No.  He was in our separate building, shop.

4   Q   How did you know he was in the shop?

5   A   Because whenever I went outside because I needed a

6   breather, I saw Nathan go into the shop.  And I followed him,

7   and he was yelling at my dad.

8   Q   And did you see your dad?

9   A   Yes, I saw him.

10  Q   How did your dad appear to you?  What did he look like?

11  A   He was very confused, and he was upset.

12  Q   How do you know he was upset?

13  A   Because he was crying.

14  Q   Did you hear your dad say anything to Mr. Bartlett?

15  A   I don't believe so.  I don't remember him saying

16  anything.

17  Q   What happened after that, that night?

18  A   My dad, I -- rented a hotel, and we stayed at our house,

19  kind of shocked about what happened.

20  Q   Did you --

21  A   Uncertain of how to proceed.

22  Q   Sorry for cutting you off.

23      Did you talk to your dad any more that night?

24  A   Huh-uh.

25  Q   Is that a "no?"

```
 1    A    No.  Gah.

 2    Q    Did you talk to your mom about what had happened?

 3    A    Yes, 'cause she was very confused of why they called.

 4    Q    Did you tell your mom about the time you'd been in bed

 5  with your dad?

 6    A    Yes.

 7    Q    How did your mom react?  Without saying what she said,

 8  how did she seem to you?

 9    A    She seemed concerned.  She was like, "Are you okay?"

10         I'm just like, "Yeah, I'm okay.  It was an accident."

11         And she was worried about how this may proceed.

12    Q    The next day, do you remember going to a forensic

13  interview?

14    A    I don't think it was the next day?

15    Q    Okay.  When do you think it was?

16    A    Maybe a day or so later.  I'm -- I'm not sure, but I

17  don't think it was the day after.

18    Q    Do you remember going in and being interviewed by a

19  woman --

20    A    Yes.

21    Q    -- named Kelsey Hess?

22    A    Yes.

23    Q    Who took you to the interview?

24    A    My mom.

25    Q    What did you tell the interviewer?
```

1    A    My side of the story.  It's -- it -- it was a lot.  Can't

2    remember exactly what I said.

3    Q    Did you tell the interviewer about your dad putting his

4    fingers in your vagina?

5    A    Yes.

6    Q    Do you know how old you were when you had that forensic

7    interview?

8    A    I was 14 at the time.

9    Q    Do you know how old you were -- you mentioned some of

10    this earlier.  Do you know how old you were when your dad put

11    his fingers inside your vagina?

12    A    Twelve.

13    Q    Are you sure?

14    A    You showed me that photo.  You went over the photos

15    whenever we discussed this case.  And we didn't really go into

16    depth about the photos whenever I was talking with Miss Brown.

17    And the --

18    Q    Well, hang on.  I'll -- I'll get to a question about that

19    'cause I -- I actually hadn't asked you again about going over

20    them with Miss Brown.  But is your testimony that you were 12?

21    A    Yes.

22    Q    Do you -- you love your dad?

23    A    Yes.

24    Q    Do you feel like you need to protect him?

25    A    I guess.

1    Q    Your testimony today is that you remember you were 12

2    when your dad put his fingers in your vagina --

3    A    Yes.

4    Q    -- right?

5         Kaitlyn, do you remember talking with the forensic

6    interviewer in May 29 -- or May 2020 at the Children's Advocacy

7    Center?

8    A    Yeah.

9    Q    And that's the interview we -- we were just talking

10   about; right?

11   A    Uh-huh.

12   Q    Were you honest in your interview with Kelsey?

13   A    Yes.

14   Q    With Miss Hess?

15   A    To my knowledge, I was honest.

16   Q    Do you recall in that interview with Miss Hess that Miss

17   Hess asked you, "Tell me when that happened, when he thought

18   you were your mom and you crawled in his bed"?

19   A    I don't remember that part.

20   Q    Do you remember her asking about the time period?

21   A    No.

22   Q    Do you remember telling Kelsey, "I honestly don't

23   remember exactly -- how long exactly.  I just knew it's been

24   some years"?

25   A    I presume?  Hmm.  Can you restate that?

1    Q    Do you remember telling Miss Hess, "I honestly don't

2    remember how long exactly.  I just know it's been some years"?

3    A    I don't remember saying that.  It's --

4    Q    Do you remember if you told Kelsey a definite age -- or

5    Miss Hess?  I apologize.

6    A    Well, I -- at the time, I didn't know exactly because we

7    didn't go over this.  And like I said, it was one of the things

8    I wanted to forget.  And I don't believe I gave her a definite

9    answer.

10    Q    And so your testimony is that -- now that you were 12.

11    Do you recall that Kelsey asked again, "Do you remember how old

12    you were?"

13         You and Kelsey talked for a bit about your age; right?

14    A    It has been over two years.  I am not very clear on what

15    we were talking about.

16    Q    Do you recall responding to Miss Hess that you really

17    didn't remember how old you were?  "It was kind of like a whole

18    repressed memory or whatever, I don't know"?

19    A    I have already said many times that I am not sure

20    verbatim.

21    Q    Can you explain today -- or can you explain why your

22    testimony today is that you were 12 when -- when you were

23    interviewed in May 2020, you couldn't remember?

24    A    Because it wasn't something that was discussed as regular

25    as it has been in this case -- regularly.

1    Q    So, Kaitlyn, you said earlier that you'd met with the

2    defense attorney and that she did show you some photos; right?

3    A    Miss Brown?

4    Q    Yes.

5    A    Yes.

6    Q    And after you met with Miss Brown, you and I met with

7    Kyle and -- or with Mr. McMaster [sic], with Mr. -- Special

8    Agent Young, and with your attorney, Shena; right?

9    A    Yes.

10   Q    During that meeting, do you remember we asked you if you

11   could remember how old you were?

12   A    Could you please state that again?

13   Q    Yeah.  During our meeting, couple weeks ago, do you

14   remember that we asked you if you could remember how old you

15   were when your dad put his fingers in your vagina?

16   A    Not really.

17   Q    Do you remember us asking about that?

18   A    Oh, asking about the age?

19   Q    Yes.

20   A    Yes.

21   Q    And do you remember that you brought up that you had seen

22   a photo from Miss Brown?

23   A    Uh-huh.

24   Q    And that Miss Brown had shown you the photo that was

25   about the same time period?

1    A    Yes.

2    Q    Is that Government's Exhibit 5?

3         Here, I'll put it up for you.  It's been previously

4    admitted.

5         Is that the photo that you brought up that Miss Brown had

6    shown you?

7    A    Yes, because you were asking me to think very, very hard

8    on the time period.  And I remember going through those photos,

9    and I saw this photo.  And it kind of reminded me of that same

10   time period.

11   Q    And do you recall saying that you knew you were over 12?

12   A    I really don't recall.

13   Q    Okay.  Your testimony today is that you were over 12?

14   A    Yes.

15   Q    Why does it matter that you're more than 12?

16   A    Because you told me and -- and -- excuse me.  You asked

17   me how old I was.  You went into great detail.  And you also

18   mentioned that it was important that we know the time period

19   because of the certain sentence.  So I was looking through the

20   photos, and it did remind me of the time.

21   Q    Did Miss Brown also talk to you about how important age

22   was?

23   A    I do not remember.

24   Q    Did Miss Brown tell you that you being more than 12 was

25   very important in this case?

1    A    I do not remember.

2    Q    You don't remember, or you don't want to answer?

3    A    I don't remember because recently I just had surgery and

4    I've been sleeping and I have been taking my prescribed

5    narcotic medications and I'm having not the best memory.  I am

6    trying to remember as best as I can.

7    Q    Okay.  I want to go back to when CPS -- when DHS got

8    involved in May 2020.  So you said your dad went --

9         THE COURT:  And, counsel, could I see you a second?

10         MS. DIAL:  Yes, Your Honor.

11         (The following proceedings were had at the bench

12    outside the hearing of the jury:)

13         THE COURT:  How much longer you going to be?

14         MS. DIAL:  I am on my very last page.  I've probably got

15    six questions.

16         THE COURT:  Okay.  Okay.

17         MS. BROWN:  Was it scheduling?

18         (The following proceedings were had in open court,

19    within the presence and hearing of the jury:)

20    Q    (By Ms. Dial) Kaitlyn, you said your dad went and stayed

21    at a hotel?

22    A    Yes, to my knowledge.  Uh.

23    Q    Fair.  Thank you.  We're almost done.  I know you're

24    uncomfortable.  Just a couple more questions.  Okay?

25    A    Okay.

1   Q    So did your dad stay at the hotel?

2   A    I believe so.

3   Q    For how long?

4   A    I have no clue.

5   Q    At some point, did your dad come back home and you had to

6   leave?

7   A    Yes, I did have to leave.

8   Q    When was that?

9   A    I don't know.

10   Q    Was it just a couple of days after you -- after your

11   family found out about all of this?

12   A    I'm very spotty on the timeline.  I really don't know.  I

13   know that I stayed at my grandma's for some time and then my

14   uncle.  I'm just very spotty on the timeline 'cause it was two

15   years ago.

16   Q    Why did you have to go stay with them?

17   A    I'm pretty sure because my dad came back to the house

18   'cause we couldn't afford staying in a hotel that long.

19   Q    And so you had to leave?

20   A    Uh-huh.

21   Q    Were you sad about that?

22   A    Yes, I was.

23        **MS. DIAL:**  Could I have just a moment, Your Honor?

24        **THE COURT:**  Yes.

25   Q    (By Ms. Dial) When was the last time you saw your dad

1    before today?

2    A    I don't remember the date, but I think my mom was off

3    working that day, so it would probably have been the night

4    before the day he was brought in by, I believe, the FBI?

5    Q    Kaitlyn, earlier you said you felt like you have to

6    protect your dad.  Do you want to be testifying here against

7    your dad?

8    A    Not against my dad.

9    Q    Do you regret telling Meagan?

10    A    Yes.

11    Q    Why?

12    A    Because she blew it out of context.

13    Q    Do you blame yourself for all of this?

14    A    A little bit because I should have -- I should have

15    really known her better and trusted her because I was not very

16    close to her.  My sister -- my sister is the one that was close

17    to her.

18         So I guess I just kind of had a moment when I felt like I

19    was getting some sister-type affection that I wasn't receiving

20    from my sister.  And I just kind of treated her like I would my

21    sister if we had a better relationship at the time.

22    Q    Thank you, Kaitlyn.  I don't have any other questions for

23    you.

24    A    Okay.

25         **THE COURT:**  Okay.

1           Ladies and gentlemen, it's time for you to take a break.

2    We're going to have -- it's a midafternoon break, so it'll be

3    15 minutes.  I'll see you back at the end of that time.

4           **CSO:**  All rise.

5                (A recess was taken.)

6           **THE COURT:**  Please bring in the jury.

7                (Jury present.)

8           **THE COURT:**  Please be seated.

9      Miss Brown?

10          **MS. BROWN:**  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12   BY MS. BROWN:

13    Q    Did you get some water, Kaitlyn?

14    A    Yeah.

15    Q    Okay.  Let me know if you need a break.

16    A    Okay.

17    Q    When Miss Dial was questioning you right before our

18   break, she asked you when the last time you saw your dad was

19   prior to walking in the courtroom today.  Do you remember that

20   question?

21    A    Uh-huh.

22    Q    And you'd said that it was when the FBI came and arrested

23   him for this case; right?

24    A    The night before.

25    Q    Would that have been October of last year?

1    A    I believe so.

2    Q    Has it been five or six months since you've seen or

3    spoken to your father?

4    A    Yes.

5    Q    And is that because when -- when you testified prior to

6    the break, you told the jury that when you were at Starbucks®

7    with your dad, the day that you found out Meagan Bartlett had

8    called CPS, that your dad said you had to separate.  Do you

9    remember testifying about that?

10    A    Uh-huh.

11    Q    You and your dad had to separate?

12    A    Uh-huh, yes.

13    Q    I want to clarify something.  That's because DHS, or CPS,

14    told your mother and your father that your dad had to be away

15    from you and your sister; right?

16    A    Yes.

17    Q    Not because he wanted to leave; right?

18    A    No.

19    Q    And not because you or your mom or anybody other than

20    some Government agency wanted him to leave; correct?

21    A    Correct.

22    Q    And then, at some point, he was told he could return, but

23    you had to leave the home --

24    A    Uh-huh.

25    Q    -- right?

1    A    Yes.

2    Q    And that was, again, not because it was your mom or your

3    dad who wanted you guys to be separated, but rather because DHS

4    wanted you guys to be separated?

