1           UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                   Plaintiff,       )
                                     )
6   vs.                              )        CASE NO. 21-CR-450-GKF
                                     )
7                                    )
    RAYMOND LEE GOLDESBERRY,         )
8                                    )
                    Defendant.       )
9   _____)

10

11

12              TRANSCRIPT OF PROCEEDINGS
                     MARCH 29, 2022
13         BEFORE THE HONORABLE JOHN ANTOON II
               UNITED STATES DISTRICT JUDGE
14            JURY TRIAL - VOLUME II OF III

15

16

17

18

19

20              A P P E A R A N C E S

21       MS. CHANTELLE DIAL and MR. KYLE MCWATERS, Assistant United
    States Attorneys, Northern District of Oklahoma, United States
22  Attorney's Office, 110 West 7th Street, Suite 300, Tulsa,
    Oklahoma, 74119, appeared on behalf of the plaintiff.
23

24       MS. ANDREA BROWN, Andrea Brown Law Firm, PLLC, 2021 South
    Lewis Avenue, Suite 520, Tulsa, Oklahoma, 74104, appeared on
    behalf of the defendant.
25

1                                **<u>INDEX</u>**

2                         VOLUME II OF III

3    WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:
     Kelsey Blevins
4            Direct By Mr. McWaters........................... 203
             Cross By Ms. Brown.............................. 233
5            Redirect By Mr. McWaters........................ 276

6    Deniece Ishem
             Direct By Ms. Dial.............................. 281
7            Cross By Ms. Brown.............................. 283

8    Motion Hearing......................................... 286

9    WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:
     Brenna Gusman
10           Direct By Ms. Dial.............................. 302
             Cross By Ms. Brown.............................. 319
11           Redirect By Ms. Dial............................ 332

12   Plaintiff Rests....................................... 333

13   Defendant's Rule 29................................... 333

14   WITNESSES CALLED ON BEHALF OF THE DEFENDANT:
     Carla Barboza
15           Direct By Ms. Brown............................. 341
             Cross By Ms. Dial.............................. 347
16
     Michelle Goldesberry
17           Direct By Ms. Brown............................. 353
             Cross By Ms. Dial.............................. 371
18           Redirect By Ms. Brown........................... 393

19   Defendant's Rule 29 Re-urged.......................... 400

20   Jury Instruction Conference...................... 404,426

21   Defendant Rests....................................... 424

22

23

24

25

1  PROCEEDINGS:

2  ----------------------------------------------------------------

3       **THE COURT:**  Okay.  Well, I'll give you time before you

4  call them.

5       **MS. DIAL:**  Okay.

6       **THE COURT:**  So you've rearranged your schedule and you're

7  not calling them now; is that right?

8       **MS. DIAL:**  We have one witness that we could put ahead of

9  them.

10      **THE COURT:**  Okay.

11      **MS. DIAL:**  Kelsey Hess.

12      **THE COURT:**  Okay.

13      **MS. DIAL:**  She's the forensic interviewer.  And then --

14  and I expect that she would take until probably the morning

15  break between direct and cross.

16      **MS. BROWN:**  I agree.

17      **MS. DIAL:**  And --

18      **THE COURT:**  Okay.  That'll work.

19      **MS. DIAL:**  -- then we could put them on after the morning

20  break if that works if --

21      **THE COURT:**  Okay.

22      **MS. DIAL:**  Or --

23      **THE COURT:**  And then would that be the end of your case?

24      **MS. DIAL:**  No.  Then we've got Deniece Ishem.  She's going

25  to be five minutes.  She's reporting on something the defendant

1  said in a child safety meeting.  And then Brenna Gusman, she's

2  the DHS worker that did the investigation and interviewed the

3  defendant, so she'll talk about the defendant's statements.

4  And then that is the end.

5          THE COURT:  Okay.

6          And are you still going to put on character evidence?

7          MS. BROWN:  No, Your Honor.  I have -- I did e-mail with

8  Stacia Alsabrook, the child's therapist, to get a little more

9  information about her personal situation, as well as indicate

10  to her that, when she comes, she would need to bring her file

11  pursuant to your order.  And I heard back from her and,

12  essentially, she said, you know, thank you for keeping me

13  posted and let me know.

14      I told her that I wouldn't need her this morning, that

15  she -- I think that the Government's case would at least take

16  until the lunch hour and that, over the lunch hour, I would --

17  I would give her an update as far as our progress.  And then I

18  have one DHS worker subpoenaed who is available to testify this

19  afternoon as well.

20          THE COURT:  Okay.  So we should finish the evidence today.

21          MS. BROWN:  I believe so.

22          THE COURT:  Yeah.  Okay.  I'll come back with you once the

23  jury is ready.  Thank you very much.

24          CSO:  The jury --

25          THE COURT:  Anything else I can do for counsel?

1    **MS. DIAL:**  No, Your Honor.

2    **THE COURT:**  Miss Brown?

3    **MS. BROWN:**  Thank you, Judge.

4    **THE COURT:**  Okay.

5    **CSO:**  Judge?

6    **MS. DIAL:**  Oh, yes, sorry, there was one other thing,

7    Judge.

8    Sorry, Johnny.

9    **CSO:**  No, you're fine.

10    **MS. DIAL:**  The Bartletts, I know the Court had said Nathan

11    Bartlett wasn't excused from his subpoena.  I believe it was

12    just for Miss Brown to make a record.  Can they be excused from

13    their subpoena now?

14    **THE COURT:**  Yes.

15    **MS. DIAL:**  Thank you.

16    **CSO:**  The jury is ready --

17    **THE COURT:**  Okay.

18    **CSO:**  -- whenever you are.

19    **THE COURT:**  Okay.  I'll be back in just a few minutes.

20    **CSO:**  All rise.

21    (A recess was taken.)

22    **THE COURT:**  Please return the jury.

23    **CSO:**  Yes, sir.

24    **THE COURT:**  Counsel's present.  Defendant is present.

25    **CSO:**  All rise.

 1                 (Jury entered the courtroom.)

 2        **THE COURT:**  Please be seated.

 3     Good morning, ladies and gentlemen.

 4                 (Jurors replied, "Good morning.")

 5        **THE COURT:**  I hope you had a good break and an easy ride

 6  in this morning.

 7     Who -- who's the Government's next witness?

 8        **MR. MCWATERS:**  Kelsey Blevins, Your Honor.

 9        **THE COURT:**  Okay.

10                 (The witness approached the bench.)

11        **THE DEPUTY COURT CLERK:**  Miss Blevins, if you'll go ahead

12  and stop right there, I'll swear you in.

13     Do you solemnly swear that the testimony you're about to

14  give in this matter before the Court will be the truth, the

15  whole truth, and nothing but the truth, so help you God?

16        **MS. BLEVINS:**  I do.

17        **THE DEPUTY COURT CLERK:**  Thank you.  Go ahead and have a

18  seat, and you can adjust the microphone if you need to.

19        **THE COURT:**  Before -- before we begin, ladies and

20  gentlemen, I don't think I introduced Mr. Johnny Phorn to you

21  yesterday.  He's the security officer who's working with you in

22  the morning, and then one of his colleagues substitute in the

23  afternoon.

24     But like Miss Butler, his -- he has many responsibilities,

25  and one of those is to make sure that you're secure and

1    comfortable.  So wanted to make sure I introduced him before we

2    begin.

3          What is your name, ma'am?

4          MS. BLEVINS:  It's Kelsey Blevins.

5          THE COURT:  Would you spell your name, please.

6          MS. BLEVINS:  Yes.  K-e-l-s-e-y, B-l-e-v-i-n-s.

7          THE COURT:  You may inquire.

8                          KELSEY BLEVINS,

9    called as a witness herein, having been first duly sworn on

10   oath, was examined and testified as follows:

11                       DIRECT EXAMINATION

12   BY MR. MCWATERS:

13   Q    Good morning, Miss Blevins.  What do you do for a living?

14   A    I'm the manager of forensic services at the Child Abuse

15   Network.

16   Q    Do you have any other titles or responsibilities there?

17   A    I'm also a forensic interviewer there.

18   Q    And how long have you been in that position?

19   A    Since February of 2019.

20   Q    As a manager of forensic services, can you describe some

21   of your responsibilities?

22   A    Yes.  So I conduct forensic interviews on some of the

23   most shocking and heinous cases, and I also supervise the

24   forensic interviewing team.  I also participate in community

25   education.

1    Q    When you say you supervise the team, can you give us a

2    little bit more background on that?

3    A    Yes.  So I supervise a team of four forensic interviewers

4    at the center.  So I participate in trainings with them and do

5    peer review and feedback with them on their interviews.

6    Q    Part of your community outreach education, do you put on

7    various trainings for law enforcement?  Kind of give us a

8    little flavor of what that entails.

9    A    Yes.  We do some trainings for law enforcement on

10    forensic interviewing, and we also do trainings for the

11    community on child abuse and mandated reporting.

12    Q    Can you describe your educational background for the

13    jury?

14    A    Yes.  I have a Masters of Science in Forensic Science

15    with an emphasis in forensic psychology, and I have a Bachelors

16    of Science in Psychology with a minor in sociology.

17    Q    All right.  Do you have any continuing education

18    requirements for your job?

19    A    Yes.  We are required to participate in a minimum of

20    eight hours of continuing education every year.

21    Q    What does that continuing education consist of?

22    A    That consists of online trainings, live-instructor-led

23    trainings, and in-person trainings.

24    Q    What kind of conferences and seminars do you attend to

25    fulfill that requirement?

1    A    So I attend conferences based on child abuse, mandated

2    reporting, forensic interviewing, and other topics in the

3    field, like family dynamics and child sexual abuse.

4    Q    Do you have to do -- fulfill that requirement every year?

5    A    Yes.

6    Q    Do you have to submit your work to peer review?

7    A    Yes.  Forensic interviewers participate in a formal

8    meeting that's called "peer review."  And during peer review,

9    you can present or watch an interview that someone else has

10   conducted so we can receive and give feedback.

11   Q    How often do you -- how often do you have to participate

12   in peer review?

13   A    I believe we have to participate in peer review a minimum

14   of two times per year for our accreditation, but at my center,

15   at our site, we participate in national peer review once a

16   month.

17   Q    So 12 times a year?

18   A    Yes.

19   Q    And for the continuing-education classes that you said

20   that you had to take, you said you had to do eight hours; is

21   that right?

22   A    A minimum of eight hours.

23   Q    And about how many do you do typically per year?

24   A    I probably do well over 60 hours of continuing education

25   every year.

1    Q    Are there any prerequisite trainings or certifications

2    that you have to have to become a forensic interviewer?

3    A    Yes.  You have to go through 40 hours of ChildFirst®

4    Protocol Training, which includes mock interviews that you have

5    to participate and pass, and a written test.

6    Q    How do you pass a mock interview?

7    A    The other interviewers that are going through the

8    training, as well as the instructors, watch your mock

9    interview, and they grade your skill set and your adherence to

10    the protocol, and they give you a pass or fail grade.

11    Q    You said you had to take a class on the ChildFirst®

12    Protocol?

13    A    It's a 40-hour training on ChildFirst® Protocol.

14    Q    What do you learn through that training?

15    A    How to use the ChildFirst® Protocol to interview children

16    that are involved in the child abuse investigation.

17    Q    I believe you said this.  You have to become certified at

18    the end of that program; is that right?

19    A    There's not a certification.  It's just passing the

20    40-hour training, which includes the written test and passing

21    the mock interview.

22    Q    Are there any accreditations that either you or your

23    office have to have to -- to be con- -- to continue doing what

24    you do to keep current?

25    A    The Child Abuse Network is accredited by the National

1  Children's Alliance, so there's a set of standards that the

2  center, as a whole, has to adhere to, to maintain that

3  accreditation.

4  Q    All right.  What is the National Children's Alliance?

5  A    The National Children's Alliance is an accrediting body

6  that accredits most of the children's advocacy centers in the

7  state and in the nation.

8  Q    Do you know what their standards are?

9  A    There's several standards.  Some of them include having a

10  child-friendly setting.  Some of the standards are specific to

11  each partner agency involved in all -- our multidisciplinary

12  team.  And there are standards specific to forensic

13  interviewing.

14  Q    It is, like you said, a -- a nationally recognized

15  institution, though?

16  A    Yes.

17  Q    And they have their own internal standards that are

18  reviewed periodically?

19  A    They have standards that they participate in

20  reaccreditation with our agency, so they do a site visit every

21  three years.  And we have to update our practices to make sure

22  we're adhering to those standards.

23  Q    Let's move in a little bit on your background as a

24  forensic interviewer.  Can you describe for the jury what a

25  forensic interviewer is?

1    A    Yes.  A forensic interviewer is someone who is specially

2    trained to talk to a child or a teenager that is involved in a

3    child-abuse investigation, in a way that's not leading or

4    suggestive and focuses on the child's best interests and their

5    development and trauma level throughout the interview.

6    Q    What is the purpose of a forensic interview?

7    A    The purpose of a forensic interview is to get the child's

8    statement in a way that's not leading or suggestive and

9    elimits -- eliminates the need for multiple interviews and

10    eliminates as much suggestibility as possible.

11    Q    You said it eliminates the need for multiple interviews.

12    Is that important?

13    A    Yes.  The research shows that multiple interviews can

14    cause the child's statement to sound contrived or rehearsed.

15    It's disrespectful to the victim to make them go through

16    multiple interviews.  And it's the most trauma-focused,

17    child-focused way to interview children that are involved in

18    these types of investigations.

19    Q    Where are forensic interviews typically used?

20    A    Forensic interviews are conducted in a forensic

21    interviewing room.  At our center, we have two rooms, and they

22    have two-way glass so the child is on one side with the

23    interviewer, and the investigators are on the other side of

24    that two-way glass, and they're able to see and hear the

25    interview as it's taking place.

1    Q    What's the age range typically for a forensic interview?

2    A    Between three and seventeen.

3    Q    And that would be for the -- for the subject, for the

4    interviewee; is that right?

5    A    Yes.  The ChildFirst® Protocol allows us to interview

6    children between the ages of three and seventeen.

7    Q    What's the goal of a forensic interview?

8    A    The goal of the forensic interview is to allow the child

9    to have a space that is child-friendly and safe for them to

10   talk about what they may or may not have experienced in a way

11   that's not suggestive or leading and that focuses on their

12   development and their trauma level.

13   Q    Is the goal to obtain a disclosure from the child of

14   sexual abuse?

15   A    No.

16   Q    You said that you use this in -- in cases where there

17   have been allegations.  Is there a reason why it's preferred

18   for a forensic interviewer to do this interview as opposed to

19   law enforcement?

20   A    Yes.  So there's a few reasons why.  One of them is that

21   the forensic interviewer is a neutral party.  We don't

22   investigate any of the allegations, so we are a neutral party

23   as compared to law enforcement who does investigate.

24        And also we've gone through extensive training to be able

25   to talk to kids in a way that's developmentally appropriate for

1    them.  And that focuses on their best interest.

2    Q    You said "developmentally appropriate."  So does that

3    imply that there are appropriate and inappropriate ways to

4    interview children?

5    A    Yes.  The protocol is the same regardless of the child's

6    age, but there are certain questions that a three-year-old may

7    not be capable of answering as compared to a 17-year-old.

8    Q    You mentioned the ChildFirst® Protocol that you had

9    training in.  Is that a commonly used protocol by forensic

10   interviewers across the country?

11   A    Yes.

12   Q    Are there others?

13   A    Yes.

14   Q    And what do -- do these protocols have things in common?

15   A    Yes.  All of the protocols are more alike than they are

16   different.  They all have the same general phases or stages.

17   They're just slightly different.

18   Q    Is the ChildFirst® Protocol periodically updated?

19   A    Yes.

20   Q    When -- when I say "updated," does that mean that --

21   well, explain to me what you mean by that, that it's updated.

22   A    The ChildFirst® Protocol, I believe, was last updated in

23   2019, and they just review the steps of the protocol and

24   different ways to use anatomical drawings and things like that.

25   Q    Do you know why they -- why it undergoes that review

1    process?

2    A    In forensic interviewing, there's a lot of science, and

3    there's a lot of art, so a lot of it is about building your

4    skill set as a forensic interviewer.  And it's very important

5    to include current research in the process that we use.  So

6    they go and update the protocol and the process according to

7    what's new research in the field.

8    Q    During your career, how many forensic interviews have you

9    participated in?

10   A    Around 980.

11   Q    And in those interviews, do you always get a disclosure?

12   A    No.

13   Q    Can you describe a little bit about what when I -- when I

14   say "disclosure" and when you say "disclosure," can you

15   describe to the jury what you mean -- what we mean by that

16   term?

17   A    Yeah.  The term "disclosure," it just means if the child

18   is talking about or disclosing some type of abuse or

19   maltreatment.

20   Q    Through your training and experience, have you become

21   familiar with different types of disclosures?

22   A    Yes.

23   Q    Based on your educational background, your training,

24   experience, have you become knowledgable in the process of

25   victimization and disclosure process of child abuse victims as

1  well as the psychological and physical symptoms displayed by

2  child abuse victims?

3  A    Yes.

4  Q    And have you testified as an expert before?

5  A    Yes.

6  Q    On what topics?

7  A    On the process of disclosure and child sexual abuse.

8  Q    About how many times approximately?  Do you know?

9  A    I've testified twice in state criminal court as an

10  expert.

11       MR. MCWATERS:  Your Honor, at this time, the Government

12  would like to move to qualify Ms. Blevins as an expert in child

13  and adolescent forensic interviews, sexual abuse disclosures,

14  and victim behavior in response to child abuse.

15       THE COURT:  The witness is qualified to give testimony

16  pursuant to Rule 702 in those areas.

17       MR. MCWATERS:  Thank you, Your Honor.

18  Q    (By Mr. McWaters) Ms. Blevins, are you being paid any

19  extra to be an expert in this trial today?

20  A    No.

21  Q    Okay.  Just -- this is a normal day at the office for

22  you?

23  A    Yes.  This is just part of my job.

24  Q    Let's talk a little bit about childhood responses to

25  sexual abuse.  Is there a single way that children react or

1    respond to sexual abuse?

2    A    No.

3    Q    Why is that?

4    A    Every child is different, and every case is different.

5    So the reactions can be very widely varied.

6    Q    What are some of the -- the reasons why those can be

7    widely varied, those -- those responses?

8    A    There's a lot of external and internal factors that can

9    influence a child's response.  Some of those can include fear,

10   shame, guilt, having been threatened by the offender, not

11   having a supportive caregiver believe them when they do

12   disclose.  There are many factors that can influence the

13   child's response.

14   Q    I think you already answered this, but when you conduct a

15   forensic interview, are you affirmatively trying to elicit a

16   disclosure in that interview?

17   A    No.

18   Q    And is it possible for a child to react to sexual abuse

19   by not disclosing?

20   A    Yes.

21   Q    Why -- why would that be?

22   A    Again, every child and every case is different.  The

23   process of disclosure is not a one-time event.  It's an

24   evolving process.  So if a child was undergoing a forensic

25   interview, they may or may not disclose.

1    Q    So let's talk a little bit about disclosure.  You already

2    gave the jury a definition of what a disclosure is.  What is

3    the -- the process of disclosures?  Are there different phases?

4    Like, give us a little bit more of a holistic background of

5    what a disclosure is.

6    A    Yes.  So the process of disclosure is an evolving process

7    and not a one-time event.  There are some phases of the

8    disclosure.  There's denial.  There's tentative disclosure,

9    active disclosure, recantation, and reaffirmation.

10   Q    Do all children go through each of those phases?

11   A    Not necessarily.

12   Q    Do they go through them in that order?

13   A    Not necessarily.

14   Q    Do they go -- do they always go through any of those

15   processes?

16   A    Not necessarily.

17   Q    Are there -- so we talked about the phases in the process

18   of disclosure.  Are there different types of disclosures?

19   A    Yes.

20   Q    What are some of those types?

21   A    So the two main types of disclosure are accidental

22   disclosures and purposeful disclosures.  An accidental

23   disclosure, an example would be if the abuse is uncovered

24   inadvertently through perhaps STI testing or a diagnosis of a

25   sexually transmitted disease.

1    And then a purposeful disclosure is where the child is

2    purposefully or actively telling someone that something has

3    happened.

4    Q    When you say -- so another way, I guess, to -- to put a

5    purposeful disclosure is it's -- it's -- comes from the child

6    itself as opposed from some other external factor; is that

7    right?

8    A    Yes.

9    Q    Is there -- are there any other types of disclosures?

10   A    Those are the two main types.  But the phases of

11   disclosure also talk about active disclosures and tentative

12   disclosures.

13       An active disclosure is a lot like purposeful.  The child

14   is actively talking about the details they can remember about

15   what's happened.  They may not remember all of the details, but

16   they're actively giving what they can remember.

17       And a tentative disclosure is where the child's giving

18   vague information or pieces of information to test and see what

19   the reaction is going to be to their disclosure, to see if

20   they're going to be supported or believed.

21   Q    Will different types of disclosures result in -- in

22   different effects on the child?

23   A    It can, yes.

24   Q    How will those manifest?

25   A    So, for example, in a tentative disclosure, if the child

1    is giving vague information to someone and they are not

2    supportive or they are critical of the offender or they don't

3    believe them, it may cause the child to then recant, which is

4    another phase of the process.  And recantation just means the

5    child's taking it back and saying, "It didn't happen."

6    Q    If -- if a child has a tentative disclosure and then --

7    to someone who's not necessarily an authority figure, just a

8    friend, and then that's reported, can that also -- reported to

9    an authority figure, can that have an effect on the child?

10   A    Can you repeat the question?

11   Q    If -- if a child discloses to a friend and then that

12   disclosure's made to an authority figure, like an agency or

13   something, would that have an effect on the child?

14   A    Yes, because in the tentative disclosure phase, they're

15   testing the waters to see what might happen if they do

16   disclose.  So it may not have been their intention for anyone

17   beyond that friends that they were telling to know about it.

18   Q    Can -- can a child react to a potential disclosure by

19   minimizing the conduct?

20   A    Yes.

21   Q    Can you explain what it means for a child to minimize

22   abuse?

23   A    Yes.  So "minimizing," in this field, that term is a

24   characteristic of tentative disclosures.  So minimizing, or an

25   example of minimizing, would be, "It only happened one time,"

1    or "It's not that big of a deal."

2         There's other characteristics of tentative disclosures as

3    well, like forgetting.  Just the child saying they forget.

4    There's also empowerment, or sometimes it's called "superhero,"

5    where the child might make statements such as, "And then I

6    punched him in the face and ran away," and things like that.

7    So there's other characteristics of a tentative disclosure.

8    Q    Okay.  Could possible aspects of -- of minimizing, could

9    it be that it was an accident or -- or taking responsibility

10   for the abuse?

11        **MS. BROWN:**  Objection.  Leading.

12        **THE COURT:**  The counsel's entitled to some degree of

13   leading in questioning an expert.  Overruled.

14        **THE WITNESS:**  Can you repeat the question?

15   Q    (By Mr. McWaters) Sure.  If -- if -- is one aspect of

16   minimizing by a -- by a child, can it be that they are taking

17   responsibility for it or saying that it was an accident?

18   A    Yes, that could be a characteristic.  Saying it was an

19   accident could also be a form of another characteristic of

20   tentative disclosure, which is discounting.

21   Q    When children are sexually abused, do they all disclose

22   in the same way?

23   A    No.

24   Q    In your training and experience, do children sometimes

25   delay disclosing or not disclose sexual abuse?

1    A    Yes.

2    Q    Why are some of the reasons for that?

3    A    So some of the reasons for a delayed disclosure are very

4    similar to the other influences on the process of disclosure.

5    So fear, shame, guilt.  They may have been threatened.  They

6    may not be aware or understand that what happened to them was

7    abusive.  There's a lot of factors that can influence them not

8    telling immediately after it happens.

9        A lot of the research shows that most children delay

10   disclosure.  And most of the time, if they don't delay

11   disclosure, it's because the perpetrator is a total stranger to

12   them, someone that they don't know or love or care about

13   because in 90 percent of cases, the offender is someone that

14   they know and love.

15   Q    So let me -- let's unpack that for the jury a little bit.

16   You're saying that it's actually more common for there to be a

17   delayed disclosure when it's someone that the victim knows?

18   A    Yes.

19   Q    You also mentioned something about a child potentially

20   forgetting or -- or -- about the abuse.  Would -- would that

21   also affect the child's memory of the abuse?

22   A    So when we are talking about forgetting, that's another

23   characteristic of the tentative disclosure.  And remembering

24   that the tentative disclosure is where the child's giving vague

25   information or pieces of information to test the waters.

1      They may say, "I forgot," or they might discount and say,

2  "It's not that big of a deal," or they might minimize and say,

3  "It only happened one time."  So forgetting is a characteristic

4  of the tentative disclosure.

5  Q    Would you expect a child to be able to tell you the exact

6  dates on which an abuse occurred?

7  A    No.

8  Q    And why not?

9  A    That would be an unrealistic expectation even for an

10  adult, especially in cases of long-term abuse.  If it has been

11  going on for a long time, they're not likely to be able to

12  remember much more than the very first time it happened, the

13  last or most recent time it happened, and anything in between

14  that was different.

15      In cases of a one-time event that's not long-term abuse,

16  it's just not realistic to expect a child or an adult to be

17  able to remember every single detail about the day, time, and

18  place because that's just not how memory works.

19  Q    Is there a -- a typical person that a child will disclose

20  to or is it -- is it kind of random?

21  A    Not necessarily.  It just depends on who the child feels

22  safe or comfortable with in telling their disclosure to.

23  Q    You said that disclosures of sexual abuse are influenced

24  by a lot of different factors.  You -- and you said that a lot

25  of them are internal factors; is that right?

1    A    Yes.

2    Q    What do you mean by an internal factor?

3    A    So internal factors could be the child's development, the

4    severity of abu- -- the abuse they experienced and the trauma

5    level that they have following that abuse.  It could be a

6    linguistic barrier.  That would be an internal factor if

7    there's -- they speak a different language or developmentally

8    they don't have the language to talk about what happened.

9    Q    Would the relationship to the abuser affect dis- -- be an

10    internal factor, or would that be something different?

11    A    I would consider relationship to the offender as an

12    external factor, but it is a factor that can influence the

13    disclosure.

14    Q    Well, let me be a little more specific.  When I say "the

15    relationship," not necessarily just the external relationship,

16    but how the -- the victim feels about the abuser.

17    A    Yes.

18    Q    Is that "yes," that would be a factor that would --

19    A    Yes, that would --

20    Q    -- affect disclosure?

21    A    Yes, that would be a factor.

22    Q    So for -- for external factors, what -- what are some of

23    those factors that would affect how a child responds to sexual

24    abuse?

25    A    So external factors would be things like some of the

1    reasons children delay disclosure is because they may be aware

2    of the family dynamics and how they are going to change if they

3    do disclose.  They might be concerned that they're going to be

4    removed from their home by child welfare and placed into the

5    foster care system.

6        They may be ready to disclose because they're concerned

7    something is going to happen to a sibling or a friend.  There's

8    lots of external factors that could influence their disclosure.

9    Q    Would it be unusual for a child to be around the abuser

10   and act like nothing happened?

11   A    No.

12   Q    Do sexually abused children have certain behaviors?

13   A    Not necessarily.

14   Q    How might the relationship a child has with her abuser

15   impact disclosure?

16   A    So most of the time, the child knows and cares about the

17   offender, whether it's a family member or a family friend.

18   They have a relationship where they care about that person, and

19   they like the relationship.  They just don't like what that

20   person is doing to them.  So those things can affect their

21   willingness to disclose.

22       They may be worried that something bad is going to happen

23   to the offender.  They might be concerned that they're going to

24   be hurt or someone else might be hurt as a result of their

25   disclosure.

 1        They might feel guilty for talking about it because
 2   they've been told by the offender, you know, "Bad things will
 3   happen if you talk about it."  There's all kinds of factors
 4   that can influence that.
 5   Q    Based -- let's talk -- move away from just the initial
 6   disclosure to reasons why disclosures can be delayed.  Based on
 7   your -- your training and experience, is it common for victims
 8   to delay disclosure of sexual abuse?
 9   A    Yes.
10   Q    And I believe you already testified earlier that it --
11   it's actually common for a victim who has a close relationship
12   with the abuser to delay disclosure; is that right?
13   A    Yes.
14   Q    Is there a reason for that?
15   A    They may be protecting the offender.  They may be
16   concerned that something bad is going to happen if they do
17   disclose.  They may be in the denial phase of disclosure where
18   they just don't want to admit that it's happened.
19        They could be threatened by that offender.  You know,
20   "You're going to get in trouble if you say anything."  There's
21   a lot of factors that can influence it.
22   Q    How does age play a factor in the process of delayed
23   disclosures?
24   A    So in delayed disclosures, younger kids in particular
25   sometimes may not be aware that's what's happening to them is

1    abuse, and so they don't disclose because they don't know that

2    there's any reason to.  And older kids may have a greater

3    understanding of the family dynamics.

4         They may be more aware that the offender is the primary

5    breadwinner for the home, and therefore, their finances might

6    be affected if that person were to go to jail.  So an older

7    child might have a better understanding of those types of

8    things.

9    Q    Let's move on to discuss internal distress and trauma in

10   children in sexual abuse.  Can the trauma of abuse also impact

11   disclosure?

12   A    Yes.

13   Q    How?

14   A    The child's trauma level can definitely impact

15   disclosure.  They may be in a dissociating phase of the

16   disclosure, the tentative disclosure process, where they might

17   talk about, you know, "when he touches me, I go to the blue

18   forest."

19        It can affect their memory.  Trauma can affect your

20   memory and make it difficult to remember minute details about

21   what happened or be able to explain in detail about what

22   happened.

23        Their trauma level is something that we try to focus on

24   whenever they're participating in a forensic interview because

25   we wouldn't want to create more trauma.  We were trying to --

1    we're trying to minimize the trauma to that child and to that
2    family during the process.
3    Q    So that goes back to something you said earlier that you
4    want to minimize the number of forensic interviews; right?
5    A    Yes.
6    Q    So and I believe you said that the goal is for only there
7    to be one forensic interview?
8    A    Yes, the goal is for there to only be one.  But in some
9    cases, the ChildFirst® Protocol does allow for an extended
10   interview, where it occurs over multiple sessions.
11   Q    And why would -- why would there be a need for multiple
12   interviews?
13   A    The need for that, one of the reasons could be the
14   child's trauma level.  During the forensic interview, if they
15   are disclosing and they become very upset or emotional and
16   that -- the trauma level is affecting their ability to
17   disclose, then the interviewer may choose to end the interview
18   and continue it in a second session so that we're making sure
19   we're still putting the child first and focusing on what's in
20   their best interest.
21   Q    But if there are no issue -- you said if there are issues
22   with disclosure.  If there are no issues with the disclosure,
23   is it common for there to be a second interview?
24   A    No, it's uncommon.  It does happen, but they're -- it
25   happens under extenuating circumstances.

1    Q    How is the disclosure process affected by delayed

2    disclosure if someone is disclosing something that's happened

3    months or even years in the past?

4    A    So again, it can affect memory.  We typically ask

5    children about the first time something happened, the last or

6    most recent time, and anything different in between because

7    those are the moments that are going to stand out the most in

8    their memory, particularly in cases of delayed disclosure where

9    the event may have happened six or seven years ago and you're

10   asking them to recall details of events that occurred many

11   years past.  So we would ask those things to try to mitigate

12   the issues of memory.

13   Q    Are there psychological symptoms of a victim of -- that a

14   victim of child sexual abuse may display?

15   A    In some cases, yes.

16   Q    And what are some of the -- the common symptoms?

17   A    So in my training and experience, I often speak with kids

18   who are experiencing self-harming and suicidal ideation.  I've

19   also seen kids that have had to be institutionalized or

20   hospitalized in psychiatric facilities because they're

21   struggling with PTSD or anxiety.  So there can be a number of

22   psychological effects.

23   Q    Based on your training and experience, when victims of

24   sexual abuse are disclosing or talking about their abuse, do

25   they all respond in the same way?

1   A    No, not necessarily.

2   Q    And why is that?

3   A    Again, because every kid and every case is different.

4   Q    When a child is forced to talk about sexual abuse, are

5   there certain responses you might expect, based on your

6   training and experience?

7   A    I wouldn't -- I wouldn't necessarily expect certain

8   responses because in my training and experience and in my work

9   that I do in the field, I'm not in a position where I would

10  force a child to disclose.  So I'm not familiar with the

11  characteristics that one might see in that situation.

12  Q    All right, Miss Blevins.  Let's talk a little bit about

13  the -- the case today here.  Were you working at -- as a

14  forensic interviewer on May 29th, 2020?