5    A    Yes.

6    Q    And then after some period of time where you lived with

7    your grandparents and -- and you moved around just a little

8    bit, I think you went to your aunt and uncle's for a short

9    period of time as well?

10   A    Yes.

11   Q    Then you were allowed to come home --

12   A    Uh-huh.

13   Q    -- right?

14   A    Yes.

15   Q    And -- and your dad was allowed to be with you; correct?

16   A    Yes.

17   Q    And so for about a year since all this whole thing

18   started, you got to live with your mom and your dad and your

19   sister again; correct?

20   A    Yes.

21   Q    But then last fall, October of 2021, when this case got

22   filed --

23   A    Uh-huh.

24   Q    -- that's when the rules, again, came up where -- now,

25   this time it was the Court said -- your dad had to live

1    somewhere else if you were going to stay in the home; correct?

2    A    Correct.

3    Q    So all of that wasn't what we could call voluntary, was

4    it?  Like Dad being out of the home or you being out of the

5    home, that wasn't something you wanted, was it?

6    A    Yes.  That --

7    Q    You --

8    A    -- wasn't something I wanted.

9    Q    It wasn't something you wanted.  Okay.

10   A    Uh-huh.

11   Q    Think it's pretty obvious, you've already answered, you

12   don't want to be here, do you?

13   A    I do not want to be here.

14   Q    And, in fact, isn't it true that after this case got

15   filed, your mother informed you that I had said, "Hey, I think

16   the Government will probably call and -- and want to talk to

17   the girls," so you were expecting these people at this table to

18   contact you --

19   A    Absolutely.

20   Q    -- some months ago; right?

21   A    Absolutely.  In the beginning.

22   Q    And isn't it true that you got frustrated when they

23   hadn't reached out or tried to talk to you?  Isn't that true?

24   A    Yes.

25   Q    And isn't it true that you repeatedly asked your mom, who

```
 1   you were living with, if you could talk to me if they weren't
 2   willing to talk to you?
 3        MS. DIAL:  Objection.
 4        THE WITNESS:  Yes.
 5        MS. DIAL:  Beyond the scope.
 6        MS. BROWN:  Your Honor, there was quite a bit of testimony
 7   about --
 8        THE COURT:  No, no, no, no.
 9        MS. BROWN:  Oh, I'm sorry.
10        THE COURT:  I think it is beyond the scope.  It's
11   sustained.
12   Q    (By Ms. Brown) When Ms. Dial was asking you, before our
13   break, about how you and I met at my office, do you remember
14   those questions?
15   A    Not all of them, but most of them.
16   Q    You remember her asking you just about that topic?
17   A    Yes.
18   Q    Okay.  Was that -- you wanted to come talk to me, didn't
19   you?
20   A    Yes.
21   Q    Did I force you to come talk to me?
22   A    No.
23   Q    Did I insist that you come talk to me?
24   A    No.
25   Q    Did I threaten or intimidate you in any way when we
```

1    spoke?

2    A    No.

3    Q    Were you there completely voluntarily?

4    A    Absolutely.

5    Q    Were you there voluntarily much later than you actually

6    wanted to be?  You had wanted to speak to me for quite some

7    time, and I had declined; right?

8    A    Yes.

9    Q    You said that when you came to my office, you and your

10   mom and your sister were there for three or four hours?

11   A    To my knowledge.

12   Q    Okay.  To the best of your recollection, it was several

13   hours?

14   A    Yes.

15   Q    Like a whole afternoon kind of a thing?

16   A    Yes.

17   Q    And in that time, when you were at my office, I wasn't

18   just talking to you for three or four hours, was I?

19   A    No.  You were talking to all three of us.

20   Q    So I intermittently asked questions of your mom and of

21   your sister and of you, and the whole time that I talked to

22   each of you was three or four hours?

23   A    Yes.

24   Q    And when we met in my office and we were talking about

25   all kinds of things, I had a large stack of photographs, didn't

1  I?

2   A    Yes.

3   Q    More than just the five that the Government showed you

4  today; correct?  Take your time.

5   A    Correct.  Uh-huh.

6   Q    And I had just -- I had about 30 or 40 pictures that I --

7  I told you and your mom and your sister I had just recently

8  gotten from the Government; correct?

9   A    Correct.

10   Q    And then I had about 30 pictures of my own that I had

11  printed off and had just turned over to the Government.  So I

12  had about 60 or 70 photos with me; correct?

13   A    Uh-huh, correct.

14   Q    That packet, when we met in my office, of photos, I just

15  passed it to each one of you and said, "Can you think of any

16  reason why any of these would be important to the Government;"

17  correct?

18   A    Correct.

19   Q    Trying to figure out, you know, why it was that they had

20  30 or 40 family photos in evidence; correct?

21   A    Correct.

22   Q    And you flipped through them very quickly, and your only

23  comment, unless I'm mistaken, was that these were not the most

24  flattering pictures of you?

25   A    Correct.

1   Q    And you didn't dwell on any particular one of them very

2   long, did you?

3   A    Correct.

4   Q    And did you even flip through and look at each and every

5   one of the 60 or 70 photos that I showed you?

6   A    I briefly looked through them.

7   Q    But as you told Miss Dial in your meeting with her, and

8   then again the jury today, one of those pictures triggered some

9   memory in your mind?

10  A    Yes.

11  Q    And you shared that with Miss Dial?

12  A    Yes.

13  Q    And that was the picture of the fair --

14  A    Yes.

15  Q    -- correct?

16  A    Yes.

17  Q    The one from October of 2017?

18  A    Yes.

19  Q    As you've said, you believe this whole case, this whole

20  situation, us being in court, is completely blown out of

21  context; correct?

22  A    Absolutely.

23  Q    And -- and you maintained that -- you've said that from

24  the beginning; correct?

25  A    Correct.

1    Q    Anybody who's asked you, including the forensic
2    interviewer back in May of 2020, you told them all along this
3    was a big misunderstanding, a big mistake?
4    A    Correct.
5    Q    You also told the forensic interviewer, unprompted, that
6    your dad is a good man, didn't you?
7    A    Yes.
8    Q    And that you believed fully that he was at least
9    half-asleep when all this happened; correct?
10   A    Yes.
11   Q    When your dad was touching you and you turned around and
12   said, "Dad, what are you doing," is that when you saw that his
13   eyes were closed?
14   A    Yes.
15   Q    And you'd testified earlier that he was kind of snoring
16   while he was touching you; correct?
17   A    Correct.
18   Q    You also mention in your forensic interview that you
19   think your dad has sleep apnea or narcolepsy?
20       **MS. DIAL:**  Objection.
21       **THE WITNESS:**  Yes.  Can I --
22       **THE COURT:**  No, no.
23       **THE WITNESS:**  Can I elaborate on that?
24       **THE COURT:**  That wasn't -- that's not what -- I don't
25   recall that being said.

1    **MS. BROWN:**  Right.  It's foundational.

2    **THE COURT:**  You can ask another question.

3    **THE WITNESS:**  I would like to --

4    **THE COURT:**  No.

5    **THE WITNESS:**  Okay.

6    **THE COURT:**  There's no question pending.

7    Q    (By Ms. Brown) You mentioned -- when Miss Dial was asking

8    you questions before our break today in court, you mentioned

9    that you'll be having a conversation with your father and then

10   he'll start snoring.  Do you remember that testimony?

11   A    Yes.

12   Q    And has that happened more than one time that you'd have

13   a conversation with him while he's sitting in a chair, and he

14   would just plumb fall asleep?

15   A    Yes.

16   Q    And you'd have to wake him up to finish the conversation?

17   A    Yes.

18   Q    Can you tell the difference between when your dad is

19   snoring 'cause he's asleep or if he's --

20   A    Uh-huh.

21   Q    -- breathing because he breathes loud?

22   A    Yes, I can tell the difference.

23   **MS. DIAL:**  Objection.

24   **THE COURT:**  Overruled.

25   Q    (By Ms. Brown) You can answer.  You can tell --

1    A    Yes.

2    Q    -- the difference?

3    A    Yes, I absolutely can.

4    Q    And the snoring that you referred to in the incident, the

5    touching in the bed incident, that was clearly snoring, not

6    just breathing?

7    A    Clearly.

8    Q    You said that after you exclaimed, "Dad, what are you

9    doing," then he apologized profusely.  Do you recall that

10   testimony?

11   A    Yes.

12   Q    You have never told anyone that this wasn't an honest

13   mistake, have you?

14   A    No, I've never told anyone this was [sic] an honest

15   mistake.

16   Q    You even told the forensic interviewer the -- the day,

17   May 29th, 2020, that you went in for your interview, that you

18   thought this was stupid, didn't you?

19   A    Yes.

20   Q    Before your interview, your mother told you to be honest

21   in the interview, didn't she?

22   A    Absolutely.

23   Q    And you -- you let the forensic interviewer know because

24   she was exploring if anybody was intimidating you or trying to

25   cause you to say something other than what was true; correct?

1     A     Correct.

2     Q     And you -- you relayed to the forensic interviewer that

3     you had only been told to be honest?

4     A     Yes.

5     Q     And were you honest during your interview?

6     A     Yes.

7     Q     And you understand just like -- well, you understand

8     today, obviously, we're in a courtroom and you're on the

9     witness stand, so you're under oath?

10    A     Yes.

11    Q     And so you're telling the truth today as well?

12    A     Absolutely.

13    Q     Has anyone ever told you what to say in court?

14    A     No.

15    Q     Has anyone asked you to lie?

16    A     No.  The only instructions is how the Court operates and

17    how I should behave in front of the Judge.

18    Q     Okay.  After having looked at the photographs that I

19    showed you and then looked -- did you look at the photographs

20    that -- the family photographs, like the ones that are in

21    evidence, when you met with Miss Dial?

22    A     Yes, very quickly whenever I was with you.

23    Q     And did you identify the one at the state fair is the one

24    that you recalled being -- was it -- was -- was the state fair

25    shortly after, or was the touching incident shortly after the

1  fair?

2  A    It -- the touching incident was shortly after the fair.

3  Q    Okay.  And until you saw that photograph and -- and were

4  really pressed by Chant- -- I'm sorry, Ms. Dial -- until you

5  were really pressed on the issue of when or how old you were

6  when this happened, you -- can you help me understand how you

7  be- -- are so sure today when you weren't sure before?

8  A    Because we were going over this case.  And they were, in

9  great detail, trying to pull from my memory what I do remember

10 because I tried to forget this whole thing because it was

11 completely embarrassing, and it is completely embarrassing that

12 I'm in front of this many people saying this.

13 Q    You're a very private person, aren't you?

14 A    Yes.

15 Q    When you started menstruating for the first time, you

16 didn't even tell your parents, did you?

17 A    I didn't.  I didn't believe they had to know.

18 Q    When you were in the forensic interviewer -- forensic

19 interview with Miss Kelsey Hess, she spent less than an hour

20 with you total; correct?

21 A    Correct.

22 Q    And you only met Miss Hess one time; correct?

23 A    Correct.

24 Q    There was only one touching incident ever; correct?

25 A    Correct.

1    Q    You had testified that you believed that your mom had

2    gotten out of bed and gone to work?

3    A    Yes.

4    Q    Is that because she's a nur- -- she's a labor and

5    delivery nurse; correct?

6    A    Yes.

7    Q    And so sometimes she'll get up in the middle of the night

8    or very, very early in the early morning hours and leave for

9    work while everybody's still asleep; correct?

10   A    Yes.

11   Q    But your sister, Faith, would have been home at that time

12   when this happened; correct?

13   A    I believe so.

14   Q    And you told the forensic interviewer that she was

15   probably asleep 'cause it was early in the morning?

16   A    Uh-huh, yes.

17   Q    Had you ever crawled into your mom and dad's bed after a

18   nightmare before?

19   A    Yes.

20   Q    And was that one time or more than one time before this

21   incident?

22   A    More than one time.

23   Q    And was it a couple times or several times?

24   A    Several times collectively over the years.

25   Q    Over the years.  And it wasn't something that you did

1    regularly, though, was it?

2    A    No.

3    Q    It's not like something that you did every week or even

4    every month?

5    A    No.

6    Q    Would just depend on whether you were having nightmares

7    and whether you felt safe in your room?

8    A    Yes.

9    Q    Okay.  And nothing bad or inappropriate or uncomfortable

10   had ever happened when you'd crawled into your mom and dad's

11   bed prior to the occasion that brings us to court today, had

12   it?

13   A    No, nothing.

14   Q    Uh.  And the one time that we're here about, the one time

15   that you got touched, as soon as you said the word "Dad," your

16   step -- your dad stopped; correct?