15  A    Yes.

16  Q    And did you conduct a forensic interview of Kaitlyn

17  Goldesberry on that day?

18  A    Yes.

19  Q    How old was she on the -- on that date?

20  A    I believe she was 15, but I may not have that correct.

21  Q    If I said she was 14, does that sound right?

22  A    Yes.

23  Q    How long had you been a forensic interviewer at this

24  point?

25  A    Since February of 2019.

```
 1    Q    So that's a little over a year?

 2    A    Yes.

 3    Q    Have you reviewed the forensic interview in preparation

 4    for your testimony here today?

 5    A    Yes.

 6    Q    After your re- -- after reviewing that -- that video,

 7    that interview, are there things that you might do differently

 8    today, sitting here today with -- with additional training and

 9    experience?

10    A    Yes.

11    Q    Would some of those changes have affected Kaitlyn's

12    disclosure?

13    A    They may have, and they may not have.

14    Q    Where did the interview take place?

15    A    At the CAC.

16    Q    And just for us who aren't -- might not be familiar with

17    that acronym, can you tell us again what that is?

18    A    Yes.  CAC stands for the Children's Advocacy Center.

19    It's also known as the Child Abuse Network, and that's where

20    I'm employed.

21    Q    And where is that?

22    A    At 31st and Sheridan.

23    Q    And I believe you said earlier that forensic interviews

24    take place in particular rooms.  Can you describe the -- the

25    rooms that you guys use?
```

1   A    Yes.  The forensic interview takes place in a forensic

2   interview room.  And it's set up to be child-friendly.  There's

3   two-way glass so that the investigators that we're working with

4   can sit behind the glass and observe the forensic interview as

5   it's occurring.

6        Forensic interviewers also wear an earpiece in their ear

7   so that the investigator can ask them to ask questions, and

8   then it's the interviewer's job to ask those questions in a way

9   that's not leading or suggestive.  The forensic interview is

10  also audio and video recorded, and that's standard practice in

11  the field.

12  Q    All right.  You said that you had a chance to -- to go

13  over and look at the video, and you said that there might be

14  some things that you would do differently.  Can you explain to

15  us a little bit, briefly, what some of those things would have

16  been?

17  A    Yes.  There is no such thing as a foren- -- perfect

18  forensic interview.  And part of the process of being a

19  forensic interviewer involves constantly building your skill

20  set.  So in this case, there's a lot of things that I might do

21  differently.

22       I might phrase certain questions differently or try to

23  explore more details about what she was disclosing.  And that's

24  true of a lot of cases that forensic interviewers are a part

25  of.  It's just an evolving process of building your skill set

1  and building your training.

2  Q   You told us what you would have done differently.  Is

3  there a reason why you -- you -- looking back, you realize, oh,

4  I should have done this differently?

5  A   Just that I -- it's been two years since I conducted the

6  interview, and I've been through many, many trainings since

7  then.  And I've conducted many hundreds of interviews since

8  that time.  So my skill set has advanced, and I'm -- I do some

9  things differently than I might have done two years ago.

10  Q   At the time in May of 2020, you were a -- a certified or

11  a registered or whatever forensic interviewer; is that right?

12  A   Yes.  At that time, I had completed the 40-hour

13  ChildFirst® Protocol training.

14  Q   And do you recall about how many forensic interviews you

15  had completed at that point?

16  A   I don't recall how many.

17  Q   Now, you said that you were in the -- that you were in

18  the -- at the -- the CAC in one of these rooms that was audio

19  and video recorded, and that's standard practice; is that

20  right?

21  A   Yes.

22  Q   And you were in one of these rooms for Kaitlyn

23  Goldesberry's interview?

24  A   Yes.

25  Q   Did Kaitlyn know that she was being observed and

1    recorded?

2    A    Yes.

3    Q    Is that also standard practice?

4    A    Yes.

5    Q    Is there a reason why you -- you let the -- the

6    interviewee know those things?

7    A    Yes.  It's meant to be child first and child focused.

8    That's the overriding principle of the forensic interview and

9    the forensic interviewing protocol.  So in keeping with that,

10   we wouldn't want to keep any secrets from the child.

11        We make sure out in the lobby before they ever come into

12   the room that they're aware that they will be video and audio

13   recorded and that the investigators will be watching.

14   Q    What information, if any, did you have before you

15   began -- began the interview?

16   A    Just very little information.  Basic allegations of

17   sexual abuse.

18   Q    Is there a reason for that?

19   A    Yes.  The forensic interviewer is meant to be a neutral

20   party.  So when going into a forensic interview, we don't want

21   to have a whole lot of information about the case because our

22   job is to remain neutral and non-suggestive.  So we typically

23   learn from the investigators what the allegations are and then

24   go into the interview with that information.

25   Q    What method of interviewing did you use to interview

1    Kaitlyn back in 2020?

2    A    ChildFirst® Protocol.

3    Q    And again, I think you've already answered this, but what

4    type of questions did you use during the interview?

5    A    Open-ended, non-leading questions.

6    Q    And you said that you reviewed the interview before your

7    testimony today?

8    A    Yes.

9    Q    In part of the interview, did Kaitlyn make a disclosure

10   of sexual abuse to you?

11   A    Yes.

12   Q    And just to circle back, that's not the purpose of the

13   interview; is that right?

14   A    Correct.

15   Q    But she did make a disclosure to you?

16   A    Yes.

17   Q    And what did she disclose?

18   A    She disclosed that her father touched her on her vagina

19   on her skin outside and inside her body.

20   Q    And how did -- did Kaitlyn act or appear during the

21   interview?

22   A    During the interview, her disclosure was very

23   matter-of-fact, but she was also protective of the alleged

24   offender and a bit defensive.  And she was exhibiting some of

25   those characteristics of tentative disclosure, like minimizing

1  and discounting.

2  Q    Were there any physiological observations that you made

3  of -- of Kaitlyn?

4  A    No.

5  Q    What about her -- her general demeanor?

6  A    Her general demeanor, again, was just matter-of-fact

7  about the disclosure she was making, but she was a bit

8  defensive and was kind of exhibiting some of those

9  characteristics.

10  Q    Did she seem to want to be there?

11  A    She made statements about things having been blown out of

12  proportion and feeling like it wasn't that big of a deal.  I

13  don't recall her explicitly saying she didn't want to be there.

14  Q    Did she ever change what she said?

15  A    No.

16  Q    Did she contradict herself?

17  A    No.

18  Q    Did she use terminology consistent with a 14-year-old?

19  A    Yes.

20  Q    And is it your job to form any type of judgment about the

21  allegations?

22  A    No.

23  Q    In your education, training, and experience, are there

24  any additional impressions of Kaitlyn's demeanor during the

25  interview?

1    A    Just that she was exhibiting those characteristics, and

2    she was making statements about feeling like it wasn't that big

3    of a deal.  But as far as the disclosure piece, as I've seen in

4    many cases that I've been part of, the disclosure itself was

5    just very matter-of-fact about what happened.

6    Q    How did the interview end?

7    A    At the end of the protocol, the last stage is closure.

8    So what we do is assess for safety with the child, who they

9    feel safe with, who they could talk to if they didn't feel

10   safe.  And then we return the child to a neutral state by

11   talking about a neutral topic.  And then we close out the

12   interview.

13   Q    All right.  Thank you, Miss Blevins.  I'm -- I'm finished

14   questioning, but Miss Brown may have some questions for you.

15        **MR. MCWATERS:**  I pass the witness, Your Honor.

16        **THE COURT:**  Ms. Brown, you may inquire.

17        **MS. BROWN:**  Thank you, Your Honor.

18                        **CROSS-EXAMINATION**

19   BY MS. BROWN:

20   Q    Miss Blevins, I believe that there's been multiple

21   references to your last name being Hess for the jury.  You're

22   the same person as Kelsey Hess; correct?

23   A    Yes, ma'am.  I got married.

24   Q    Just to clarify.  Thank you.  And congratulations.

25   A    Thank you.

1   Q    The ChildFirst® 40-hour training that you referenced in

2   direct examination, that's not a training that is limited to or

3   only available to forensic interviewers; correct?

4   A    Correct.

5   Q    Prosecutors go to that training?

6   A    Yes, I believe so.

7   Q    I've been to that training?

8   A    I'm unaware.

9   Q    You're familiar with my background; correct?

10  A    No.

11  Q    Oh, okay.

12       Law enforcement officers go to that training?

13  A    I believe so, yes.

14  Q    So it's not something that's special or unique to

15  forensic interviewers.  It's available to anybody in the area

16  that deals with possibly talking to children about abuse of

17  some kind?

18  A    It's available to individuals that work in the field,

19  yes.

20  Q    Basically did you go to the -- did you go to the one in

21  the Oklahoma City?  Did you go in Tulsa?

22  A    I went to Norman.

23  Q    Norman?  Okay.  So you go up to Norman for a week with a

24  handful of other people.  It could be a dozen.  It could be 20

25  or more people in any given class; correct?

1  A    I don't recall how many people were in my class.

2  Q    And you sit through some lectures and some talks, and

3  then they give you a little bit of homework at night.  And then

4  at the end of the week, somebody pretends to be a child.  You

5  don't really interview a real child for your qualifying

6  interview; correct?

7  A    No.  You do a mock interview with someone who does

8  pretend to be a child, and then we also do an interview on a

9  real child that's limited to the narrative event practice.

10  Q    So for example, a -- a class of children will go to the

11  zoo and have a field trip that's a real, actual field trip for

12  them.  And then you're not interviewing them about sexual

13  abuse.  You're interviewing them about the experiences they

14  have at the zoo; correct?

15  A    In my case, the children were at a school, and someone

16  from a zoo brought animals.  And then we interviewed them about

17  that event and that event only in the narrative event practice

18  format.

19  Q    Okay.  And then at the end, there's a written test;

20  correct?

21  A    Yes.

22  Q    And that's just pass, fail; correct?

23  A    Yes.

24  Q    You have, as you said, only been conducting forensic

25  interviews at the Child Abuse Network since February of 2019.

1    But being a forensic interviewer at CAN is your very first

2    professional job; correct?

3    A    Yes.

4    Q    Prior to doing what you do now, you were just a nanny;

5    correct?

6    A    I was in graduate school.  And while I was in graduate

7    school, I nannied, but I also worked as a research assistant,

8    and I also worked as a teaching assistant for the university.

9    Q    When you interview children at the -- at the Child Abuse

10    Network, you are interviewing children involving topics of a

11    much broader variety than just child sexual abuse; correct?

12    A    When we conduct interviews at the Child Abuse Network,

13    we're interviewing about all possible forms of abuse and

14    maltreatment and family dynamics.

15    Q    The Child Abuse Network forensic interviewers can

16    interview children about physical abuse; correct?

17    A    Yes, that's correct.

18    Q    Exposure to pornography?

19    A    Yes.

20    Q    Exposure to drugs and alcohol abuse?

21    A    Yes.

22    Q    Exposure to domestic violence?

23    A    Yes.

24    Q    If a child witnesses a crime, they can be forensically

25    interviewed; correct?

1    A    Yes.

2    Q    And so in the 900 or so interviews you've conducted to

3    date, not all of those involved interviewing children about

4    allegations of sexual abuse; correct?

5    A    Yes.

6    Q    You are, of course, aware that ChildFirst® Protocol that

7    you've discussed is a relatively new forensic interview

8    protocol, at least for the Child Abuse Network; correct?

9    A    I know that at the Child Abuse Network, the interviewers

10    that have been employed there over the last 15 years have used

11    Child -- the ChildFirst® Protocol.

12    Q    You're not aware that in just a few of the past years,

13    they were using the CornerHouse RATAC method?

14    A    So I am aware of some interviewers there having used the

15    CornerHouse RATAC method.  But, again, the protocols are all

16    much more alike than they are different, and so they still

17    utilize the same general concepts and the same research behind

18    each protocol and the same general phases.

19    Q    And -- and so speaking of the general phases, whether

20    you're talking about ChildFirst® or you're talking about RATAC,

21    you're going to open your interview, like you said, with

22    rapport building, getting to know you; correct?

23    A    Correct.

24    Q    Whether you're talking to a three-year-old or a

25    seventeen-year-old, you want to make sure the child is

1  comfortable talking to you before you get into the nitty-gritty

2  of why they're there; correct?

3    A    It's not necessarily my job to make sure or verify that

4  they're comfortable, but the purpose of rapport is to help

5  build their comfort level and to help us identify their

6  development and their ability to narrate.

7    Q    So for several minutes -- and it -- and it depends on a

8  particular interview, right? -- but for up to, you know,

9  anywhere from 5 to 20 or 30 minutes, you can talk to them about

10  what they like about school, what they do in their free time,

11  what they are doing over summer break or Christmas break,

12  animals that they have in the house, interests that they have.

13  Just before you even start talking about the allegations;

14  correct?

15    A    Correct.  The first phase of the protocol is rapport

16  building.  And during rapport building, we may ask questions

17  about their interests, the last time they went on a trip,

18  things like that.

19        And then in doing that, we're also participating in

20  narrative event practice, which the purpose of narrative event

21  practice is just to identify their ability to narrate an event

22  from beginning to end.

23    Q    Then at some point you transition, and different

24  protocols call it different things, but for lack of a better

25  phrase, into some sort of inquiry as to the reason that they're

1    there; right?  You ask them if they've ever experienced any

2    touches or anything that makes them feel uncomfortable or

3    anything like that, in a sexual abuse case; right?

4    A    We do what's called the transition to topic of concern.

5    Asking about sexual abuse related questions comes a little bit

6    later, and that's called the touch inquiry.

7         But in the transition of topic -- the transition to topic

8    of concern is where we do what's called an open invitation and

9    ask the child something similar to, "What do you know about

10   coming to talk to me today," or "Tell me, like, what's been

11   going on lately," so that we're giving them the opportunity to

12   talk about things in an open-ended way.

13   Q    And it serves a dual purpose as well.  In addition to

14   giving them an opportunity to tell you in their own words, you

15   know, what they know about why they're there, it also allows

16   the investigators on the other side of the mirror, right,

17   and -- and people like myself and the prosecutors who look at

18   the video later, to see if the child discloses any kind of

19   negative influences or, you know, "I was told I was here today

20   because I'm supposed to tell such and such did such and such,"

21   versus, for example, in Kaitlyn's interview, where when you

22   asked her what her -- what she'd been told prior to coming in,

23   she was told to be honest; correct?

24   A    I don't recall the specific part of the interview that

25   you're referencing.  But as far as the investigators and how

1    they're interpreting what the child is saying, that's out of my

2    scope of practice.

3    Q    Because once you're finished with your interview with a

4    child, in most cases when there's not a second interview, you

5    never see or hear from that child again; correct?

6    A    Correct.

7    Q    In this particular situation with Kaitlyn Goldesberry,

8    you interviewed Kaitlyn Goldesberry on May 29th of 2020, and

9    you never saw or talked to her since; correct?

10   A    Correct.

11   Q    You don't follow the case to see if criminal charges are

12   filed or if DHS does anything with the children's family;

13   correct?

14   A    Correct.

15   Q    That's not part of your job?

16   A    Correct.

17   Q    You would agree with me that no matter what protocol

18   you're using, but including ChildFirst®, it is a loosely based

19   guidelines for interviewing a child.  It's not a rigid

20   protocol, you have to step -- follow Step 1, Step 2, Step 3;

21   correct?

22   A    Correct.  The protocol is semi-structured.

23   Q    And by "semi-structured," that means a lot of

24   recommendations; correct?

25   A    To me, "semi-structured" means that you don't have to

1    follow the protocol necessarily in order, step-by-step.  It's

2    meant to be fluid so that if you're in that open invitation

3    during the transition of topic of concern and the child just

4    starts to disclose, you can follow the child because the

5    overriding principle of the protocol is to focus on the child

6    and their best interest.

7    Q    Different interviewers may interpret or implement those

8    recommendations or guidelines in the protocol in different

9    ways.  Would you agree?

10   A    Correct.  Different interviewers may have different -- a

11   different skill set.  They -- their art, so to speak, may be

12   different.  But all interviewers should be following an

13   evidence-based protocol.

14   Q    You, as an interview- -- viewer, get to use your own

15   judgment in a lot of ways; right?

16   A    Yes.

17   Q    In fact, like you said on direct, there are times when

18   the investigators on the other side of the mirror would like

19   you to ask a question.  They tell you in your earpiece.

20        And then you decide in your mind without saying anything

21   out loud that that's not an appropriate question based on your

22   training and experience, and either decide not to ask that

23   question or to try to rephrase it; correct?

24   A    Correct.

25   Q    But you also would admit that, having looked back at your

1   interview two years later, there were several things you would

2   do differently; correct?

3   A    I would admit that there are things that I may have done

4   differently compared to two years ago, and there may be things

5   from six months ago that I might do differently.

6   Q    Because relatively speaking, back in May of 2020, you

7   didn't have a ton of experience, certainly not as much as you

8   have now?

9   A    In May of 2020, I did not have as much experience as I

10  have now.

11  Q    You mentioned in direct examination with Mr. McWaters

12  that, as the current manager at the Child Abuse Network, or the

13  CAC, CAN -- CAN or -- or Child Advocacy Center, that you

14  specifically currently interview a lot of the cases that

15  involve allegations that are shocking and heinous; correct?

16  A    Correct.

17  Q    Shocking and heinous can be a number of things, but those

18  words kind of are self-defining.  Would you agree?

19  A    I agree that those words can mean a lot of different

20  things.  And I interview on the shocking and heinous cases as

21  well as cases that are not shocking or heinous.

22  Q    And you would agree with me that this interview and these

23  allegations that you were talking to Kaitlyn about don't fall

24  under the category of shocking and heinous; correct?

25  A    That's outs- -- outside of my scope of practice.  I don't

1  determine if something is shocking or heinous.

2      But when an interview is scheduled at the center, if it's

3  particularly -- involves particularly advanced skills, like

4  presenting evidence in the interview, or if it involves

5  training -- the need for training on child sex trafficking,

6  things like that, then I would do that interview myself as the

7  most experienced interviewer at the CAC.

8  Q    The current position that you occupy, you took over for

9  Jessica Stombaugh; correct?

10 A    No.  Jessica Stombaugh's position was a program director.

11 My position is a new position at the center.

12 Q    You would agree that previous forensic interviewers prior

13 to your starting, like Jessica Stombaugh, Ali Kern, David

14 Glanz, Amy Howard, Melissa Gantz, they all have more experience

15 than you in this area; correct?

16     MR. MCWATERS:  Objection.  Relevance.

17     THE COURT:  Sustained.

18 Q    (By Ms. Brown) You've only testified two times in court

19 before today; correct?

20 A    No.

21 Q    Isn't that what you said on direct?

22 A    I've testified twice as an expert witness in court, but

23 I've testified as a fact witness probably ten times.

24 Q    Okay.  And so by fact witness, you're just talking about

25 the interview that you did like in this case, Kaitlyn's

1  interview, and not giving your opinions about the process of

2  disclosure, and educating the jury about tentative disclosures

3  versus active disclosures and a lot of the things that you went

4  over with Mr. McWaters; correct?

5  A    Correct.

6  Q    The amount of time that you spent specifically with

7  Kaitlyn Goldesberry on May 29th of 2020, was about 60

8  minutes; correct?

9  A    I believe it was around 50 to 60 minutes, yes.

10  Q    And in that 50 to 60 minutes, that included the period of

11  time that you talked to her about school, what she likes to do,

12  what she likes to read, all the different animals that she has

13  in her home, her sugar gliders, her dogs, her cat Smokey that

14  died.  You guys discussed *Twilight*, *Harry Potter*, and everybody

15  that lives in the home; correct?

16  A    Yes.

17  Q    And all of that occurred before you ever started talking

18  about what happened between Kaitlyn and her dad in the bed;

19  correct?

20  A    I believe so.

21  Q    And in that 50 to 60 minutes, that also encompassed a

22  period of approximately four minutes when Kaitlyn needed to go

23  to the bathroom, so you gave her an opportunity, because if you

24  put the child first, to be comfortable before resuming the

25  interview; correct?

1    A    I'm unaware of how long it was that she was in the

2    restroom, but yes, she took a break to go use the bathroom.

3    Q    And, of course, for purposes of anybody that's looking at

4    the DVD later, including yourself, you don't stop the

5    recording.  You just -- the recording starts before you ever

6    get in the room.  And then all the coming and going of going to

7    the bathroom and coming back in, the video is continuing to

8    play; correct?

9    A    Yes.

10   Q    Okay.  So basically there's nothing you're hiding.  It's

11   very transparent; correct?

12   A    It's just part of standard practice.  If the child is

13   going to take a break because they need to use the restroom or

14   they just are feeling overwhelmed, whatever the reason is, it's

15   just standard practice to leave the recording going.

16   Q    That 50 to 60 minutes total that you spent with Kaitlyn

17   in May of 2020, also includes the time, like you discussed,

18   where you do closure, as well as returning to a neutral topic

19   to make the child comfortable and make sure the child feels

20   safe before the interview is over; correct?

21   A    Yes.

22   Q    So it would be fair to say that in the 50 to 60 minutes

23   that you took -- talked to her entire -- in its entirety, and

24   including the bathroom break, all the rapport building and --

25   and getting to know you, the closure, and return to neutral,

1    all of that right there in the middle was just the inquiry

2    about what happened in the bedroom with -- with Mr. Goldesberry

3    and Kaitlyn; correct?

4    A    I'm unaware of exactly how much time we spent covering

5    the topic of concern or the disclosure.

6    Q    I'm sorry, my question was probably a bad question.

7        Specifically that 50 to 60 minutes was not exploring the

8    disclosure the entire time.  The 50 to 60 minutes was the

9    entire time you were with Kaitlyn from beginning to end,

10   including the break, rapport, closure, and return to neutral

11   topic; correct?

12   A    Yes, ma'am.

13   Q    Thank you.

14       You discussed with Mr. McWaters the -- the phases that a

15   child can go through when'd -- when disclosing sexual abuse;

16   correct?

17   A    Yes.

18   Q    And you talked about how a child can be in denial or

19   outright deny that abuse has occurred even though it has;

20   correct?

21   A    Yes, that can happen.

22   Q    And it can happen that a child will tentatively disclose,

23   what we call dipping a toe in the water, giving some details

24   but not all the details, or saying it happened one time when it

25   really happened more than one time, but that doesn't always

1    happen; correct?

2    A    Correct.  It can happen in some cases and not in others.

3    Q    You talked about recantation where a child discloses some

4    kind of abuse and then sometimes takes it back.  That also

5    doesn't always happen; correct?

6    A    Correct.  It can happen in some cases and in others not.

7    Q    You talked about accidental versus purposeful

8    disclosures.  Accident or can -- excuse me -- accidental can be

9    anything, like literally the abuse is in the process of

10   happening and Mom comes home and catches them; correct?

11   A    Correct.  An accidental disclosure is where the abuse is

12   uncovered or identified by accident, and that can be a number

13   of scenarios.

14   Q    But you would agree with me that the phases of

15   disclosure, whether a child ever goes through denial or ever

16   tentatively discloses, whether a child actively discloses or

17   possibly recants, that all assumes that sexual abuse or abuse

18   occurred; correct?

19   A    Not necessarily.

20   Q    Let me ask a different question.

21        In order for a child to disclose sexual abuse, that child

22   would have had to have been sexually abused; correct?

23   A    Not necessarily.

24   Q    Okay.  You're saying children can make it up?

25   A    It's unlikely that a child would make up or fabricate.

1    And in this case, there was no motive to fabricate identified

2    in the interview.  But the research does show that that can

3    happen.  But it doesn't always happen.  And it's unlikely for

4    it to happen.

5    Q    I think you're not understanding my question.  What

6    I'm -- what I'm talking about is when we talk about the process

7    of disclosure, this series of things that the research

8    indicates can happen but doesn't always happen, that process of

9    disclosure, if a child is disclosing sexual abuse tentatively,

10   that's because they were sexually abused; correct?  It assumes

11   that abuse occurred.

12   A    Not necessarily.  The process of disclosure is just a set

13   of characteristics or factors that influence or could influence

14   what the child is saying, and it's not always related to sexual

15   abuse.  It might be related to physical abuse.  It -- the

16   process is not a diagnostic tool.  It's not meant to identify

17   whether or not abuse occurred.

18       It's just meant to explain certain characteristics that a

19   child might be showing when they are disclosing, not

20   necessarily that their disclosure is factual or true.  It's

21   just meant to explain those characteristics and those factors

22   that might influence the disclosure that's being made.

23   Q    Okay.  Let me ask you this.  You talked about how

24   children can minimize, but they don't always; correct?

25   A    Correct.

1   Q    For example, a minimization could be saying that it only

2   happened one time; correct?

3   A    Correct.  That could be an example.

4   Q    Alternatively it could actually have only happened one

5   time, so that wouldn't be minimizing.  It would just be the

6   reality that that child experienced; correct?

7   A    That is a possibility.  But that characteristic of

8   minimizing isn't meant to determine whether or not it did

9   happen one time or more than one time.  It's just meant to

10  explain why something like that might occur or a child might

11  make statements like that in an interview or in the process of

12  disclosure.

13  Q    Okay.  Another example would be, as far as possible

14  examples of minimizing, a child saying that it was an accident;

15  correct?

16  A    Correct.  That could be a possible example.

17  Q    For example, a child is showering; right?  And a male

18  that is not an appropriate person to see the child in the nude

19  intentionally comes into the bathroom and pulls the curtain

20  back, but then after, you know, observing the child or what

21  have you, tries to convince the child that he didn't know she

22  was in the shower; right?

23       That could be an example of something appearing to be an

24  accident when we know that it wasn't; correct?

25  A    That will depend on the disclosure that the child is

1  making.

2   Q    Right.  I'm telling you the disclosure that the child's

3  making.  That would be an example of minimizing; correct?

4   A    It could be an example of minimizing.  It could also be

5  an example of discounting.  Those two things are very similar

6  characteristics of a tentative disclosure.  But again, it would

7  depend on their disclosure and what phase of the disclosure

8  process they're in because those characteristics only describe

9  the tentative disclosure phase.

10   Q    Alternatively if a child comes in for a forensic

11  interview and discloses to you that they were on the toilet,

12  completely naked about to get in the shower but hadn't turned

13  the shower on, and a male adult walked into the bathroom and

14  observed them, that could actually be an accident; correct?

15   A    As the interviewer, it wouldn't be my job to determine if

16  it was an accident or not an accident.  It would just be my job

17  to listen to the child's statement and whatever they're

18  disclosing, and it's not my job to confront the child's

19  perception of what happened.

20   Q    Correct.  So when you're here testifying as an expert

21  about the various things that can happen when a child is

22  disclosing sexual abuse, including tentative disclosures,

23  including minimizing, you're not here offering an opinion

24  specifically about Kaitlyn's disclosure, are you?

25   A    Correct.  Because in this case, I conducted the interview

1    for Kaitlyn.  And as a forensic interviewer, we -- it's not our

2    job to have an opinion or to identify if the child's telling

3    the truth or not telling the truth.  It's just our job to ask

4    the questions in a way that's not leading or suggestive and

5    follow the protocol.

6    Q    So you testified on direct examination with Mr. McWaters,

7    you said 90 percent of cases are someone that the child knows

8    and loves; correct?  When talking about sexual abuse; correct?

9    A    Correct.

10   Q    And that's based on research in the field; correct?

11   A    Correct.

12   Q    Not your own personal necessary experience.  You're not

13   tallying each time or anything.  It's just research in the

14   field; correct?

15   A    Correct.  That comes from a large body of research in the

16   field.  And in my training and experience, I'm not tallying

17   each time, but overwhelmingly the number of interviews that

18   I've conducted, most of the time the alleged perpetrator is

19   someone that the child knows and cares about, both in cases of

20   sexual abuse and physical abuse or other forms of abuse or

21   maltreatment.

22   Q    And specifically with that statistic that you gave the

23   jury, the 90 percent of cases where someone the child knows and

24   loves is the perpetrator, that research that you're relying on

25   for that statistic, the research in the field is based on

1   confirmed cases of sexual abuse; correct?

2   A    I believe it's based on what's called substantiated cases

3   of abuse.  I'm unaware if it's based solely on sexual abuse.

4   But it's based on cases that are substantiated, which is just a

5   word that essentially means that they were found to be true or

6   accurate.

7   Q    And when these cases are found to be true or accurate,

8   that's past the time that the child's ever in the Child Abuse

9   Network with you.  It's when DHS makes a finding or a criminal

10   Court or jury makes a finding substantiating or confirming

11   abuse; correct?

12   A    I'm unaware of exactly when the substantiations occur,

13   but it does occur following the interview because the forensic

14   interview is typically the first step in the investigation.

15   Q    You testified with Mr. McWaters on direct that it's

16   unreasonable to expect a child or even an -- an adult to recall

17   a date or time when an event occurred; correct?

18   A    Correct.

19   Q    And that's just, again, based on the research in the

20   field as to trauma, specifically any kind of trauma, and

21   pertaining specifically to sexual abuse; correct?

22   A    Not necessarily pertaining just to sexual abuse, but

23   memory in general.  The example most used would be in term --

24   in cases of long-term sexual abuse where if you were to ask a

25   child to be able to recount every detail of every time it

1    happened, every place it happened, and everything that

2    happened, that's considered unrealistic because, even for an

3    adult in a healthy relationship, like a marriage, for example,

4    it would be unrealistic to ask how many times that adult in

5    their marital relationship had had sexual relations with their

6    partner, where at, when did it happen, how many times, and all

7    the details of what happened.

8         It's just not a realistic expectation for memory in

9    general, whether trauma occurred or not.

10   Q    But you would agree with me that a traumatic event can

11   affect a child's memory?

12   A    Yes.

13   Q    And as well as an adult's?

14   A    Yes.

15   Q    Even if an -- an act or an event occurs that doesn't

16   necessarily rise to the level of a crime, that act or event can

17   still be traumatic for the child; correct?

18   A    Correct.  Every child is different.  Every case is

19   different.  And trauma can affect people differently.  So an

20   act wouldn't necessarily have to be criminal to feel

21   traumatizing to a child.

22   Q    When you were discussing with Mr. McWaters on direct that

23   there might be some differences were you to conduct Kaitlyn

24   Goldesberry's interview today with the additional training and

25   experience that you have versus two years ago in May of 2020,

1    you mentioned that one of the things you might do differently

2    would be explore more details with Kaitlyn; correct?

3    A    Correct.

4    Q    And one of those details potentially might be exploring

5    more of the conversation that occurred after the event that

6    happened in the bed between Kaitlyn and her father; correct?

7    A    It may have been.

8    Q    When you testified on direct examination that going into

9    your interview with Kaitlyn, you only knew the bare bones basic

10   allegations, essentially that there was an allegation of sexual

11   abuse; correct?

12   A    Correct.

13   Q    You didn't have police reports.  They hadn't even been

14   generated yet; correct?

15   A    Correct.

16   Q    Law enforcement wasn't even there.  It was just DHS,

17   Brenna Gusman; correct?

18   A    I'm unaware if law enforcement was involved, but I do

19   know that Brenna Gusman was the DHS worker involved.

20   Q    And Ms. Gusman was on the other side of the mirror

21   talking to you through your earpierce, cor- -- earpiece;

22   correct?

23   A    It would have been either Miss Gusman or any other child

24   welfare investigator because interviews are not conducted

25   without an investigator present.

1   Q    When you reviewed your interview of Kaitlyn, you recall

2   where you asked if Kaitlyn wanted to see the room on the other

3   side of the mirror.  You remember that; correct?

4   A    I don't recall that directly, but I often ask the kids

5   that question.

6   Q    When was the last time you watched your interview with

7   Kaitlyn?

8   A    Yesterday.

9   Q    So you don't remember showing her the room and

10  specifically saying on camera, "This is where Miss Brenna is"?

11  A    I don't recall specifically saying that.

12  Q    You testified on direct with Mr. McWaters that Kaitlyn

13  disclosed that her father touched her on the vagina on the skin

14  outside and inside the body; correct?

15  A    Correct.

16  Q    She also very specifically disclosed to you that her

17  father was sleeping when that happened; correct?

18  A    I believe what she said was that he was half asleep when

19  that happened.

20  Q    That he was half asleep, that he was snoring, and his

21  eyes were closed; correct?

22  A    I don't recall what she said about snoring or eyes

23  closed.  Just that she said that she -- he was half asleep when

24  that happened.

25  Q    You watched this interview yesterday, and you don't

1    remember her saying, "He was half asleep.  I crawled in his

2    bed.  He thought I was my mom.  He woke up.  He was like, 'I'm

3    sorry'"?