17   A    Yes.

18   Q    And that's when you had to describe for him or explain to

19   him what had happened?

20   A    Yes.

21   Q    You would agree with -- with your father -- Miss -- Miss

22   Dial asked you about it on direct -- you had a -- a

23   conversation with your dad after; right?

24   A    Yes.

25   Q    Where you guys discussed what had happened; right?

1    A    Yes.

2    Q    During that conversation, isn't it true that you and your

3    dad discussed ways to make sure something like this never

4    happened again?

5    A    Yes.

6    Q    And did that include him asking you to just always be

7    sure, if you came into his bed and he was asleep, that you woke

8    him up so that he knew you were in bed with him?

9    A    Yes.

10    Q    During that conversation with your dad right after it

11    happened, did you and him discuss talking to your mom about

12    this?

13          MS. DIAL:  Objection.

14          THE WITNESS:  Yes.

15          MS. DIAL:  Hearsay.

16          THE WITNESS:  Yes.

17          MS. BROWN:  Just the --

18          THE COURT:  That -- that question does not call for

19    hearsay.  But if you're going to object to further response,

20    I'll hear from you.  You want to be heard?

21          MS. DIAL:  Yes, Your Honor.

22          MS. BROWN:  I'm not going to get into hearsay.

23          THE COURT:  Okay.

24          MS. BROWN:  I have no intention of getting into hearsay.

25          THE COURT:  Okay.

1    Q    (By Ms. Brown) So backing up to -- to my last question.

2    A    Uh-huh.

3    Q    During that conversation with you and your dad after this

4    happened, part of that discussion, one of the topics was

5    whether or not to tell your mom; right?

6    A    Yes.

7    Q    And it was you who insisted that you didn't want your dad

8    to tell your mom, and you didn't want to tell your mom?

9    A    Yes.  I was --

10   Q    Why?

11   A    -- severely embarrassed.

12   Q    Okay.  Did you and him both agree after you begged him

13   not to tell your mom that you wouldn't and he wouldn't?

14   A    Yes.

15   Q    Do you appreciate that your dad respected your wishes?

16   A    I do.

17   Q    During that conversation before your -- you convinced

18   your dad not to tell your mom, he wanted to tell your mom,

19   didn't he?

20   A    Yes.

21   Q    Did your dad ever tell you not to tell anybody?

22   A    No.

23   Q    Did your dad ever tell you not to tell your therapist?

24   A    No.

25   Q    Did your dad ever tell you not to tell your friends?

```
 1    A    No.

 2    Q    It was you who wanted to keep this private --

 3    A    Yes.

 4    Q    -- and not talk about it with anybody else; correct?

 5    A    Yes.  He was only interested in making sure I was okay.

 6    Q    I know that these are embarrassing topics, and I

 7   apologize, but I have to ask these questions.  You started your

 8   period shortly after you turned 11; correct?

 9    A    Yes.  That's the same time my mom did.

10    Q    And you grew pubic hair even before you started your

11   period?

12    A    Yes.

13        MS. DIAL:  Objection.  Outside the scope.

14        THE COURT:  Overruled.

15    Q    (By Ms. Brown) Before you even started your period at --

16   at 11, you had already grown pubic hair?

17    A    Yes.

18    Q    Okay.  And did you, back when you were 11 or 12 years

19   old, do anything special as far as grooming or shaving or

20   waxing your pubic hair?

21    A    No.

22    Q    Okay.  You don't have any scars or anything on your

23   vaginal area that would immediately indicate to somebody that,

24   you know, that was your body, like a mole or a raised, textured

25   skin?
```

1      A      I do not.

2      Q      Okay.  I want to talk about Meagan Bartlett for a moment.

3  Before all this happened, you would consider her a friend;

4  would you agree?

5      A      Yes.

6      Q      You thought you could trust her, didn't you?

7      A      Yes.

8      Q      You at least felt comfortable talking to her back in May

9  of 2020; correct?

10      A      Yes.

11      Q      And you felt like you could confide in her; correct?

12      A      Yes.

13      Q      Middle school, teenage years, the -- those can be

14  difficult for a girl; right?

15      A      Yes.

16      Q      Were they particularly difficult for you?

17      A      Yes.

18      Q      Did you get bullied at school?

19      A      Yes.

20      Q      Did you change schools because you were being bullied?

21      A      Yes.

22      Q      And then did you get bullied again at your new school?

23      A      It depends.  There was a lot of schools.

24      Q      Okay.  Did you get bullied at more than one school even

25  though you had left one school to try to avoid the bullying?

1    A    Yes.

2    Q    Did the bullying include body shaming?

3    A    Yes.

4    Q    When you were talking to Meagan about these heavy things

5    that were happening in your life, did you include talking about

6    your grandma and your grandpa dying?

7    A    Yes, that was the first.

8    Q    And why was that so traumatic for you?

9    A    Because I love them dearly and just I -- I was the type

10   of kid that I loved them so much, you couldn't stop me from

11   being there in their last moments, but I didn't know the effect

12   it would have on me.

13   Q    Did you watch both of them die before your eyes?

14   A    Yes.

15   Q    Around this time, you also had a cat Smokey who you were

16   very, very close to; correct?

17   A    Yes.

18   Q    And right around that time, Smokey died as well?

19   A    Yes.

20   Q    And all these things that were happening that were

21   causing you -- do you suffer from depression?

22   A    Yes, genetic --

23   Q    Do you --

24   A    -- depression.

25   Q    And do you suffer from anxiety?

1    A    Yes.

2    Q    And have you for a very long time?

3    A    Yes.

4    Q    As a result of these things and maybe even other things,

5    did you start cutting at some point?

6        MS. DIAL:  Objection.

7        THE WITNESS:  Yes.

8        MS. DIAL:  Relevance.

9        THE COURT:  Sustained.

10    Q    (By Ms. Brown) While you were confiding in Meagan, is one

11    of the main topics you discussed with her that you had been

12    cutting?

13    A    Yes.

14    Q    And while you were telling Meagan all these other things,

15    is that when you threw in that, oh, by the way, one of the most

16    embarrassing things that's ever happened to me in my life is

17    while my dad was sleeping and I was in bed with him, he touched

18    me, and it was horrifying?

19    A    Yes.  Among other embarrassing things.

20    Q    Before you told Meagan about this incident in the bed

21    with you and your dad, was this incident that brings us to

22    court something that was regularly occupying your mind?

23    A    No.  I felt comfortable with her.  And I just kind of

24    just let out all of the pain that I just kind of chuck away in

25    the back of my head.

1   Q    Other than what you've described for us in court today,

2   has your dad ever done anything sexual or inappropriate to your

3   body?

4   A    No.

5   Q    In the years that happened after this incident, okay, the

6   incident that brings us here, did you ever crawl in your

7   parents' bed again?

8   A    No.

9   Q    Okay.  Did your dad ever crawl in bed with you?

10  A    No.

11  Q    Was that part of the interventions that you and your dad

12  agreed on that night to make sure nothing like this ever

13  happened again?

14  A    Yes.

15  Q    Regarding the affidavit -- take your time.  I'm going to

16  do that as well.

17       Do you recall -- do you recall my asking you if you'd be

18  comfortable to swearing to an affidavit?

19  A    I believe so.

20  Q    And do you recall me telling you that you did not have

21  to, in any way, sign anything, but that I was going to prepare

22  something that I needed to attach to something I was going to

23  file in court?  Do you recall that?

24  A    Yes.

25  Q    And that I explained to you that it would be a sworn

1    statement, much like you would be swearing to tell the truth in

2    court.  But that if anything was wrong or I'd gotten anything

3    from our conversation lost in translation between taking notes

4    and typing up the affidavit, that you needed to read every word

5    before you signed it, and let me know if anything was wrong or

6    you wanted me to change anything?

7    A    Absolutely.

8    Q    And were you happy to sign the affidavit?

9    A    Yes.

10   Q    Is that because you felt like the Government wasn't

11   listening to you?

12   A    Yes.

13   Q    You feel safe at home even when your dad's there?

14   A    Yes.

15   Q    You think us all being here this week is completely

16   unnecessary?

17   A    Completely.

18   Q    Do you want to be able to live with your dad again?

19   A    Yeah.  I miss him.

20   Q    You go to therapy; correct?

21   A    Yes.

22   Q    Your therapist's name is Stacia Alsabrook?

23   A    Yes.

24   Q    And you've been seeing her and talking to her for years

25   before any of this ever came up; correct?

1    A    Yes, before it came into discussion.  Yes.

2    Q    And you've -- how often do you see Stacia?

3    A    It depends on her vail -- availability.  Sometimes it

4    could be every two weeks to every four weeks.

5    Q    Okay.  So at least once, if not twice, a month?

6    A    Yes.

7    Q    And that's been consistent?  Even when COVID hit, you got

8    to do Zoom conferences with her so you could continue therapy;

9    correct?

10   A    Yes.

11   Q    And among the things you talked to Miss Alsabrook about

12   were the bullying and the cutting and --

13   A    Yes.

14   Q    -- and the loss of your grandparents and all those other

15   things you talked --

16   A    Uh-huh.

17   Q    -- to Meagan about?

18        What did you originally start seeing Miss Alsabrook for?

19   A    Excuse me.  For -- for my bullying, and that was -- that

20   was before anyone knew about the cutting.  But mainly for the

21   bullying and the loss of two grandparents.

22   Q    And even though it started about that, have you continued

23   to, and do you still to this day, see Miss Alsabrook?

24   A    Yes.

25   Q    Do you trust her?

US DISTRICT COURT - NDOK
REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

```
 1    A     Absolutely.

 2    Q     Do you feel like you can tell her anything?

 3    A     Yes.

 4    Q     Do you feel like if you tell her things -- well, let me

 5    ask a better question.

 6          In addition to seeing Stacia Alsabrook, did you also,

 7    within the last couple of months, start seeing yet another

 8    therapist?

 9    A     Yeah.

10    Q     And this therapist, he didn't --

11          MS. DIAL:  Objection.

12          THE COURT:  Sustained.

13    Q     (By Ms. Brown) Do you trust him as well?

14    A     Yes.

15    Q     Do you feel like there -- if -- if there's anything you

16    needed to confide in someone, anything at all, you could tell

17    either Stacia Alsabrook or your -- Dr. Ed, your other

18    therapist?

19    A     Absolutely.

20    Q     Would you agree with me that your demeanor or your -- do

21    you know what "demeanor" means?

22    A     Yes.

23    Q     Your attitude during the forensic interview, would you

24    agree that you were irritated and uncomfortable?

25    A     Yes.
```

1    Q    You rolled your eyes several times?

2    A    Yeah.

3    Q    At one point, she asked you a question, and in response,

4    you said, "Jesus Christ"?

5    A    That sounds like me.

6    Q    Was that expressing your frustration?

7    A    Yes.

8    Q    But you were still honest with her?

9    A    Yes.

10   Q    During the forensic interview, didn't she ask you what

11   you could do or what you would do if there was something at

12   home that made you feel unsafe?

13        MS. DIAL:  Objection.

14        THE COURT:  Sustained.

15   Q    (By Ms. Brown) Isn't it true that in addition to meeting

16   with your not one, but two therapists, you articulated to the

17   forensic interviewer that you would run away if you didn't feel

18   safe?

19        MS. DIAL:  Objection.

20        THE COURT:  Sustained.

21        MS. BROWN:  If I may just have one moment, Judge?

22        THE COURT:  Yes, ma'am.

23            (Discussion held off the record.)

24        MS. BROWN:  Pass the witness.

25        MS. DIAL:  Thank you, Your Honor.

1                        REDIRECT EXAMINATION

2    BY MS. DIAL:

3    Q    Kaitlyn, you just said that after the incident with your

4    dad putting his fingers inside of you, that you never got into

5    your parents' bed again; right?

6    A    Yes.

7    Q    Is that because you no longer felt safe there?

8    A    No.  It's because I didn't want anything to happen like

9    that ever again.  And I didn't want to wake my parents up

10   because I felt bad.

11   Q    You also said that your dad didn't tell you not to tell;

12   right?

13   A    Yes.

14   Q    But your dad did spend a while telling you that it was

15   all an accident; right?

16   A    No.

17   Q    He didn't tell you it was an accident?

18   A    He didn't spend a while telling me it was an accident.

19   Q    How long do you think he talked to you about it

20   afterwards?

21   A    Not that long.  I was uncomfortable, and I didn't want to

22   talk about it much further.  And -- and we just clarified what

23   we needed to and moved on.