4         You don't remember that?

5    A    I do remember that.  I just don't have a transcript in

6    front of me or have every word of the interview memorized.

7    Q    Sure.  And I'm not asking that.  I'm just asking if you

8    remember the fact that she specifically mentioned he was

9    snoring and that his eyes were closed.

10        **MR. MCWATERS:**  Objection.

11   Q    (By Ms. Brown) Do you remember --

12        **MR. MCWATERS:**  Asked and answered.

13        **THE COURT:**  Sustained.

14   Q    (By Ms. Brown) Kaitlyn told you during the course of the

15   interview that she feels safe in her home; correct?

16   A    Yes.

17   Q    She told you that if there was anything going on that

18   made her feel not safe, she would absolutely tell you; correct?

19   A    Yes.

20   Q    She also told you she would consider running away or

21   pulling a knife on her dad if he tried anything like that;

22   correct?

23   A    Yes.

24   Q    Would you agree with me that teenagers can be

25   particularly difficult to forensically interview regard --

1    regarding allegations of sexual abuse?

2    A    No, not necessarily.

3    Q    You don't think that just generally teenagers are more

4    difficult to talk to?

5    A    No, not necessarily.

6    Q    You testified that Kaitlyn was very matter-of-fact;

7    correct?

8    A    Correct.

9    Q    In other words, she didn't get emotional; right?

10    A    She appeared to be irritated or defensive.  But when I

11    think of the word "emotional" or when I see kids get emotional

12    in interviews, typically that involves crying or getting upset,

13    and that is not something that occurred in her forensic

14    interview.

15    Q    Yeah.  "Irritated" is definitely the word to use for the

16    way that she was acting.  Would you agree?

17    A    My interpretation of her demeanor in the forensic

18    interview was that she was a bit defensive, maybe irritated,

19    but it's not my job to assign feelings or emotions to her or

20    her behavior.  During the disclosure piece, she was

21    matter-of-fact.

22    Q    Well, you -- you assigned the words "protective" and

23    "defensive" to her; correct?

24    A    She --

25    Q    That's your opinion?

1   A    That's not my opinion.  She made statements that her

2   father was a good man, and she made statements about feeling

3   safe with him.

4   Q    As far as interviewing child sexual abuse -- or -- or

5   children pertaining to allegations of child sexual abuse in the

6   process of disclosure, that area is not a predictive science,

7   is it?

8   A    I don't understand the question.

9   Q    Sure.  You can't look at research in your field and

10  predict outcomes or future events; correct?

11  A    Correct.

12  Q    Your area of expertise, this area that you're here

13  testifying as an expert to, it isn't a hard science; correct?

14  A    I don't know that I would necessarily, it's not a hard --

15  say it's not a hard science because there is a large body of

16  different types of research that has been conducted.  But it --

17  I would say that it's a social science.

18  Q    It doesn't use math, like scientists and hard science do

19  where they have control over variables and conclusions, like

20  chemistry or physics; correct?

21  A    Correct.

22  Q    Soft sciences, or what was the word that you used?  Did

23  you use soft science?

24  A    No, ma'am.  I said it's a social science.

25  Q    Social sciences.  Social sciences or soft sci- -- or soft

1  sciences use a process of collecting empirical data and then

2  use the best methods possible to analyze that information, but

3  the results can be difficult to predict.  Would you agree?

4    A    I would say that there's a lot of debate about the

5  differences between a, quote, unquote, hard science or soft

6  science.  But even in the social sciences, even if they're

7  considered a soft science, they do use statistical data and

8  statistical information to analyze the empirical data that

9  they're collecting.

10   Q    And that statistical data you're using is that

11  substant- -- is all those substantiated cases of sexual abuse;

12  correct?

13   A    I'm unaware of what statistical data you're referring to,

14  but I myself am not a researcher, so I can't testify to what

15  they're using in their research.

16   Q    So you're relying on the research without understanding

17  the research?

18   A    I am relying on a large body of research that has

19  informed the development of the ChildFirst® Protocol.  And that

20  research includes topics like suggestibility, trauma, child

21  development, family dynamics, and a number of other things.

22  That research is a large body of research that informs the

23  entire process.

24   Q    But you did testify earlier that the research is based on

25  substantiated cases in the area of child sexual abuse; correct?

1    A    I testified that there is some research that is based on
2    substantiated cases of child sexual abuse.

3    Q    Your field doesn't use the scientific method; correct?

4    A    Correct.

5    Q    There's no divining rod for intent of suspected cases of
6    sexual abuse; correct?

7    A    I don't understand the question.

8    Q    The research and -- and your training in this field
9    pertaining to the process of disclosure and the characteristics
10    of disclosure that you have testified to today, both on direct
11    and then with me, those are based on confirmed or, as you said,
12    substantiated cases of abuse or molestation; correct?

13    A    Correct.

14    Q    The process of disclosure itself, by definition only,
15    applies to cases where the child was, in fact, sexually abused;
16    correct?

17    A    No, not necessarily.

18    Q    Explain.

19    A    Because the process of disclosure doesn't just
20    necessarily pertain to child sexual abuse cases.  It often
21    does.

22        But it can also pertain to child physical abuse cases,
23    cases where children have been exposed to violence, whether
24    that's domestic violence or witnessing of a crime.  The process
25    of disclosure is just a set of phases and factors that

1  influence the child's disclosure.

2  Q    Obviously we're just here talking about child sexual

3  abuse today, though, so I'm limiting my question to -- to cases

4  or instances and research pertaining to child sexual abuse.

5  You would agree that when there has been no sexual abuse,

6  there's nothing to process; correct?

7  A    Not necessarily.

8  Q    You have no idea how accurate you are specifically in

9  distinguishing children who have been exposed to sexual abuse

10  from non-abused kids, correct, 'cause that's not part of your

11  job?

12  A    Correct.  That's not part of my job.

13  Q    And you have no idea how accurate or inaccurate the FBI

14  is in distinguishing abused kids from non-abused kids; correct?

15  A    Correct.  I'm unaware of what the FBI does.

16  Q    And you have no idea how accurate or inaccurate the

17  United States Government is in distinguishing abused kids

18  versus non-abused kids, do you?

19       **MR. MCWATERS:**  Objection.  Foundation.

20       **THE COURT:**  Overruled.

21       **THE WITNESS:**  I'm unaware.

22  Q    (By Ms. Brown) Sometimes children don't tell because

23  there's nothing to tell; right?

24  A    In some cases, that's possible, yes.

25  Q    Alternatively some children don't disclose ever, and they

1    have been abused; correct?

2    A    That can happen as well, yes.

3    Q    But if a child never discloses abuse, it is also possible

4    that it's because they haven't been abused; correct?

5    A    That is possible, yes.

6    Q    Some children only disclose some of what happened to

7    them; agreed?

8    A    Yes.

9    Q    But you have no way of knowing whether that's the case in

10    any given interview or any given situation with a child;

11    correct?

12    A    Correct.  My job is just to explore details of the

13    child's statement.

14    Q    And that includes your interview with Kaitlyn; correct?

15    A    Correct.

16    Q    You aren't here saying under oath that you think Kaitlyn

17    lied or minimized or anything like that, are you?

18    A    Correct.  That's not part of my job.

19    Q    You aren't saying here under oath that Kaitlyn withheld

20    information for you -- from you, are you?

21    A    Correct.  It's not my job to determine if information is

22    being withheld.  It's just my job to explore details of the

23    statements being made.

24    Q    Have you studied the psychological and behavioral

25    characteristics of sexually abused kids?

1    A    Only in the scope of the process of disclosure and
2    forensic interviewing.

3    Q    Excuse me.  The research that you rely on is based at
4    least largely -- this large body of research that you've been
5    talking about in this social science is based on kids you've
6    never met or talked to yourself; correct?

7    A    Correct.

8    Q    Those children are cases that you've studied in the
9    research that you rely on -- essentially you were told in the
10    materials that you reviewed, studied, or -- or went to a
11    lecture about that those were, in fact, substantiated cases, as
12    you said before?

13    A    Correct.

14    Q    Essentially, to be clear, you've been told that these
15    kids in the research that you were relying on were sexually
16    abused, but you don't have any personal basis of knowledge for
17    that; correct?

18    A    So my knowledge for that comes from the many trainings
19    that I've been to, including the ChildFirst® Protocol training.
20    And in that protocol training, they talk about all of the
21    different hundreds of studies that have been conducted on
22    children who have experienced sexual abuse, children who have
23    experienced physical abuse and other types of abuse and
24    maltreatment.

25        They also include several studies that have been

1  conducted on suggestibility and child development and a number

2  of other things.

3  Q    But you would agree that you are here saying that, you

4  know, one, abused children can have certain characteristics or

5  go through certain processes; correct?

6  A    Correct.

7  Q    And two, that if a child appears to have some or all of

8  those characteristics, based on your experience, that can mean

9  that the child could have been or might not have been sexually

10  abused; correct?

11  A    Correct.

12  Q    You would agree that the research in the field indicates

13  that children react in a lot of different ways to sexual abuse.

14  Yes?

15  A    Correct.

16  Q    And some children are severely traumatized; correct?

17  A    Correct.

18  Q    The research indicates that some peo- -- some children

19  appear to take it in stride; correct?

20  A    The research indicates that children can react in a

21  number of different ways, and that it's not the same in every

22  case or for every child.

23  Q    Each case and each child is different; right?

24  A    Correct.

25  Q    Some children can act out; right?

1    A    I don't understand the question.

2    Q    It's a bad question.

3         Some children who've experienced sexual abuse can react

4    by acting out physically or sexually; correct?

5    A    Yes.  Some children who have experienced any form of

6    abuse or maltreatment or trauma may exhibit signs or symptoms

7    of that through acting out, but that can apply to some cases

8    and not to others.

9    Q    Some children can become withdrawn if they've been

10   abused; correct?

11   A    Correct.

12   Q    Some children tell right away; right?

13   A    Correct.

14   Q    And some people -- and some children never tell; right?

15   A    Correct.

16   Q    Some children may have very accurate memories of the

17   traumatic event, but some may not have very clear memories;

18   correct?

19   A    Correct.

20   Q    It's also indicated in the research that some children

21   have false memories during abuse.  Like you mentioned, that

22   they say that they went to the blue forest, and that's just a

23   coping mechanism; correct?

24   A    The example I used for that is an example of dissociating

25   as a characteristic of tentative disclosure.

1    Q    Some children can even display psychological symptoms of

2    abuse.  Would you agree?

3    A    Yes.

4    Q    But alternatively some children can act perfectly normal

5    despite being subjected to years of sexual abuse; correct?

6    A    Yes.

7    Q    Children can also be traumatized by a number of other

8    things that don't involve sexual abuse; correct?

9    A    Yes.

10    Q    There have been no studies or no research in your field

11    that indicate that just because a child acts in a certain way,

12    that means the child has been sexually abused; correct?

13    A    I'm unaware.

14    Q    You're not aware of any studies or -- or results

15    indicating that, are you?

16    A    Correct.

17    Q    Would you agree with me that because there's no reliable

18    way to know that a child is acting a certain way and thus that

19    means there's sexual ab- -- that's a bad question.  Let me --

20    let me start over.

21        You would agree with me that because there's no reliable

22    way to say a child acts a certain way when they've been

23    sexually abused, we cannot conclude that a child has been

24    sexually abused just because he or she is acting a certain way?

25    A    That's not part of my job, and that would be outside of

1    my scope of practice.

2    Q    Some children who have been sexually abused wet the bed;

3    correct?

4    A    In my training and experience, I have had a few cases

5    where the child involved in the investigation does wet the bed,

6    but I couldn't say if it was because or not because of their

7    experience with childhood sexual abuse.

8    Q    And you just answered, I believe, most of my next

9    question because you're -- you cannot say that just because a

10   child wets the bed, that means that he or she were sexually

11   abused; correct?

12   A    Correct.  Determining whether abuse did or did not occur

13   is not part of my job, and that's outside of my scope of

14   practice.

15   Q    Some children who have experienced sexually abu- --

16   sexual abuse, like you said in direct examination with

17   Mr. McWaters, can experience PTSD or depression, things like

18   that?

19   A    Yes.

20   Q    But it is also true that some children who have

21   experienced any other kind of trauma, such as watching a -- a

22   person die before their eyes, that can also cause PTSD,

23   depression, anxiety, any number of -- of those diagnoses;

24   correct?

25   A    I'm not a psychiatrist or a psychologist, so I can't

1    testify to what could potentially cause PTSD or anxiety.  Just

2    that in my training and experience, I have interviewed kids who

3    have been diagnosed with those disorders, potentially as a

4    result of experiencing abuse.

5    Q    But not confirmed, not anything that -- it -- it's just

6    all potential; correct?

7    A    I don't understand the question.

8    Q    I'll ask another one.

9         Some children, for example, who have been bullied in

10   school or experienced body shaming can also experience PTSD or

11   depression; correct?

12   A    Again, I -- I can't diagnose someone with PTSD or

13   depression or anxiety.  But in my training and experience, I

14   have interviewed kids who have expressed that they have been

15   diagnosed with those disorders and who have also expressed

16   suicidal ideation and self-harming tendencies.

17        But that's really just outside of my scope of practice

18   and my qualifications.

19   Q    Kaitlyn specifically disclosed to you in your interview

20   with her school -- bullying by schoolmates and body shaming by

21   peers; correct?

22   A    Yes.

23   Q    In fact, during the course of your interview, like you've

24   said earlier in your testimony, you weren't just exploring, and

25   you don't ever just explore the one specific allegation that,

1    you know, you're told about going into the interview.  Do you

2    understand my question?

3    A    Yes.

4    Q    Is that true?

5    A    Yes, that's correct.

6    Q    So, for example, while you were interviewing Kaitlyn,

7    even though you didn't have any reason to believe there was

8    anybody abusing drugs or alcohol in the home, you still

9    explored that because you always explore that when you're

10   interviewing a child; correct?

11   A    We always explore other possible forms of abuse or

12   maltreatment, and that can sometimes in- -- include exploring

13   alcohol or drug use in the home.

14   Q    Another example is, going into this interview, you

15   weren't given any information and Kaitlyn didn't bring up

16   anything that caused you to believe that she had been exposed

17   to pornography, but you asked questions about that like you

18   would typically with a child that you're interviewing; correct?

19   A    Yes.  Again, it's just a form of continuing to explore

20   any other possible abuse or maltreatment.

21   Q    And -- and in Kaitlyn's instance, she disclosed that the

22   only pornography she'd been exposed to was by her peers at

23   school; correct?

24   A    I believe so.

25   Q    You have not reviewed Kaitlyn's medical records, school

1    records, or counseling records prior to interviewing her or

2    coming in here to testify today; is that true?

3    A    Correct; I have not.

4    Q    Are you aware that Kaitlyn has seen a therapist for over

5    four years?

6    A    No, I'm unaware of her having seen a therapist for over

7    four years.  But in her interview, she does say that she has a

8    counselor.

9    Q    Professional standards in your area indicate that

10   interviewers, such as yourself, should avoid bias; right?

11   A    Correct.

12   Q    And to alleviate bias, interviewers should address

13   multiple hypotheses in their interviews for a child, at minimum

14   both possibilities that a child could have been sexually abused

15   and the possibility that the child wasn't sexually abused;

16   correct?

17   A    Correct.

18   Q    To remain neutral because that's your job; right?

19   A    Yes.

20        **THE COURT:**  Okay.  Excuse me, Miss Brown.

21        Ladies and gentlemen, you've been in your chairs for 90

22   minutes and so has the court reporter, so it's a good time to

23   take a break.  This is a midmorning break.  It'll be 15

24   minutes.

25        **CSO:**  All rise.

1           (A brief recess was had.)

2       **THE COURT:**  Please return the jury.

3       **CSO:**  All rise.

4           (Jury entered the courtroom.)

5       **THE COURT:**  Please be seated.

6       Miss Brown, you may continue.

7       **MS. BROWN:**  Thank you, Your Honor.

8   Q    (By Ms. Brown) Miss Blevins, right before we took our

9   morning break, we were discussing bias and how your job as a

10  forensic interviewer is to remain neutral and avoid bias to the

11  extent possible; correct?

12  A    Correct.

13  Q    Okay.  So assuming sexual abuse or assuming that a child

14  has not been exposed to sexual abuse, one or the other, whether

15  your assumption is -- is on one end of the spectrum or the

16  another, would inherently invite bias.  You would agree?

17  A    I would agree.  We go into the interview without

18  assumptions and as neutral and unbiased as possible.

19  Q    And you as a forensic interviewer should never assume a

20  child has been sexually abused just because DHS or law

21  enforcement wanted the child to be forensically interviewed;

22  correct?

23  A    Correct.  We don't make assumptions.

24  Q    Just to be real clear, when a child comes in for a

25  forensic interview with you, and you've already testified that

1    you don't follow up with them or check in on them or -- or --

2    or follow their -- what happens to them unless they end up

3    having to come back in for another forensic interview, but you

4    also don't follow through to see if criminal charges are ever

5    filed or DHS takes action in the case or anything like that.

6    That's also not part of your job; correct?

7    A    Correct.

8    Q    And it's not part of your job to determine whether a

9    crime happened; correct?

10   A    Correct.

11   Q    And it's not your job to issue an opinion as to whether

12   you believe the child that you forensically interviewed;

13   correct?

14   A    Correct.

15   Q    Pursuant to your previous testimony, since it's fairly

16   common for a child or even an adult -- but in this case

17   obviously we're talking about a child -- to not be able to

18   recall when, as far as dates, or how old, as far as ages, they

19   were if they were sexually abused; correct?

20   A    Can you repeat the question?

21   Q    Hmm, it was a bad one.

22        You would agree with me that it's not uncommon for a

23   child to not be able to recall when, as far as a date, or how

24   old they may have been, as far as an age, when they're

25   discussing an incident with you; correct?

1    A    Correct.

2    Q    You would also agree, though, that it's often helpful to

3    probe with additional non-leading, non-suggestive questions in

4    an attempt to narrow down a date or an age if that's at issue?

5    A    Correct.  What we would do is ask additional questions in

6    a non-leading or non-suggestive way to try to identify a

7    timeline, and we do that by asking about significant --

8    possible significant events in the child's life, like what

9    grade were you in, what season it might have been.  But

10    children are not always able to answer those questions.

11    Q    Again, anticipating some of my next questions, questions

12    such as, "Do you recall whether it was hot or cold outside," or

13    "Do you remember whether something important like a birthday or

14    a holiday happened near in time," can sometimes assist a child

15    articulating a more specific date or age; correct?

16    A    Sometimes it can, yes.

17    Q    And there are times when something tangible, like an

18    object or a picture or even sometimes a smell, can trigger a

19    child's memory and help the child recall, or at least narrow

20    down things like dates and ages that are difficult for them to

21    pinpoint?

22    A    Yes.

23    Q    Kaitlyn consis- -- well, when -- when Mr. McWaters was

24    asking you questions -- I want to make sure I'm remembering

25    your phrasing as best as I can.  You said on direct examination

1    that Kaitlyn did not change or contradict herself; correct?

2    A    Correct.

3    Q    And she used terminology that was typical in your

4    experience of a 14-year-old girl?

5    A    Yes.

6    Q    And that can at least help identify, you know -- when a

7    child is not using age-appropriate terminology or is not

8    consistent, that can suggest a motive to fabricate; correct?

9    A    Not necessarily.

10    Q    But it can?

11    A    Yes, it can.

12    Q    But Kaitlyn not only was consistent and didn't contradict

13    herself, she consistently maintained throughout her interview

14    with you that when she crawled into bed with her dad,

15    unbeknownst to him, while he was asleep and snoring, his eyes

16    were closed; correct?

17        **MR. MCWATERS:**  Objection.  Mis- -- mischaracterizes.

18        **THE COURT:**  The -- overruled.  The witness may answer the

19    question.

20        **THE WITNESS:**  I do not recall specifically if she made

21    mention of his eyes being closed.  What I recall about her

22    forensic interview at this time is that she crawled into bed

23    with her dad, and she told me he was half asleep.

24    Q    (By Ms. Brown) And she wasn't inconsistent about that

25    fact at all, was she?

1    A    No, she was not.

2    Q    And, in fact, that particular part where you were

3  discussing the incident in the bed, you did attempt to rehash

4  it a number of times, such that Kaitlyn was rolling her eyes;

5  correct?

6    A    I can't testify to why she's rolling her eyes, but in the

7  forensic interviewing protocol, sometimes we will ask repeated

8  questions in different ways so that we can try to explore

9  details about the statements that are being made and make sure

10 that we're not just focusing on one event but trying to get as

11 many details as possible about the statements that the child is

12 making.

13   Q    And regardless of why Kaitlyn was rolling her eyes, you

14 would agree that when you were doing that very important tactic

15 during the forensic interview of asking the same thing in

16 different ways, that was during the time that she was -- it was

17 caught -- she was rolling her eyes during that period of time?

18   A    I don't recall during which part of the forensic

19 interview or what time she rolled her eyes, but I do recall her

20 rolling her eyes.

21   Q    You have no information either from Kaitlyn or the

22 research or your training and experience that allows you to

23 tell this jury under oath that Kaitlyn was not being a hundred

24 percent truthful in May of 2020, do you?

25   A    Correct.  That is not part of my job.

1        MS. BROWN:  Pass the witness, Your Honor.

2        MR. MCWATERS:  Very brief redirect, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. MCWATERS:

5   Q    Miss Blevins, you are here today to testify as an expert

6   on the ChildFirst® Protocol, disclosures of sexual abuse,

7   disclosing, and partial disclosures and forced disclosures; is

8   that right?

9   A    Correct.

10  Q    And as part of that testimony, you can, and in fact you

11  did, give opinions, based on your training and experience, of

12  Kaitlyn's demeanor during the forensic interview; is that

13  right?

14  A    As an expert witness, I can give opinions.  But as the

15  forensic interviewer who conducted her interview, I cannot.

16  Q    But today, you earl- -- on direct, we did talk about that

17  you saw certain demeanors and -- and certain signs of -- of

18  different types of -- of a disclosure; is that right?

19  A    Yes.  We talked about different characteristics of a

20  tentative disclosure.

21  Q    And you said that one of those characteristics is

22  minimization; is that right?

23  A    Yes.

24  Q    And you said that you saw some signs of minimizing in the

25  forensic interview; is that right?

1    A    Yes.

2    Q    And you also talked about something called a "superhero?"

3    And what -- what -- can you refresh my memory on that?  What

4    exactly is that?

5    A    Yes.

6        **MS. BROWN:**  Objection.  Outside the scope of cross.

7        **THE COURT:**  Overruled.

8        **THE WITNESS:**  Yes.  Another one of the characteristics of

9    a tentative disclosure is called empowerment, and it's also

10   known as superhero.  And this is something that we see kids

11   sometimes do in their disclosure where they'll make statements

12   like, "And then I punched him in the face and I flew out the

13   door," or "And then I beat him up and I ran away and flew to

14   another country."

15       It's statements that are improbable, but they're

16   empowering statements that the child is making during the

17   disclosure.

18   Q    (By Mr. McWaters) And during cross-examination,

19   Miss Brown asked you about a statement that Kaitlyn made that

20   if she felt unsafe or that if her dad did anything to her, she

21   would pull a knife out on him; is that right?

22   A    Yes.

23   Q    And Miss Brown also asked you on cross-examination if she

24   felt safe at home; is that right?

25   A    Yes.

```
 1    Q    Can -- is -- is it possible for an abused child to still
 2    feel safe at home?
 3    A    Yes.
 4    Q    And then also is it common for kids who often cry in
 5    forensic interviews?
 6    A    I wouldn't necessarily say it's common.  It just depends
 7    on the child and their reaction to the abuse they've
 8    experienced.  In my training and experience, I've seen kids
 9    cry.  I've seen kids be angry.  I've seen kids act very
10    matter-of-fact and have no visible reaction at all.
11        MR. MCWATERS:  That's all the questions I have, Your
12    Honor.  Thank you.
13        THE COURT:  You may step down, ma'am.
14        Counsel, come forward, please.
15            (The following proceedings were had at the bench
16    outside the hearing of the jury:)
17        THE COURT:  Okay.  It's 11.  Is there anything else you
18    can do before you address dealing with 404 question?
19        MS. DIAL:  I have one -- a short -- a little short witness
20    that'll be five minutes.  I could call her.
21        MS. BROWN:  And she's in the hallway.
22        MS. DIAL:  She's in the hallway.  That's the only --
23        THE COURT:  Well, then, why don't we try this.  Tell me
24    what you both think about this.  We could proceed with Faith or
25    the mother and then, at some point, we'll break and you
```

1    proffer -- you can proffer their testimony outside the presence

2    of the jury, and then we'll address it.

3        MS. DIAL:  We don't intend to call Faith and Michelle if

4    they don't -- if they aren't testifying to 404(b).

5        THE COURT:  Okay.  Okay.  We'll see how -- take this next

6    witness.  I'll talk --

7        MS. DIAL:  With -- with --

8        THE COURT:  -- to you again.

9        MS. DIAL:  With the next witness, Your Honor, we're

10   calling her solely for the defendant's statements during this

11   meeting.  She was a facilitator that also knew about the

12   family's history.

13       I just want to make the Court aware that we're going to

14   keep it fairly brief, but I anticipate that there may be some

15   desire to cross on the family services and everything that they

16   did afterwards.  We would object to that.

17       MS. BROWN:  I -- no.  I -- they made it very clear they're

18   calling her for the defendant's statements and the defendant's

19   statements only.

20       THE COURT:  Okay.

21       MS. BROWN:  Thank you.

22           (The following proceedings were had in open court,

23   within the presence and hearing of the jury:)

24       MS. DIAL:  The Government calls Deniece Ishem.

25       THE DEPUTY COURT CLERK:  Ma'am, if you'll come forward --

1      **MS. ISHEM:**  Oh, sorry.

2          **THE DEPUTY COURT CLERK:**  -- right here.

3      Oh, that's okay.  And I'll swear you in real quick, and

4  then we'll get you in the seat.  If you could raise your right

5  hand.

6              (Witness sworn.)

7          **THE WITNESS:**  Yes.

8          **THE DEPUTY COURT CLERK:**  Thank you.

9          **THE WITNESS:**  Thank you.

10         **THE DEPUTY COURT CLERK:**  Uh-huh.  Go right there to the

11  witness stand, and adjust the microphone if you need to.

12         **THE COURT:**  Ma'am, would you state your full name, please.

13         **THE WITNESS:**  Deniece Ishem -- well, Deniece Chavonne

14  (ph.) Ishem.

15         **THE COURT:**  Would you spell your first and last name.

16         **THE WITNESS:**  D-e-n-i-e-c-e.  And my last name is

17  I-s-h-e-m.

18         **THE COURT:**  Thank you, ma'am.

19         **THE WITNESS:**  Uh-huh.

20         **THE COURT:**  You may inquire.

21     **MS. DIAL:**  Thank you, Your Honor.

22             DENIECE ISHEM, called as a witness herein, having

23  been first duly sworn on oath, was examined and testified as

24  follows:

25

1                        DIRECT EXAMINATION

2    BY MS. DIAL:

3    Q    Miss Ishem, where do you work?

4    A    For Department of Human Services.

5    Q    What's your role?

6    A    I am a facilitator in child welfare.

7    Q    Were you working as a facilitator in child welfare back

8    in May -- or back in June of 2020?

9    A    Yes.

10   Q    Are you familiar with Raymond Goldesberry?

11   A    Yes.

12   Q    Were you a facilitator on a CPS investigation of him back

13   in June of 2020?

14   A    Yes.

15   Q    And did you facilitate a child safety meeting in

16   June 2020?

17   A    Yes.

18   Q    What's a child safety meeting?

19   A    Basically we are there to make a liked decision to

20   determine, like, if a level of intervention is needed.  And as

21   far as my role, I'm considered a neutral party to the case, and

22   I do a lot of information gathering.

23   Q    Okay.  We're not going to get into any of your

24   determination.  But as part of your neutral fact-finder,

25   neutral information gathering --

1    A    Uh-huh.

2    Q    -- do you hear from the different people in the

3    investigation?

4    A    Yes.

5    Q    Did -- at your child safety meeting, did the defendant

6    talk about the investigation and the incident?

7    A    The incident, yes.

8    Q    And I should be more clear, the incident involving his

9    daughter Kaitlyn Goldesberry?

10    A    Yes.

11    Q    Did he confirm that this incident with Kaitlyn had

12    happened?

13    A    Yes.

14    Q    Did he say in June 2020, how long ago it had happened?

15    A    Yes.

16    Q    What did he say?

17    A    Three to four years ago.

18    Q    Are you aware of how old Kaitlyn was at the time of this

19    child safety meeting you held?

20    A    During the meeting, she was 14?

21    Q    So if he said that the incident had happened three or

22    four years prior, how old would Kaitlyn have been?

23    A    Around 10 or 11?

24    Q    Thank you.

25         **MS. DIAL:**  No other questions, Your Honor.

US DISTRICT COURT - NDOK
REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

```
 1                        CROSS-EXAMINATION
 2   BY MS. BROWN:
 3    Q    Good morning, ma'am.
 4    A    Good morning.
 5    Q    Would it be fair to say that you facilitate quite a few
 6   child safety meetings?
 7    A    Correct.
 8    Q    Do you have specific recollection of this particular
 9   child safety meeting and the -- and Mr. Goldesberry's
10   statements themselves without using notes to refresh your
11   recollection?
12    A    Correct.
13    Q    So it would be fair --
14    A    Yes.
15    Q    -- to say that this was one of many, many, many child
16   safety meetings that you facilitated as a neutral party, and
17   you have to rely on a report or notes to -- to remember exactly
18   what one person said?  Correct?
19    A    Can you repeat that for me?
20    Q    Uh-huh.  And I apologize if my questions aren't --
21   aren't -- aren't clear.  Just keep letting me know.
22    A    Okay.
23    Q    Because you do so many of those meetings, this isn't a
24   specific child safety meeting that the Goldesberrys had that
25   you -- that you -- that sticks out in your mind or anything
```

1    like that; right?

2    A    It's several cases that I have facilitated that has stuck

3    out in my mind.

4    Q    Okay.

5    A    It is situational.

6    Q    Okay.  But specifically with regard to Mr. Goldesberry's

7    statements, you don't remember their context or, you know, how

8    certain statements came up or if he was being questioned or

9    just voluntarily talking in this meeting; correct?

10    A    I do remember this meeting.

11    Q    You do remember this meeting?  Okay.

12    A    Yes.

13    Q    And so in this meeting, was Mr. Goldesberry being

14    questioned or interrogated, or was he just given an opportunity

15    to speak?

16    A    He was given an opportunity to tell his side of the

17    story.

18    Q    And when he did that, including when he said when he

19    believed that it happened, he wasn't able to give a date

20    specifically or a year specifically, was he?  He just said

21    approximately three to four years ago; is that accurate?

22    A    Correct.

23    Q    And during the course of the child safety meeting while

24    Mr. Goldesberry was talking, he was remorseful regarding the

25    incident; correct?

1    A    From my recollection, he did appear to be remorseful of

2    the incident.

3    Q    But while being remorseful, he maintained that he thought

4    it was his wife; correct?

5    A    Correct.

6         **MS. BROWN:**  That's all I have, Judge.

7         **MS. DIAL:**  No redirect, Your Honor.

8         **THE COURT:**  You may step down, ma'am.

9         Okay.  Ladies and gentlemen, yesterday, I told you that

10   there might be times where the -- that your breaks were

11   extended.  And I'd let you go about your own affairs during

12   that time.  This is -- it -- it happened.  I thought it might.

13   So from my standpoint, it's hard to judge how long witnesses

14   will take.

15        It's just kind of an estimate on my part.  I'm responsible

16   for the estimate; nobody else is.  Ideally, I would like to

17   break at lunch and have you back at one.  But I have some

18   matters I need to take up outside of your presence.  And so I'm

19   going to let you go now and ask that you be back at one

20   o'clock, and we will proceed at one.

21        I don't think that's going to put us behind schedule, by

22   the way.  I think we'll -- we're still on schedule.  So enjoy

23   your lunch break, and please remember and observe the

24   instructions I gave you at the beginning.  Thank you.

25        **CSO:**  All rise.

 1         **JUROR:**  Thank you.

 2             (Jury out.)

 3         **THE COURT:**  Be seated, counsel.

 4         In reviewing the similar fact evidence, whether it's under

 5    the new rules or under 404, the Court is required to make a

 6    rigorous analysis of not only the relevance of the facts, but

 7    also do a 403 balancing.  But regardless of whether this

 8    proffered information regarding the defendant's touching of his

 9    daughter Faith is admitted or not, I'm obligated to make a

10    thorough analysis of my reasoning, for purposes of appellate

11    review and for the benefit of counsel.