24   Q    He clarified; right?

25   A    We clarified.

1    Q    What did you have to clarify?

2    A    I had to clarify that I did have a nightmare and I -- I

3    did crawl into bed and making sure that -- that I wasn't there

4    for, like, the whole time, you know.  Just clarifying that I

5    understand that it was a mistake, and I would like to move on.

6    Q    He clarified that it was a mistake; right?

7    A    I understood that it was a mistake because I heard his

8    snoring and I saw his eyes closed.

9    Q    Can people pretend to snore?

10    A    I'm pretty sure it's possible, but I don't believe he was

11    pretending to snore.

12    Q    Your testimony today is that it was your request to keep

13    it a secret because you were embarrassed?

14    A    Yes.

15    Q    You didn't tell the forensic interviewer that, did you?

16    A    I'm not sure.  I was very uncomfortable in the whole

17    situation, and I wanted to leave as soon as possible.

18    Q    You didn't tell DHS workers that it was your request to

19    keep it quiet, did you?

20    A    I don't know because I was really frustrated.

21    Q    So this is new information, that it was your request to

22    keep it quiet?

23    A    It's always been that.  I, as -- I haven't gotten that

24    into detail about it because I was very upset that we were

25    going through this.  I didn't want to talk about it.

1    Q    Are you trying to keep your dad out of trouble for

2    keeping it quiet?

3    A    I'm not trying to keep him out of trouble.  I'm telling

4    the truth.

5    Q    You said that your dad told you it was an honest mistake;

6    is that right?

7    A    I believe so.

8    Q    That's what you really want to believe, don't you?  That

9    it was just a mistake?

10   A    I know that it was a mistake.

11   Q    How?

12   A    Because nothing had ever happened beforehand, and nothing

13   happened afterward.  And we moved on.  I wanted to move on.

14       **MS. DIAL:**  No other questions, Your Honor.

15       **THE COURT:**  You may step down, ma'am.

16       **THE DEPUTY COURT CLERK:**  Uh-huh.

17       **THE WITNESS:**  Okay.

18       **CSO:**  And take your water if you want.

19       **THE WITNESS:**  Yeah.

20       **CSO:**  Leave that.

21       **THE WITNESS:**  Okay.

22       **THE COURT:**  Who's your next witness?

23       **MS. DIAL:**  Meagan Bartlett, Your Honor.

24       **CSO:**  Right here.

25       **THE DEPUTY COURT CLERK:**  Ma'am, if you'll go ahead and

1    stand right here, I'll swear you in.  Thank you.  Please raise

2    your right hand.

3              (Witness sworn.)

4        **THE WITNESS:**  Yes.

5        **THE DEPUTY COURT CLERK:**  Thank you.  You can go ahead and

6    have a seat in the witness stand and adjust the microphone if

7    you need to.

8        **THE COURT:**  What is your name, ma'am?

9        **THE WITNESS:**  Meagan Bartlett.

10       **THE COURT:**  Would you spell your name.

11       **THE WITNESS:**  M-e-a-g-a-n, B-a-r-t-l-e-t-t.

12       **THE COURT:**  You may inquire.

13       **MS. DIAL:**  Thank you, Your Honor.

14             MEAGAN BARTLETT, called as a witness herein, having

15   been first duly sworn on oath, was examined and testified as

16   follows:

17                           DIRECT EXAMINATION

18   BY MS. DIAL:

19   Q    Miss Bartlett, where are you from?

20   A    Dewar, Oklahoma.

21   Q    Is that where you still live?

22   A    I currently live in Webb City, Missouri.

23   Q    And did you graduate from high school in Dewar?

24   A    Yes.

25   Q    Did you go to college?

1   A    Yes.  I attended college in Miami, Oklahoma.

2   Q    And what did you study?

3   A    First I studied English, and then I switched to history.

4   Q    Do you currently work?

5   A    Yes.

6   Q    Where do you work?

7   A    Alorica.

8   Q    What's that?

9   A    We are a call center service.  I work for Best Buy

10  mostly.  I work for Alorica, but Best Buy is our client.  So I

11  handle calls for Best Buy customer service.

12  Q    Do you know the defendant, Raymond Goldesberry?

13  A    Yes.

14  Q    How do you know him?

15  A    He was my dad's best friend my entire life.

16  Q    So how long have you known him?

17  A    Twenty-two years.

18  Q    Is that how old you are?

19  A    Yes.

20  Q    And you said he was your dad's best friend.  Did you live

21  near Mr. Goldesberry?

22  A    No.  My dad moved from Tulsa when I was still a baby.  So

23  we would always travel to visit the Goldesberrys.

24  Q    How often do you think you would travel?

25  A    Often.  A few times a month, I would see them.

1  Q    And what would you do when you would go see them?

2  A    Spend time with them.  Spend time with his daughters.  I

3  would spend time with them.  They were like my second parents.

4  Q    Who was your second -- like your second parents?

5  A    Raymond and Michelle.  We just would hang out at the

6  house.  They would take me to the movies.  We would cook

7  dinner, have dinner.

8  Q    And who's Michelle?

9  A    Raymond's wife.

10  Q    And you said "daughters."  Who are his daughters?

11  A    Faith and Kaitlyn.

12  Q    Do you know their ages?

13  A    Faith is 20 now; Kaitlyn is 16.

14  Q    When you were growing up, did you spend equal amounts of

15  time with both of them or more time with one or the other?

16  A    I spent more time with Faith when we were younger, but as

17  Kaitlyn was going through puberty, I spent more time with her.

18  She was my little sister.  She needed as much support as she

19  could get so I spent --

20  Q    What -- I apologize.

21  A    -- so I spent more time with her.

22  Q    I'm sorry for cutting you off.

23  A    No, it's all right.

24  Q    What types of things would you and Kaitlyn do?

25  A    We would sit down and do puzzles.  I would take her

1   shopping with me, to the mall, to Walmart, or we'd just sit

2   down and talk.  I'd ask her if she needed to unload anything,

3   if there's any school drama I needed to hear about.  I would

4   help her with her chores, like cleaning the kitchen, doing the

5   dishes.

6   Q    I'd like to direct your attention to May 2020.  At the

7   end of that month, do you recall Kaitlyn staying with you?

8   A    Yes.

9   Q    And where were you living at that time?

10   A    In Miami, with my grandparents.

11   Q    And did Kaitlyn come out and stay with you at your

12   grandparents?

13   A    Yes.

14   Q    And what were you doing with Kaitlyn during that time?

15   A    We mostly swam in the pool or did puzzles.  We didn't

16   leave the house very much.  We just kind of hung out, you know,

17   did stuff in the house, puzzles, TV.

18   Q    When Kaitlyn was visiting you at the end of May 2020, did

19   you -- did you and Kaitlyn have a conversation about things

20   that were bothering her?

21   A    Yes.

22   Q    During that conversation, did Kaitlyn share things with

23   you that made you worried?

24   A    Yes.

25   Q    What did you do after you heard these things from

1    Kaitlyn?

2    A    I encouraged her to tell her mother.

3    Q    Okay.  You were all out at your house; right?

4    A    Yes.

5    Q    So did you encourage her to call, or did you do something

6    else?

7    A    No.  I encouraged her to tell me the rest of the story

8    first.  She did not disclose everything.  I felt like there was

9    more.  I told her whenever we got back, though, she should tell

10   her mother.

11   Q    Did you take her back home to her parents?

12   A    Yes.

13   Q    That night or the next day or something else?

14   A    She had started disclosing things to me a day or two

15   before I took her home to her parents.

16   Q    And when you got her back home to her parents, did you

17   encourage her to talk to her mom about what she'd told you?

18   A    Yes.

19   Q    Did you participate -- did you see Kaitlyn go talk to her

20   mom?

21   A    Yes.  I originally went into a separate room with them.

22   I asked Kaitlyn if she would like me to leave the room, if that

23   would be more comfortable for her, and she requested that I

24   did.

25   Q    So did you leave?

1    A    Yes, I left the room.

2    Q    And so you weren't there for the conversation between

3    Kaitlyn and her mom?

4    A    No.

5    Q    Did you see anybody else walk into that room to talk to

6    Kaitlyn and her mom?

7    A    No.

8    Q    Where did you go during that time?

9    A    I was in the living room with my unc- -- with Raymond and

10    my boyfriend and Faith.

11    Q    And at some point, did Michelle come back out?

12    A    Yes.  She came back out and said she and Kaitlyn were

13    going for a drive.

14    Q    When they got back from that drive, what did you see --

15    or let me -- let me ask a different question.

16        When they got back from the drive, did everyone come back

17    to the main room again?

18    A    Very briefly.  Michelle asked that Raymond go back to

19    their bedroom with her and Kaitlyn.

20    Q    And so then what did you see them do?

21    A    I saw them -- Michelle, Raymond, and Kaitlyn head to

22    Michelle and Ray's bedroom.

23    Q    And what did you do?

24    A    I sat in the living room with Faith and my boyfriend.

25    Q    So you weren't a part of the conversation between

1    Michelle, Raymond, and Kaitlyn?

2    A    No.

3    Q    At some point, did Michelle come back out and talk to you

4    and Faith?

5    A    Yes.

6    Q    Did you and Michelle and Faith discuss what Michelle had

7    been talking to Kaitlyn about?

8    A    Yes.

9    Q    Did you and Michelle and Faith talk about other topics as

10   well?

11   A    Yes.

12   Q    Did those topics concern you?

13   A    Yes.

14   Q    Did you learn other things that night that worried you?

15   A    Yes.

16   Q    And what did you do?

17   A    I encouraged them to go to the police.

18   Q    Are you aware if they did?

19   A    No.

20   Q    So what did you do next?

21   A    I tried to get Kaitlyn to come back to Miami with me that

22   evening along with Faith.  Kaitlyn declined.  Faith accepted.

23   And we left the house.

24   Q    Did you make any reports after that night?

25   A    I did.  The next day, I called CPS.

1    Q    Did -- anybody you talked to before you called CPS?

2    A    I spoke with my father.  I asked him the best course of

3    action to take.

4    Q    And you then called CPS?

5    A    Yes.

6    Q    And did you report what you had heard and seen while you

7    were at the Goldesberrys'?

8    A    Yes.

9    Q    At some point, the Goldesberrys found out that you had

10   reported, didn't they?

11   A    Yes.

12   Q    How did they react?  How did -- let's focus on, how did

13   Kaitlyn react?

14   A    Angrily.

15   Q    Well, how do you know she was angry?

16   A    She was explosive and loud, and she was just -- if you

17   know Kaitlyn, you knew her energy was angry.

18   Q    So after the Goldesberrys learned that you had reported,

19   did you go back to the Goldesberry house?

20   A    Yes.

21   Q    And who was there?

22   A    Raymond was located in the backyard.  I did not see him.

23   I was inside the house with Michelle, Faith, and Kaitlyn.

24   Q    And that's when Kaitlyn was yelling at you?

25   A    Explosive, yes.

1    Q    Without telling me what anyone said, how did Michelle

2    react to you telling CPS?

3    A    Also angrily.

4    Q    How do you know she was angry?

5    A    Also explosive, yelling, her tone of voice.

6    Q    And you said you didn't see the defendant?

7    A    No.

8    Q    You -- I believe you said he -- he was in the backyard.

9    If you didn't see him, how did you know that?

10   A    I was told.

11   Q    Okay.  How did all of that make you feel when they got

12   mad at you for telling?

13   A    Upset, scared, worried.  That's -- that's pretty much it.

14   Q    Have you talked to any of them since that night when they

15   confronted you for telling?

16   A    No.  I've had no contact.

17   Q    Because you don't want contact?

18   A    I would love to have contact with the girls.

19   Q    Were the Goldesberrys like a second family to you?

20   A    Ray and Michelle were my second parents.  And those girls

21   were my sisters.

22   Q    How has it been since you reported it?

23   A    I've lost an entire family.

24         **MS. DIAL:**  No other questions, Your Honor.