12         We've been a little bit handicapped in doing that.

13    Ideally, I would have asked for more complete briefing than I

14    had.  I know you are very busy in this district, and I had

15    little notice of the motions and didn't know that I would be

16    handling them until just a couple days before I left.

17         So I've not had an opportunity to do more than read the

18    cases that you cited and that my brilliant, young law clerk

19    provided me, which were legion.  They were, I think, everything

20    that there was, included everything there was from this -- the

21    Tenth Circuit, including the *Meacham* case that you gave me most

22    recently.

23         I don't know how you want to go about this.  Do you want

24    to proffer the testimony of one or more of the witnesses you

25    have remaining to make the record more complete?

1    **MS. DIAL:**  For the 404(b), Your Honor?

2    **THE COURT:**  Uh-huh.

3    **MS. DIAL:**  Yes, I can.

4    **THE COURT:**  Before you do that -- and I'll give you a

5    minute to get ready to do that.  You know, I've never -- I've

6    never dealt with 413 or 414, simply because we don't see these

7    kinds of cases very often in federal court.

8    I've not had it come up.  And the last time I did this

9    kind of work was in state court, and that goes back really to

10   trial experience about 30 years.  So I'm a little bit rusty on

11   it.  But the 40 -- it seems to me particularly with regard to

12   the *Meacham* case that -- that -- where they talk about

13   liberally construing Rule 414, that that's what the Courts have

14   done.

15   I think we talked about that earlier on.  It's gone from a

16   fairly rigid and demanding test to a far more liberal test.  In

17   *Meacham*, the Court was -- recognized that 414 -- as I recall,

18   that 414 didn't apply, so he did a 404 analysis but was

19   informed by the -- the history, the legislative history behind

20   414.

21   I've neglected 413.  Can you tell me why 413 is not

22   applicable here?

23   **MS. DIAL:**  If I could have just a moment, Your Honor?

24   **THE COURT:**  I'll tell -- I'll give you some time.  We'll

25   take a break, and I'll come back.  And let's take a ten-minute

1    break.

2         **MS. DIAL:**  Okay.  Thank you, Judge.

3         **CSO:**  All rise.

4         **THE COURT:**  And you can line up your witnesses as well.

5              (A recess was taken.)

6         **THE COURT:**  Mr. Phorn does a good job of keeping me on

7    schedule.

8         You may proceed.

9         **MS. DIAL:**  Thank you, Your Honor.

10        I appreciate the Court giving me time to look over 413

11   again.  I'd looked at it before, and I'd discussed it also with

12   the appellate unit beforehand.  413 and 414 are not applicable

13   here because 413 and 414 are focused on propensity evidence.

14   And I think the -- the *Meacham* case goes to the issue, or it is

15   more closely aligned to what we're looking at here.

16        In *Meacham*, the Court considered that 413 and 414 were

17   really broad.  It was Congress's attempt to allow trials of

18   this nature to include propensity evidence, to include that

19   people that sexually abuse children often continue that for

20   years.  That was the intent of 413 and 414.

21        **THE COURT:**  Of 414.

22        **MS. DIAL:**  414, yes.

23        **THE COURT:**  413 is not limited to children, is it?

24        **MS. DIAL:**  No, it's not.

25        **THE COURT:**  Okay.

1          **MS. DIAL:**  But 413 also defined -- it's focused on sexual

2    assaults.  The acts we're talking about here are better suited

3    by 404(b), which the *Meacham* Court points out is narrower.

4          It limits -- the Government can't say that it's propensity

5    evidence.  It's solely to help explain motive, intent, which

6    the *Meacham* Court found that, although the evidence could have

7    come in under 414, the narrowing of 404(b) was not improper.

8          It supported that, even though the evidence is similar to

9    the type of evidence the Government might present under Rule

10   414, it doesn't mean that the evidence is inadmissible under

11   404(b).  And specifically why 413, 40 -- or 414 -- well, 414,

12   we've already established isn't because the child was 14 -- the

13   other child.

14         But 413, as well, requires that there was sexual assault.

15   That is not what Faith or Michelle are going to testify to

16   because they're going to testify to the initial behaviors, to

17   the escalation of behaviors.  The -- Faith will -- is expected

18   to testify that when she was 14, so when Kaitlyn would have

19   been 10, that her dad helped her remove tampons.

20         She is now expected to testify that it was at her request.

21   There was no sexual act.  Similar to the minimizing that we've

22   heard from Kaitlyn, she's going to take on the responsibility

23   of, this was her idea.  And perhaps it was.  That will be her

24   testimony.

25         Michelle's going to talk about walking in and -- and,

1    excuse me, Your Honor -- Miss Goldesberry -- Mrs. Goldesberry's

2    going to talk about walking in and catching the defendant

3    shaving Faith Goldesberry's genitals, when Miss Goldesberry

4    was, again, around this same age, when Kaitlyn is 10, maybe 11.

5        These aren't even -- they're -- they're not 413 because

6    they aren't even other bad acts necessarily.  They're other

7    acts.  They don't rise to the level of 413 and 414 because the

8    defendant and his family insists that there was no sexual

9    intent.

10       413 looks at any conduct -- also considered sexual

11   assault, any conduct prohibited by Chapter 109 which, for the

12   incidents with Faith when she was 14, would be 18 U.S.C. 2243,

13   the abusive sexual contact with a minor.  She insists that

14   there was no sexual intent.  So they're not even --

15       **THE COURT:**  She's going to -- I guess you're not going to

16   call her for a -- to proffer her testimony because you're both

17   clear on what it -- what it is.  She's going to say that she --

18   in both instances, she went to -- to the defendant and asked

19   him to do the things that he did --

20       **MS. DIAL:**  Yes.

21       **THE COURT:**  -- to assist her.

22       **MS. DIAL:**  Yes, that it was her request.

23       **THE COURT:**  And so ordinarily, a child cannot give consent

24   to -- for an improper sexual -- for improper sexual contact.

25   But in this case, they're going to say that it was for medical

1    or personal assistance, taking it out of the realm of illegal

2    contact.

3        **MS. DIAL:**  Yes.

4        **THE COURT:**  Okay.

5        **MS. DIAL:**  And --

6        **THE COURT:**  Okay.  Well, I appreciate your candor.

7    Appreciate your candor, then.  Proceed with your 404 argument.

8    I --

9        **MS. DIAL:**  Thank you, Your Honor.  The -- the other

10   element of that is his sexual int- -- his intent in doing it.

11   And I believe that they will testify their belief of his intent

12   was that it was just medical.  But the reason that it's a

13   relevant -- that it's relevant bad acts -- relevant acts for

14   his motive and his intent is because when Faith is 14, the

15   defendant is having close, personal contact with her genitals.

16       He's helping her remove tampons.  He's up close and

17   personal then.  She then needs help shaving.  His wife, I

18   expect, is going to testify that she was home, but when Faith

19   asked the defendant to help her, he agreed.  He went and had

20   more close, personal, upfront contact with his daughter's

21   genitals.

22       So then, within this time period of a year -- presumably,

23   Faith's saying she's 14, Kaitlyn saying she's 10.  Then

24   sometime after that, after the defendant has had these

25   opportunities to view, to touch, to be in direct contact with

1    his teenage daughter's genitals, then, when he's given the

2    opportunity when his 11-, maybe 12-year-old child crawls into

3    bed with him -- there's no mom around to catch.

4        She falls asleep.  Her testimony was she fell asleep.  Now

5    he has an opportunity.  There's not a child that's just like,

6    "Just pull out the tampons."  There's not a mom that's going to

7    walk in and catch him shaving.  He has the opportunity that he

8    didn't have in the prior ones.

9        And so those prior instances where he is interacting with

10   his daughter's genitals and then, shortly afterwards, digitally

11   penetrating another daughter, and when she wakes up and when

12   she reacts, his rationale -- he says his intent was his wife.

13   That's why those are so relevant.

14       They're not prior abusive sexual acts, but they are the

15   build-up to his escalation and to why he then seizes this

16   chance when the other daughter gets into his bed.

17       **MS. BROWN:**  May I respond?

18       **THE COURT:**  Yes, ma'am.

19       **MS. BROWN:**  First and foremost, I, too, appreciate the

20   Government's candor because I agree that, for the reasons

21   listed, 413 and 414 do not apply.  I am very familiar with

22   those statutes and their identical counterparts in Oklahoma

23   state law.  And so since that's been conceded, I'll -- I'll

24   leave it at that.

25       With regards to 404, first of all, there is -- to clarify

the proffer of testimony, Faith Goldesberry will testify that

her father was not shaving her genitals.  In fact, no shaving

or touching ever actually occurred.  She was wearing a swimming

suit.

She was shaving her own bikini line, not her genitals, but

the area that is exposed and open when you're at a swimming

pool while wearing a swimming suit where, from time to time,

unfortunately, hair still grows.  And she found herself unable

to reach a certain spot, more towards her buttocks at the back,

not in the genital area, but the anal area.

And when she couldn't reach that spot, while wearing a

swimming suit, she handed -- she -- she went and got her dad

'cause her mother was sleeping.  She handed him the razor and

asked him if he could just get that one spot she couldn't

reach.  Before he ever made any contact with her body, much

less her genitals, Mom woke up and walked by and took over.

And Mom did, in fact, at Faith's, again, request, assist

her in reaching that area that, admittedly, for all females is

a -- is a difficult spot, especially for a young woman of 14

who has not had a significant amount of practice in that

grooming.  Both tampon incidents were, again, Faith asking her

father specifically for assistance because she was new to using

tampons.

And in -- they were instances where she was using a

different kind of tampon than she was used to, and there was

1   either no string so she couldn't fish it out 'cause typically

2   a -- a tampon has a string that comes out of the vaginal cavity

3   and you can yank on the string and pull it out, or the string

4   was weak and broke, and so she didn't know how to get the

5   tampon out.

6        This is a family wherein Mrs. Goldesberry is a labor and

7   delivery nurse and has been since these children were born.

8   And talking about genitals, talking about labor and delivery

9   and reproduction and menstruation is not taboo in this house.

10  It is also -- not necessarily in the record but would be

11  testified to by Faith and/or Michelle if either of them were

12  called, that Mr. Goldesberry has medical training.

13       He was an EMT before he did his current occupation.  And

14  as an EMT, he wore a glove both times he was removing the

15  tampon.  There was nothing sexual about it.  I -- I guess it

16  could -- remains to be argued whether it's appropriate or

17  inappropriate, but it is not a criminal act.

18       So those details in the proffer of -- of evidence, I

19  think, really delineate why this is not admissible under

20  404(b).  There was not close, personal contact with any

21  genitals during the shaving incident.  In fact, there was no

22  contact at all.  And during the tampon incident, it was, yes,

23  close, personal contact with the genitalias, but with a glove

24  and at Faith's request.

25       It is a huge leap to argue that, based on one or both of

 1    those two unrelated incidents with a different child who

 2    actually requested the assistance for medical and hygiene

 3    purposes -- to then argue that Mr. Goldesberry seized an

 4    opportunity to sexually abuse Kaitlyn when she crawled into his

 5    bed after her mother left for work.

 6        That argument is actually not in keeping with the 404(b)

 7    absence of mistake or intent requirement.  That is actually an

 8    argument, really for the first time, that these acts should be

 9    admitted under a common scheme or plan.  Very clearly, one is

10    not a -- under the law, under the appropriate statute -- under

11    the appropriate case law for 404(b), in any way aligned with

12    what a common scheme or plan requires.

13        This is why, obviously, the Government is attempting to

14    admit it under 404(b).  But these acts -- these two acts, which

15    everybody in the Goldesberry family agrees how they happened,

16    do not -- are not relevant nor are they probative at all

17    with -- with regards to what Mr. Goldesberry's intent or lack

18    of intent was when Kaitlyn was in his bed.

19        And they are not relative, relevant, or probative in any

20    way to whether he was mistaken when Kaitlyn crawled in bed, and

21    he was, as she says, half-asleep, snoring, and with his eyes

22    closed.  The instances are so very different if, for no other

23    reason, than because one instance was requested and the other

24    was obviously uninvited contact.

25        So in order for a proper admission under 404(b), they

1    would have to draw some ability to show that it is high --

2    highly probative and is not substantially prejudicial and does

3    go properly to the defendant's state of mind, his intent, or

4    his mistake or lack of mistake when Kaitlyn was in bed, and

5    when that naturally leads to the 403 analysis.

6        While these acts don't fall under criminal statutes in --

7    in our federal code of evidence, so they don't fall under 413

8    or 414, they are nevertheless -- it is extremely prejudicial

9    for the defendant to have to defend against an argument that

10   Faith asking her father for help somehow caused him to seize an

11   opportunity years later with a different child under different

12   circumstances, for inappropriate contact.

13       And so I believe that the Court's original ruling under

14   the 404(b) analysis was appropriate and that the -- the

15   defendant's notice for other bad acts under 404(b) should

16   continue to be denied.

17       **MS. DIAL:**  Nothing else, Your Honor.

18       **THE COURT:**  Okay.

19       My ruling is the same.  I will not allow the offered

20   404(b) testimony.  And I'll give a more complete ruling at some

21   point as my reasons for the ruling.

22       **MS. DIAL:**  Thank you, Your Honor.

23       **THE COURT:**  Okay.

24       **MS. DIAL:**  Our only question, if we believe that defense

25   has opened the door at any point, how does the Court prefer

1    that we...

2         **THE COURT:**  Just let me know.

3         **MS. DIAL:**  But not a sidebar; right?

4         **THE COURT:**  No.  You know, you're entitled to a sidebar.

5    I don't know that you need to do it right then.  I'll leave

6    that up to you.  But there have been a couple of occasions

7    where I've made a note in the margin that it was close so...

8         **MS. DIAL:**  We have some of those notes as well, and

9    we'll --

10        **MS. BROWN:**  Bring it.

11        **MS. DIAL:**  -- bring it up if we believe it's --

12        **THE COURT:**  Okay.

13        **MS. DIAL:**  -- been opened.

14        **THE COURT:**  Okay.

15        **MS. DIAL:**  Thank you.

16        **THE COURT:**  Okay.

17        That leaves you an opportunity to get a bite to eat.

18    We'll come back at one.  And then what happens?

19        **MS. DIAL:**  We're calling Brenna Gusman.

20        **THE COURT:**  Okay.

21        **MS. DIAL:**  And that's the end of the Government's case.

22        **THE COURT:**  Okay.

23        So you need to be ready to go, Ms. Brown.

24        **MS. BROWN:**  Yes, sir, I am.  Thank you.

25        **THE COURT:**  Okay.

1      **CSO:**  All rise.

2              (Noon recess was taken.)

3      **THE COURT:**  Ready to proceed?

4      **MS. BROWN:**  Yes, Your Honor.  If I could just take up a

5   brief scheduling issue with you.

6      **THE COURT:**  Very brief.

7      **MS. BROWN:**  Yes, very quickly.

8      **THE COURT:**  Please be seated.

9      **MS. BROWN:**  Oh, thank you.

10      I -- just to make sure you can hear me.  The counselor,

11   Stacia Alsabrook, texted me as I was walking in the courtroom

12   that she was having trouble finding parking, but that she is

13   here.  I did not call her and talk to her last night because

14   she had just lost the family member and was --

15      **THE COURT:**  Yeah.

16      **MS. BROWN:**  -- she was with family.

17      Based on the Court's ruling now, I would like just a very

18   brief opportunity before calling her to the stand.

19      **THE COURT:**  I'll give you that opportunity, but let's

20   bring the jury in.

21      **MS. BROWN:**  Sure.  I just wanted to --

22      **THE COURT:**  Okay.

23      **MS. BROWN:**  -- to -- to know when you wanted to do that.

24   Thank you.

25      **THE COURT:**  Thank you, Ms. Brown.

1      **MS. DIAL:**  Your Honor, I apologize.  There is one other

2  thing before we bring in the jury.  The defendant keeps falling

3  asleep and snoring.  I'm not sure if it's intentional or

4  unintentional.

5      **THE COURT:**  I haven't heard him snoring.  I'm aware

6  he's -- he appears to be sleeping.

7      **MS. DIAL:**  Yes.  I think if the Court could direct him

8  to -- he needs to stay awake.  If it's a medical thing, we

9  haven't been informed of that.

10      But it's very intimately tied to, and defense counsel has

11  even tied it to, the defense in this case that he somehow can't

12  stay awake.  If -- if that's real, then that's a concern for

13  trial.  And if it's not real, then it's putting on a show for

14  the jury.

15      **THE COURT:**  Would you tell the jury I'll be with them in

16  just a minute.

17      **CSO:**  Yes, sir.

18      **MS. BROWN:**  Your Honor, it's not a show.  It's very real.

19  If --

20      **THE COURT:**  Well, but either way it's a problem because --

21      **MS. BROWN:**  I --

22      **THE COURT:**  -- if he's not awake for trial and there's a

23  conviction, then -- then you're going to bring it up then --

24      **MS. BROWN:**  I --

25      **THE COURT:**  -- or somebody is.

 1       **MS. BROWN:**  I absolutely agree.  I have addressed it with

 2   him from the very beginning.  The first time it happened, I was

 3   sitting right next to him, and it shocked me so I --

 4       **THE COURT:**  He can stand up.

 5       **MS. BROWN:**  -- jerked him awake.

 6       It is a medical issue, though, and -- and they are aware

 7   of that.

 8       **THE COURT:**  Well, I don't think you can stand up.

 9       I will tell you what, this is an unusually designed

10   courtroom because counsel can't see one another.  The defendant

11   is behind the Government, so they can't keep an eye on them.  I

12   will try to do a better job.  I will ask --

13       **MS. BROWN:**  Johnny.

14       **THE COURT:**  -- Mr. Phorn to help me and Ms. Butler to help

15   me and, when Mr. Wiles comes back, I'll ask him to help me

16   because he's been observing it.

17       **MS. BROWN:**  I -- I agree.  It is something that I've

18   addressed with him each time it has happened.  I will tell you,

19   the only time that it happened that I did not immediately, or

20   at least don't believe that I immediately was aware of it was

21   when I was questioning Miss Bartlett in cross-examination.  He

22   was to my back.

23       And while I was questioning her, I could hear him snoring.

24   So I -- I walked from the podium over here and jerked him and

25   then walked right back over.  Again, I -- I agree it's

1   concerning.  In an ideal world, that would never happen,

2   especially more than one time, but especially not loud enough

3   that it's disruptful to the Court.

4        And I apologize.  But I -- I assure you, I've had multiple

5   conversations with my client, and it is not in any way intended

6   to be disrespectful to these proceedings or Your Honor or the

7   jury.

8        **THE COURT:**  Okay.

9        Please return the jury.

10       **CSO:**  Yes, sir.

11       **THE COURT:**  Thank you, Ms. Brown.

12       **CSO:**  All rise.

13       **MS. BROWN:**  I -- yes.

14           (Discussion held off the record.)

15       **MS. BROWN:**  That's okay.  Yeah.  I -- we just got to be

16  really, really careful about it.

17       **THE DEFENDANT:**  Sorry.

18       **CSO:**  All rise.

19           (Jury present.)

20       **THE COURT:**  I hope you had a good lunch.  It's kind of

21  Oklahoma breezy out there right now.  Have a chair.

22       You may proceed.

23       **MS. DIAL:**  Thank you, Your Honor.  The Government calls

24  Brenna Gusman to the stand.

25       **THE DEPUTY COURT CLERK:**  Uh-huh, perfect.  And I'll swear

1    you in.  Thank you.  Would you raise your right hand.

2                (Witness sworn.)

3            THE WITNESS:  I swear.

4            THE DEPUTY COURT CLERK:  Thank you.  Go ahead and have a

5    seat in the witness chair, and adjust the microphone if you

6    need to.

7            THE WITNESS:  Okay.

8            THE COURT:  Yes, ma'am.  What is your name?

9            THE WITNESS:  My name is Brenna Gusman.

10           THE COURT:  Would you spell your first and last name.

11           THE WITNESS:  Uh-huh.  It's B-r-e-n-n-a; last name,

12   G-u-s-m-a-n.

13           THE COURT:  You may inquire.

14           MS. DIAL:  Thank you, Your Honor.

15                BRENNA GUSMAN, called as a witness herein, having

16   been first duly sworn on oath, was examined and testified as

17   follows:

18                        DIRECT EXAMINATION

19   BY MS. DIAL:

20    Q    Miss Gusman, where are you from?

21    A    I am from Texas.

22    Q    Where do you live now?

23    A    I currently live in Tulsa.

24    Q    When did you move to Tulsa?

25    A    I moved to Tulsa in August of 2017.

1    Q    Why did you move here?

2    A    For a job.

3    Q    Where do you work?

4    A    I currently work for Family & Children's Services as a

5    behavioral health case manager and wellness coach.

6    Q    What do you do in that position?

7    A    I provide individualized rehab sessions for clients

8    dealing with low or moderate mental health disorders.  We teach

9    coping skills, anger management, stress management, the list

10   goes on.

11   Q    Do you have any degrees?

12   A    I do.

13   Q    What do -- what are your degrees in?

14   A    I have a bachelor of science in psychology with a minor

15   in general business.

16   Q    And prior to your current job, did you ever work for the

17   Department of Human Services?

18   A    I did.

19   Q    Is that DHS?

20   A    Yes.

21   Q    What was your role at DHS?

22   A    My role was to investigate child abuse and neglect.

23   Q    Did you have a specific title?

24   A    Yes.  I worked in child protective services as a child

25   abuse/neglect investigator.

1    Q    When -- when were you a CPS investigator?

2    A    I started doing investigations in October of 2019 and

3    stopped in May of 2021.

4    Q    Why did you stop?

5    A    I relocated to a different county.

6    Q    So you were a CPS investigator October -- is -- could you

7    tell me those dates one more time?

8    A    Uh-huh.

9    Q    Sorry.

10   A    I started investigations in October of 2019 -- I'm sorry;

11   of 2018.

12   Q    October of 2018?

13   A    Yes.

14   Q    And continued in CPS investigations until when?

15   A    Until April, May of 2021.  I had a six-month break, still

16   working for DHS, but I worked in foster care.

17   Q    Let's focus on the CPS investigator part.  So what were

18   your duties as a CPS investigator?

19   A    My job was to take in allegations of abuse or neglect and

20   then conduct an interview -- or, I'm sorry; an investigation

21   and determine whether the allegations occurred or not and

22   determine safety of a child in their home.

23   Q    Did you have specific training to be a CPS investigator?

24   A    Yes.

25   Q    What type of training?

1    A    We had in or- -- in order to be an investigator, you're

2    required to have a bachelor's degree.  We also did three months

3    of training, as well as a certification.

4    Q    What was the three months of training in?

5    A    The three months of training, we went over common

6    miscon- -- common misconceptions of things that families deal

7    with.  We also discussed how to conduct interviews in a

8    non-leading manner and how to determine the safety of a child

9    depending on allegations.

10   Q    And then you said you had annual training after that?

11   A    Yes.

12   Q    What types of cases did you investigate?

13   A    When I first started with DHS, I did just general

14   investigations.  Those consisted of investigating domestic

15   violence, substance use, unsafe living situations.  I did that

16   for about a year until I moved to a more specialized unit.

17   Q    What was the more specialized unit?

18   A    The specialized unit that I worked in, depending on the

19   allegations, they had to meet certain criteria for us to

20   investigate.  Some examples of these would be child deaths,

21   broken bones, skull fractures, as well as sexual abuse with the

22   alleged perpetrator living in the home.

23   Q    That was the focus for the sexual abuse when you were in

24   the specialized unit?

25   A    Yes.

```
 1    Q    Do you recall when you were assigned to the specialized
 2  unit?
 3    A    I started in this unit in 2020.  I believe it was
 4  August -- I'm sorry; 2019.  August 2019 up until July of 2020,
 5  so about a year.
 6    Q    What was your role in the investigation --
 7    A    To --
 8    Q    -- in an -- generally in investigations?
 9    A    To determine whether a child was safe or not in the home
10  and if the allegations had occurred or not.
11    Q    Was your role to refer criminal charges?
12    A    No.
13    Q    Was your role to bring criminal charges?
14    A    No.
15    Q    Your focus was on the child's safety?
16    A    Correct.
17    Q    As a CPS investigator, were there specific protocols you
18  were required to follow?
19    A    Yes.
20    Q    One or more --
21    A    There were many.
22    Q    -- than one?
23         Many?  We're going to get into some of those later.  But
24  for now, I want to draw your attention to May 2020.  Were you
25  working in the specialized unit in May 2020?
```

1   A    Yes, I was.

2   Q    And on May 25th, 2020, were you assigned a referral

3   regarding allegations of abuse involving the Goldesberry

4   family?

5   A    Yes, I was.

6   Q    At that point, was it your job to investigate the

7   allegations in the referral?

8   A    Yes.

9   Q    You said there are specific protocols you have to follow.

10  As a CPS investigator, are there protocols for when you start

11  an investigation?

12  A    Yes, there are.

13  Q    That the investigation protocol?

14  A    Yes.

15  Q    Does that protocol suggest the order of interviewing

16  people?

17  A    Yes.

18  Q    What's that order?

19  A    The first person we are required to interview when we

20  receive an investigation is the victim, then other children in

21  the home, then the adults in the home that are not alleged to

22  have abused or neglected the child, and then the alleged

23  perpetrator.

24       Once the in- -- once those interviews are complete, then

25  we will call references, so family, friends, other people that

1    may be able to give insight as to the allegations.

2    Q    If your job isn't to bring criminal charges, what's the

3    purpose of your interview?

4    A    To determine if the allegations occurred and to determine

5    safety of the child in the home.

6    Q    In cases involving allegations of sexual abuse, do you

7    interview the child?

8    A    No.

9    Q    Who interviews the child?

10   A    We have a forensic interviewer interview the child.

11   Q    Now, going back to your specific investigation of the

12   referral in this case, what did you do when you received the

13   referral on May 25th, 2020?

14   A    The first thing I did outside of looking up any available

15   information, such as criminal history, any additional child

16   welfare history, I attempted to make contact with the family at

17   their home.

18   Q    And did you make contact at the home?

19   A    I did not make contact with the family but I -- there was

20   a grandmother living in the home who was not able to give any

21   information at the time because we were so early on.  But I had

22   left a business card for her in --

23   Q    What did --

24   A    -- order to get in contact with Michelle and Kaitlyn.

25   Q    What did you do then?

1    A    I believe I called Michelle to figure out where she was

2    because I was required to make contact with the family that

3    day.

4    Q    When you say "Michelle," who are you referring to?

5    A    Michelle was the mother of the victim in this

6    investigation.

7    Q    Mrs. Goldesberry?

8    A    Yes, that's correct.

9    Q    And so did you call Mrs. Goldesberry that night?

10   A    I believe I did.  I did have contact with her.  I don't

11   remember exactly if she had called me or if I had called her.

12   Q    Do you recall what you told her?

13   A    Yes.

14   Q    Did you give her details of the specific allegations?

15   A    No.

16   Q    What did you tell her?

17   A    I informed her that there was an investigation with

18   allegations against the father in the home and that a forensic

19   interview would need to be conducted.  And in the meantime, the

20   alleged perpetrator and the victim were to have no contact.

21   Q    And who was the alleged perpetrator and who was the

22   victim?

23   A    The alleged perpetrator was the natural father, Raymond

24   Goldesberry; and the victim identified in the case was Kaitlyn

25   Goldesberry.

1    Q    What did you do after that?

2    A    After that, I waited until the scheduled forensic

3    interview and sat in on that interview.  I believe it was the

4    next day.

5    Q    You observed the forensic interview?

6    A    I did.

7    Q    What did you do after the forensic interview?

8    A    After the interview, I informed the mother, Michelle,

9    that there had been a disclosure of sexual abuse occurring and

10   that, until the investigation is complete, the child and the

11   natural father were to have no contact.

12   Q    How did Mrs. Goldesberry appear to you when you told her

13   there was a disclosure?

14   A    The biggest takeaway from the interaction showed that

15   they were more concerned regarding the timeline of the

16   investigation and when I would be complete with -- or when I

17   would finish.

18   Q    Because she was concerned for Kaitlyn or something else?

19   A    That her family wouldn't be apart.

20   Q    Was she worried about the defendant coming back home?

21   A    Yes.

22   Q    Did she want him to come back home?

23   A    Yes.

24   Q    After the forensic interview, what was your next

25   investigative step?

1    A    After the forensic interview and speaking with the mother

2    as to the investigation -- or the disclosure that had been

3    made, the next person that I interviewed was the adult daughter

4    in the home, Faith.  And I conducted her interview next.

5    Q    How did Faith Goldesberry, Miss Goldesberry, appear to

6    you in the interview of her?

7    A    The interview that Faith had given was very defensive

8    about the incident that had happened.

9    Q    Was she angry?

10    A    Annoyed is -- is how I perceived those emotions.

11    Q    Did you then interview Mrs. Goldesberry?

12    A    Yes.

13    Q    And how did Mrs. Goldesberry -- this is separate from

14    when you told her about the disclosure; right?

15    A    Yes.

16    Q    So you told Mrs. Goldesberry about Kaitlyn's disclosure

17    and then, at a later date, interviewed Mrs. Goldesberry?

18    A    Yes.

19    Q    How did Mrs. Goldesberry appear to you in your interview?

20    A    Again, the concern -- the concern was more about how long

21    it was going to take me to do the interviews, or the

22    investigation.

23    Q    You mentioned earlier that you told Mrs. Goldesberry that

24    the defendant and Kaitlyn couldn't stay in the same house;

25    right?

1    A    Correct.

2    Q    Did you remove Kaitlyn, like put her in foster care?

3    A    No, I did not.

4    Q    But during the investigation, did you -- did you

5    ensure -- or make sure that they weren't staying in the same

6    house?

7    A    Yes.

8    Q    And during your investigation, did Kaitlyn stay at the

9    Goldesberry house the whole time, or did she leave at some

10   point?

11   A    She left.

12   Q    Could you tell us about that?

13   A    The natural father and Kaitlyn were to have no contact.

14   The original plan was that the father would be leaving the

15   home; however, I received a phone call from the mother asking

16   if the father could come home and if Kaitlyn can stay with a

17   relative an hour away.

18   Q    And so is that what happened?

19   A    Yes.

20   Q    You keep saying "natural father."  What -- what do you

21   mean by that?

22   A    The biological father.

23   Q    Is that a term that you use as a CPS investigator?

24   A    Yes.

25   Q    Okay.

 1    A    I can use a different term if I need to.

 2    Q    No, you're fine.  I just wanted to make sure we

 3 understood the same thing by the term.

 4         So you said then that, at some point, the defendant came

 5 back home, and Kaitlyn was the one that was sent to live

 6 somewhere else?

 7    A    Correct.

 8    Q    Do you recall interviewing other friends and family

 9 members related to the Goldesberrys?

10    A    Yes.

11    Q    And were -- did you, at some point, then interview the

12 defendant?

13    A    I did.

14    Q    I'd like to turn to your interview of the defendant.

15 Before coming today, have you had a chance to review your

16 reports?

17    A    Yes.

18    Q    And in reviewing those reports, do you recall when you

19 interviewed the defendant?

20    A    Yes.

21    Q    Do -- what is that date?

22    A    June 12 of 2020.

23    Q    Where did you interview him?

24    A    At his place of work.

25    Q    Okay.  Was anyone else present during the interview?

1    A    Yes.

2    Q    Who else?

3    A    I had a new DHS worker shadowing.

4    Q    Did she conduct the interview?

5    A    No.

6    Q    Who did?

7    A    I conducted the interview.

8    Q    Did you force the defendant to interview with you?

9    A    No.

10   Q    So why did you go to his place of work?

11   A    That's where it was convenient for the interview.  We try

12   to con- -- we try to do these interviews as quick as possible

13   to get to a determination of safety, and that was the earliest

14   available and best place to do the interview.

15   Q    Did you coordinate that with the defendant then?

16   A    Yes.

17   Q    So you've set up the interview with him; right?  You

18   didn't surprise him at work?

19   A    No.

20   Q    And during your interview of the defendant, did you ask

21   him specifically about him putting his fingers into Kaitlyn's

22   vagina?

23   A    Yes.

24   Q    Did he admit to putting his fingers inside Kaitlyn's

25   vagina?

 1    A    Yes.

 2    Q    Did you talk about that incident with the defendant?

 3    A    I did.

 4    Q    When he was talking to you about it, did he remember what

 5  he had done?

 6    A    Yes.

 7    Q    Did he tell you that it was what other people had told

 8  him he had done?