25                         CROSS-EXAMINATION

```
1    BY MS. BROWN:
2    Q    Just as a foundational question:  You are not related to
3    Oklahoma Governor and United States Senator Dewey Bartlett, are
4    you?
5    A    No direct relation as far as I know.  I have been told it
6    could be a distant relation, but I do not know him personally.
7    Q    And same question:  You don't know personally or aren't
8    related to Mayor Dewey Bartlett Jr; correct?
9    A    Correct.
10   Q    Okay.  When you and Faith went back to Miami the night
11   before you reported, that was the night before Memorial Day;
12   correct?  Sunday, May --
13   A    I --
14   Q    -- 24th?
15   A    -- believe so.
16   Q    Okay.  So that night that you went back with Faith to
17   Miami, you claim that you had already told Faith what Kaitlyn
18   had said about the incident with her -- their dad?
19   A    Yes.
20   Q    And you're saying that Faith left town with you and
21   didn't stay with her sister or her family even though you'd
22   told her all this?
23   A    Yes.
24   Q    So you left Kaitlyn, the child, with Raymond and Michelle
25   and took Faith, the adult, to Miami with you?
```

1    A    Yes.

2    Q    But you were so concerned for Kaitlyn that you'd felt

3  like you needed to call DHS the next day?

4    A    Yes.

5    Q    And when you called DHS, that was when you and Faith were

6  in Miami, and Kaitlyn was in Tulsa with Raymond and Michelle?

7    A    Yes.

8    Q    Okay.  You had -- you told DHS when you called and

9  reported this on Monday, May 25th, that you had seen Kaitlyn

10  that morning, but that wasn't true, was it?

11    A    I did not tell them I saw her that morning.

12    Q    Okay.  So if the DHS records indicate that you said you

13  saw the child -- Kaitlyn, the child in question, that morning,

14  those records are inaccurate?

15    A    I saw her the morning before.

16    Q    Sunday -- Sunday morning, the morning before you went

17  back to Miami?

18    A    I do not know what day of the week it was.

19    Q    Okay.  But whatever day of the week it was, the day that

20  you reported, you had not seen Kaitlyn that morning; correct?

21    A    No.  I had only been in contact with Faith since the

22  night before.

23        MS. BROWN:  Your Honor, may I approach the witness?

24        THE COURT:  For what?

25        MS. BROWN:  To show her about the reporting documents that

1    I referred to.

2         **THE COURT:**  Did you show it to counsel?

3         **MS. BROWN:**  It's Bates 19.

4         **MS. DIAL:**  It's in Government's Exhibit -- should be in

5    discovery with Government's Exhibit 19.

6         **MS. BROWN:**  Okay.

7    Q    (By Ms. Brown) Do you have the binder up there that has

8    the Government's exhibits?  It should be white.

9    A    This one?

10   Q    Yeah.  Yeah.  Will you turn to No. 19 for me, Tab 19.

11   Tell me when you've had a -- okay.

12        Now, the way these reports are, there's like little

13   blocks.  Do you see what I'm saying?

14   A    Uh-huh.

15   Q    I'm just going to try to help you see if -- you're

16   welcome to read the whole thing if you want.  If you flip back

17   to the page before the page that has the exhibit sticker on it,

18   the one that's -- says page 18 at the bottom in red, you see

19   No. E, reporter information, Meagan Bartlett.

20        That's you; correct?

21   A    I do not see anything on this page.

22   Q    On page -- when -- when you --

23   A    Eighteen.

24   Q    I'm sorry.  When you flip to the 19 tab, but the very

25   first page.

```
 1    A    Uh-huh.

 2    Q    The one that has the Exhibit 19 sticker on it.

 3         I'm not trying to confuse you, I promise.  I just want to

 4    make sure you're on -- literally on the same page as I am.

 5    A    Yeah.

 6    Q    And you can see where it says, E, reporter information,

 7    Meagan Bartlett.

 8         That -- you're the reporter; correct?

 9    A    Yes, I am the reporter.

10    Q    The person that called CPS.  And then F is the details.

11    And so if you flip the page -- I'm not trying to trick you --

12    if you go to -- there's two big blocks, three, four -- fifth

13    block, "Reporter saw the child this morning," that is not

14    something that you said.  They got that wrong?

15    A    I'm sorry; I'm not seeing it.

16    Q    It's okay.  Are you having a hard time?

17    A    I am.

18    Q    That's okay.  So on -- there's these red numbers right

19    here on the bottom.  I'm on page 19.

20    A    Uh-huh.

21    Q    Okay?  And then if you'll look at the bold question,

22    "Does the child have any injuries," do you see that?

23    A    Does the child have injuries?

24         I do see it.

25    Q    Okay.  And then right under that, it says, "Reporter" --
```

1  that's you -- "saw the child" -- that's Kaitlyn -- "this

2  morning."

3    A    "This morning" is referring to very, very early in the

4  morning, as in an hour or two after midnight.

5    Q    So the night before?

6    A    Yes.

7    Q    And even though you were the person who called DHS and

8  really kind of get -- got this whole ball rolling, they didn't

9  contact you to interview you for three weeks, did they?  It was

10  June 15th, 2020?

11    A    Correct.

12    Q    Your boyfriend, John Mahan, was present at the

13  Goldesberrys' house the night that you brought Kaitlyn back

14  with you from Miami; correct?

15    A    Yes.

16    Q    And then did he return to Miami with you and Faith?

17    A    Yes.

18    Q    Okay.  But when you and Kaitlyn went to Miami that

19  Thursday before, a couple days before, it was just you and

20  Kaitlyn in the car on the way to Miami?

21    A    Yes.

22    Q    Okay.  You told law enforcement that on the days that you

23  were sharing this information with Mrs. Goldesberry -- so I'm

24  talking about Michelle -- that you texted Mrs. Goldesberry

25  several times.  Do you recall that?

1    A    I do remember having a text conversation.

2    Q    Supposably, according to you, on the day you brought

3    Kaitlyn home from Miami, you texted Mrs. Goldesberry --

4    Goldesberg -- I'm sorry; Goldesberry, to meet you and Kaitlyn

5    in Faith's room.  Do you remember claiming that?

6    A    I do not remember specific details about it, no.

7    Q    Okay.  That's okay.  If you'll flip for me with that

8    binder to Tab No. 21.

9         And then obviously at some point during the course of

10    the -- this case pending, you've met with the folks over here

11    at this table; correct?

12    A    Yes.

13    Q    Okay.  And when you met with them, they asked you a bunch

14    of questions.  And one of the times you met with them was in

15    December of 2020; correct?

16    A    I am not sure on specific dates.

17    Q    Okay.  If you'll look at the Tab No. 21 that I just

18    referenced, if you'll glance at that, does that look like a

19    summary of the time that you met with them?

20    A    Yes.  I was in contact with a separate FBI agent in

21    December of 2020.

22    Q    Okay.  So I'm just making sure timeline-wise, you --

23    A    Yes.

24    Q    -- understand what I'm saying.

25         So in that conversation with that FBI agent, when that

```
1    FBI agent was interviewing you -- let's see if I can find it so
2    I can help.  Did you tell that FBI agent that you had texted
3    Michelle and asked her to come and talk -- Mrs. Goldesberry,
4    and asked her to come and talk to you in Faith's room?
5    A    I do not remember the specific conversation.
6    Q    Okay.  Would looking through your statement there help
7    refresh your recollection since it's been since December of
8    2020?  I can direct your atten- -- Miss Bartlett?  Would
9    looking at that help you refresh your recollection?
10   A    Yes.
11   Q    Okay.  Just skip to that second page for me, same tab,
12   third paragraph, after "Faith."
13   A    I do have a vague memory of texting Michelle.  I do not
14   remember the specific words used.
15   Q    Okay.  But do you remember -- now, do you remember not
16   only texting her, but then telling the FBI that you texted her?
17   A    Yes.
18   Q    Okay.  Not trying to trick you.
19        And then again, according to you, after you and Faith
20   spoke privately -- do you remember discussing that just a few
21   minutes ago on direct examination where you had a private
22   conversation with Faith?
23   A    Yes.
24   Q    Okay.  After you and Faith spoke in Faith's room, you
25   also claim you texted Michelle to join you.  Do you recall
```

1    that?

2    A    Yes.

3    Q    Okay.  And so something as simple as turning over those

4    text messages could have corroborated at least that part of

5    your story; correct?

6    A    Yes.

7    Q    But you never provided those text messages to DHS, TPD,

8    the FBI, or the prosecutors, did you?

9    A    No.

10   Q    By the time you and Faith return from Miami to Tulsa, you

11   had already made your CPS -- or your DHS referral; correct?

12   A    I'm sorry.  By the time Faith and I returned to Tulsa?

13   Q    Uh-huh.

14   A    Yes.

15   Q    'Cause you made it when you were in Miami.

16   A    Yes.

17   Q    Okay.  So you had already started the investigation

18   before you brought Faith back to Tulsa.  And so you already

19   knew -- by the time you and Faith made it from the hospital

20   where you were visiting your mom back to the Goldesberrys', you

21   already knew that CPS had contacted Michelle by then; correct?

22   A    I didn't.  CPS was not in contact me -- with me.  I did

23   not know when they made contact.

24   Q    Isn't it true that while you and your dad were visiting

25   your mom in the hospital, Faith was in the car waiting?

1    A    Yes.

2    Q    And then Faith starts trying to get ahold of you to tell

3    you that -- that you guys need to go?  Do you remember that?

4    A    Yes.

5    Q    And that was also via text message; correct?

6    A    I do believe so.  I know she tried to call me a couple of

7    times.

8    Q    And that was because, while Faith was in the car waiting

9    at the hospital for you and your dad to visit your mom, Faith

10    got a call indicating that CPS was involved, and she was

11    frantic to get home; isn't that true?

12    A    Yes.

13    Q    Okay.  So by the time you and your dad get back in the

14    car with Faith, Faith knew something was up that involved DHS;

15    correct?

16    A    Yes.

17    Q    Did she seem surprised?

18    A    Disappointed.

19    Q    You did provide the text messages that Faith sent you to

20    the Government while you were in the hospital visiting your

21    mom, though; correct?

22    A    Yes.

23    Q    And then you provided text messages to the Government

24    that you sent Faith on her 19th birthday in July 2020, months

25    after this happened; correct?

1    A    Yes.

2    Q    Your mother was in the hospital because she had attempted

3    suicide; correct?

4        **MS. DIAL:**  Objection.

5        **THE WITNESS:**  She --

6        **THE COURT:**  Sustained.

7    Q    (By Ms. Brown) Are you aware that the Sunday night, the

8    night before you called DHS, Mr. Goldesberry had confronted

9    your father, and they'd had a disagreement?

10       **MS. DIAL:**  Objection.  Relevance.

11       **THE COURT:**  Sustained.

12   Q    (By Ms. Brown) No one from the Tulsa Police Department

13   ever contacted you or attempted to interview you, did they?

14   A    No.

15   Q    Detective Scott Murphy with the pol- -- Tulsa Police

16   Department was assigned to this case.  But he or anybody from

17   his unit or office never attempted to get a recorded interview

18   with you, did they?

19   A    No.

20   Q    So after you made the referral, which is documented,

21   correct, 'cause you've seen that documentation?

22   A    (Witness nodded head up and down.)

23   Q    DHS interviewed you about three weeks later in June of

24   2020; correct?

25   A    Yes, I do believe so.

1    Q    But then nobody else with any agency or law enforcement

2    or anybody bothered to contact you and ask you about any of

3    this until that conversation that we just discussed with the

4    FBI agent in December of 2020; correct?

5    A    Correct.

6    Q    And that first conversation with the FBI, that was just

7    over the phone; right?  They didn't even bring you into their

8    offices?

9    A    Correct.

10    Q    The night that you've described that you brought Kaitlyn

11    home and Kaitlyn and Michelle -- oh, sorry -- Kaitlyn and

12    Mrs. Goldesberry had a private conversation that you weren't

13    privy to; right?  You remember that part?

14    A    (Witness nodded head up and down.)

15    Q    They left; right?

16    A    Yes.

17    Q    And when Michelle and Kaitlyn came back, they had pizza;

18    correct?

19    A    I don't remember.

20    Q    Okay.  Do you recall that you ate with them that night?

21    A    Yes.  I usually ate dinner with them when I was there.

22    Q    Okay.  Do you recall the conversation prior to

23    Michelle -- I'm sorry -- Mrs. Goldesberry and Kaitlyn having

24    their private conversation where the group was discussing what

25    they were going to eat for dinner, and Michelle ordered pizza?

1    A    I do not.

2    Q    Then the FBI and the prosecutor interviewed you again on

3    February 17th of 2022, just maybe a month ago?

4    A    Yes.

5    Q    And in that interview, that was now two years after this

6    conversation that you had with Kaitlyn and ultimate

7    confrontation that you guys had at the Goldesberrys' house;

8    correct?

9    A    Yes.

10   Q    And you haven't spoken to any member of the Goldesberry

11   family, not Mr. or Mrs. Goldesberry and not Kaitlyn or Faith,

12   since that May 2020 night when Kaitlyn was explosively angry at

13   you; correct?