 9    A    No.

10    Q    He gave you specific details based on his own memory?

11    A    Correct.

12    Q    What did he specifically recall doing?

13    A    He said he rolled over on his stomach to stimulate.  He

14  reached past the shorts and panties, began to stimulate after

15  his fingers were past the labia majora.

16    Q    Sorry.  To clear that up, after his fingers were past the

17  labia majora, he did what?

18    A    Began to stimulate.

19    Q    Did he use those words?

20    A    He did.

21    Q    He talked about labia majora?

22    A    Yes.  He had asked specifically if it was technically

23  considered penetration if he only made it past the labia

24  majora.

25    Q    Did he ask if it counted as penetration?

 1    A    Correct.

 2    Q    If he only made it past her labia majora?

 3    A    Correct.

 4    Q    And then you've said that he told you after his fingers

 5    were past her labia majora, he began to stimulate her?

 6    A    Correct.

 7    Q    And did he tell you what happened after that?

 8    A    That Kaitlyn had said, "Dad," and then there was a

 9    45-minute conversation about the incident.

10    Q    Who was -- 45-minute conversation between whom?

11    A    Raymond and Kaitlyn.

12    Q    And he told you the conversation was how long?

13    A    Forty-five minutes.

14    Q    Did he tell you if he ever followed up with Kaitlyn again

15    after that?

16    A    No.

17    Q    Did he say if they ever spoke of it again after that?

18    A    No.

19    Q    After conducting all of these interviews, what's your

20    next step in an -- in an investigation?

21    A    The next step after all the interviews, including

22    references, is to determine safety based off of our safety

23    threshold.

24    Q    And to do that generally in these investigations, are

25    there three possible rulings that you can make after an

1    investigation is complete?

2    A    Yes.

3    Q    What are those three?

4    A    The first ruling would be ruled out, which means there is

5    absolutely no way that the incident had occurred or the

6    allegations had happened.

7         The next ruling is unsubstantiated, which means it could

8    have happened, it could not have happened, but there's not

9    enough information to make a determination that it did occur.

10        And then the last ruling is substantiated, which means,

11   based on all the information obtained, we have enough

12   information to say that, yes, this incident did occur.

13   Q    And if you substantiate in a case, generally, what do you

14   do after that?  What's the purpose of substantiating?

15   A    After we substantiate, we then discuss a plan going

16   forward, typically safety interventions or services

17   recommended.

18   Q    Is the purpose of substantiating to put steps in place to

19   protect the safety of the child?

20   A    Correct.

21   Q    Based on your investigation of the Goldesberrys, did you

22   find that the family needed services?

23   A    Yes.

24   Q    What were the services you recommended?

25   A    We recommended trauma-informed therapy for Kaitlyn.  We

1   recommended a PEGS class, which is a parent education group

2   where parents of victims of sexual abuse learn about how to

3   help care for the child, lead them through recovering from

4   whatever it is that they may have experienced.  And then we

5   recommended a family-centered services case.

6   Q    Who did you recommend the -- recommend the PEGS class

7   for?

8   A    Michelle, the mother.

9   Q    And then a family-centered services case?

10  A    Yes.

11  Q    What does that mean?

12  A    A family-centered services case is when we put an

13  out-of-home safety plan up for the family.  This is where the

14  ca- -- the child is not in the home, and a DHS worker will

15  monitor to ensure that the family is following through with the

16  services that are recommended in order to change the behavior

17  that had led to the child being a victim of abuse or neglect.

18  Q    Do you know if the family followed those recommendations?

19  A    I don't know for sure.  I just did the investigation, and

20  that was my role.

21  Q    So once you finish the investigation, is your portion

22  over?

23  A    Yes.

24  Q    Do you have any further involvement in the case after you

25  finish the investigation?

1    A    I do not.

2    Q    Have you had any contact with the Goldesberrys since you

3    finished your investigation?

4    A    I have not.

5        **MS. DIAL:**  Government passes the witness, Your Honor.

6                          CROSS-EXAMINATION

7    BY MS. BROWN:

8    Q    So, Miss Gusman, in total, with DHS, you were only

9    working with DHS for less than three years with a six-month

10   break?  October of 2018 to May of 2021 with a break?

11   A    Correct.

12   Q    Okay.  But in that time, you were only in the specialized

13   unit for less than a year; correct?

14   A    Correct.

15   Q    You testified on direct examination that, once an

16   allegation comes in, you have an obligation to investigate;

17   correct?

18   A    Correct.

19   Q    Anyone can call DHS, and, in fact, everyone in Oklahoma

20   is required to report suspicious abuse or neglect; correct?

21   A    That's correct.

22   Q    And at the time that you begin an interview, whatever the

23   allegation is, that's what you're looking into; correct?

24   A    Can you repeat the question?

25   Q    No.  Let me ask you a better one because I think it's

1  just as confusing as you do.

2      You -- you testified on direct that part of your job is

3  to interview and investigate with the goal of determining

4  whether something happened or not; correct?

5  A    Correct.

6  Q    It wasn't in any way disputed from Kaitlyn's forensic

7  interview, through your investigation, all the way through when

8  you interviewed Mr. Goldesberry, what happened; correct?

9  Everybody said the same thing; right?

10  A    Correct.

11  Q    And so it wasn't difficult for you to make a finding in

12  this particular investigation that the thing had occurred, the

13  incident in the bed, because Kaitlyn disclosed that in her

14  forensic interview; correct?

15  A    Correct.

16  Q    And that's what you're saying when you say Kaitlyn

17  disclosed in the forensic interview.  You're talking about the

18  incident in the bed with her and her father where he thought

19  that Kaitlyn was his wife; correct?

20  A    Correct.

21  Q    And so from that very first interview with Kaitlyn all

22  the way to the end of your investigation where you interviewed

23  your suspect, Mr. Goldesberry, there was no disputing that it

24  had happened.  Nobody was saying that it didn't happen;

25  correct?

 1    A    Correct.

 2    Q    And nobody was even arguing about what had happened,

 3    'cause sometimes, you know, one person says something happened

 4    in your investigations, another person says something else

 5    happened, and then you have to figure out what the truth is;

 6    right?

 7    A    Correct.

 8    Q    But, really, DHS's job, your -- your role as an

 9    investigator and an agency is to protect the safety of the

10    children of Oklahoma; correct?

11    A    Correct.

12    Q    It is not to determine whether a crime occurred; correct?

13    A    Correct.

14    Q    And when you say you substantiated an allegation, that is

15    totally different as far as your burden or the requirements for

16    you to substantiate than is different in a courtroom in a

17    criminal case; correct?

18    A    Correct.

19    Q    You don't have to look at whether or not anything

20    happened beyond a reasonable doubt in order to substantiate;

21    isn't that true?

22    A    Correct.

23    Q    When you were in the specialized unit, is that the unit

24    that is housed at the Child Abuse Network, also known as CAN?

25    A    Yes.

1    Q    So at the time of your investigation, you were actually

2    working in the same building that offices the forensic

3    interviewers; correct?

4    A    That's correct.

5    Q    While you're doing your work, while you're making your

6    phone calls, while you're working on your computer, any time

7    you're in your office, you're in the same building, officing

8    right next to the forensic interviewers; correct?

9    A    That's correct.

10   Q    You said on direct examination that one of the things you

11   do early on in your investigation is check what child welfare

12   history and criminal history; correct?

13   A    Correct.

14   Q    The Goldesberry family has no child welfare history;

15   correct?

16   A    Not against the children.

17   Q    And the criminal history, are you -- are you looking into

18   all the adults in the home or only your suspect?

19   A    This is all the adults in the home.

20   Q    And --

21   **THE COURT:**  Counsel, approach -- sorry to interrupt, Miss

22   Brown.

23   Will counsel approach the bench, please.

24   **MS. BROWN:**  Yes.

25            (The following proceedings were had at the bench

 1   outside the hearing of the jury:)

 2        THE COURT:  Is that the -- is that the -- Kaitlyn in the

 3   back?

 4        MS. BROWN:  Yes.

 5        THE COURT:  Has the Rule of Sequestration been lifted?

 6        MS. BROWN:  It is local custom that once a -- a witness

 7   has been relieved of their subpoena, that they can continue to

 8   watch the trial.

 9        Shena Burgess, who is the guardian ad litem, had a

10   conversation with Ms. Dial and I last night because she

11   indicated that Kaitlyn expressed that she wanted to be here for

12   some of the testimony today, and we both said that we had no

13   objection to that.  I apologize if that was --

14        THE COURT:  It's not the custom where I'm from.

15        MS. DIAL:  Miss Brown's right, Your Honor.  If we were

16   done with her and not expecting her again, then usually the

17   victim is permitted to come back in.  I think it was an

18   unintentional violation for us of the Rule but --

19        THE COURT:  Well, I -- if you want to lift it, I will lift

20   it.  It's for the protection of the integrity of the testimony

21   for witnesses.  If there's no chance of her being called as a

22   rebuttal witness --

23        MS. DIAL:  There is not.

24        THE COURT:  -- it must be -- okay.

25        MS. BROWN:  Thank you, Your Honor.

1        **MS. DIAL:**  I apologize, Your Honor.

2        **THE COURT:**  Okay.

3            (The following proceedings were had in open court,

4    within the presence and hearing of the jury:)

5        **THE COURT:**  You're comfortable there?

6        **THE WITNESS:**  As comfortable as I can be.

7        **THE COURT:**  Would you like a glass -- a bottle of water?

8        **THE WITNESS:**  No, I'm okay.

9        **THE COURT:**  Okay.

10       **THE WITNESS:**  Thank you.

11   Q    (By Ms. Brown) Unless I'm mistaken, I believe I had just

12   asked about early on in your investigation, you look into,

13   understandably, whether or not the suspect, in this case Mr.

14   Goldesberry, has any criminal history.  You determined that he

15   did not; correct?

16   A    Correct.

17   Q    One of the very early, important aspects of your

18   investigation is scheduling a forensic interview for the child,

19   in this case Kaitlyn; correct?

20   A    Correct.

21   Q    And then after the other interviews that you did, after

22   the forensic interview -- which you observed; correct?

23   A    Yes, I did.

24   Q    In some, if not most, of your investigations when you're

25   in this specialized unit, you're also conducting what's

1    commonly referred to as a "joint investigation;" correct?

2    A    Yes.

3    Q    Meaning that if it's possible that some crime may have

4    occurred, you go ahead, when you get assigned the case, and

5    notify the Tulsa Police Department or whatever the appropriate

6    law enforcement agency is for jurisdiction purposes so that

7    they can conduct an investigation alongside you; correct?

8    A    Correct.

9    Q    That often also means that when you're observing a

10   forensic interview, such as Kaitlyn's or whatever child's being

11   forensically interviewed in your investigation, that the

12   detective assigned to the criminal case is with you in the

13   observation room and also has access to the earpiece for the

14   forensic interviewer; correct?

15   A    Sometimes.

16   Q    But in this particular case, Tulsa Police Department,

17   Detective Scott Murphy who was assigned to this case, was not

18   with you when you observed Kaitlyn's forensic interview, was

19   he?

20   A    He was not.  It was just myself.

21   Q    And then moving to June 12th of 2020, when you

22   scheduled a interview with the defendant, Mr. Goldesberry, that

23   was something that he did not have to do; correct?

24   A    Correct.

25   Q    It was voluntary, yes?

1    A    Yes.

2    Q    And he had no issues speaking to you; right?

3    A    No.

4    Q    He agreed not only to speak to you, but allow you to come

5    to his place of employment so that you guys could talk

6    somewhere that was convenient?

7    A    That's correct.

8    Q    But because you're not -- you're not a law enforcement

9    officer, are you?

10    A    I'm not.

11    Q    You're not a police officer or an agent or anything like

12    that; right?

13    A    No.

14    Q    And so you -- you don't have any kind of obligation to

15    notify suspects of their -- what's commonly referred to as

16    *Miranda* rights and things like that; right?

17    A    I -- I don't do any of that.

18    Q    Right.  And -- and it's because you're not a police

19    officer; right?

20    A    That's correct.

21    Q    But obviously, you're aware, based on the probably

22    several joint investigations that you conducted in the time

23    that you were with DHS, oftentimes when you interview the

24    suspect in your investigation, law enforcement ends up using

25    that in court, like today; correct?

```
 1    A    I'm not sure.

 2    Q    Well, let me ask a better question.  You're here

 3 testifying to some of my client's statements, yes?

 4    A    Yes.

 5    Q    But you didn't notify him of his Miranda rights 'cause

 6 that's not your responsibility; correct?

 7    A    Correct.

 8    Q    But nevertheless, obviously, the statements that he made

 9 are being used against him in court today; correct?

10    A    Correct.

11    Q    When you were interviewing my client, it was you who

12 asked him whether he penetrated her; correct?

13    A    Correct.

14    Q    And so when you asked him, "Did you penetrate her," his

15 response to your question was, "Does it count if I got past the

16 labia majora?  Does that count as penetration?"

17    A    Yes, that was a question he asked.

18    Q    No.  That was the cont- -- let me ask you a better

19 question.  That was the context of how that statement was made.

20 It was in response to your question about penetration and him

21 asking if past the labia majora counts as penetration?

22    A    The beginning of the interview started with me informing

23 him of the disclosure that had been made.  At that time, he had

24 essentially given his side of the story and then had stated,

25 "Does it count as penetration if I only made it past the labia
```

1  majora?"

2  Q    Isn't it true that during the course of your interview,

3  you told him that Kaitlyn disclosed penetration?

4  A    Yes.

5  Q    Kaitlyn never used the word "penetration" during her

6  forensic interview, did she?

7  A    No.

8  Q    That was your word; correct?

9  A    Correct.

10  Q    And that's fine.  But -- but my question that I want to

11  make real clear is in response to your saying, "Kaitlyn

12  disclosed penetration in her forensic interview.  Did you

13  penetrate her," he responded with, "Does it count as

14  penetration if I made it just past the labia majora?"

15  A    Yes.

16  Q    And at least to your knowledge or in your experience, is

17  "labia majora" a medical term for part of our organs?

18  A    Yes.

19  Q    Are you aware that he has medical training and was

20  previously an EMT?

21  A    He did state he was previously an EMT.

22  Q    So it didn't surprise you or offend you that he used the

23  medical term for the "labia majora," did it?

24  A    No, not at all.

25  Q    As far as your options when you -- when you're finished

1    with your investigation, you talked about how you could rule

2    out, that there's no way that it happened.  That's one option;

3    correct?

4        A    Correct.

5        Q    Obviously, that wasn't an option here since both the

6    child and your suspect said that it happened and agreed how it

7    happened; correct?

8        A    Correct.

9        Q    The other option, the second option, is unsubstantiated,

10   which means that either it might have happened or it might not,

11   but despite your best efforts and the amount of time that you

12   have by protocol to in- -- investigate these matters, you just

13   weren't able to make a determination one way or the other;

14   correct?

15       A    Correct.

16       Q    And, obviously, with the child and the suspect both

17   saying that it happened and saying the same thing, you

18   obviously weren't going to unsubstantiate, were you?

19       A    I was not.

20       Q    And so that only leaves one other option, which is to

21   substantiate; correct?

22       A    Correct.

23       Q    And so once you substantiated because there was no

24   dispute whatsoever that this had happened, then you have to

25   decide what to do next or what to recommend; correct?

1    A    Correct.

2    Q    And now you've closed out your investigation.  You've

3  substantiated that this allegation that was reported to DHS has

4  happened.  And your priority as an agency, DHS, is the safety

5  of the children; correct?

6    A    That's correct.

7    Q    And in this particular case, there was only one child in

8  the home because Faith was already over 18 at the time of your

9  investigation; correct?

10   A    Correct.

11   Q    You did discuss, what we call, safety interventions with

12 the family.  In other words, ways to avoid that something like

13 this never happens again; correct?

14   A    That's correct.

15   Q    And when you were discussing those safety interventions

16 with the Goldesberry family, nobody was opposed to putting

17 safety interventions in place, were they?

18   A    No.

19   Q    You mentioned how you recommended, in this particular

20 case, family-centered services, which is also commonly

21 called FCS; correct?

22   A    That's correct.

23   Q    And when you recommended family-centered services, that

24 was one option.  But the other option that you did not

25 recommend was Court intervention, meaning going to juvenile

1    court; correct?

2    A    Correct.

3    Q    And would you agree with me that family-centered services

4    being in the home is a less invasive recommendation than Court

5    intervention?

6    A    Correct.

7    Q    So your recommendation was not the most extreme or

8    invasive recommendation that you could have made; correct?

9    A    Correct.

10    Q    You mentioned that, pursuant to the family-centered

11    services, or FCS case, that a safety plan was put in place with

12    the kiddo out of the home to ensure the child's safety;

13    correct?

14    A    Correct.

15    Q    You are aware that while family-centered services was

16    working with this family, Kaitlyn was allowed to return home,

17    and she and Raymond were both allowed to be in the home

18    together?

19        MS. DIAL:  Objection.  This is beyond the scope and

20    foundation.

21        THE COURT:  Well, on the first -- on the first grounds,

22    the objection is sustained.

23        MS. BROWN:  Thank you.

24    Q    (By Ms. Brown) While you testified that various members

25    of the Goldesberry family, including Faith and

1  Mrs. Goldesberry, were either irritated or -- I don't want to

2  get your words wrong; I apologize -- annoyed -- "annoyed" I

3  think is the word that you used for Faith.

4      Even though Faith appeared to be annoyed, did you find her

5  to be disrespectful of you during the course of your

6  investigation?

7  A    No.  I wouldn't say that.

8  Q    And while Mrs. Goldesberry, who you've referred to as

9  Michelle, appeared to be primarily concerned with reuniting her

10  family all under one roof, would you agree that she also wasn't

11  disrespectful of you during the course of your investigation?

12  A    No.

13  Q    And you didn't experience, at any point in time during

14  your contact with my client, Mr. Goldesberry, that he was

15  disrespectful of you or the Department as well; correct?

16  A    No.

17      **MS. BROWN:**  Pass the witness, Your Honor.

18                     REDIRECT EXAMINATION

19  BY MS. DIAL:

20  Q    Defense asked you a little bit more about your interview

21  with the defendant.  How did the defendant appear to you during

22  that interview?

23  A    He was forthcoming with information.  I -- I can't speak

24  in detail the emotions, or if there were any emotions.  It was

25  very matter-of-fact.

1    Q    And in your interview, did -- in June 2020, did the

2    defendant tell you how many years prior this digital

3    penetration had occurred?

4    A    Three to four years was across-the-board with all of my

5    interviews.

6        **MS. DIAL:**  No other questions, Your Honor.

7        **THE COURT:**  You may step down, ma'am.

8        Who's your next witness?

9        **MS. DIAL:**  The Government rests, Your Honor.

10       **THE COURT:**  Okay.

11       Ladies and gentlemen, it's now time for you to take

12   another break.  It's a little early for you -- well, not

13   really.  So you -- this'll be your first afternoon break.  I'll

14   see you in about 15 minutes.

15       **CSO:**  All rise.

16       **JUROR:**  Thank you.

17       **JUROR:**  Thank you.

18           (Jury out.)

19       **THE COURT:**  Ms. Brown?

20       **MS. BROWN:**  Thank you, Your Honor.  Your Honor, at this

21   time, the defense would make a motion for a judgment of

22   acquittal under Rule 29.  The defendant's motion for a judgment

23   of acquittal is -- is offered because the de- -- evidence was

24   insufficient to sustain a conviction as to Counts 1 and 2.

25       But particularly, specifically, I do not believe that

1    there's evidence that has been presented, testimony in -- in --
2    in evidence, that could sustain a finding of guilt as to Count
3    1.

4        THE COURT:  The motion's directed to Count 1, so I assume
5    it's dealing with the age.

6        MS. DIAL:  I'm -- I am assuming it's the age as well, Your
7    Honor, since there -- I was just pulling up the ele- -- the
8    elements.  The Government maintains that there is sufficient
9    evidence for this case to go to the jury.  The jury's heard
10   testimony about the incident from the victim.

11       They've heard testimony about the defendant's statements,
12   his actions afterward that can -- that they can infer intent --
13   and guilty intent from.  And they've heard testimony from two
14   witnesses, two DHS workers, that the defendant said that this
15   incident occurred three or four years prior.  That was made in
16   2020 -- early 2020 when the victim was 14.

17       Three or four years prior, she would have been 10 or 11.
18   So there is evidence to support that, despite the victim's own
19   testimony here this week that she was 12.

20       THE COURT:  Okay.

21       Any rebuttal?

22       MS. BROWN:  Yes, Your Honor.  I -- I do want to make the
23   record and Your Honor very clear that the motion under Rule 29
24   is -- pertains -- as it pertains, is to both counts.  Count 1
25   specifically because of the age.  But as to both counts

1    specifically because, pursuant to the elements, the -- the jury

2    would have to be able to find that this happened knowingly.

3        "Knowingly" means that it was a done -- an act done

4    voluntarily, intentionally, and not because of mistake or

5    accident.  Not only is that in our jury instructions, but that

6    is the law firmly settled for -- as it pertains to both Counts

7    1 and 2.

8        Seeing as there is no evidence that this was knowingly

9    done, that it was done voluntarily, intentionally, and not

10   because of a mistake or accident, I believe that a judgment for

11   acquittal under Rule 29 would be appropriate at this time.

12       **THE COURT:**  So if we had a case of a shooting with an

13   eyewitness -- yeah, well, with -- yeah, three people in the

14   room.  A shoots B.  C sees it.  A says it wasn't intentional.

15   B says it wasn't -- well, he can't talk; he's dead.  C says

16   it's not intentional.  Then the Court should grant a verdict of

17   not guilty on a Rule 29 motion?

18       **MS. BROWN:**  Absolutely.  If -- if the shooting required

19   intent.

20       **THE COURT:**  The jury's not entitled to make that -- draw a

21   conclusion based on the circumstances, a conclusion as to

22   intent?  Somebody has to actually say that it was intended?

23       **MS. BROWN:**  I don't know that some -- no.  Somebody

24   doesn't have to say it was intentional or knowingly, but there

25   has to be evidence in the record that the jury could consider

 1    that would -- could show that it was intentional.  All of the

 2    evidence in the record is that this was a mistake or an

 3    accident.

 4        THE COURT:  Well, what if -- what -- isn't a jury entitled

 5    to determine whether an explanation of the conduct as being

 6    accidental -- entitled to evaluate that and determine whether

 7    it's a rational explanation?

 8        MS. BROWN:  I don't believe so, if there is no evidence to

 9    support that.

10        THE COURT:  Do you have any case law?

11        MS. BROWN:  No, not with me.  No.  I believe that the

12    definition of "knowingly" and -- and the element of re- --

13    requiring a knowing act, specifically not a mistake or

14    accident, there has to be some evidence in the record that the

15    jury could find that.  There is no evidence in the record.

16        THE COURT:  The cir- -- the circumstances alone are not

17    enough?

18        MS. BROWN:  I do --

19        THE COURT:  It has to be testimony?

20        MS. BROWN:  I -- the circumstances certainly would be

21    enough if there was a circumstance that had been testified to

22    that could allow for anything other than an absence of an --

23    anything other than a mistake or an accident.  The problem is

24    that the only evidence that this might not have been

25    intentional is an opining by an expert that is specifically

1    clarifying her testimony that she is not testifying that that's

2    what she believes Kaitlyn said.

3        She didn't make any comment on her opinion about Kaitlyn's

4    testimony.  Her only opinion as to the circumstances

5    surrounding disclosures in general was based on research and --

6    and other cases she's not a part of.  So if -- if you look

7    at --

8        **THE COURT:**  Look, I'll reserve ruling on that and let you

9    find me a case that says what you are -- supports what you're

10   saying.

11       **MS. BROWN:**  Thank you, Your Honor.

12       **MS. DIAL:**  Your Honor, can I point out the one piece of

13   evidence that I believe does support knowingly?

14       **THE COURT:**  Yeah.

15       **MS. DIAL:**  The jury should be entitled to determine the

16   intent, to judge the credibility of the defendant's

17   explanations back in 2020.  And there is sufficient evidence of

18   knowingly because of what the jury just heard from Miss Gusman

19   about what the defendant knew he had done.  This is --

20       **THE COURT:**  Right.

21       **MS. DIAL:**  -- not a, he was asleep and did it in his

22   sleep.

23       He explicitly described to Miss Gusman.

24       **THE COURT:**  So you're saying it was knowing, but he didn't

25   say it -- that he knew it was his daughter.

1    **MS. DIAL:**  The act was knowing.  He was awake for it.  And

2    the jury should be able to determine the credibility of the

3    excuse.

4    **THE COURT:**  Yeah.  Okay.

5    **MS. DIAL:**  Thank you, Judge.

6    **THE COURT:**  Are you ready to go, Ms. Brown?

7    **MS. BROWN:**  Your Honor, I -- I do have a witness here that

8    I could go ahead and call.  But since I only need maybe five

9    minutes max just to clarify the Court's rulings with Miss

10   Alsabrook because I have not had an opportunity to talk to her

11   due to the -- the loss that she suffered in her family since

12   the Court's ruling.

13   I wanted to advise her of the Court's rulings so that I --

14   that she -- she knows what the Court's rulings were.  I had

15   told her the last time we talked that, at that point, we didn't

16   know what was coming in and what wasn't coming in, and I wanted

17   to advise her so that we're on the same page about that.

18   It shouldn't take very long 'cause we had previously

19   discussed what her testimony would be under both circumstances.

20   I just wanted to let her know what ended up happening.

21   **THE COURT:**  Okay.  Well, you got about -- you got a few

22   minutes left.

23   **MS. BROWN:**  Thank you, Judge.

24   **MS. DIAL:**  Your Honor, I believe the Court's ruling was

25   that for Miss Alsabrook to testify, that defense needed to

1    produce her counseling records.  We haven't received any of her

2    reports or --

3         THE COURT:  You have the records?

4         MS. BROWN:  As I said -- as I said earlier, as I was

5    walking into the courtroom -- not the courthouse but the

6    courtroom from lunch, I got a text message from Miss Alsabrook

7    that she was having trouble finding parking and she wasn't

8    here.  I had instructed her via e-mail last night that when she

9    appears, she needed to bring her records.

10        THE COURT:  Okay.

11        MS. BROWN:  So I haven't had a chance to get them.

12        THE COURT:  Okay.  Okay.  Thank you-all.

13        CSO:  All rise.

14             (A recess was taken.)

15        THE COURT:  Please return the jury.

16        MS. BROWN:  Your Honor, I -- I just -- Ms. Dial just

17   asked, and I just informed her that I am going to relieve Ms.

18   Alsabrook of her subpoena, and I'm not intending to call her.

19   And with the Court's permission, if Christy or myself could

20   just let her know, she's right outside the courtroom, so she

21   could get back to her family.

22        THE COURT:  Sure.  Go ahead and do it.

23        MS. BROWN:  Okay.  Thank you.

24        (To Ms. Alsabrook) Thank you.

25        Thank you, Your Honor.

1      **CSO:**  Ready?

2      All rise.

3              (Jury present.)

4      **THE COURT:**  Please be seated.

5      Ms. Brown?

6      **MS. BROWN:**  Thank you, Your Honor.  The defense calls

7  Carla Barboza.

8      Just right in the middle in front of that court reporter.

9      **THE DEPUTY COURT CLERK:**  If you want to stop right there,

10  I'll swear you in.

11      **MS. BARBOZA:**  Okay.

12      **THE DEPUTY COURT CLERK:**  Please raise your right hand.

13              (Witness sworn.)

14      **THE WITNESS:**  Yes, I do.

15      **THE DEPUTY COURT CLERK:**  Thank you.  Go ahead and have a

16  seat in the witness chair there, and you can adjust the

17  microphone if you need to.

18      **THE WITNESS:**  Thank you.

19      **THE COURT:**  Yes, ma'am.  What is your full name?

20      **THE WITNESS:**  My full name is Carla DeCarvalho Tavares

21  (ph.) Barboza.

22      **THE COURT:**  Okay.  Well, let's stick with first and last

23  name.

24      **THE WITNESS:**  Yes.  It's Carla Barboza.

25      **THE COURT:**  Okay.  Would you spell your fist and last

 1  name.

 2      **THE WITNESS:**  First name is C-a-r-l-a; last name is

 3  B-a-r-b-o-z-a.

 4      **THE COURT:**  Okay.  Thank you, ma'am.

 5      **THE WITNESS:**  Sure.

 6      **THE COURT:**  You may inquire.

 7      **MS. BROWN:**  Thank you, Your Honor.

 8          CARLA BARBOZA, called as a witness herein, having

 9  been first duly sworn on oath, was examined and testified as

10  follows:

11                          DIRECT EXAMINATION

12  BY MS. BROWN:

13  Q    Miss Barboza, how are you currently employed?

14  A    I am employed with Department of Human Services.

15  Q    How long have you been with DHS?

16  A    Five years.

17  Q    And what is your current assignment or position with DHS?

18  A    I am a family-center services supervisor.

19  Q    Is family-centered services often referred to as FCS in

20  your department?

21  A    Correct.

22  Q    How long have you been with -- well, how long have you

23  been with family-centered services?

24  A    I've been with family-center [sic] services for three

25  years.

1   Q   Okay.  So when you'd started with DHS five years ago,

2   what department or position were you in?

3   A   I was a CPS worker.

4   Q   And is that the investigator that gets assigned

5   allegations that come in through the DHS hotline and does the

6   initial investigation?

7   A   That's correct.

8   Q   In the particular case that brings us to court today, the

9   Goldesberry case, was Brenna Gusman the investigator in this

10  case?

11  A   Correct.

12  Q   So prior -- in the past, prior to this particular case,

13  you were also doing that job, but you didn't -- not in this

14  case?

15  A   Correct.

16  Q   Okay.  Just making that clear.

17      After you were with child protective services, or CPS, as

18  an investigator, then what department or position did you move

19  to?

20  A   After CPS, I moved to permanence planning.

21  Q   And what is permanency planning?

22  A   Permanence planning's when DHS place kids in custody, in

23  State custody.

24  Q   Okay.  That's when Court intervention is required?

25  A   Yes.

1    Q    And that did not happen in the Goldesberry family case;

2    correct?

3    A    No.

4    Q    Then after you were with permanency planning, is that

5    when you moved to FCS, or family-centered services?

6    A    Correct.

7    Q    And now you've been promoted as a supervisor?

8    A    Correct.

9    Q    When CPS does an investigation, how quickly are they

10    required to wrap up their investigation pursuant to DHS

11    protocol?

12    A    Our policy states that they should close an investigation

13    in 60 days.

14    Q    So in this particular case, pursuant to your protocol,

15    Brenna Gusman would have been in and out of the Goldesberry

16    family's home and lives in 60 days or less?

17    A    Yes.

18    Q    Comparatively, is FCS, or family-centered services, in

19    the home or with the family longer typically?

20    A    Yes.  Family-center services usually can be open -- a

21    case can be open for 180 days.

22    Q    And just quick math, if I'm not mistaken, is that six

23    months?

24    A    Correct.

25    Q    Thank you.  That's why I went to law school so I don't

1  have to do math.

2      So how -- so when you got assigned to be the FCS worker

3  for the Goldesberry family, that was after Brenda [sic] Gusman

4  had concluded her investigation, made her recommendations, and

5  was no longer working with the family; is that correct?

6  A   Correct.

7  Q   You're not here to speak about her investigation.  That

8  wasn't something you were a part of; correct?

9  A   No, I was not.

10 Q   But you got the case and, in this particular case,

11 because the recommendation from the Department was an FCS case,

12 what did you do?

13 A   FCS, usually we work with the families when children are

14 not placed in custody, and we try to work with the families to

15 make sure that the behaviors that led DHS to be involved with

16 them will be corrected.

17 Q   Is it fair to say that the goal of the Department in

18 general is always to promote and protect the safety of

19 Oklahoma's children?

20 A   Correct.

21 Q   So when you got this case with the Goldesberrys, your

22 goal was to ensure that something like this, the bed incident

23 that we've all been hearing about between Kaitlyn and Mr.

24 Goldesberry, that there were interventions, protocols,

25 services, whatever, in place so that something like that never

1    happened again?

2    A    Correct.

3    Q    At the time that -- well, you said permanency planning is

4    when a child is placed in custody.  That's when they go, like,

5    into a foster home; correct?

6    A    Correct.

7    Q    Okay.  And that's when the juvenile court gets involved;

8    correct?

9    A    Correct.

10   Q    And none of those two things happened in this case with

11   the Goldesberrys; correct?

12   A    No.

13   Q    The family, when you got involved with the Goldesberry

14   family, were they already in counseling?