14   A    Correct.

15   Q    To be absolutely clear, when Kaitlyn and Michelle -- when

16   Kaitlyn and Mrs. Goldesberry went back into the bedroom, they

17   asked you to leave, and you have no idea the topic of

18   conversation or the substance of that conversation while you

19   were gone; correct?

20   A    Correct.

21   Q    And then there was a separate conversation on the night

22   that you and Faith came back from Miami after you'd made the

23   DHS referral.  And in that conversation, that was when your dad

24   was at the house -- the Goldesberrys' house, not your

25   boyfriend; correct?

1    A    Correct.

2    Q    And that was the night that your dad and Raymond had a

3    conversation out in the back, but you weren't privy to that

4    too; correct?

5    A    Correct.

6    Q    And it was that second, separate night that you -- that

7    Kaitlyn found out that you had told Faith what she had told you

8    in confidence, and Kaitlyn was mad at you for having told Faith

9    as well?

10    A    Kaitlyn knew I told Faith the night that I encouraged her

11    to tell Michelle.

12    Q    Before you went back to Miami?

13    A    Yes.

14    Q    So according to you, even though there were two nights

15    that you were at the Goldesberrys' house over the course of a

16    week, all kind of around Memorial Day weekend in May of 2020,

17    your testimony is that you had told Mrs. Goldesberry and Faith

18    the stuff that Kaitlyn told you that made you concerned before

19    you ever went back to Miami; correct?

20    A    I did not tell Michelle what Kaitlyn had told me.  I

21    encouraged Kaitlyn to tell her herself.

22    Q    You just told Faith?

23    A    Faith opened up to me.  I did not give her any details

24    until after she opened up to me and gave me the same details

25    Kaitlyn did.

 1      **MS. BROWN:**  Objection, Your Honor.  Nonresponsive.

 2  Violation of 404.

 3      **THE COURT:**  Overruled.

 4  Q    (By Ms. Brown) Was Mrs. Goldesberry surprised by this,

 5  for lack of a better phrase, incident or allegation that brings

 6  us to court today?

 7  A    No.

 8  Q    You remember talking to the FBI in December of 2020, and

 9  you told them then that she wasn't surprised.  But then two

10  years later, when the FBI and the prosecutors met with you in

11  February of 2022, you told them that Mrs. Goldesberry was

12  surprised by the allegation.

13  A    She was surprised by the CPS call.

14          (Defendant Goldesberry snoring.)

15      **MS. BROWN:**  Just a moment, Judge.

16  Q    (By Ms. Brown) Have you ever seen Raymond fall asleep

17  sitting up in a chair in the middle of the day?

18  A    Yes.

19  Q    Is that something that he does fairly frequently?

20  A    Yes.

21  Q    Is he a heavy sleeper?

22      **MS. DIAL:**  Objection.  Knowledge.

23      **THE COURT:**  Sustained.

24  Q    (By Ms. Brown) So you were -- you were concerned for

25  Kaitlyn and -- and you wanted her to go back to Miami with you,

```
 1   didn't you?
 2   A    Yes.
 3   Q    But she didn't want to go with you, did she?
 4   A    No.
 5   Q    And she didn't know, oh, that you had told anybody or
 6   were planning on telling anybody when she chose to stay with
 7   her parents; correct?
 8   A    She did not know I was planning on contacting CPS.
 9   Q    Okay.  You are -- are you -- are you 30?  You were born
10   in '91?
11   A    I am 22.  I was born in '99.
12   Q    Hmm.  Would you flip to Tab No. 21 for me.  That's that
13   same report from December of 2020 --
14   A    Okay.
15   Q    -- that we looked at earlier.
16   A    Yes.
17   Q    Right there on the first line, doesn't -- doesn't this
18   say that you told the FBI and the prosecutors that you were
19   born in 1991?
20   A    That is what is -- is written down on record.  I told
21   them afterward, though, that we had caught that typo, and that
22   I was indeed born in '99.
23   Q    So this official record that's in that binder in front of
24   you is wrong; right?  They made a mistake?
25   A    On my date of birth.
```

1    Q    Correct.

2         What do you do for a living?

3    A    I am a call center agent.

4    Q    Isn't it true that you have a business Instagram account

5    as well?

6         **MS. DIAL:**  Objection.

7         **THE COURT:**  Overruled.

8         **THE WITNESS:**  It's not my business.

9    Q    (By Ms. Brown) Well, isn't it true that you actually

10   described it as a business Instagram account to the prosecutors

11   when you met with them and they asked you about it?

12   A    I don't believe I ever described it as a business.

13   Q    On that Instagram account, you ask men for money in

14   exchange for edgy boudoir, nearly nude photos with plants;

15   correct?

16        **MS. DIAL:**  Objection.  Relevance.

17        **THE COURT:**  Sustained.

18   Q    (By Ms. Brown) If you wouldn't mind, please, Miss

19   Bartlett, turning to Tab 22.

20   A    (Witness complied.)

21   Q    On that tab, this is -- this is the summary from your

22   interview in February of this year, correct, what you're

23   looking at?  Just to make sure we're looking at the same thing.

24   A    Yes.

25   Q    And if you'd flip to the fourth page in that tab, it

1    should have a -- a number 263 in red at the bottom.

2         Are you there?  Okay.

3    A    Yes.

4    Q    One, two, three, four, fifth paragraph, it's the -- it's

5    the big paragraph that starts with "approximately."

6    A    Yes.

7    Q    Okay.  Isn't it true that it at least reflects in this

8    report that you called it a business account?

9    A    It does reflect it is a business account.

10   Q    So that would also be --

11        **MS. DIAL:**  Objection.

12        **THE COURT:**  Sustained.

13   Q    (By Ms. Brown) Would you agree there are multiple

14   mistakes in these reports?

15   A    I would agree there are a couple of mistakes.

16   Q    That's fair.  Thank you.

17        **MS. BROWN:**  If I may have just one moment, Judge?

18        **THE COURT:**  Yes, ma'am.

19             (Discussion held off the record.)

20        **MS. BROWN:**  Pass the witness.

21                       REDIRECT EXAMINATION

22   BY MS. DIAL:

23   Q    Miss Bartlett, did you write the reports that you've just

24   looked at?

25   A    No.

1    Q    So any mistakes in there, those weren't made by you;

2    right?

3    A    Correct.

4    Q    You were asked about, "Reporter saw the child this

5    morning."  I think you said early morning?

6    A    Yes, one or two in the morning.

7    Q    Help us understand what you mean.  Were you at the

8    Goldesberrys' till one or two?

9    A    Yes.

10   Q    And this is the night that what -- what night is this?

11   When they found out you'd called CPS?

12   A    No.  This is the night I had taken Kaitlyn back to Tulsa.

13   Q    The night you encouraged her to tell her mom?

14   A    Yes.

15   Q    And I believe you testified that you saw her and her mom

16   go in a room; right?

17   A    Yes.

18   Q    And defense counsel clarified with you that you had no

19   idea the substance of the conversation between Mrs. Goldesberry

20   and Kaitlyn when they went back that first time?

21   A    No.

22   Q    You didn't know what they talked about; right?

23   A    I was not privy to the conversation.

24   Q    Your testimony earlier was, later that night, you saw the

25   defendant go in the room again, this time with Mrs. Goldesberry

1    and Kaitlyn; right?

2    A    They went into a separate room.  But, yes, they all

3    entered a room together.

4    Q    And you -- they all went in and talked, but you weren't a

5    part of that, were you?

6    A    Correct.

7    Q    Did you learn the substance of that conversation from

8    Michelle when she came out --

9    A    The words --

10    Q    -- with --

11    A    -- were never said specifically.

12    Q    Okay.  And I don't want to get into specific words of

13    anyone.

14    A    Right.

15    Q    Did Michelle come out and reference what the conversation

16    with the defendant and Kaitlyn and her had been about?

17    A    Yes.

18    Q    And was Michelle's statement part of what concerned you

19    when you made your CPS report?

20    A    Yes.

21    Q    And later that night, you took Faith home but not

22    Kaitlyn.  I know defense had asked you about that.  Why didn't

23    you take Kaitlyn?

24    A    She did not want to come with me.

25    Q    Can you make Kaitlyn do anything she doesn't want to do?

1    A    Nobody can make Kaitlyn do anything she doesn't want to

2    do.

3         **MS. DIAL:**  No other questions, Your Honor.

4         **THE COURT:**  You may step down, ma'am.

5         Counsel, come forward, please.

6              (The following proceedings were had at the bench

7    outside the hearing of the jury:)

8         **THE COURT:**  Who -- who is your next witness?

9         **MS. DIAL:**  Nathan Bartlett.

10        **THE COURT:**  How long will he be?

11        **MS. DIAL:**  We think we could be done with him before five

12   for both sides.

13        **THE COURT:**  Okay.

14             (The following proceedings were had in open court,

15   within the presence and hearing of the jury:)

16        **CSO:**  One of the jurors needs to use the restroom.

17        **THE COURT:**  Okay.

18        We'll take a short break.  Let's say ten minutes.  Okay?

19   Thank you.

20        **CSO:**  All rise.

21             (Jury out.)

22        **THE COURT:**  And you-all can take a break too.

23        **MS. BROWN:**  Thank you, Judge.

24             (A recess was taken.)

25        **THE COURT:**  I've been educated on the pronunciation of

1  what we call "Miami."  I guess we've been doing it wrong in

2  Florida.

3       MS. BROWN:  We just want to be different, Judge.

4            (Discussion held off the record.)

5            (Jury present.)

6       THE COURT:  Please be seated.

7       Who's your next witness?

8       MR. MCWATERS:  Your Honor, the Government calls Nathan

9  Bartlett to the stand.

10      THE DEPUTY COURT CLERK:  Would you raise your right hand,

11 please.

12            (Witness sworn.)

13      THE WITNESS:  I do.

14      THE DEPUTY COURT CLERK:  Thank you.  You can go ahead and

15 have -- have a seat right there, and then adjust the microphone

16 if you need to once you sit down.

17      THE COURT:  Sir, what is your full name?

18      THE WITNESS:  Nathan Andrew Bartlett.

19      THE COURT:  Spell your first name.

20      THE WITNESS:  N-a-t-h-a-n.

21      THE COURT:  You may inquire.

22            NATHAN ANDREW BARTLETT, called as a witness herein,

23 having been first duly sworn on oath, was examined and

24 testified as follows:

25

```
 1                        DIRECT EXAMINATION

 2    BY MR. MCWATERS:

 3    Q    Mr. Bartlett, where do you live?

 4    A    I live in Miami, Oklahoma.

 5    Q    And how long have you lived there?

 6    A    Six years.

 7    Q    Where do you currently work?

 8    A    Boys & Girls Club of Ottawa County.

 9    Q    And how long have you worked there?

10    A    Two months.

11    Q    And before the Boys & Girls Club, where did you live?

12    A    Say it --

13    Q    I'm sorry.

14    A    -- again.

15    Q    I'm sorry.  Where did you work?

16    A    I worked at the NEO A&M campus police department.

17    Q    What do you do for the campus police department?

18    A    I was the deputy director, which is the equivalent of a

19    assistant police chief.

20    Q    Before -- so how long have -- prior to working in the

21    campus police office, were you in law enforcement as well?

22    A    Yes.

23    Q    Approximately how many years do you think that you have

24    been in law enforcement?

25    A    Right around 20.
```

1   Q    Were you working for the campus police department in

2   2020?

3   A    Yes.

4   Q    And being -- being someone who has been in law

5   enforcement for a while, are you familiar with the term

6   "mandatory reporter?"

7   A    Yes.

8   Q    Do you know what that -- can you explain what that term

9   means?

10  A    What that term means is if you suspect child abuse has

11  gone on, you are duty-bound to report it to DHS, to whatever

12  authorities are available.

13  Q    Are there any exclusions or exemptions from -- from that

14  requirement?

15  A    No.

16  Q    And in 2020, were you a mandatory reporter?

17  A    Yes.

18  Q    I'd like to move on to your relationship with the

19  defendant, Mr. Goldesberry.  You know Mr. Goldesberry?

20  A    Yes.

21  Q    How do you know Mr. Goldesberry?

22  A    We have been friends since we were 16 in high school.

23  Q    So not to ask you an awkward question, but how long have

24  you known the defendant?

25  A    Twenty-six years?

1    Q    And we'll try not to do the math on that.  How would you

2    describe your relationship to the defendant prior to 2020?

3    A    Close, extremely close.

4    Q    And now, how would you describe your relationship to the

5    defendant?