15   A    They were.

16   Q    Was Kaitlyn already in counseling?

17   A    Yes.

18   Q    And so during the time that you were with the family --

19   well, let -- let me back up.

20        We've heard some testimony that Kaitlyn left the home for

21   a period of time.  Are you aware of that?

22   A    Yes.  When I got the cases, she was already on what we

23   call out-of-home safety plan.

24   Q    And an out-of-home safety plan is different than foster

25   care or Court intervention; correct?

```
 1    A    It is.  It's different.

 2    Q    How long was Kaitlyn out of the home total?

 3    A    I believe she was out of home, I don't have the correct

 4    date, but probably for about 30 days.

 5    Q    About one month?

 6    A    Yes.

 7    Q    And then with the Department's and your blessing, Kaitlyn

 8    came back home, and all four Goldesberrys were back under the

 9    same roof?

10    A    Yes, af- --

11         MS. DIAL:  Ob- --

12         THE WITNESS:  At first --

13         MS. DIAL:  Objection.  Leading.

14         THE COURT:  Sustained.

15         MS. BROWN:  I'll rephrase.

16    Q    (By Ms. Brown) Once -- once it was determined that

17    Kaitlyn's safety plan outside of the home with relatives was no

18    longer necessary, what happened?

19    A    So when we decided that Kaitlyn could be -- go back home,

20    first we moved Kaitlyn back home.  But Mr. Goldesberry was not

21    home at that time.  We asked him to be out of the home at that

22    time.  So she went back, but he went out.  He was not in the

23    home.

24    Q    And then what happened?

25    A    And then after we work little longer with the family and
```

1    we addressed that it's safe to -- if Kaitlyn was okay at that

2    time, he was able to go back home.

3    Q    And so at some point before you closed out your case, is

4    that when all four of them were back in the home together?

5    A    That's correct.

6    Q    Was any one of the Goldesberrys disrespectful to you --

7    to you or FCS's rules during the course of your dealings with

8    them?

9    A    No.

10    Q    Were they cooperative?

11    A    Absolutely.

12    Q    Did they do everything that you asked of them?

13    A    Yes.

14    Q    Did you have concerns at the time that you reunite --

15    reunited the family, for Kaitlyn?

16    A    No.

17        **MS. BROWN:**  Pass the witness.

18                            CROSS-EXAMINATION

19    BY MS. DIAL:

20    Q    Ms. Barboza, when you took over the case, were there a

21    number of recommendations that the family was supposed to

22    follow?

23    A    Yes.  When I got the case, they were supposed to

24    participate in a family-centered services; that the family

25    should continue counseling; and, if I'm not mistaken, Mom

1  should complete PEG classes.

2  Q    Did Mom complete PEG classes?

3  A    She had -- during my case, she had, I -- I believe it

4  scheduled, that -- that assessment for the PEG classes, but I

5  never received any information.

6  Q    She didn't complete the PEG classes; correct?

7  A    I never received any information.

8  Q    So you -- you stated on direct that the family received

9  services for six months; is that correct?

10 A    Yeah.  Can be between -- can be between three months to

11 six.

12 Q    But not longer than six months; right?

13 A    Longer just if it's necessary.

14 Q    And you determined that it wasn't necessary, and you

15 closed this case?

16 A    Not just me.  Like, there was a group of people.

17 Q    One of the recommendations was also for trauma-focused

18 therapy for Kaitlyn; correct?

19 A    Correct.

20 Q    Did you ensure that Kaitlyn received trauma-focused

21 therapy?

22 A    She was -- when I spoke to her counselor at that time,

23 she stated that she would recommend her to go to another

24 counseling for that.

25 Q    Did you make sure that Kaitlyn went to another counselor

1  for that?

2  A    I never received any documentation related to that.

3  Q    So you didn't guarantee -- or you didn't ensure that the

4  family was following up on the recommendations?

5  A    Not that -- that recommendation.

6  Q    I just want to confirm with you, you -- you received the

7  completed investigation that the defendant had put his fingers

8  in Kaitlyn's vagina; correct?

9  A    Correct.

10  Q    And you received the recommendation -- or understood that

11  from the investigation there was a recommendation that the

12  child receive trauma-focused counseling; correct?

13  A    Yeah.  Their recommendation was that she received the

14  counseling, was not a specific for trauma.

15  Q    Miss Barboza, is your testimony that it was just

16  counseling?  It was not trauma-focused counseling?

17  A    It's my understanding there was counseling according to

18  the DA report.

19       **MS. DIAL:**  If I can have just a moment, Your Honor?

20       **THE COURT:**  Yes, ma'am.

21            (Discussion held off the record.)

22  Q    (By Ms. Dial) There is a white notebook to the side of

23  you.  If you could open that up and turn to Tab 25 -- excuse

24  me; 26.  That's Government's Exhibit 26.

25  A    Oh, right here.

1    Q    And do you see the red numbers at the bottom?

2    A    Yes.

3    Q    Could you go to 00081?  That's the sec- -- the second --

4    A    Uh-huh.

5    Q    -- page of Government's Exhibit 26.

6    A    Uh-huh.

7    Q    At the bottom of that page, this is -- this is a DHS

8    report; right?

9    A    Right.

10   Q    And you've -- commonly work with these DHS reports?

11   A    Correct.

12   Q    Okay.  At the bottom, is there a portion that has the

13   recommendations at the conclusion of the investigation?

14   A    Uh-huh.

15   Q    And isn't it true that the rec- --

16        **THE COURT:**  Is that a "yes" or "no," ma'am?

17        **THE WITNESS:**  Yes.

18   Q    (By Ms. Dial) Isn't it true that the recommendations are

19   that Kaitlyn receive trauma-focused therapy and sexual abuse

20   therapy?

21   A    Correct.

22   Q    Those were the recommendations; right?

23   A    Yes.

24   Q    So to confirm -- you can close the book now.

25        To confirm, you took over the case and the -- the

1  defendant had acknowledged -- he'd said that he had put his

2  fingers in his daughter's vagina; right?

3  A    That's according to the investigation.

4  Q    Right.  And did he deny that to you later?

5  A    No.

6  Q    He admitted that he had put his fingers in his daughter's

7  vagina; right?

8  A    Correct.

9  Q    And he -- did he tell you how long ago?

10  A    When I got the investigation, I believe he said --

11      **MS. BROWN:**  Objection.  Outside the scope of direct.

12      **THE COURT:**  Wish to be heard?

13      **MS. DIAL:**  No, Your Honor.  I'll withdraw the question.

14  Q    (By Ms. Dial) He -- he never denied that he put his

15  fingers in her vagina; correct?

16  A    No, he never denied.

17  Q    And the child never denied that it had happened; correct?

18  A    No.

19  Q    And you were aware that the child had -- had other mental

20  health concerns; correct?

21  A    Correct.

22  Q    And the recommendation was that this child needed

23  trauma-focused therapy and sexual abuse therapy; correct?

24  A    Correct.

25  Q    And for the six months that you worked with this family,

1  you never ensured that she got the treatment that she needed?

2  A   I did not work with the family for six months.

3  Q   Isn't --

4  A   I worked with the family for three months.

5  Q   So you actually closed out the case at three months

6  without ensuring that this child was receiving sexual abuse

7  therapy; is that correct?

8  A   That's correct.  She was receiving counseling.

9      **MS. DIAL:**  No other questions, Your Honor.

10     **THE COURT:**  You may step down, ma'am.

11     **MS. BROWN:**  Michelle Goldesberry.

12     Go on up to the front in the middle.

13     **MRS. GOLDESBERRY:**  Front in the middle?

14     **MS. BROWN:**  Uh-huh.

15     **THE DEPUTY COURT CLERK:**  Thank you.  Would you please

16  raise your right hand.

17     **THE WITNESS:**  Uh-huh.

18         (Witness sworn.)

19     **THE WITNESS:**  I affirm, yes.

20     **THE DEPUTY COURT CLERK:**  Thank you.

21     **THE WITNESS:**  Uh-huh.

22     **THE DEPUTY COURT CLERK:**  You can go right to the witness

23  chair, and adjust the microphone if you need to.

24     **THE WITNESS:**  Okay.  Okay.  Thank you.

25     **THE COURT:**  What is your name, ma'am?

1    **THE WITNESS:**  Michelle Mack- -- Michelle Goldesberry.

2    **THE COURT:**  Okay.

3    You may inquire.

4    **MS. BROWN:**  Thank you, Your Honor.

5    MICHELLE GOLDESBERRY, called as a witness herein,

6    having been first duly sworn on oath, was examined and

7    testified as follows:

8                          DIRECT EXAMINATION

9    BY MS. BROWN:

10   Q    Mrs. Goldesberry, are you the wife of Raymond

11   Goldesberry, the man on trial today?

12   A    Yes.

13   Q    How long have you guys been married?

14   A    For 22 years this July.

15   Q    How or from whom did you find out about the incident in

16   your marital bed between your daughter Kaitlyn and your husband

17   that brings us to court today?

18   A    I first found out from a phone call from DHS asking me if

19   I knew of any allegations of sexual abuse on Kaitlyn from

20   Raymond.  And I said no.  And I asked her if -- if I -- she

21   could give me details, and she's like, "No, I can't give you

22   any details over the phone."

23       So then my next phone call was to my husband asking,

24   "Okay.  This is my phone call I just got; what's going on?"

25   Q    Okay.

1    **THE COURT:**  Okay.  That -- you've answered the question.

2         You may ask another question.

3    **MS. BROWN:**  Thank you, Your Honor.

4    Q    (By Ms. Brown) Did you ultimately find out eventually

5    what brings us to court today?

6    A    Yes.

7    Q    Okay.  And we'll get to that in a minute.  But back when

8    it happened, whenever it happened, did either Kaitlyn or

9    Raymond tell you about it right away?

10   A    No.

11   Q    When you found out about it in May of 2020, did it -- how

12   did you feel about that?

13   A    I was surprised at first, just finding out ab- -- what

14   happened and I didn't know about it until now.  I was concerned

15   about Kaitlyn.  But ultimately, I was just shocked at first

16   just hearing everything.

17   Q    Okay.  Did you come to have conversations with your

18   daughter about the incident and why she didn't tell you?

19   A    Yes, we did.

20   Q    And without going into what she said -- I'm just trying

21   to make sure we all follow the rules.  But you did have

22   conversations with her?

23   A    I did, yes.

24   Q    And without going into what anybody said, based on those

25   conversations that you had with your daughter Kaitlyn after you

1  found out about it, do you now feel like you have a better

2  understanding of why she didn't tell you?

3  A    Yes, I do.

4  Q    Did you have conversations -- no.

5       Let me ask you this:  Do you believe that either your

6  daughter or your husband was hiding something from you that

7  caused you concern?

8  A    No, I don't.

9  Q    Why not?

10  A    I don't feel like they were trying to hide it 'cause they

11  didn't want me to know 'cause it was a secret or anything like

12  that.  It was just Kaitlyn was really embarrassed, and she

13  didn't want anyone to know.  She didn't want to talk about it.

14  She just wanted to forget it 'cause it was embarrassing to her.

15  Q    Once DHS came into your life and you became aware of this

16  incident that now brings us to court today, what was your

17  priority?

18  A    Kaitlyn.  Making sure she was safe and she was okay.

19  Q    Is it fair to assume you also ultimately decided that you

20  wanted to prioritize keeping your family together?

21  A    Absolutely.

22  Q    As far as her comfort level with discussing her personal

23  bodily things, how is Kaitlyn?

24  A    She's not very comfortable when it comes to her own

25  personal body.  In talking about stuff in general, because I'm

1    a nurse, I mean, she's comfortable with talking about general

2    stuff.  But her specifically, she's very uncomfortable.

3    Q    When she started menstruating for the first time, did she

4    tell you right away?

5    A    No.

6    Q    I want to talk a little bit about your and your husband's

7    bedroom.  Okay?  The bedroom, did it have any window treatments

8    on it?

9    A    Yes.

10    Q    And the home that you live in now, is that the same home

11    that you've lived in basically since Kaitlyn was born?

12    A    Yes.

13    Q    And in the master bedroom, can you tell me about what's

14    on the windows that can affect lighting?

15    A    Well, we have blackout curtains, and we also have, like,

16    a thick mil black plastic that is stapled on the inside of the

17    window frame just because I work night shift and wanted to make

18    sure my room was blacked out.

19    Q    When the blackout curtains are drawn and the lights are

20    off, is your room dark?

21    A    Yes.

22    Q    Is it completely dark?

23    A    Yes.

24    Q    If you walk into that room in the middle of the day or

25    the middle of the night, can you tell what time of day it is?

 1    A    No.

 2    Q    I want to talk about instances leading up to May of 2020.

 3  Did your daughter Kaitlyn regularly get in bed with you and

 4  your husband?

 5    A    No.

 6    Q    Was that something that had happened on occasion in the

 7  past?

 8    A    On occasion, but nothing that was regular.

 9    Q    When she was 11 or 12 years old, around the time of 2017,

10  was it -- would your answer change?  Was that a time that she

11  regularly got into bed with you --

12    A    No.

13    Q    -- and your husband?

14    A    No.

15    Q    As far as Raymond's sleeping habits, is he a heavy

16  sleeper?

17    A    Yes.

18    Q    Does he have any eccentricities or other-than-normal

19  sleeping behaviors?

20    A    Yes.  He --

21    Q    Can you tell us about that?

22    A    He does have sleep apnea.  He was officially diagnosed

23  with that.  He's had it for years.  He will talk in his sleep.

24  Let's see, he snores very loudly.  And with the apnea, like

25  you'll hear him snoring and then it'll stop for a while and

1  then he'll continue snoring.  And he falls asleep, you know,

2  sitting in his recliner chair a lot.

3  Q    Okay.  So sitting upright, he's even fallen asleep?

4  A    Yes.

5  Q    In all the 20-plus years that you've been married -- and

6  congratulations, by the way.

7  A    Thank you.

8  Q    Can you tell us whether Raymond ever initiates sex with

9  you?

10  A    He does.

11  Q    And can you tell me about that?

12  A    I mean, if we're alone in our bedroom, you know, he'll

13  initiate, you know, if it's -- you know, before we're -- we go

14  to sleep or sometime in the middle of the nights.  You know,

15  he'll go to sleep later than me sometimes and I'll already be

16  asleep and he'll try to wake me up.  I don't know if you need

17  any more details.

18  Q    Well, let me ask you some follow-up questions.

19  A    Okay.

20  Q    Has he ever initiated or tried to initiate sexual

21  activity with you by manually stimulating or fingering you?

22  A    Yes.

23  Q    And has that ever happened while you were still in bed

24  with him?

25  A    Yes.

1    Q    Has that happened fairly regularly throughout your
2    marriage?
3    A    Yes.
4    Q    Is that something that ever concerned or offended you?
5    A    No.
6    Q    As a married couple, have there been times where you
7    reciprocated and consented and engaged in the sexual activity
8    when he was manually stimulating you?
9    A    Yes.
10   Q    Has there ever been a time when perhaps, for whatever
11   reason, you weren't in the mood, or any other reason, he
12   attempts to initiate sexual contact and you declined to engage
13   in sexual activity?
14   A    Yes.
15   Q    I want to talk to you about the night that Meagan
16   Bartlett and your daughter Kaitlyn came back to Tulsa into your
17   home from Miami, Oklahoma.  Do you have that night in mind?
18   A    Yes.
19   Q    Sunday, May 24th, 2020, the day before Memorial Day?
20   A    Yes.
21   Q    That night did you have a private conversation with your
22   daughter Kaitlyn?
23   A    I did.
24   Q    Whose idea was that conversation?
25   A    Meagan was really insistent that Kaitlyn and I needed to

1    talk, and I wasn't sure why.  But she just said we needed to

2    talk alone.

3    Q     And did you and -- and your daughter Kaitlyn, in fact,

4    talk in private that night?

5    A     Yes, we did.

6    Q     Without going into the words that Kaitlyn used because,

7    again, we're just -- we're following rules, there's lots of

8    rules in court -- can you tell me the subject matter of the

9    conversation that you and Kaitlyn had in private that night?

10   A     It was about self-harm.

11   Q     Up until that point, were you aware that your daughter

12   Kaitlyn had started cutting?

13   A     No.

14   Q     Okay.  So was that when you found out that she was

15   harming herself?

16   A     Yes.

17   Q     Did that concern you?

18   A     Absolutely.

19   Q     At that point, when you found out that she was harming

20   herself, did you already know that she was suffering bullying

21   at school?

22   A     Yes, I did.

23   Q     And had you already attempted to address helping her with

24   that?

25   A     Yes.

1    Q    At that point in time, in May of 2020, when she had begun
2    cutting and disclosed that to you, had she already been seeing
3    a counselor or a therapist?
4    A    She had, yes.
5    Q    Were you also aware that she had experienced body shaming
6    from her peers?
7    A    I believe that was part of the bullying.
8    Q    Okay.
9    A    Yeah.
10   Q    And were you also aware that she was struggling with
11   grief from the loss of both of her grandparents?
12   A    Yes.
13   Q    Did Kaitlyn watch her grandparents die?
14   A    Both of them, she did, yes.
15   Q    Was Kaitlyn especially close to those grandparents?
16   A    Yes, she was.
17   Q    So knowing that your daughter was already struggling --
18   does she have any mental health diagnoses?
19   A    She does.
20   Q    Does she have anxiety and depression?  PTSD?
21   A    Anxiety and depression at the time that this event would
22   have taken place, and she's been since diagnosed with bipolar.
23   Q    Does bipolar run in your family?
24   A    It does.
25   Q    Your father had bipolar?

1    A    My father did, yes.

2    Q    While you and Kaitlyn were talking and she's disclosing

3    that she has been cutting herself, did you guys leave the

4    house?

5    A    We did.

6    Q    And what did you go do?

7    A    We went to get pizza because I had already ordered the

8    pizza and it was ready and I had a house full of people that

9    needed to eat.  So I ask Kaitlyn if she was okay with going

10   with me so we could talk some more, and it was just her and I

11   that went to pick up the pizza.

12   Q    When you came back from picking up the pizza, at any

13   point in time that night, did you also have a private

14   conversation with your daughter Kaitlyn that involved your

15   husband, Raymond?

16   A    Yes.

17        **MS. DIAL:**  Objection.  Leading.

18        **THE COURT:**  Sustained.

19   Q    (By Ms. Brown) When you got back with the pizza, what did

20   you do with --

21   A    I mean, we ate our pizza just because you -- you know, it

22   was there and fresh food we needed to eat.  But then

23   afterwards, I ask Kaitlyn if she could talk with her -- her dad

24   and I.  And we needed to have a conversation about what we had

25   talked about earlier.

1    Q    And during that conversation that involved your husband,

2    Mr. Goldesberry, at that point in time, was the subject matter

3    of that private conversation different or the same as the

4    conversation that you'd had earlier with Kaitlyn?

5    A    It was the same.

6    Q    Later that night, did your daughter Faith leave the

7    house?

8    A    She did.

9    Q    Did she go back to Miami with Kai- -- Meagan?

10    A    She did.

11    Q    And did Kaitlyn stay behind?

12    A    She did, yes.

13    Q    At the point at time in which your older daughter, Faith,

14    and Meagan Bartlett left to go back to Miami, were you aware of

15    the incident involving your husband and your daughter that

16    brings us to court today?

17    A    No.

18    Q    If you had known at that point, would you have wanted

19    Faith to leave?

20    A    No.

21    Q    How would you describe Kaitlyn?

22    A    She's very opinionated.  She's very outspoken.  She --

23    she loves animals.  She loves babies.  We call her, you know,

24    the -- the baby stealer.  If there's a baby around in the room,

25    she's like, "Come here.  Give me.  Give me.  I want the baby."

```
 1          So very much into babies and any animals.  She loves
 2   animals.
 3   Q     You have several animals at home?
 4   A     Yes.
 5   Q     You -- professionally, you said you were a nurse.  Are
 6   you specifically a labor and delivery nurse?
 7   A     Yes.
 8   Q     And were you doing that back in 2017 as well?
 9   A     Yes.
10   Q     How many days a week do you work?
11   A     Three days a week normally.
12   Q     And is that pretty consistent with what you were doing
13   back in 2017?
14   A     It is, yes.
15   Q     How long are your shifts?
16   A     Twelve-hour shifts.
17   Q     And do you have a set schedule where, you know, you work
18   every Monday, Wednesday, Friday from this time to that time, or
19   does it vary?
20   A     It's -- it's variable, yeah.  The hours are the same, but
21   the days are variable.
22   Q     Are there also separate times where you're on-call and
23   have to leave if you get called in?
24   A     There is, yes.
25   Q     A lot of babies --
```

1    A    Yes.

2    Q    -- come unexpectedly?

3    A    Yep.

4    Q    Have there ever been times where you've had to leave

5    early in the morning while your family was still in the home

6    asleep?

7    A    Yes.

8    Q    And typically, when you leave early in the morning before

9    your children or your husband are awake, what do you do?  Do

10    you leave them sleeping or wake them up or something else?

11    A    I don't bother my children; I let them sleep.  But I -- I

12    tell my husband I'm leaving.  He's usually still in bed.  I'll

13    just, you know, give him a quick kiss and say, you know, "Bye.

14    I love you.  Have a good day."

15          And it -- it -- it's usually my routine.  But if I'm in a

16    hurry, I'm not able to, I'll just leave if I need to.

17    Q    So routinely or regularly, mostly you'll kiss him

18    goodbye?

19    A    Uh-huh.

20    Q    Even if he's still asleep in bed?

21    A    Yes.

22    Q    But not every time?

23    A    Not every time, no.  And there's times that he'll forget

24    too.  He'll call me later and be upset, "How come you didn't

25    kiss me goodbye?"

 1        And I'm like, "Well, I did, but you probably just don't
 2   remember 'cause you were half-asleep."
 3        It became a joke between us after it happened so many
 4   times.
 5   Q    Okay.  When -- obviously, you've already said that
 6   neither Kaitlyn nor your husband, Mr. Goldesberry, told you
 7   about this incident right afterwards.  So would it be fair to
 8   say you have no idea whether you kissed Raymond goodbye this
 9   particular day that this incident happened?
10   A    Yeah, I have no idea.
11   Q    'Cause we don't know what date it happened on; right?
12   A    Correct.
13   Q    Do you have any scars or moles or any raised or -- or
14   abnormal tissue around your vaginal area that could potentially
15   alert somebody, just upon blind-touching you, that it's you?
16   A    No.
17   Q    Do you have any kind of specific, regular pubic shaving,
18   grooming, waxing routine?
19   A    No.  It can vary depending on the season or events I
20   have.  So it -- it's -- nothing regular.
21   Q    So just to be really clear -- and I know these are
22   personal questions, and I apologize.
23   A    It's okay.
24   Q    But it's necessary.
25   A    That's okay.

1    Q    Is there a time where you have pubic hair?

2    A    There is, yes.

3    Q    And is there times where you've groomed and you have

4    perhaps less or trimmed pubic hair?

5    A    There is, yes.

6    Q    But it -- it just depends?

7    A    It depends, yeah.

8    Q    Okay.  Has anybody ever mistaken you for your daughter

9    Kaitlyn?

10    A    Yes.

11    Q    Who?

12    A    Faith has before, just in passing, like walking down the

13    hallway if the light isn't on and it's kind of dark and

14    she'll -- it -- it's either one.  Like, she'll see Kaitlyn and

15    think it's me and say, "Hey, Mom," and Kaitlyn's like, "Uh, no,

16    it's me."

17        And then vice versa.  If I'm walking down the hall,

18    she'll say, "Hey, Kaitlyn."  And it was around the time that

19    Kaitlyn and I were the same heighth and --

20    Q    So speaking of obviously you and Kaitlyn and your height,

21    are you and Kaitlyn the same height today?

22    A    Not today.

23    Q    You mentioned your hair.  Your hair right now is dark and

24    curly and shoulder length?

25    A    Uh-huh.

1    Q    We've met Kaitlyn.  Her hair is lighter and long and

2    wavy?

3    A    Yes.

4    Q    Has it always been that way?

5    A    No.

6    Q    Did you used to have a different hairstyle?

7    A    I did, yeah.  It was long and straight and a lot lighter

8    than this is now, similar to Kaitlyn's at the time.

9    Q    Is Kaitlyn's hair naturally as light as it is right now?

10   A    No.  She gets it highlighted.

11   Q    Okay.  So there was a time where her hair was darker?

12   A    Yes.

13   Q    And was there a time when her hair was shorter?

14   A    Yes.

15   Q    Then similar questions about weight.  Are you and Kaitlyn

16   the same weight right now?

17   A    No.

18   Q    Has there been a time where you were significantly closer

19   in weight to each other than you are today?

20   A    Yes, yeah.

21   Q    Did you lose some weight?

22   A    I have.

23   Q    Congratulations.

24   A    Thank you.

25   Q    And over the course of the years, between approximately

1    2017 and -- and now, has Kaitlyn gained a little bit of weight?

2    A    Well, yeah, she's grown.  Yeah.

3    Q    She's older?

4    A    She's older.  She's gotten taller as well, yeah.

5    Q    Okay.  So I -- I started questioning, talking about when

6    and how you found out about the incident that brings us all to

7    court today.  I'm going to call it the bed incident between

8    your husband and -- and your daughter.  Okay?

9    A    Okay.

10   Q    You said you found out about that from DHS, Brenna

11   Gusman, but that she didn't give you details; correct?

12   A    Correct.

13   Q    You said after Miss Gusman called you to just let you

14   know that she needed to -- did she let you know that she needed

15   to schedule a forensic interview for Kaitlyn?

16   A    Yes.

17   Q    And did you agree to that?

18   A    Yes.  We did so the next day.

19   Q    Did you have any objection to that or try to avoid that?

20   A    No.

21   Q    And so you said that after Ms. Gusman told you there was

22   some allegation involving sexual abuse involving your husband

23   and your daughter but wouldn't give you details, you called

24   your husband?

25   A    Yes.

1    Q    Where was your husband when you called him?

2    A    I believe he was at Starbucks®, they'd -- at 41st

3    Street.  They just left Starbucks®.

4    Q    Okay.  And where were you when you spoke to DHS on the

5    phone?

6    A    I was at work.

7    Q    Okay.  So you -- neither one of you were at home?

8    A    No.

9    Q    Did you also speak with Kaitlyn at some point that day?

10   A    I did in person later on that day.

11   Q    And did you do that with your husband present or

12   privately?

13   A    No, it was private.

14   Q    Did you talk about the incident or the allegation that

15   brings us to court today with your husband in front of Kaitlyn,

16   or did you do that privately?

17   A    I did that privately.

18   Q    And when you say you spoke to them both privately, was

19   that separately?

20   A    It was separately, yes.

21   Q    Obviously, after the conclusion of the investigation, DHS

22   stayed in your lives for a little while longer; right?

23   A    Yes.

24   Q    We've heard from Miss Gusman and Miss Barboza.  Did DHS

25   recommend that Kaitlyn get trauma-focused therapy or

1    trauma-focused counseling?

2    A    I believe they did.

3    Q    And did she go for trauma-focused counseling or

4    trauma-focused therapy with another counselor that's not Stacia

5    after that recommendation?

6    A    She stayed with Stacia.  We thought it was in her best

7    interest to stay with the same counselor 'cause she felt

8    comfortable with her, and Stacia said that she could do trauma

9    therapy.

10   Q    So I guess my question is:  Did Kaitlyn get the trauma

11   therapy that was -- trauma-focused therapy that was

12   recommended?

13   A    Yes.

14   Q    And to date, does she still see Stacia Alsabrook?

15   A    She does.

16   Q    And does she see any other counselors or therapists?

17   A    She has seen other counselors and therapists.  She's

18   currently seeing another one through Indian Health Services to

19   help pay for medications, yeah.

20   Q    Okay.

21        **MS. BROWN:**  Just one moment, Judge.

22            (Discussion held off the record.)

23        **MS. BROWN:**  Pass the witness, Your Honor.

24                          CROSS-EXAMINATION

25   BY MS. DIAL:

1   Q    Mrs. Goldesberry, I'd like to start by confirming just a

2   couple of things with you.  So I believe your direct testimony

3   was that you work 12-hour shifts; right?

4   A    Yes.

5   Q    What are the times of that again?

6   A    I have to be clocked in by 6:30 a.m.  And as far as when

7   I leave, it's just after I'm able to give report and get all of

8   my charting caught up.  I give report to the night shift

9   between 6:40 p.m. and seven.  I may have to stay later to catch

10  up on charting.

11  Q    Okay.  And your test- -- what time do you leave for work?

12  A    I leave for work around six in the morning.

13  Q    That's the time that you leave?

14  A    6:00 a.m., yes.

15  Q    Okay.  You -- you testified on direct that you work the

16  night shift and that that's why you have the dark lights?

17  A    I have previously worked the night shift.  When I first

18  started working in Hillcrest, I started off as a night shift

19  nurse, and I was a night shift for like two-and-a-half years.

20  And then after two-and-a-half years, I stayed on day shift, and

21  I haven't been back to night shift.

22  Q    When was that?

23  A    Well, I started working at Hillcrest in December of 2008.

24  So for two-and-a-half years after that is when I switched to

25  night shift.

1    Q    So isn't it true --

2    A    Or day shift; sorry.

3    Q    Isn't it true that you worked the night shift 2008 to

4    2010?

5    A    Yes.

6    Q    And so in 2017, the time period we're talking about,

7    that's seven years after you've worked the night shift?

8    A    Yes.

9    Q    But your testimony is you just left on the blackout

10   curtains from when you worked the night shift seven years

11   prior?

12   A    Yep.

13   Q    Your testimony also today was that you regularly would

14   tell your husband, "I'm leaving;" is that correct?

15   A    Yes.

16   Q    On direct, you testified that you didn't know anything

17   about these allegations until 2020; right?

18   A    That's correct.

19   Q    And after you learned of the allegations, you told your

20   husband he needed to leave; is that right?

21   A    Yes, at the --

22   Q    Per -- per --

23   A    -- request of DHS.

24   Q    -- DHS?

25   A    Yeah, per protocol.

1    Q    And so he left?

2    A    Yes.

3    Q    And how long did he stay at the hotel?

4    A    I believe he stayed there the first night.  And then the

5    next day after the forensic interview when I spoke with Brenna

6    Gusman, she had told me that it could take up to a week to do

7    the investigation.  And then we decided that we can't ap- --

8    afford a hotel for a week.

9         So then Kaitlyn stayed at my mom's overnight till we can

10   kind of figure out something a little bit more long-term for

11   over the next week or so.  And then the next night, she did

12   come back, so Raymond stayed in ano- -- a hotel for a second

13   night.  And then once I was able to get Kaitlyn out with her

14   aunt and uncle in Chandler, then Raymond came back home.

15   Q    Chandler's about an hour away; right?

16   A    Yes.

17   Q    From where you live?

18   A    Uh-huh.

19   Q    And how -- and Kaitlyn stayed out at Chandler for about

20   30 days; correct?

21   A    Around, yeah.

22   Q    Your testimony is that the first night when Meagan and

23   Kaitlyn came back, about May 24th, May 25th, 2020, that

24   Kaitlyn just told you she'd been cutting; is that correct?

25   A    Yes.

1    Q    And Kaitlyn talked to you about the things she was

2    struggling with; correct?

3    A    Well, yes.  I asked her, you know, what led you to want

4    to self-harm?

5    Q    But your testimony is that she didn't tell you anything

6    about this incident, about her dad putting his fingers in her

7    vagina?

8    A    Oh, no.

9    Q    And then a couple days later, you find out about --

10    A    Yes.

11    Q    And you didn't know about it until that time period;

12    right?

13    A    That's correct.

14    Q    Mrs. Goldesberry, I think you -- you made reference on

15    direct to your family being pretty open based on your career.

16    You guys talk about things; is that correct?

17    A    That's correct.

18    Q    So your family's really open about the body?

19    A    Yeah, in talking about it.  Uh-huh.

20    Q    Is Kaitlyn part of your family?

21    A    She is.

22    Q    Why would Kaitlyn not be comfortable telling you that

23    she'd started her period?

24    A    Because in her -- her words was she didn't want me to

25    make a big deal about it because when Faith started her period,

1    I made a -- a -- in her opinion, a big deal.  I got her a gift

2    basket of, you know, feminine products and girly things and a

3    card that said, like, "Welcome to womanhood."  And Kaitlyn said

4    she just didn't want that attention on her.

5    Q    On direct, you talked about your body and about being

6    about the same size as Kaitlyn at the time that we think this

7    incident happened; is that correct?

8    A    That's correct.

9    Q    You don't actually know when the incident happened;

10   right?