6    A    We're not friends.

7    Q    When you say that you were close to the defendant, can

8    you give us just a lit- -- a little bit more detail about what

9    you mean by that?

10   A    He was my best friend.  Ray has always been there for me.

11   There have been times where I've been despondent.  The man has

12   held me while I cried.  There have been times when I've held

13   him when he's cried.  Our daughters grew up together.

14   Q    And you say now you are not friends with the defendant?

15   A    No, sir.

16   Q    When did you first find out about the allegations that

17   have been made against the defendant?

18   A    When my daughter Meagan came to my office.

19   Q    And, sorry; when -- when was that?  Do you remember?

20   A    I don't remember the exact date.  I believe it was in

21   April of 2020.  I would be guessing so...

22   Q    And how did you -- I think you already asked this but --

23   or answered this.  But how did you find out about the

24   allegations against the defendant?

25   A    My daughter told me.  She described what was told to her.

1   Q    What did you first think when you heard about the

2   allegations?

3   A    I, at first, thought that this is something that happened

4   due to the amount of details that I heard.

5   Q    What was your next thought after that?

6   A    That it needed to be reported.

7   Q    You said earlier that you were a mandatory reporter at

8   the time?

9   A    Yes.

10  Q    Did you want to report Mr. Goldesberry at the time?

11  A    Want?  No.

12  Q    And can you explain that?

13  A    He was my best friend.  I didn't want to believe that

14  something like that could have occurred.

15  Q    So what -- after you realized that he -- it needed to be

16  reported, what -- what were your next steps after that?

17  A    My next steps was I sat my daughter down, and we called

18  the DHS hotline.

19  Q    And you say "we."  Was it -- who actually made the

20  report?

21  A    My daughter.

22  Q    Why did you feel like you needed -- why did you feel like

23  Meagan needed to -- to make that call to DHS?

24  A    Because the description she gave me included --

25       MS. BROWN:  Objection.  Hearsay.

1    **THE COURT:**  The objection's overruled, but I think you

2    need to rephrase the question and direct the witness.

3    **MR. MCWATERS:**  Yes, Your Honor.

4    Q    (By Mr. Mcwaters) When you -- when you were telling

5    Meagan that you needed -- that she needed to make the report to

6    DHS, why did you think that you needed to make the report?

7    Without -- without getting into anyone's statements, what --

8    why did you -- what made you think that the report needed to be

9    made?

10   A    Because it fell under the requirements of the law.

11   Q    And you already said you were present when Meagan made

12   the report?

13   A    Yes.

14   Q    When did you first find out that DHS had contacted the

15   Goldesberrys about that report?

16   A    I believe it was in the next couple of days after that.

17   We had arrived at their house after dropping Faith off, and

18   Michelle had directed me to Raymond in the backyard in the

19   detached garage.

20   Q    So let's back up a little bit.  Why were you -- why were

21   you going back to the Goldesberrys' house at that point 'cause

22   you were -- you were up in Miami when Meagan made the report?

23   You said that she was in your office; is that right?

24   A    Yes.

25   Q    Okay.  So why did you drive down from Miami to -- back

1    down to Tulsa?

2    A    Faith had been staying with Meagan for several days.  And

3    her parents wanted her back home.

4    Q    And so you drove down in the car, you drove Faith down

5    and it was -- who was in the car with you?

6    A    Meagan and Faith.

7    Q    Do you recall when approximately you arrived at the

8    Goldesberrys' home?

9    A    I don't remember the exact time.

10   Q    And when you arrived at the Goldesberrys' home, who was

11   there?

12   A    Michelle, Faith, and Kaitlyn were sitting in the living

13   room.

14   Q    Was there anyone else in the house?

15   A    Not in the house.

16   Q    Was there anyone else on the property?

17   A    Mr. Goldesberry was in the detached garage in the

18   backyard.

19   Q    Was there a term that they called that -- that he called

20   it?

21   A    The shop.

22   Q    And how did you know that Mr. Goldesberry was in the

23   shop?

24   A    Michelle told me.

25   Q    What did you do when you found out that Mr. Goldesberry

1    was in the shop?

2    A    Michelle had said that he wanted to talk to me, so I went

3    back there to see him.

4    Q    And what did you and Mr. Goldesberry talk about?

5    A    When I opened the door and saw Ray, he was crying and

6    said that he had messed up and messed up real bad.  He said

7    that he was also talking to another man of God about the issue.

8    He went on to say that he wouldn't talk about what happened

9    between him and Faith.

10    **MS. BROWN:**  Objection.  We're not here about Faith.

11    **THE COURT:**  He's not going to -- he said he -- just ask

12    the next question.  Okay?

13    Q    (By Mr. Mcwaters) At some point during this conversation,

14    did you try to record the conversation?

15    A    Yes, I did.

16    Q    And why did you try to record the conversation?

17    A    Because if he was going to confess something of that

18    serious of a nature, I wanted it on recording and not just my

19    word.

20    Q    Why did you feel it was necessary to record the

21    conversation, though?

22    A    So it wouldn't be my word against his if it ever came

23    down to a criminal trial.

24    Q    Did you think he was going to say something that needed

25    to be recorded?

 1    A    I thought there was a possibility.

 2    Q    Why was that?

 3    A    Because of the details that Meagan had given me and that

 4    the way that he was acting.

 5    Q    How was he acting?

 6    A    He was crying.  He was sobbing.  He stated he had messed

 7    up.  He had further stated that he wouldn't necessarily talk

 8    about what he had done.

 9    Q    Did he ask you any other questions?

10    A    He asked me if he was speaking to Officer Nathan or

11    brother Nathan.

12    Q    And what did you say?

13    A    Brother Nathan.

14    Q    And did he say anything else about the allegations?

15    A    No.

16        MR. MCWATERS:  One moment, Your Honor.

17        THE COURT:  Okay.

18        MR. MCWATERS:  The Government passes the witness.

19        THE COURT:  Ms. Brown?

20        MS. BROWN:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22    BY MS. BROWN:

23    Q    Mr. Bartlett, you take medication that affects your

24    memory and cognitive function; correct?

25    A    Correct.

1    Q    Okay.  You have informed the prosecutors and the FBI that

2    you have a hard time with recalling certain details?

3    A    I have said there are some things I don't know or don't

4    remember.

5    Q    You said, when Mr. McWaters was talking to you, that when

6    you and your daughter Meagan arrived at the Goldesberry

7    residence, Mrs. Goldesberry and her two daughters, Kaitlyn and

8    Faith, were sitting on the couch in the living room when you

9    got there; correct?

10   A    Faith was with us and had walked in before I did.

11   Q    Okay.  That was my question 'cause face -- Faith was with

12   you when -- you're the one that brought Faith to the home?

13   A    Correct.

14   Q    Because you and your daughter Meagan had been visiting

15   your ex-wife in the hospital, and Faith was in the car while

16   you were visiting her; correct?

17   A    Correct.

18   Q    Okay.  When you and your daughter Meagan left the

19   hospital and got in the car, from the time that you guys

20   realized something was going on and Faith wanted to go home all

21   the way until you got to the actual Goldesberrys' residence,

22   okay? -- that's the time period I'm talking about just for this

23   question or a couple of questions -- isn't it true that Kaitlyn

24   called Meagan and was upset over the phone?

25   A    I can't testify to that.

1    Q    Were you and Meagan and Faith all in the same car?

2    A    Yes.

3    Q    Okay.  So isn't it true that Meagan got a call and was on

4    the phone most of the way from the hospital to the

5    Goldesberrys'?

6    A    I don't remember.

7    Q    Okay.  That's a -- that's something you can't say one way

8    or the other.  You just don't remember?

9    A    Correct.

10    Q    Okay.  You had -- were just testifying about how Mr.

11    Goldesberry asked you if he was talking to Officer Nathan or

12    his brother, Nathan.

13    A    Correct.

14    Q    And you told him it was his brother Nathan, but that was

15    not true, was it?

16    A    It was true.

17    Q    Well, you were in the process of trying to record him

18    like you were law enforcement.

19    A    I was not interrogating him.  It was if he wanted to talk

20    about it, he could talk about it.

21    Q    Okay.  Isn't it true that you tried to get him to talk

22    about it?

23    A    Negative.

24    Q    Do you recall reporting to the FBI and the prosecutors

25    that -- that when you were at the hospital and Faith was down

1    waiting for you in the car, that DHS was at the home?  Do you
2    remember saying that?
3    A    No, I've never said that.
4    Q    So if that is in their reports, that's inaccurate?
5    A    I would say that that is inaccurate.
6    Q    Okay.  There should be a binder like this next to you.
7    Let's see.  If you would turn to the Tab No. 23 for me, please.
8    A    (Witness complied.)
9    Q    Wait.  I might have got that wrong.  No, I'm -- that --
10    that's right.
11        This'd be -- do you recall talking to the Government,
12    talking to the FBI -- the date's there at the bottom left --
13    around February of this year, maybe about a month ago?
14    A    Yes.
15    Q    Okay.  And take your time; I'm not trying to trick you.
16    But I am, in an effort to save time, if it's helpful -- if
17    you'll flip to the second page of that tab.  There at the
18    bottom where you're looking, there should be a red No. 265.
19    Are we on the same page?
20    A    Correct.
21    Q    Okay.  And then second paragraph or first full paragraph
22    that starts with "Nathan and Meagan?"
23    A    I see it.
24    Q    If you would just read that quietly to yourself, and then
25    I'm going to ask you a question about that.

1    A    Okay.

2    Q    Having had an opportunity to read that, would you agree

3    that, at least according to the Government, you reported that

4    DHS was at their house?  That's the exact quote next to the

5    last line of that paragraph.

6    A    I never knew anything about DHS being at their house.

7    Q    So that's not accurate?  You would disagree that you

8    reported that to the FBI and the --

9    A    It never says --

10   Q    -- prosecutors?

11   A    -- I reported it in there.

12   Q    Well, you would agree that this is a summary of your

13   statement, correct, or your interview with them?

14   A    I would agree with that.

15   Q    Okay.  And you would agree that at least it says that you

16   reported to them, among other things, that DHS was at the

17   Goldesberrys' house?

18   A    Can you show me that exact line, please?

19   Q    Yes.  Next -- it -- it's that first full paragraph next

20   to the last line.  Starts with the words "informed Faith DHS

21   was at their house."

22   A    "Michelle informed Faith DHS --

23   Q    Don't read it.

24   A    -- was at their house."

25   Q    Don't read it out loud, sir.  I'm asking you if you would

1    agree with me --

2    A    I disagree.

3    Q    You disagree?

4    A    I never stated that.

5    Q    And that's just what I'm trying to get at, sir, that that

6    is inaccurate.  That you did not say that; is that correct?

7    A    It doesn't even say I said that in there.

8    Q    Okay.  We're going to have to go back.  Let me ask the

9    first question.  You disagree that it says that DHS was at

10   their house even though the words "DHS was at their house" is

11   in the statement?

12   A    I agree that DHS is in their house, but trying to say

13   that I knew that DHS was there would be entirely inaccurate.

14   Q    That's not what I'm trying to say.  Listen to my

15   questions.  My question is:  Does it say DHS was at their

16   house?

17   A    Yes.

18   Q    And in this statement, it is from when you met with these

19   people over here at this table and told them, to the best that

20   you could recall, what happened in May of 2020; correct?

21   A    Yes.

22   Q    And even though it says that DHS was at their house, you

23   don't have any recollection of having reported that because you

24   don't know whether DHS came to their house; correct?

25   A    Correct.

1    Q    Okay.  That's all I'm asking.

2         When you and Mr. Goldesberry were talking in the shop, he

3    indicated to you that -- that he -- when you said a "man of

4    God" earlier, he was referring to a pastor that he was speaking

5    to; is that correct?

6    A    I assumed that's what he meant.

7    Q    Okay.  And isn't it true that he articulated to you while

8    he was crying out there in the shop, just you guys talking,

9    that he was concerned about his marriage?

10   A    I don't recall that.

11   Q    Okay.

12        MS. BROWN:  Just a moment.

13             (Discussion held off the record.)

14   Q    (By Ms. Brown) Mr. -- Mr. Bartlett, ab- -- give or take

15   within the week of this happening, isn't it true that Mr.

16   Goldesberry, your friend, over the phone confronted you about

17   the way you speak of your ex-wife in front of your children?

18        MR. MCWATERS:  Objection.

19        THE COURT:  Sustained.

20        MS. BROWN:  May I make a brief record?

21        THE COURT:  Yes, ma'am.  Not here.  I'll send the jury

22   out.