11   A    No.

12   Q    So how long were you and Kaitlyn about the same size?

13   A    I mean, for several years.  I mean, we were close in

14   heighth.  I mean, it was like she was almost up to my heighth,

15   and then, I mean, she -- it took her several years to -- to get

16   to where she was not quite the same height till, you know, a

17   little bit taller than me.  So maybe two or three years.

18   Q    When was she taller than you?

19   A    Oh, gosh, it's hard to remember for sure.

20   Q    She was taller than you by the time she was 12; correct?

21   A    I believe so -- or, no, she might have been around the

22   same height or right underneath me.

23   Q    There's a white book to the side of you, the Government's

24   exhibits -- or no; excuse me.

25        Do you recall -- do you make Facebook posts?

```
 1    A    I do.

 2    Q    Do you make Facebook posts to celebrate your children's

 3    birthdays?

 4    A    I do.

 5    Q    Do you recall posting for Kaitlyn's 12th birthday?

 6    A    I'm sure if I saw the post, I can recall and...

 7         MS. DIAL:  Your Honor, may I show defense counsel and then

 8    approach the witness?

 9         It's not in the book.

10         MS. BROWN:  I know.

11         MS. DIAL:  Oh, I was asking.

12         MS. BROWN:  Yeah.  No, it's not in the book.

13              (Discussion held off the record.)

14    Q    (By Ms. Dial) Mrs. Goldesberry, I'm going to show you the

15    image I've just shown defense counsel.

16    A    Okay.

17         MS. BROWN:  May I see that one more time just really

18    quick?  I'm sorry.

19         MS. DIAL:  Yes, of course.

20         MS. BROWN:  He didn't get to see it.  Thank you.

21              (Discussion held off the record.)

22         MS. BROWN:  Than is -- no, I know.

23         THE DEFENDANT:  Yeah.

24         MS. BROWN:  Yeah.

25         Thank you.
```

1    Q    (By Ms. Dial) Please don't read the post out loud, but if

2    you would read it silently to yourself.

3    A    (Witness complied.)

4    Q    Is that a Facebook post of -- that you made for Kaitlyn's

5    12th birthday?

6    A    Yes.

7    Q    And in that post, isn't it true that you say you can't

8    believe your baby is now taller than you?

9    A    Yes.

10   Q    So by the time Kaitlyn's 12, she's taller than you;

11   right?

12   A    Probably by a hair, yeah.

13   Q    Well, enough for you to make it a Facebook post; right?

14   A    Yeah.

15   Q    Okay.  Mrs. Goldesberry, you stated that you and the

16   defendant have been married for 22 years?

17   A    This July, yes.  It'll be 22.

18   Q    And you were asked on direct about your sexual

19   relationship with your husband; right?

20   A    Yes.

21   Q    And I believe your testimony was that you frequently had

22   sex; right?

23   A    Yes.

24   Q    Okay.  You also testified that you and Kaitlyn were about

25   the same size when she was 10, 11, 12 years old; is that

 1    correct?

 2    A    Eleven and 12.  She was significantly shorter when she

 3    was 10.  But the closer she got to 12, yes.

 4    Q    Okay.  About the same stature.  You said about the same

 5    hair?

 6    A    Yes.

 7    Q    All of those things?

 8    A    Yes.

 9    Q    Okay.  I'm showing you what's been previously admitted --

10         (Discussion held off the record.)

11    Q    (By Ms. Dial) -- as -- oh, I -- I apologize.

12         This is Government's Exhibit No. 1, which was previously

13    admitted.  Who's this a photo of?

14    A    That is myself; my daughters, Faith and Kaitlyn; then my

15    sister-in-law, Lee Ann, and her daughter, Ellianna (ph.).

16    Q    Focusing on the top, that's you and your two daughters;

17    right?

18    A    It is.

19    Q    And what's the date of this?

20    A    July 4th of 2016.

21    Q    How old was Kaitlyn at that point?

22    A    She was -- gosh, just -- guess she would have had to have

23    been 11?

24    Q    And --

25    A    Or turning 11.

```
 1    Q    -- isn't it true --

 2    A    She --

 3    Q    -- from this photo, your breasts are bigger than

 4   Kaitlyn's, aren't they?

 5    A    Yes.

 6    Q    Kaitlyn's stomach appears bigger than yours; right?

 7    A    Yes.

 8    Q    How many children have you had?

 9    A    Two.

10    Q    You testified on direct that you -- that you were about

11   the same size, stature as Kaitlyn when she was about this age;

12   correct?

13    A    About the a -- what -- "this age" meaning?

14    Q    2017.

15    A    2017.  I had gained some weight from that picture in 2016

16   to 2017.  I had gained weight.

17    Q    Okay.  And so your --

18    A    I --

19    Q    -- testimony was that you and Kaitlyn were about the same

20   size?

21    A    About.

22    Q    About the same stature?

23    A    Yeah.

24    Q    All right.  How old are you, Mrs. Goldesberry?

25    A    I'm 40.
```

1    Q    So in 2017, you were 37?

2    A    Yes.

3    Q    Wouldn't you agree that a 37-year-old woman's body feels

4    differently than an 11-year-old's body?

5    A    I don't know about that.

6    Q    Does your 37-year-old body feel different from your

7    11-year-old's body?

8    A    As far as feeling your body, like, what part of your body

9    are you referencing to?

10   Q    All right.  How about your stomach?  If you've had two

11   children --

12   A    Uh-huh.

13   Q    -- in 2017 and you'd gained a little bit of weight,

14   wouldn't your stomach have felt different than an 11-year-old's

15   stomach would?

16   A    I mean, maybe, maybe not, because in those pictures, you

17   saw that Kaitlyn's stomach was a little bit bigger.

18   Q    Yeah.  But she hadn't had two kids, had she?

19   A    No.

20   Q    There wasn't any sagging or any stretchmarks or anything

21   like that, was there?

22   A    No.

23   Q    Okay.

24        MS. BROWN:  Objection.  Relevance and foundation.

25        THE COURT:  Overruled.

 1    Q    (By Ms. Dial) You testified on direct that you were --
 2   that you talked about your pubic hair on direct.  Isn't it true
 3   that a 37-year -- 37-year-old -- your 37-year-old genitals were
 4   different from an -- your 11-year-old daughter's genitals?
 5    A    I mean, it's hard to say.  I mean, as a labor and
 6   delivery nurse, I've seen women's genitals of all different
 7   ages.
 8    Q    I'm talking about your genitals.
 9    A    Oh, I mean, I don't have anything that's different.
10    Q    You think that you have the same genitals as your
11   11-year-old daughter?
12    A    We both have vaginas, yes.
13    Q    And they feel the same?
14    A    I don't feel hers, so I don't know.
15    Q    Your husband feels her, though, doesn't he?
16         MS. BROWN:  Objection.
17         THE COURT:  Oh, the -- I'm going to send the jury out, and
18   I'll be right back with you.  This isn't your break, so don't
19   get too comfortable.
20         CSO:  All rise.
21              (Jury out.)
22         THE COURT:  State the legal basis for your objection,
23   please.
24         MS. BROWN:  Form of the question and argumentative.
25         THE COURT:  It -- it implies that there's more than one

```
 1   touching in evidence.  So I think it's an improper question.
 2   The objection's sustained.
 3        Please return the jury.
 4        JUROR:  Sorry.
 5             (Jury present.)
 6        THE COURT:  Please be seated.
 7        You -- you may continue, Miss Dial.
 8        MS. DIAL:  Thank you, Your Honor.
 9   Q    (By Ms. Dial) Mrs. Goldesberry, on direct, you talked
10   about your husband initiating sex with you while you were
11   asleep; correct?
12   A    Yes.
13   Q    And I believe your testimony was that that was okay, you
14   guys were married --
15   A    Yes.
16   Q    -- correct?
17        Your husband wasn't asleep, though, was he?  He was
18   awake?
19   A    I wasn't there.
20        MS. BROWN:  Objection.
21        THE COURT:  Overruled.
22        MS. BROWN:  Lacks personal knowledge.
23        THE COURT:  Overruled.
24   Q    (By Ms. Dial) You can answer the question.
25   A    I wasn't there, so I can't testify to whether he was
```

1    asleep or not.

2    Q    I'm talking about the times that he initiated sex --

3    A    Oh.

4    Q    -- with you.

5    A    With me?

6    Q    You were the one asleep; correct?

7    A    Yes.

8    Q    And your husband was awake when he would initiate sex

9    with you while you were asleep; correct?

10    A    Most of the time, yes.

11    Q    Your comment a minute ago brings me to one of my points.

12    You -- your husband told you that he had put his fingers in

13    Kaitlyn's vagina; correct?

14    A    He said that he's not sure what he did as far as where it

15    went, that he was just going off of what Kaitlyn had told him.

16    Q    Well, are you aware that's not what he told DHS?  He told

17    DHS he put his fingers inside her vagina.

18    A    Okay.  I wasn't there for his conversation with DHS so...

19    Q    And you weren't in the room when your husband did this to

20    Kaitlyn, were you?

21    A    No.

22    Q    Okay.  So and you didn't find out about it until years

23    later; correct?

24    A    Correct.

25    Q    Okay.  And when you found out about it, it was only

1    because DHS had gotten involved; correct?

2    A    Correct.

3    Q    And only at that point did your husband decide to be

4    honest and tell you about it; correct?

5    A    I mean, he told me about it because I asked him to --

6    like, "What's going on?"  Yeah.

7    Q    But he didn't tell you on his own?  He told you because

8    DHS got involved, and he needed to explain to you; correct?

9    A    That's correct.

10    Q    And your husband told you that it was just a mistake;

11    right?

12    A    Yes.

13    Q    And you believed him?

14    A    Well, after I talked to Kaitlyn to make sure, you know,

15    if that's the way she felt like -- you know, or if she thought

16    it was a mistake or if he did it on purpose.  I just wanted to

17    get both sides of the story before I came to any, you know,

18    assumptions or conclusions.

19    Q    Kaitlyn can't tell you what the defendant intended;

20    right?  She doesn't know what he was thinking, does she?

21    A    She does not know what he's thinking, no.

22    Q    So the defendant told you he was thinking it was you;

23    right?

24    A    Yes.

25    Q    And your husband told you, "I told Kaitlyn I thought it

1  was you," his wife; right?

2     A    Yes.

3     Q    So Kaitlyn doesn't know what the -- what her dad's

4  thinking; right?

5        **MS. BROWN:**  Objection.  Calls for a legal conclusion.

6        **THE COURT:**  Overruled.

7     Q    (By Ms. Dial) Can Kaitlyn know --

8     A    Can you repeat that?

9     Q    Can Kaitlyn know what her dad is thinking?

10    A    No.

11    Q    So you took your husband at his word.  He said it was a

12 mistake, and so you believed him that it was a mistake?

13    A    After speaking with Kaitlyn too, yes.  Yeah.

14    Q    And you -- you believed him even though he had kept it

15 from you for years; correct?

16    A    Yes.

17    Q    And, Mrs. Goldesberry, on direct, you said that Kaitlyn

18 was your priority; is that right?

19    A    Yes.

20    Q    You said Kaitlyn has anxiety, depression.  She suffers

21 from bullying; is that correct?

22    A    Yes.

23    Q    She was suffering from all of these things back in 2017?

24    A    Yes.

25    Q    You had found out back in May 2020 that she was cutting

 1   herself; is that correct?

 2   A    Yes.

 3   Q    She was self-harming?

 4   A    Yes.

 5   Q    She was crying out for help; right?

 6   A    Yes.

 7   Q    And you sent her to stay with family a few days after she

 8   told you that she'd been cutting, a few days after all of this

 9   comes out, and your husband tells you that he put his fingers

10   inside Kaitlyn's vagina.  You sent her an hour away to stay

11   with family, didn't you?

12   A    After consulting with Kaitlyn, that's where she wanted to

13   go.

14   Q    She was a child.  You sent your child away after she told

15   you within the same week that she had been cutting and that her

16   father had put his fingers inside her vagina; isn't that true?

17   A    It's true that I sent her where she felt safe, yes.

18   Q    You're her mother?

19   A    Yes.

20   Q    Why wasn't she safest with you?

21   A    She was safe with me.

22   Q    You said you sent her where she felt safe.

23   A    Well, because she couldn't be in the same house as

24   Raymond.

25   Q    Because you picked your husband over Kaitlyn?

```
 1   A    No.  It wasn't a matter of picking.  It was a matter of
 2   actually working out how we could keep Kaitlyn in one place and
 3   Raymond in one place.  It was just he -- the way it worked out
 4   as far as logistics.
 5        And I ask Kaitlyn, "Would you want to stay here with me
 6   and, you know, have your dad go out there, or do you want to go
 7   out the -- yeah, out there and him stay here?"
 8        And she wanted to go out there 'cause, you know, she
 9   wanted to spend time with other family as well.
10   Q    And so your husband came home?
11   A    He did.
12   Q    And you and your husband were able to stay together while
13   your child was out of the home; correct?
14   A    Uhm --
15   Q    Is that correct?
16   A    Well, except for --
17   Q    Yes?
18   A    -- the weekends.
19        MS. BROWN:  Your Honor?
20        THE WITNESS:  It's partially correct.
21        MS. BROWN:  Objection.
22        THE COURT:  Okay.  The objection's overruled.
23        But you need to listen to the question.  If you can answer
24   it --
25        THE WITNESS:  Okay.
```

 1        THE COURT:  -- answer it "yes" or "no," if it calls for a

 2    "yes" or "no" response.

 3        And then if you need to --

 4        THE WITNESS:  Okay.

 5        THE COURT:  -- explain, I'll give you an opportunity to

 6    explain.

 7        Your attorney will have an opportunity --

 8        THE WITNESS:  Okay.

 9        THE COURT:  -- to talk to you again.

10        MS. BROWN:  Your Honor, that wasn't my objection.

11        THE COURT:  I overruled your objection.  Did -- do you

12    want to be heard on your objection?

13        MS. BROWN:  Well, you overruled the objection, but then

14    the basis that you said, it was not the basis of my -- my

15    objection is that counsel's not --

16        THE COURT:  No.  We're not going to talk in front of the

17    jury, remember?  The -- the -- if you need -- if you need to

18    speak to me outside the presence of the jury, I'll give you

19    that opportunity.

20        MS. BROWN:  Yes.

21        THE COURT:  Okay.

22        Ladies and gentlemen, if you'd step outside, please.

23        JUROR:  It's not a long break.

24        CSO:  Shh, shh.

25            (Jury out.)

1          THE COURT:  See, how you get this to...

2      How do I scroll up on this?

3          THE COURT REPORTER:  Is it not going up?  Let's see.

4          THE COURT:  Maybe right here?  Okay.

5          THE COURT REPORTER:  There you go.  You got it.

6          THE COURT:  Okay.

7      So the record is -- you may sit down, ma'am.

8          THE WITNESS:  Okay.

9          THE COURT:  So the record is clear, multiple people were

10     talking at the same time.  There's an objection given without a

11     basis.  The witness was not responding to the question, and

12     counsel was interrupting her narrative answer.  So tell me what

13     your objection is.

14         MS. BROWN:  My objection is that counsel was not giving

15     the witness an opportunity to respond.  Counsel --

16         THE COURT:  Well --

17         MS. BROWN:  -- didn't like the response.

18         THE COURT:  Okay.

19         MS. BROWN:  And that's why there were multiple people

20     talking --

21         THE COURT:  No.

22         MS. BROWN:  -- over each other.

23         THE COURT:  No.  She wasn't responding to the question.

24         MS. BROWN:  And --

25         THE COURT:  That's why I gave her an instruction to --

1   gave her an instruction to answer the question.  And then if

2   she needed to explain her answer, I would give her an

3   opportunity, and I explained to her, you would have another

4   opportunity.  So I did respond to your objection.

5        I -- I overruled it.  But I did correct the situation.

6   The situation was not that counsel was interrupting her only.

7   It was that she wasn't answering the question.  That's why

8   counsel was interrupting her, trying to get her to answer the

9   question.

10       So please return the jury.

11       **CSO:**  Yes, sir.

12           (Jury present.)

13       **THE COURT:**  You may be seated.

14       And you may proceed, Miss Dial.

15       **MS. DIAL:**  Thank you, Your Honor.

16  Q   (By Ms. Dial) Isn't it correct -- isn't it true, that

17  after -- in the week that it came out that Kaitlyn was cutting

18  and that your husband had put his fingers in her vagina a few

19  years earlier, isn't it true that you sent Kaitlyn to live with

20  family so that the defendant could come home?

21  A   I'd sent her down there so they could stay separated,

22  yes.  Not necessarily so he could come home.  It was one or the

23  other.

24  Q   Okay.

25  A   We were just making arrangements for them to not stay at

1    the same place.  That -- that's all.

2      Q    And the --

3      A    Yeah.

4      Q    -- arrangement -- yes or no? -- the arrangement was the

5    defendant would come back and be with you?

6      A    The arrangement was --

7         **THE COURT:**  You can answer that question with a "yes" or

8    "no."

9         **THE WITNESS:**  Yes.

10         **THE COURT:**  And then explain your answer.

11         **THE WITNESS:**  Yes.

12      Q    (By Ms. Dial) Thank you.

13         You stated on direct that your priority is Kaitlyn;

14    correct?

15      A    Yes.

16      Q    Was your priority Kaitlyn -- your priority wasn't Kaitlyn

17    when you allowed your husband's defense attorney to text your

18    underage daughter, was it?

19      A    I got screenshots of the texts.  I was aware that they

20    were texting.

21      Q    You allowed your husband's defense attorney to text your

22    child; correct?

23      A    Actually, my daughter texted her first.  That's correct.

24      Q    And you allowed that to continue; correct?

25      A    Correct.

1   Q    You allowed your husband's attorney to write an affidavit

2   for -- for Kaitlyn; correct?

3   A    Correct.

4   Q    And then you took Kaitlyn back to your husband's

5   attorney's office so that Kaitlyn could sign that affidavit;

6   correct?

7   A    That is correct.

8   Q    So isn't it true that your priority in all of this is to

9   keep your husband out of trouble?

10  A    No.  My priority is having Kaitlyn heard.

11       **MS. DIAL:**  There are no other questions, Your Honor.

12       **THE COURT:**  One minute, please.

13            (Discussion held off the record.)

14       **THE COURT:**  Yes, Ms. Brown, you may proceed.

15       **MS. BROWN:**  Thank you, Your Honor.

16                         REDIRECT EXAMINATION

17  BY MS. BROWN:

18  Q    Mrs. Goldesberry, let's start with the meeting at my

19  office.  All right?

20  A    Yes.

21  Q    Where -- where you ended with Ms. Dial.  Isn't it true --

22  Kaitlyn repeatedly asked to meet with me, and I declined to

23  meet with her; correct?

24  A    Correct.

25  Q    And you had just said your priority was having Kaitlyn be

1    heard.  Was that your idea or hers or somebody else's?

2    A    It was both of our ideas.  She wanted to be heard.

3    Q    And -- and you were just following her wishes?

4    A    Yes.

5    Q    How many times did I meet with Kaitlyn?

6    A    That time we first met with Kaitlyn was the first time --

7    Q    So just once?

8    A    -- in your office.

9         Yeah.  Just once in your office was the first time.

10   Q    And when I notified you that I had prepared the

11   affidavit, did I also notify you that I had let Kaitlyn know

12   via text message?

13   A    Yes.

14   Q    And did you check her text messages to make sure that

15   they were appropriate?

16   A    I did.

17   Q    And in the text messages that I sent to Kaitlyn, were

18   they similar to the ones that I sent to you?

19   A    The exact screenshot, yes.

20   Q    And was that just notifying her about the voluntariness

21   and that there was no obligation to sign the affidavit?

22   A    That's correct.

23   Q    And was the substance of that, or the topic of that, also

24   to ensure that both of you knew, as mother and daughter, that

25   if anything was wrong or needed to be corrected, that I would

1    absolutely do that?

2    A    Yes, that's correct.

3    Q    During the course of the time that I talked to Kaitlyn,

4    were you in the room?

5    A    When you talked to Kaitlyn, yeah, the first time, I was.

6    Yes.

7    Q    Well, you keep saying "first time."  Did I only meet with

8    Kaitlyn --

9    A    Yeah.

10    Q    -- one time?

11    A    That's right.  I -- yeah, I think -- I keep thinking

12    'cause we went up this -- the day after to sign the affidavit,

13    but you were not there.  So that's why I'm...

14    Q    Right.  So the one --

15    A    Yeah.

16    Q    -- and only time I talked to Kaitlyn and --

17    A    Yes.

18    Q    -- and heard her out, were you present?

19    A    I was.

20    Q    And did you read the affidavit before your daughter

21    signed it?

22    A    I did.

23    Q    And was everything in the affidavit consistent with what

24    she had previously said the day before?

25    A    Yes.

1   Q    Okay.  Miss Dial made a big deal about Chandler being an

2   hour away.  Do you remember those questions?

3   A    Yes.

4   Q    During the time, the 30 days at most, that Kaitlyn was

5   out of the home and living with her aunt and uncle in Chandler,

6   was COVID restricting children from being able to go to school?

7   A    Yes.

8   Q    In other words, was she able to do her online schooling

9   in Chandler or at home the same?

10  A    I believe, at that time, it was during the summer so --

11  Q    Oh.

12  A    -- by the time she was in Chandler, so it wasn't an

13  issue.

14  Q    Was there any -- did she ever ask in that 30 days that

15  she was there to come home?

16  A    She knew she couldn't.  But I made a point to go out

17  there every single weekend and spend the weekend with Kaitlyn

18  to make sure that she and I got to spend time, and that she was

19  my priority.

20  Q    During the entire course that -- from the moment that you

21  found out about the incident in the bed between Kaitlyn and

22  Raymond, specifically pertaining to that incident -- from the

23  very first time that you heard about it from one or both

24  Kaitlyn and Raymond, Mr. Goldesberry, all the way to present,

25  has anybody ever given you the impression that your husband

1   touched Kaitlyn's breasts?

2   A    No.

3   Q    So whether your breasts and her breasts were the same

4   size wouldn't necessarily be that big of a deal?

5   A    No.

6   Q    During the course of the entire time from you fin- --

7   finding out about this all the way up until today, have either

8   one of them or anybody from DHS or law enforcement or anybody

9   given you the indication that Raymond touched or groped or

10  grabbed or felt Kaitlyn's stomach?

11  A    No.

12  Q    So if your stomach and her stomach weren't identical,

13  that also wouldn't be a red flag for you?

14  A    No.

15       MS. BROWN:  Pass the witness.

16       THE COURT:  Okay.

17  You may step down, ma'am.

18       THE WITNESS:  Thank you.

19       THE COURT:  Who's your next witness?

20       MS. BROWN:  I believe we need to make a brief record.

21       THE COURT:  Okay.

22  You may step --

23       THE WITNESS:  You --

24       THE COURT:  -- down, ma'am.

25       THE WITNESS:  Your Honor, am I released from my subpoena?

1     **MS. BROWN:**  Yes, from my perspective.

2     **MS. DIAL:**  Yes, Your Honor.

3     **THE COURT:**  Yes, ma'am, you are.

4     **THE WITNESS:**  All right.  Thank you, Your Honor.

5     **THE COURT:**  Well, ladies and gentlemen, I'm going to

6  call -- you're entitled to another break.  So this'll be a

7  15-minute break.

8     **CSO:**  All rise.

9          (Jury out.)

10          (Discussion held off the record.)

11     **THE COURT:**  Yes, ma'am?

12     **MS. BROWN:**  Thank you, Your Honor.

13     At this point in time, the only other potential witness

14  would be my client.  I wanted to go ahead and make that record.

15  He has informed me after much discussion over the course of the

16  time leading up to trial, as well as each day during trial, of

17  his wishes, and it's my understanding that he does not intend

18  to testify.  And if the Court wants to inquire of him prior to

19  the defense resting.

20     **THE COURT:**  Okay.  Thank you, Miss Brown.

21     Mr. Goldesberry?

22     **THE DEFENDANT:**  Yes, Your Honor.

23     **THE COURT:**  Raise your right hand, be sworn.

24          (Defendant sworn.)

25     **THE DEFENDANT:**  Yes, ma'am.

 1          THE DEPUTY COURT CLERK:  Thank you.

 2          THE COURT:  Sir, what's your name?

 3          THE DEFENDANT:  Raymond Lee Goldesberry, Your Honor.

 4          THE COURT:  Okay.  You're represented here by competent

 5   counsel, and she's had an opportunity to talk to you about your

 6   right to testify; is that correct?

 7          THE DEFENDANT:  That is correct, Your Honor.

 8          THE COURT:  You can be seated and just talk into --

 9          MS. BROWN:  Oh.  Here, take --

10          THE COURT:  -- the microphone.

11          MS. BROWN:  -- this.

12          THE COURT:  You're pretty tall and --

13          THE DEFENDANT:  Thank you.

14          THE COURT:  -- don't want you to have to stoop down to

15   talk.

16          THE DEFENDANT:  Thank -- thank you, Your Honor.

17          THE COURT:  She's also -- I -- it appears talked to you

18   about your right not to testify?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Now, I want to make sure that you're

21   exercising your -- your decision freely and voluntarily.  Has

22   anyone threatened you or coerced you to make this decision?

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  And has anyone promised you any reward or

25   benefit --

1      THE DEFENDANT:  No, Your Honor.

2      THE COURT:  -- to make this decision?

3      THE DEFENDANT:  No, Your Honor.

4      THE COURT:  So and have you had an opportunity to fully

5   discuss the decision with your attorney, Ms. Brown?

6      THE DEFENDANT:  Yes, Your Honor.

7      THE COURT:  Do you need any more time to talk to her?

8      THE DEFENDANT:  No, Your Honor.

9      THE COURT:  So what is your decision, to testify or not to

10   testify?

11      THE DEFENDANT:  To not testify.

12      THE COURT:  Okay.

13   Are you satisfied with that inquiry?

14      MS. BROWN:  Yes, Your Honor.  Thank you.

15      THE COURT:  Are you satisfied with that colloquy?

16      MS. DIAL:  Yes, Your Honor.

17      THE COURT:  Okay.

18      MS. BROWN:  Your Honor, just briefly while the jury is

19   still out, I know that my original Rule 29 motion is under

20   advisement, and I intend to see if there's any additional law

21   for the Court.

22   But for the record, I did want to renew my Rule 29 at the

23   close, since I will formally rest in front of the jury.  But at

24   this point, I intend to rest.  And so since they're already

25   out, I just wanted to go ahead and renew my Rule 29 motion.

 1          THE COURT:  Okay.

 2          MS. BROWN:  Thank you, Judge.

 3          THE COURT:  And my ruling is the same.

 4          MS. BROWN:  Thank you.

 5          THE COURT:  I'll take it under advisement.  And you don't

 6     need to renew it in the presence of the jury unless --

 7          MS. BROWN:  No.

 8          THE COURT:  -- you -- and I don't need to do it again.

 9          This is it.

10          Okay.  Now, how long do you want to argue?

11                 (Discussion held off the record.)

12          MS. DIAL:  Total of 30 for the Government, Your Honor.

13          MS. BROWN:  I was going to ask for 45, and I don't have an

14     objection if they want that additional time as well, if the

15     Court is inclined to give me that much time.  And full

16     disclosure, I may or may not use all of it but I --

17          THE COURT:  I think you will.

18          MS. BROWN:  I -- yeah.  I -- I -- I ended up talking

19     longer than I thought in open, and I have more to say now.  And

20     so out of an abundance of caution...

21          THE COURT:  Well, could you live with 40 minutes?

22          MS. BROWN:  Yes.

23          THE COURT:  Okay.

24          MS. BROWN:  Yes, I can.

25          THE COURT:  You each have 40 minutes.  Oh.  Do you want

1    a -- do you want a warning when you reach -- when you get about

2    five minutes out?

3         **MS. BROWN:**  Yes, sir.

4         **MS. DIAL:**  Yes, please, Your Honor.

5         **THE COURT:**  Okay.  Do you -- you have a light on the

6    podium; is that right?

7         **MS. DIAL:**  It lights up right there --

8         **THE COURT:**  Oh, I see.

9         **MS. DIAL:**  -- in front.

10         **MS. BROWN:**  I -- I'm almost never looking at it.  That's

11    my problem.

12         **THE COURT:**  Okay.  Well, we'll try to give you notice when

13    you get close to your time.

14         **MS. DIAL:**  Is the Court's preference to do closings before

15    jury instructions?

16         **THE COURT:**  You know, I just have always done the

17    instructions afterwards.  Do you have a preference?

18         **MS. DIAL:**  No, I'm happy with that.  But usually it's the

19    reverse, so I would need --

20         **THE COURT:**  They usually instruct and then argue here?

21         **MS. DIAL:**  Generally, but -- yes, but I don't ob- -- I

22    don't object to the --

23         **THE COURT:**  Oh, well.

24         **MS. DIAL:**  -- Court doing it --

25         **THE COURT:**  I'll do it eith- --

1      **MS. DIAL:**  -- your way.

2      I would just need time to run down and print 'cause I

3  assumed we were doing jury instructions.  So I need to go print

4  my closing outline.  I have it but I -- I came unprepared.  I'm

5  sorry, Your Honor.

6      **THE COURT:**  Well --

7      **MS. DIAL:**  'Cause I --

8      **THE COURT:**  -- let's not get ahead of ourselves.

9      We have other work to do.

10      **MS. DIAL:**  Okay.

11      **THE COURT:**  And we may not get to your argument today.

12  We'll see.

13      What do you prefer?

14      **MS. BROWN:**  I'll be honest, I don't have a strong

15  preference one way or the other.  But it is my custom and --

16  and -- and our local custom that we do the jury instructions --

17  settle the jury instructions, and then the jury is instructed

18  and immediately followed by closing arguments.

19      **THE COURT:**  Huh.

20      **MS. BROWN:**  If -- if jury instructions aren't settled

21  before closing argument, I'm not -- I -- I --

22      **THE COURT:**  Oh, they will --

23      **MS. BROWN:**  This is just new to me.  I -- I don't --

24  I'd -- can we reference the anticipated jury instructions in

25  our closing argument 'cause I had intended to make reference to

1    a couple of the instructions?

2        THE COURT:  Oh.  You can make reference to them if you --

3    you can't editorialize them in any way.  You could say you

4    think that the Court will say and a -- and I mean, most the

5    instructions you're probably referring to are boilerplate

6    instructions.  You're --

7        MS. BROWN:  Yes.

8        THE COURT:  So they don't ever change so...

9        MS. BROWN:  Well, and -- and, frankly, I don't necessarily

10   think our instructions conference -- I mean, I haven't

11   conferred with the Government, but I don't have many changes.

12   I have, I think, one; and it's not a big deal.  It's actually

13   either my ignorance or a typo just depending --

14       THE COURT:  There's one typo.

15       MS. BROWN:  Oh, that's the one I --

16       THE COURT:  There's one typo.

17       MS. BROWN:  Okay.  Okay.  Thank you.  'Cause I --

18       THE COURT:  Okay.

19       MS. BROWN:  I read it three or four times, and I thought

20   I'm almost positive that's not correct.  But other than that --

21       THE COURT:  No, but it --

22       MS. BROWN:  -- I don't have any objections to the --

23       THE COURT:  You talking about, oh, it should be "make?"

24       MS. BROWN:  Yes.

25       THE COURT:  Yes, I got that.

 1      **MS. BROWN:**  Okay.  I mean, other than that, I don't have

 2  any requested instructions or objection to the instructions as

 3  proposed by Your Honor.

 4      **THE COURT:**  What about the Government?

 5      **MS. DIAL:**  There are a few edits that we have proposed,

 6  but no additional requests for instructions.

 7      **THE COURT:**  Okay.  Well, why don't -- are you ready to

 8  proceed with that?

 9      **MS. DIAL:**  Yes, I am, Your Honor.

10      **THE COURT:**  I'm not sure I am.  I've got to get a copy of

11  the instructions but...

12          (Discussion held off the record.)

13      **THE COURT:**  Okay.  Tell me -- tell me what you've got.

14      **MS. DIAL:**  On page 4, it refers to "the Government"

15  throughout and then shifts to, "It is only required that the

16  prosecution's proof exclude..."

17      To keep it uniform, I believe the -- the model uses

18  "Government" as well.

19      **MS. BROWN:**  I'm sorry.  What line are -- I'm -- at page 4?

20      **MS. DIAL:**  Page 4, the line that says, "It's only required

21  that the -- that the prosecution's proof exclude any reasonable

22  doubt...."

23      **MS. BROWN:**  Okay.  Thank you.

24      **MS. DIAL:**  Just for uniformity and in line with the model

25  instructions, I believe it's "Government's."

 1    **MS. BROWN:**  Sorry.