23        Ladies and gentlemen, I need just a minute, please.

24        CSO:  All rise.

25             (Jury out.)

1        THE COURT:  All right.

2        MS. BROWN:  Thank you, Your Honor.

3        THE COURT:  I assume that -- I assume the object- -- or

4   what's the basis of the objection?

5        MR. MCWATERS:  Relevance, Your Honor.

6        THE COURT:  Okay.

7        Go ahead.

8        MS. BROWN:  Your Honor, I believe that the confrontation

9   that occurred within a week of this occurring upset

10  Mr. Bartlett.  I believe that -- the proffer would be that if

11  allowed to continue to question, that my client had a phone

12  conversation that was heated and that upset Mr. Bartlett within

13  a week of this occurring, within days of he and Meagan calling

14  DHS and reporting this incident, and it was specifically --

15       THE COURT:  See, the problem I have is I don't know what

16  the witness has said that is inconsistent with your theory of

17  the case at all.  And you go into cross-examination, what --

18  you're going to try to show that he had a motive to fabricate?

19  Is that it?

20       MS. BROWN:  Correct.

21       THE COURT:  What did he fabricate about, do you think?

22       MS. BROWN:  It -- it's not a motive to fabricate.

23       THE COURT:  What -- what is the point you're trying to

24  make?

25       MS. BROWN:  The -- it -- it's a motive to have gotten

1    DH- -- to blow this up bigger than it should have been.

2         THE COURT:  Do you disagree that he's required by law to

3    do that?  I mean, in Florida, I know you are.  I assume that

4    Oklahoma's the same.  If you get information of a sexual

5    battery on a child, you're required to report it.

6         MS. BROWN:  But, again, it -- it kind of --

7         THE COURT:  Particularly if you're in a position of

8    authority, like in law enforcement.

9         MS. BROWN:  I certainly don't disagree with that.  In

10   fact, in Oklahoma, everyone's a mandatory reporter.

11        THE COURT:  Well, I think it is that way everywhere.

12        MS. BROWN:  Uh-huh.  And it should be.  I agree.  However,

13   I -- I believe that their motives for the fabrication of some

14   of the things that they reported --

15        THE COURT:  Wait a minute.  "Their motives?"  Whose

16   motives?

17        MS. BROWN:  The Bartletts.

18        THE COURT:  Well...

19        MS. BROWN:  I just wanted to be sure and make a record for

20   appeal purposes, Your Honor.

21        THE COURT:  Well, I'm taking you at your word that you

22   somehow think this is relevant, and I don't know that you can

23   connect it.

24        MS. BROWN:  Okay.  Your Honor, since we're outside the

25   presence of the jury, before I pass this witness, I am going to

1    reiterate my request and objection to the Court's ruling, while

2    I understand and respect the Court's ruling, for appeal

3    purposes, to the --

4         THE COURT:  Your 404 objection?

5         MS. BROWN:  No.  The Government's motion in limine with

6    regard to Mr. Bartlett and Meagan and the incident in the bed

7    that you ruled on this morning.

8         THE COURT:  You're going too fast for me.  Let me take

9    this up first.  Okay?

10        MS. BROWN:  Okay.

11        THE COURT:  I'll give you an opportunity to make your

12   other record.

13        The original question was that --

14        MS. BROWN:  About a week prior --

15        THE COURT:  -- Mist- --

16        MS. BROWN:  -- had they gotten into an argument?

17        THE COURT:  They'd gotten into an argument, and it was

18   about how --

19        MS. BROWN:  Mr. Bartlett speaks --

20        THE COURT:  -- Mr. Bartlett talked to his wife?

21        MS. BROWN:  Talks about his wife in -- in front of his

22   children.  Essentially, he's disresp- -- the argument --

23        THE COURT:  Okay.

24        MS. BROWN:  -- of course --

25        THE COURT:  Why don't you ask him the question outside the

US DISTRICT COURT - NDOK
REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1    presence of the jury?

2        **MS. BROWN:**  Okay.

3    Q    (By Ms. Brown) Isn't it true that within a week of this

4    occurring, Mr. Goldesberry confronted you about the way that

5    you speak regarding your ex-wife, Nikkie, in front of your

6    children?

7    A    Not that I recall.

8    Q    Do --

9    A    Nothing.

10   Q    Do you recall there being a conversation that upset you

11   over the phone where Mr. Goldesberry was telling you he did not

12   appreciate the way that you talked about your ex-wife and the

13   names that you called her at -- or being disparaging about her

14   in the presence of your daughters, Meagan and Sara?

15   A    No.  Mr. Goldesberry was more disparaging about my wife

16   than I ever was.

17   Q    So you -- it's your testimony that you were not upset,

18   within the week, at Mr. Goldesberry about anything?

19   A    No, I was not.

20       **THE COURT:**  So?

21       **MS. BROWN:**  No need to reiterate that --

22       **THE COURT:**  Okay.

23       **MS. BROWN:**  -- in front of the jury.

24       **THE COURT:**  So now are you through with this witness?

25       **MS. BROWN:**  The only other record that I need to make is

1    that I -- the Government had filed a motion in limine that --

2         THE COURT:  Okay.  We're not going to do that now 'cause

3    that's going to make us late.  I'll let you do it after the

4    jury's left.

5         MS. BROWN:  Okay.

6         THE COURT:  Please return the jury.

7         MR. MCWATERS:  Brief redirect, Your Honor?  Very brief.

8         THE COURT:  It'll have to be very brief.

9         MR. MCWATERS:  Yeah.  Yeah, it will be.

10        THE COURT:  After I release you, Mr. Nathan, you're to

11   remain on-call until you hear otherwise.  Okay?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  I mean, Mr. Bartlett.

14             (Jury present.)

15        THE COURT:  Yes, sir.

16        MS. BROWN:  Your Honor, I pass the witness.

17                       REDIRECT EXAMINATION

18   BY MR. MCWATERS:

19   Q    Mr. Bartlett, do you remember defense counsel asking you

20   questions about medical prescriptions that you were on?

21   A    Yes.

22   Q    And do you remember that she asked you if those medical

23   prescriptions have any effect on your memory?

24   A    Yes.

25   Q    Do those medical prescriptions that you are taking

1    currently today affect your testimony today?

2    A    No.

3    Q    Did it affect your ability to testify truthfully today?

4    A    No.

5    Q    One other line, Mr. Bartlett, about -- defense counsel

6    asked you, again, about you recording the conversation?

7    A    Yes.

8    Q    Were -- do you recall that?

9    A    Yes.

10   Q    Were you able to record the conversation?

11   A    No.

12   Q    Did the defendant ask you anything about recording the

13   conversation?

14   A    No.

15   Q    All right.

16        **MR. MCWATERS:**  Thank you.

17        **THE COURT:**  Okay.

18        You may step down, sir.  You're -- Mr. Bartlett, you --

19   you're not released from your subpoena, though.  You need to

20   remain on-call.

21        **THE WITNESS:**  Yes, sir.

22        **THE COURT:**  Okay?  Thank you, sir.

23        Ladies and gentlemen, thank you very much for your time

24   and attention today.  You've been a very good jury.  And I know

25   this is a long day, and I imagine some of you have long drives

1    home.  I appreciate your patience.  If you'll be back at

2    nine o'clock tomorrow, we'll resume with this case.

3        I think we're on schedule or ahead of schedule, and I hope

4    we'll keep it that way.  Thank you.  Remember my instructions.

5    Do not talk about this case with anyone.

6        If you -- when you get home or if you call your friends,

7    talk to family members, and they want to know about the case,

8    you tell them the Judge is an old grouch, and he's instructed

9    me not to talk about it and I'm not going to do it until the

10   case is finished.  Okay?

11       **CSO:**  All rise.

12            (Jury out.)

13       **THE COURT:**  You know, this is a short case without many

14   witnesses and it -- it seems simple to me, but I'm not -- I'm

15   not a lawyer in the case.  It's simple, but it's got some --

16   some wrinkles in it.

17       But there's -- there's not much dispute as to the acts

18   that took place.  It's all about intent.  And that's why some

19   of these things we wind up talking about seem -- I'm -- and

20   it's difficult to understand the significance of them.

21       Ms. Brown, what do you want to do now?  You want to --

22       **MS. BROWN:**  I just wanted to make a -- may I approach the

23   podium?

24       **THE COURT:**  Yes.

25       **MS. BROWN:**  Just to make sure you can hear me.

1    I just wanted to make a brief record for appellate

2    purposes in the event that it -- an appeal were to become

3    necessary.  This morning, Your Honor heard a number of motions

4    before we got started with voir dire.

5        THE COURT:  Right.

6        MS. BROWN:  And one of the motions that we heard was a

7    Docket Item No. 54, which was the Government's motion in limine

8    regarding Mr. Bartlett, who just testified, and his daughter

9    and an incident where they were in bed, and he put his arm

10   around her and touched her breast.

11       The Court sustained the Government's motion in limine, and

12   so I didn't attempt to get into that with Mr. Bartlett in front

13   of the jury.  But in the event of an appeal, I wanted to

14   re-urge my objection to the Court's ruling.

15       THE COURT:  Okay.

16       MS. BROWN:  Thanks, Judge.

17       THE COURT:  Okay.  Thank you.  Thank you, Ms. Brown.

18       Okay.  You've all had a long day.  Have a good night.

19   I'll see you back tomorrow at nine o'clock.

20       MS. DIAL:  Your Honor --

21       MS. BROWN:  Thanks, Judge.

22       MS. DIAL:  -- can I briefly address the 404(b) matter?

23       I promise it'll be brief.

24       THE COURT:  Well, I read the *Isabella* case before we came,

25   but you can go ahead and argue it.  Yes.

1      **MS. DIAL:**  I'm not even planning to argue.  There was one

2  additional case --

3      **THE COURT:**  Okay.

4      **MS. DIAL:**  -- that I've already provided to counsel, and I

5  would like to provide to the Court.

6      **THE COURT:**  Okay.  That's great.

7      **MS. DIAL:**  That was all.

8      **THE COURT:**  Thank you.

9      **MS. DIAL:**  It's the -- the *Meacham* or *Meacham* case and --

10      **THE COURT:**  Okay.

11      **MS. DIAL:**  -- that was it.

12      Not planning any argument unless the Court wishes to hear

13  from the Government.

14      **THE COURT:**  And it's a reported case?

15      **MS. DIAL:**  It is.

16      **THE COURT:**  Okay.  That helps.

17      So you two -- you didn't go to school in Oklahoma,

18  probably.

19      **MS. DIAL:**  No, I did not.

20      **THE COURT:**  Where'd you go to school?

21      **MS. DIAL:**  Michigan.

22      **THE COURT:**  University of Michigan?

23      **MS. DIAL:**  No, Michigan State.

24      **THE COURT:**  Michigan State.

25      **MR. MCWATERS:**  Virginia.  Actually I went to undergrad

1    here in Oklahoma, but I went to law school in Virginia.

2         **THE COURT:**  Oh, you did?

3         **MR. MCWATERS:**  Yes, sir.

4         **THE COURT:**  UVA.

5         **MS. BROWN:**  I actually didn't go to law school in

6    Oklahoma.

7         **THE COURT:**  You didn't?  Where did you go?

8         **MS. BROWN:**  Texas.  I -- I -- I went to undergrad and law

9    school at SMU in Dallas.

10        **THE COURT:**  Oh, SMU?

11        **MS. BROWN:**  Uh-huh.

12        **THE COURT:**  Wow.

13        **MS. BROWN:**  But then I came right back home.

14             (Discussion held off the record.)

15        **THE COURT:**  So you have a copy of this case.  I'll read

16   this --

17        **MS. BROWN:**  I --

18        **THE COURT:**  -- before I see you tomor- -- I won't say I'll

19   read it tonight, but I'll read it before I see you tomorrow.

20        **MS. DIAL:**  Thank you, Your Honor.

21        **MS. BROWN:**  Thank you, Your Honor.

22        **THE COURT:**  Have a good night.

23        Thank you for your help.

24        **CSO:**  All rise.

25             (Proceedings adjourned at 5:02 p.m.)

                    US DISTRICT COURT - NDOK
            REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1           (For further proceedings, see Volume II of III.)

2

3                **REPORTER'S CERTIFICATION**

4      I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

5  TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6

7        CERTIFIED:     *s/Leslie K. Ruiz*

                       Leslie K. Ruiz, CSR, RPR, RMR

8                      United States Court Reporter

                      333 W. 4th Street, Room 411

9                      Tulsa, OK  74103

                      (918)699-4794

10                    leslie_ruiz@oknd.uscourts.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25