 2         (Discussion held off the record.)

 3    **MS. BROWN:**  Thank you so much.

 4    **MS. DIAL:**  Section 2241.  Where in 2241?

 5    **THE COURT:**  Okay.  All right.  That's a good edit.  Thank

 6   you.  I hadn't caught that before.  That's a good edit.

 7    **MS. DIAL:**  Then --

 8    **THE COURT:**  You have any more?

 9    **MS. DIAL:**  A couple more, Your Honor.

10    **THE COURT:**  Okay.

11    **MS. DIAL:**  Then, of course, the edits on 8 with the

12   defendant's testimony, or not to testify.

13         On page 10, it was --

14    **THE COURT:**  Wait a minute.  Don't get ahead of me.  You're

15   not -- you're not concerned with the text.  You're just --

16   you're pointing out that I've not made --

17    **MS. DIAL:**  Right.

18    **THE COURT:**  -- the selection because it was just made

19   so...

20    **MS. DIAL:**  Right.

21    **THE COURT:**  And that's where the "may" should be "make" at

22   the bottom of that page.  What else?

23    **MS. DIAL:**  On page 10, this was an error I made.  "Kelsey

24   Hess," Hess is her maiden name.  I put her as -- I've known her

25   as Kelsey Hess.  I put her as "Kelsey Hess" in the trial brief.

1    It should be "Blevins."  And that's the name she stated on the

2    record, B-l-e-v-i-n-s.

3        THE COURT:  Well, I'm glad you bring that up.  Do you have

4    another edit?

5        MS. DIAL:  Regarding her opinion?

6        THE COURT:  You have any other edits in the instructions?

7        MS. DIAL:  Yes, I do.

8        THE COURT:  Okay.  I need to make a note so I don't forget

9    the one I have, the issue I have.  Okay.  Go ahead.

10        MS. DIAL:  And then I believe that her testimony

11    regarding, the Government had submitted proposed instructions

12    that detailed her -- the -- what she would testify as an

13    expert.  And I believe that is what the Court qualified her on.

14    So we would suggest just using the language from the proposed

15    jury instructions about her expert testimony.

16        THE COURT:  It's on page what?

17        MS. DIAL:  That is in the Government's --

18        MS. BROWN:  Page 16.

19        MS. DIAL:  -- filing, Docket 45.

20        MS. BROWN:  Page 16.

21        MS. DIAL:  Thank you.

22        MS. BROWN:  Uh-huh.

23        MS. DIAL:  Page 16.

24        THE COURT:  Sixteen of my set?

25        MS. DIAL:  Sixteen -- or I'm --

 1          THE COURT:  No, not 16.

 2          MS. DIAL:  -- on page 10 of your instructions, Your Honor.

 3      And there's a highlighted portion that says, who expressed

 4  opinions regarding --

 5          THE COURT:  Okay.

 6          MS. DIAL:  -- blank.

 7          THE COURT:  I -- I'm -- we'll take another break, and I'll

 8  get the court reporter to print that out.  It came out pretty

 9  fast, and I didn't write it down.  The -- and -- well, you have

10  it in your -- in your proposed instructions; right?

11          MS. DIAL:  Yes.  Our proposed instruction had what we

12  anticipated she would be qualified to testify.

13          THE COURT:  Okay.  I've got it.  I've got it now.

14      Thank you, Cody.

15          THE LAW CLERK:  Uh-huh.

16          MS. DIAL:  Page --

17          THE COURT:  Well, it says "forensic examination?"  Let's

18  see.

19          MS. DIAL:  It could be forensic interview.

20          MS. BROWN:  I don't know if you want me to be heard after

21  she's finished?

22          THE COURT:  Well, if you want to be heard, I'll let --

23          MS. BROWN:  I do want to be.

24          THE COURT:  -- you be heard.

25      Do you have your set of instructions in front of you?

1    **MS. DIAL:**  Yes, I do.

2    **THE COURT:**  Is that what -- is that what the qualifying

3    question was?  I think it was something different.

4    **MS. DIAL:**  Actually, I do think it was something

5    different.

6    **MS. BROWN:**  Your Honor?

7    **THE COURT:**  And is that the point you were going to make,

8    Ms. Brown?

9    **MS. BROWN:**  Yes.  I have an objection to the use of the

10   phrase "the forensic examination of K. G."

11   Miss -- Mrs. Blevins was very, very clear in her testimony

12   that she --

13   **THE COURT:**  Well, you may not -- you may not need to go

14   through that objection.

15   **MS. BROWN:**  Oh.

16   **THE COURT:**  Let's make sure what we have here.

17   **MS. BROWN:**  Oh, okay.  I would propose "process of

18   disclosure and types of disclosure."  That's what she was

19   qualified for.

20   **MS. DIAL:**  The question, Your Honor, was, the Government

21   moved to qualify Miss Blevins as an expert in child and

22   adolescent forensic interviews, sexual abuse disclosures, and

23   victim behavior in response to child abuse.

24   **THE COURT:**  Okay.  Now, that's what was -- that's what the

25   question was, right, and that's what I qualified her as?

1        **MS. DIAL:**  Yes, Your Honor.

2        **THE COURT:**  Okay.  Let me see that.  Okay.  Okay.  We're

3   on page 10.  What's next?

4        **MS. DIAL:**  Page 13, the elements.  At this stage, because

5   of the confusion with M. V., I -- I --

6        **THE COURT:**  That was the thing I was going to bring up.

7   Your -- you have the same problem with the indictment that goes

8   to the jury.  It says -- it says "M. V."  And I think it ought

9   to be consistent all the way through.

10       I don't know whether you-all can just stipulate that M. V.

11  is Kaitlyn Goldesberry or -- but you need to either do that

12  or -- really can't amend the indictment, I suppose, but...

13       **MS. BROWN:**  I don't have an objection to stipulating that

14  M. V. is Kaitlyn Goldesberry.  If the Court --

15       **THE COURT:**  Okay.

16       **MS. BROWN:**  -- and the Government want it to be consistent

17  with the indictment, I'm fine with that.

18       I think it's pretty indisputed [sic] and -- and there's

19  really -- I agree, you -- we've seen juries get hung up on

20  much, much less before.

21       **THE COURT:**  Yeah.

22       **MS. BROWN:**  And then, of course, counsel can clarify or

23  explain in closing argument.  But I don't have an objection to

24  stipulating that M. V. is Kaitlyn Goldesberry.

25       **THE COURT:**  Not just juries.  I was confused about it

1  coming in here because I've never -- I've not seen a -- the use

2  of that abbreviation so --

3      MS. BROWN:  I will be honest with you, Miss Dial will

4  remember that I was confused as well as soon as I got the

5  indictment.

6      THE COURT:  So let's just -- if you would draft a

7  stipulation.

8      MS. DIAL:  Okay.

9      THE COURT:  And it just has to say the parties agree that

10 any reference to M. G. in court documents or testimony refers

11 to --

12     MS. BROWN:  Kaitlyn Goldesberry.

13     THE COURT:  -- Kaitlyn Goldesberry, something like that.

14     MS. DIAL:  Yes, Your Honor.

15     THE COURT:  Okay.

16     MS. DIAL:  And the -- the M. V. was a --

17     THE COURT:  So then we would change this to Kaitlyn

18 Goldesberry, right, on -- in -- on page 13?

19     MS. DIAL:  If it were changed to Kaitlyn Goldesberry, then

20 the instructions would have to be sealed, I think, because

21 she's a minor.  It could be changed to K. G., her initials, or

22 it could just be M. V. within --

23     THE COURT:  Okay.

24     MS. DIAL:  -- the clarification of the stipulation.

25     THE COURT:  Well, we'll leave it M. V., then.  And with a

1    stipulation, that'll clear it up for them.

2        MS. DIAL:  On that first element --

3        THE COURT:  But I send the stipulations back with the

4    jury.

5        MS. DIAL:  Yes.

6        THE COURT:  Okay.

7        MS. DIAL:  And we'll -- we'll get that ready.

8        The first element, "the defendant knowingly engaged," the

9    statute is "knowingly engaged or attempted to engage in a

10   sexual act."  And so to track the -- the statute, I believe

11   that the first element should include "or attempted to engage."

12       THE COURT:  Ms. Brown?

13       MS. BROWN:  I believe that -- and I obviously, as we all

14   have, probably handled cases that it was indicted as an

15   attempt.  If it's indicted as an attempt, I think that that's

16   an appropriate language.  I believe that if -- as it is

17   indicted, that it's not indicted as an attempt, then that

18   additional language would be confusing and misleading.

19       MS. DIAL:  It is indicted as that, Your Honor.  It -- the

20   superseding indictment reads "knowingly engaged in and

21   attempting to engage in" for both Count 1 and Count 2.

22       MS. BROWN:  Oh.

23       THE COURT:  Okay.

24       MS. BROWN:  I withdraw my objection.

25       THE COURT:  Okay.  So it would read "knowingly engaged in

1    or attempted to engage in a sexual act."

2        **MS. DIAL:**  Yes, Your Honor.

3        **THE COURT:**  And that would also be the case with Count 2;

4    right?

5        **MS. DIAL:**  That would be the case with Count 2.

6            (Discussion held off the record.)

7        **THE COURT:**  There's -- you -- you've indicted -- you've

8    indicted in the conjunctive, not in the alternative.  There's a

9    standard instruction --

10       **MS. BROWN:**  Uh-huh.

11       **THE COURT:**  -- at least in the Eleventh Circuit, that says

12   "and means or."

13       Do you have that standard instruction here?

14       **MS. DIAL:**  I will check if we have the standard.  I know

15   we charge in the conjunctive and prove in the disjunctive so...

16       **THE COURT:**  Yeah.  It's a standard instruction in the

17   Eleventh.

18       **MS. DIAL:**  We will look for the instruction on that.

19       **THE COURT:**  Okay.

20       **MS. BROWN:**  Yeah.  I'm not immediately familiar with a

21   standard instruction, but that doesn't mean it doesn't exist.

22       **MS. DIAL:**  The definition for "sexual act" on 13 includes

23   just -- I believe it includes just Subsection (D) of 2246(2).

24   2246(2) is the -- the definition of sexual act, and then it

25   breaks it out into a couple of options.

 1          And I -- I was wrong.  The -- the proposed one just

 2     includes (C), "the penetration, however slight."

 3          **THE COURT:**  Hold on one second.  Let me get my realtime

 4     going here.  What do I click to get back to you, Leslie?

 5          **THE COURT REPORTER:**  Let's see here.  Is it not going?

 6          **THE COURT:**  No, because I scrolled up and I think that

 7     the --

 8               (Discussion held off the record.)

 9          **THE COURT:**  Well, now, Leslie, there's a big gap

10     between -- I'm missing 13 minutes.

11          **THE COURT REPORTER:**  Oh, no.

12          **THE COURT:**  Or not 13 minutes, 13 seconds.

13               (Discussion held off the record.)

14          **THE COURT:**  Okay.  You were still on 13, and where were

15     you?

16          **MS. DIAL:**  The definition of "sexual act," Your Honor.

17     The --

18          **THE COURT:**  Okay.

19          **MS. DIAL:**  -- statute that defines sexual act is 18 U.S.C.

20     2246(2).

21          That statute breaks out four possibilities for sexual act.

22     The one in the -- in the Court's proposed final is just

23     Subsection (C).  Subsection (D) of sexual act includes, "the

24     intentional touching, not through the clothing, of the

25     genitalia of another person who has not attained the age of

1    16," with the same intent as (C).

2        Based on the testimony that was presented, the

3    appropriate -- the Government's position is that the

4    appropriate definition of "sexual act" would include both

5    Subsections (C) and (D), penetration or intentional touching.

6        **THE COURT:** Okay. You can -- you can give me a typed

7    proposed amendment to this. Okay?

8        **MS. DIAL:** Yes, Your Honor. It would be the same proposed

9    amendment to the next instruction as well.

10        **THE COURT:** Right.

11        **MS. DIAL:** And then no other proposed edits except to the

12    verdict form, just in reference to juries sometimes getting

13    confused. It's simple but on the -- the note for what to do if

14    they find him guilty, we would just propose adding "and have

15    your foreperson sign this ver- -- verdict form on the next page

16    without answering Question 2," just so that they know where to

17    go.

18        We don't have any other requested additions to the jury

19    instructions, Your Honor.

20        **THE COURT:** Well, if you -- I think maybe the best thing

21    to do, then, is to proceed with argument because I'm not going

22    to be able to get these things ready right now. I keep -- I

23    think the best use of time would be to argue now and get that

24    out of the way.

25        Is -- there's no confusion as to what the instructions are

1    at this point.  I've -- I've clearly indicated the edits to be

2    made; right?

3           MS. BROWN:  It's --

4           MS. DIAL:  I don't --

5           MS. BROWN:  I don't have a copy of their questions, so I'm

6    not clear on what goes in on the --

7           THE COURT:  It says the -- the question, which I assume is

8    the same question that's in the record -- I think counsel read

9    it --

10          MS. BROWN:  Uh-huh.

11          THE COURT:  -- is that the witness is qualified as an

12   expert in child and adolescent forensic interviews, sexual

13   abuse disclosures, and victim behavior in response to child

14   abuse.

15          MS. BROWN:  And -- and while I don't dispute that that is

16   most likely verbatim what the question was, the witness herself

17   clarified that -- and narrowed the area of her expertise and

18   took forensic interviewing -- she narrowed the -- her -- her

19   expertise to -- she made a qualifying answer at one point

20   saying, "I'm testifying as a fact witness as to forensic

21   interviews, but I'm here testifying as expert."

22          And I -- and my notes indicate -- but, again, it is not

23   the court reporter, and I wasn't writing down the questions.

24   But my notes indicate that she qualified her expertise herself

25   later on after that question and clarified that -- that her

1    expertise was limited to the -- she was testifying as an expert

2    in the areas of the process of disclosure and types of

3    disclosure.

4        THE COURT:  Does that have anything to do with what your

5    argument will be?

6        MS. BROWN:  Yes, to a degree.  It would touch on that

7    because I am going to highlight that she is not -- she was not

8    here testifying as an expert pertaining to Kaitlyn's forensic

9    interview specifically.

10       THE COURT:  Well, you can say that she didn't testify to

11   that, I suppose.

12       MS. BROWN:  But so the question --

13       THE COURT:  Do you want a -- do --

14       MS. BROWN:  -- it takes out Kaitlyn's name and it just --

15   would you read it to me one more time?

16       I'm sorry.

17       THE COURT:  The full question --

18       MS. BROWN:  Well, just the --

19       THE COURT:  "Your Honor, at this time, the Government

20   would move to qualify Ms. Blevins as an expert in child and

21   adolescent forensic interviews -- interviews, child sexual

22   abuse disclosures, and victim behavior in response to child

23   abuse."

24       You're saying she didn't express opinions on those things

25   and that makes a difference in whether we should...

1          **MS. BROWN:**  I think that her testimony and the argument

2     that will, I believe, inevitably flow from both sides about her

3     testimony was largely confined to the process of disclosure and

4     the types of disclosure.

5          And I -- I -- I don't have an objection to the child and

6     adolescent forensic interviewing as in -- in general, as

7     opposed to Kaitlyn's forensic interview.  But I -- she --

8          **THE COURT:**  She talk -- she gave -- she didn't give any

9     opinions about sexual abuse disclosures, such as sometimes

10    children don't come forward with them right away?  Didn't she

11    do that?

12         **MS. BROWN:**  She did, and that's the process of disclosure,

13    and she was very clear to correct --

14         **THE COURT:**  So the only thing you object to is victim

15    behavior in response to child abuse?

16         **MS. BROWN:**  Yes.  Child --

17         **THE COURT:**  So why doesn't that qual- -- why doesn't

18    delayed response -- that would be part of that too?

19         **MS. BROWN:**  I just -- the -- the witness herself clarified

20    and narrowed her expertise.  And when she did --

21         **THE COURT:**  Ms. Brown, don't tell me what she -- she --

22    she gave opinion testimony in those fields; right?  Everything

23    that is in this proposed instruction, she gave opinion about;

24    right?

25         **MS. BROWN:**  I believe that there is a distinction, and I

1  believe that her opinion was about the process of child sexual

2  abuse disclosure, not about child sexual abuse disclosures

3  themselves.  I think that it is a distinction.

4      And I believe that the witness clearly made that

5  distinction.  But just for the record, I respect Your Honor's

6  ruling, no matter what it is, but...

7      **THE COURT:**  Well, no, I -- I want the ruling to be

8  correct.  That's more important than what you might think of it

9  but...

10      **MS. BROWN:**  I would agree.

11      **THE COURT:**  But I don't understand, given our conversation

12  right now, how you can say she didn't give opinions in these

13  fields, even if she said she didn't.  She -- she talked about

14  delayed reporting.

15      **MS. BROWN:**  Uh-huh.

16      **THE COURT:**  And that would be -- that would pertain to

17  sexual abuse disclosures, and it would pertain to behavior in

18  response to child abuse.

19      **MS. BROWN:**  I believe that --

20      **THE COURT:**  I will give you time to go back in the record

21  and fool with that if you think that it is a meaningful issue.

22  But I've got a jury out here.  And I want you guys to have time

23  to argue, and I'm running out.

24      **MS. BROWN:**  Okay.  I --

25      **THE COURT:**  You make the call.  You want to go back and

1   find it?

2        **MS. BROWN:**  No.

3        **THE COURT:**  Okay.  So you withdraw your objection?

4        **MS. BROWN:**  Yes.

5        **THE COURT:**  Okay.

6        So how long does it take you to get your notes?

7        **MS. DIAL:**  Would ten minutes be too much, Your Honor?

8        **THE COURT:**  Well, ten minutes would put us at four

9   o'clock.  And that would put us -- if you each took 40 minutes,

10  that would make it 5:20.

11       **MS. DIAL:**  The Government is not going to take 40 minutes.

12       **THE COURT:**  Well, if you -- but -- but Ms. Brown is.

13       **MS. DIAL:**  Yes.

14       **THE COURT:**  And -- and you're going to take more than 20?

15       **MS. DIAL:**  Potentially, yes.

16       **THE COURT:**  Yeah.

17       **MS. BROWN:**  Could I ask a clarifying scheduling question?

18  I had assumed that once we're finished with argument, that Your

19  Honor was sending the jury out and keeping them until they're

20  finished with deliberations.  That's the custom that I'm

21  accust- -- accustomed to.  I'm just making sure.

22       **THE COURT:**  Is that what you're accustomed to too?

23       **MS. DIAL:**  I -- I wasn't --

24       **THE COURT:**  That the jury's sequestered after argument?

25       **MS. DIAL:**  No.  After the instructions are finished.

 1       THE COURT:  Yeah, it's after the instructions, my -- in my
 2   neck of the woods.  They do it differently here.
 3       MS. BROWN:  Yeah.  Well, if that's the case, then I do
 4   have an opinion back on the original question that you asked,
 5   which is:  "Do you have an opinion as to whether we do it
 6   tonight or tomorrow?"
 7       I am prepared to proceed, but I also very strongly would
 8   like the jury to go out and deliberate immediately after
 9   closing arguments.  With the number of changes that we've made
10   to the instructions and the notes that I know that I'm going to
11   reference to the instructions, I would feel more comfortable
12   having settled the instructions and having them and then
13   arguing in the morning, if Your Honor would consider that
14   option.
15       THE COURT:  Okay.  Okay.  I think that probably makes more
16   sense, really, to come back tomorrow rather than have you
17   rushing downstairs, finding your notes and...
18       MS. DIAL:  I was going to send the agent --
19       THE COURT:  Huh?
20       MS. DIAL:  -- but I...
21       THE COURT:  Well -- well, still, I mean, you go first.
22   We'd have to wait.
23       MS. DIAL:  He goes first.
24       MR. MCWATERS:  Uh-huh.
25       MS. DIAL:  I'm just rebuttal.

1       THE COURT:  Oh, oh, I see.

2       MS. DIAL:  So I was going to send the agent.

3       THE COURT:  I see.

4       MR. MCWATERS:  She's -- she's throwing --

5       THE COURT:  I see.

6       MR. MCWATERS:  -- me under the bus, Your Honor.

7       MS. DIAL:  Yes.

8       THE COURT:  I see.  But, still, we'd go over five, and I

9  told the jury I wouldn't do that.  I don't like to keep staff

10 after five so...

11      I'm going to -- I'm going to think about -- I'm going to

12 rethink the issue of instructing first.  I'm a little bit

13 uncomfortable.  Got to process the idea of argument being the

14 last thing the jury hears before they go back and deliberate.

15 I'm so used to it being -- having the last word, I don't know

16 if I want to surrender it.

17      MS. BROWN:  I was going to say that's -- that's so foreign

18 to me that I -- I -- I'm used to having the last word so I -- I

19 don't -- I don't know.

20      THE COURT:  Well, I will tell you that --

21      MS. BROWN:  This -- this is what's fun about having a

22 visiting Judge.

23      THE COURT:  -- we have exper- -- we've experimented with

24 it.

25      I think I've done it once.  But one of my colleagues

 1   has -- has been converted, and he does it the Oklahoma way now

 2   so...

 3        MS. BROWN:  I mean, what other way is there, Judge?

 4        THE COURT:  But -- well, there's the Florida way, but...

 5        Mr. Phorn, would you bring the jury in, please.

 6        CSO:  I will, Judge.

 7        MS. BROWN:  Honestly, either way, whether you instruct

 8   before or after, in -- since we're going to argue in the

 9   morning, will we have, in the morning, a final set of

10   instructions that we can at least have and reference to even if

11   you haven't instructed them?

12        THE COURT:  Yeah.  If you-all will hang around a while, we

13   can do that.

14        MS. BROWN:  Sure, yeah.  Thank you.

15        THE COURT:  Uh-huh.  Well, actually, my -- my clerk who

16   has the -- the template is probably ready to go home right now,

17   so we'll see.  Cody says he could do it.

18        MS. BROWN:  Okay.

19        THE DEPUTY COURT CLERK:  Thank you.

20        THE LAW CLERK:  Uh-huh.

21             (Jury present.)

22        THE COURT:  Please be seated, ladies and gentlemen.  You

23   know, sometimes when I qualify a jury, I break down the -- the

24   phases of a trial.  And, you know, you know what they are now.

25   It's the -- the voir dire and then opening statements and then

1   the Government's case and then the defendant's case and then

2   instructions and argument -- or argument, instructions,

3   depending on the order that is the preference, and then

4   deliberations.

5       Well, you are finished with -- with everything except

6   argument, instructions, and deliberations.  And we had to do

7   work here.  And I -- according to my calculations, I came about

8   20 minutes short of -- or 20 minutes too long, making it

9   impossible for us to finish by five comfortably, and I don't

10  want anybody to be uncomfortable.

11      Counsel's been working here.  They haven't had a break.

12  And my staff hasn't had a break since you-all left so -- and we

13  couldn't get it done before about 5:20.

14      Okay.  So we have one little matter to -- one matter to

15  take up before you leave, and I will take care of that in a

16  minute.  But then I'm going to let you go for the -- for the

17  evening and ask you to be back at a reasonable hour tomorrow

18  morning, and I think we'll finish with the work we have to do

19  here in the courtroom.

20      Ms. Brown, did you want to --

21      **MS. BROWN:**  Thank you, Your Honor.

22      The defense rests.

23      **THE COURT:**  Okay.  Thank you.

24      So have a good night.  I understand the weather's going to

25  be rough today, later this afternoon -- this evening so you can

1    get a little head start on that.  Thank you very much for your

2    patience, and I'll see you back here tomorrow at nine o'clock.

3         **CSO:**  All rise.

4              (Jury out.)

5         **THE COURT:**  And why don't you-all take a ten-minute break,

6    and then we'll come back in.  Well, I tell you what.  Better

7    than that...

8              (Discussion held off the record.)

9         **THE COURT:**  Why don't you take a -- how long do you think

10   it'll take, Cody?

11        **THE LAW CLERK:**  Oh, are we still going to get their actual

12   typed stipulation and the --

13        **THE COURT:**  Yeah, we need to get the --

14        **MS. DIAL:**  I'm going to go downstairs and do that right

15   now, and I can e-mail it to Christy as soon as it's done.

16        **THE LAW CLERK:**  Okay.

17        **MS. DIAL:**  Or directly to you, whatever your preference

18   is.

19        **THE COURT:**  Well, let's say just come back at 4:30.  If

20   we're not in the courtroom at 4:30, we'll be pretty close.

21        **MS. DIAL:**  I -- do you still want me to e-mail it to

22   Christy when --

23        **THE COURT:**  Yeah, that's great.

24        **MS. DIAL:**  -- that one's done?

25        Okay.  I'll e-mail it to her.

 1        THE COURT:  Thank you, Miss Dial.

 2        MS. DIAL:  Thank you.

 3        MS. BROWN:  I know.  Thank you.

 4            (A recess was taken.)

 5        MS. DIAL:  There wasn't a problem.  It was the suggestion

 6   that we just add to sign on the next page, just directing them

 7   to the page.  And I don't feel strongly about that.  It was

 8   just making sure that there was no confusion that they should

 9   skip --

10        THE COURT:  So just on page 2 --

11        MS. BROWN:  Right.  Just --

12        THE COURT:  -- without answering --

13        MS. DIAL:  Yes.

14        THE COURT:  -- Question 2?

15        MS. DIAL:  Yes.

16        THE COURT:  No.  I -- I don't think we need to make that

17   change.

18        MS. DIAL:  That -- I'm fine with that.

19        THE COURT:  Okay.

20        Will you send Cody a note, tell him we'll just leave the

21   verdict form like this.

22        THE DEPUTY COURT CLERK:  Okay.  Yes.  Yes.

23        MS. DIAL:  Did it come through now, Christy?

24        THE DEPUTY COURT CLERK:  It -- it didn't.

25        MR. MCWATERS:  Neither e-mail?

1    **THE DEPUTY COURT CLERK:**  I didn't get yours or Miss

2    Dial's.  But I'm -- I'm getting other than from -- again, it's

3    all from the court clerk's office or from other chambers.

4    **MR. MCWATERS:**  Some -- I mean, sometimes the -- our server

5    does -- like, our firewall takes a minute for it to go through.

6    **THE DEPUTY COURT CLERK:**  Okay.

7    **MR. MCWATERS:**  So I don't know if that's the problem.

8    **THE COURT:**  Maybe it's --

9    **MS. BROWN:**  Get back into my e-mail.

10   **THE COURT:**  -- Oklahoma weather.

11   **MS. BROWN:**  I hadn't heard we're supposed to have severe

12   weather.  What kind is it?  Thunderstorms?  Or are we going to

13   get a tornado?

14   **THE DEPUTY COURT CLERK:**  I think thunderstorms.  I

15   think --

16   **MS. BROWN:**  Aww.

17   **THE DEPUTY COURT CLERK:**  -- fur- -- yeah.

18   I think further east that --

19   **MS. BROWN:**  We just wanted to make it exciting for you

20   while you were in town, Judge.

21   **THE COURT:**  Yeah, right.

22   **MS. BROWN:**  Okay.  I'm going to forward this one to you,

23   Christy --

24   **THE DEPUTY COURT CLERK:**  Okay.

25   **MS. BROWN:**  -- and see if it's just maybe the -- their

 1    server.

 2         THE DEPUTY COURT CLERK:  I promise I haven't -- I haven't

 3    blocked you.

 4         MS. DIAL:  No.

 5         MS. BROWN:  Oh, I believe you.

 6         THE DEPUTY COURT CLERK:  I don't ev- -- I wouldn't know

 7    how to do that even if I could.

 8         MS. BROWN:  Okay.  It says it sent.

 9         MS. DIAL:  Thank you, Andrea.

10         MS. BROWN:  Uh-huh.

11         THE DEPUTY COURT CLERK:  Oh, I did -- I -- sorry.  Okay.

12         So, Judge, I'll -- you want me to just print those out for

13    you?

14         THE COURT:  Yeah.

15         THE DEPUTY COURT CLERK:  Okay.

16         MR. MCWATERS:  Yeah.  It's got to be our firewall since

17    both of them -- both of ours aren't going through.

18         THE DEPUTY COURT CLERK:  Okay.  It's --

19         MS. DIAL:  Uh-huh.

20         THE DEPUTY COURT CLERK:  Ms. Dial, the case as well?  Do

21    you want me to print that out?  That --

22         MS. DIAL:  Judge, we couldn't find -- there isn't a Tenth

23    Circuit pattern instruction on instructing in the disjunctive.

24         THE COURT:  Yeah.

25         MS. DIAL:  But we found a case, a Tenth Circuit case,

 1   saying that it was proper to instruct in the disjunctive.

 2        THE COURT:  Okay.  Well, I've got -- we're going to use

 3   the Eleventh Circuit pattern instruction, then.

 4        MS. DIAL:  That's fine.

 5        THE COURT:  Why don't you just read that authority into

 6   the record, Ms. Dial?

 7        THE DEPUTY COURT CLERK:  It's okay.  I'll go get it.

 8        MS. DIAL:  Okay.

 9        Yes, Your Honor.  That's *United States versus Thomas*, 749

10   F.3d 1302 (10th Cir. 2014).

11        THE COURT:  Okay.  And what else were you going to get?

12   Were you going to get something else?

13        MS. DIAL:  We have the parties' stipulation about M. V.,

14   and that's been signed.

15        THE COURT:  Okay.  Good.

16        You both are responsible for reminding me to do this first

17   thing.

18        MS. BROWN:  Okay.

19        THE COURT:  I'll put it up here.  Right here.

20        MS. DIAL:  And then the other responsibility was to send

21   the proposed instruction for "sexual act."  That was what we

22   had sent to Miss Butler that didn't come through until

23   Miss Brown helped.

24        So I think Miss Butler just went to grab that instruction,

25   that proposed instruction.  It's similar to what we had

 1    previously proposed, just removing (A) and (B) from the

 2    initially proposed.

 3              (Discussion held off the record.)

 4         THE COURT:  Okay.

 5         MS. DIAL:  You got it?

 6         THE COURT:  That takes care of our business, I guess;

 7    right?

 8         MS. DIAL:  That's all from the Government, Your Honor.

 9         THE COURT:  Ms. Brown, anything else?

10         MS. BROWN:  I don't believe so.  Will we get a copy of the

11    proposed instructions in the morning once they've -- the -- of

12    a new packet?  I've written all over mine while we were

13    talking.

14         THE COURT:  Get you a fresh copy.

15         MS. BROWN:  Thank you, Judge.

16         THE COURT:  I give a copy to each juror.

17         MS. BROWN:  Uh-huh.

18         THE COURT:  So...

19         MS. BROWN:  Thank you.

20         THE COURT:  Okay.  Well, you have a good night, then.

21         MS. BROWN:  Oh, well, I apologize.  I'm assuming because

22    we have both rested, that it's okay if -- this is -- Faith

23    Goldesberry is in the courtroom here.  And Donna Taylor,

24    maternal grandmother, were both still under subpoena.  They can

25    be here for closing arguments with no problem, yes?  Just --

1    **THE COURT:**  Once the evidence is closed, that's fine.

2    **MS. BROWN:**  Thank you so much, Judge.  That's all I have.

3    **THE COURT:**  Why don't you be back at 8:30 just in case.

4    **MS. BROWN:**  Uh-huh.

5    (Discussion held off the record.)

6    **MS. BROWN:**  He got it.

7    **THE COURT:**  He's --

8    **THE DEPUTY COURT CLERK:**  The --

9    **THE COURT:**  Christy --

10   **THE DEPUTY COURT CLERK:**  Did you get it?

11   **THE COURT:**  -- please remind me to do that first thing.

12   **THE DEPUTY COURT CLERK:**  Okay.

13   **THE COURT:**  I've got it here under this water bottle --

14   **THE DEPUTY COURT CLERK:**  Okay.

15   **THE COURT:**  -- so I'll remember it.

16   Okay.  You-all have a good night.  Thank you.

17   **MS. BROWN:**  Thank you.  You too, Judge.

18   **MS. DIAL:**  Thanks, Your Honor.

19   **CSO:**  All rise.

20   (Proceedings adjourned at 4:42 p.m.)

21   (For further proceedings, see Volume III of III.)

22

23                    **REPORTER'S CERTIFICATION**

24   I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

25   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

US DISTRICT COURT - NDOK
REPORTED BY:  LESLIE K. RUIZ, CSR, RPR, RMR

1

2        CERTIFIED:       *s/Leslie K. Ruiz*
                          Leslie K. Ruiz, CSR, RPR, RMR
3                         United States Court Reporter
                          333 W. 4th Street, Room 411
4                         Tulsa, OK  74103
                          (918)699-4794
5                         leslie_ruiz@oknd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25