1              UNITED STATES DISTRICT COURT FOR THE

2               NORTHERN DISTRICT OF OKLAHOMA

3

4  UNITED STATES OF AMERICA,    )
                           )

5              Plaintiff,   )
                           )

6  vs.                    )       CASE NO. 21-CR-450-GKF
                           )

7                         )
  RAYMOND LEE GOLDESBERRY,    )

8                         )
             Defendant.   )

9  _____)

10

11

12               TRANSCRIPT OF PROCEEDINGS
                  MARCH 30, 2022

13        BEFORE THE HONORABLE JOHN ANTOON II
            UNITED STATES DISTRICT JUDGE

14         JURY TRIAL - VOLUME III OF III

15

16

17

18

19

20             A P P E A R A N C E S

21     MS. CHANTELLE DIAL and MR. KYLE MCWATERS, Assistant United
   States Attorneys, Northern District of Oklahoma, United States

22  Attorney's Office, 110 West 7th Street, Suite 300, Tulsa,
   Oklahoma, 74119, appeared on behalf of the plaintiff.

23

24     MS. ANDREA BROWN, Andrea Brown Law Firm, PLLC, 2021 South
   Lewis Avenue, Suite 520, Tulsa, Oklahoma, 74104, appeared on
   behalf of the defendant.

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**<u>INDEX</u>**

VOLUME III OF III

The Court's Ruling on 404 Motion.......................... 436

Plaintiff's Closing Argument (Mr. McWaters)............... 440

Defendant's Closing Argument (Ms. Brown).................. 449

Plaintiff's Rebuttal Argument (Ms. Dial)................. 465

Instructions............................................. 472

Jury Note................................................ 492

Verdict.................................................. 494

1    PROCEEDINGS:

2    --------------------------------------------------------------

3         **THE COURT:**  Good morning.  Be seated.  We have a couple

4    housekeeping matters before the jury returns.  One is that you

5    both are -- both sides are responsible for reminding me to,

6    first off, read this stipulation.  Okay.  And Ms. Butler also

7    is going to help me remember that.

8         The other thing is we made some minor edits to the

9    instructions, and I think you got those last night.  I hope

10   you've had an opportunity to look at them.  There any

11   objections to those final edits?

12        **MS. DIAL:**  No objections.  We noticed -- Mr. McWaters

13   caught this -- that the sexual act definition for both counts

14   has "arouse of gratify" instead of "arouse or gratify."

15        **THE COURT:**  Okay.

16        **MS. DIAL:**  But that was just a minor edit.  Otherwise --

17   pardon?

18        **MR. MCWATERS:**  Page 13 and 15.

19        **MS. DIAL:**  Page 13 and 15.

20        **THE COURT:**  Okay.  We'll correct that.

21        **MS. BROWN:**  On that same vein, same pages, same

22   definition, I believe that pursuant to the definition, it

23   should read "with an intent to abuse, humiliate, harass,

24   degrade" and then take out the "or."  And it's "degrade,

25   arouse, or gratify."

 1          So essentially, the "or" that's before "arouse" should

 2     replace the "of" after "arouse" --

 3          **THE COURT:**  Okay.

 4          **MS. BROWN:**  -- to track the statute.

 5          But other than that and the -- and the "or" versus "of,"

 6     that's the only things I noticed as well.

 7              (Discussion held off the record.)

 8          **MR. MCWATERS:**  Or arouse or gratify.

 9          **THE COURT:**  Okay.

10          **MS. DIAL:**  The statute reads "abuse, humiliate, harass,

11     degrade, or arouse or gratify."

12          **THE COURT:**  Okay.

13          You got that, Cody?

14          **THE LAW CLERK:**  Do you want that one?

15          **THE COURT:**  Yeah.  They're from the statute.

16          **THE LAW CLERK:**  Okay.

17          **THE COURT:**  Okay.  You'll have another chance to look at

18     that.  We'll correct it.

19          The other item of housekeeping is that I told you I'd give

20     a more complete ruling on the 404 issue because I think that is

21     required.  If not, it's helpful to the appellate court.  So the

22     defendant in this case is charged with illegal sexual touching

23     and penetration of his daughter Kaitlyn's genitals.

24          The Government has proffered evidence of Defendant's

25     contact with Faith, Kaitlyn's older sister, including the

1  shaving of Faith's pubic hair while Faith was wearing a

2  swimming suit and, on multiple occasions, it's unclear if it

3  was two or more times, removing Faith's tampons.

4       At the time of this contact, Faith was over 14 years old,

5  and Faith requested that her father do these things.  The

6  Government concedes that the contact with Faith was not a

7  violation of state or federal law, but contends the evidence is

8  admissible under 404(b) of the Federal Rules of Evidence.

9       Defendant admits in the touching of Kaitlyn and -- that

10 the Government charges, but contends that he thought he was

11 touching his wife and not Kaitlyn until Kaitlyn shouted at him

12 to stop.  The Government wants to use the contact with Faith to

13 show intent and lack of mistake in touching Kaitlyn.

14      Under 404 evidence, other crimes or bad acts are not

15 admissible to show character or that a person acted in

16 accordance with that character or character trait, but it may

17 be admissible for other purposes, such as to show motive, plan,

18 identity, opportunity, intent, knowledge, lack of mistake, or

19 lack of accident.

20      In this case, the Government's stated reason for offering

21 the evidence is to show Defendant's penetration of his daughter

22 was not a mistake.  In deciding whether the proffered 404

23 evidence should be admitted, I've considered the rule, case

24 law, and argument of counsel.  The evidence of the extrinsic

25 touching is reliable.

1    Defendant admits that the contact occurred.  But the

2    evidence is not probative in resolving a material issue -- a

3    material issue in this case, and that is whether Defendant

4    intentionally touched Kaitlyn that it is offered to prove.

5    Even if the evidence had probative value, that value would be

6    minimal.

7    According to Defendant, the touching was routine in

8    fulfilling his role as a father of a teenage daughter.  But

9    there's a strong likelihood that jurors would find the conduct

10   shocking, and it would distract them from their central focus

11   in this case.

12   Because the evidence does not have legitimate probative

13   value and would be unduly prejudicial, I sustain the

14   defendants's objection to the proffered 404(b) evidence.

15   So we're ready to proceed.  Since I have to do some

16   correction of the jury instructions, I'm going to let you argue

17   first.

18   **MS. DIAL:**  Okay.

19   **THE COURT:**  And I will retire.  And when the jury's ready,

20   we'll bring them in.

21   **MS. BROWN:**  Did Your Honor have an opportunity to review

22   the one case that I sent last night?

23   **THE COURT:**  I have not.  I just found out about it on the

24   way in and I --

25   **MS. BROWN:**  Okay.

1          THE COURT:  -- had other things to do.

2          MS. BROWN:  Sure.  Sure.

3          THE COURT:  I probably won't get to that until after --

4          MS. BROWN:  Okay.

5          THE COURT:  -- the jury returns a verdict.

6          MS. BROWN:  Thank you.

7          THE COURT:  Okay.

8          CSO:  All rise.

9               (A recess was taken.)

10         THE DEPUTY COURT CLERK:  We're back on the record in Case

11    21-cr-450-JA-1, United States of America versus Raymond Lee

12    Goldesberry.

13         THE COURT:  Counsel for the Government ready to proceed?

14         MS. DIAL:  We are, Your Honor.

15         THE COURT:  Counsel for the defendant ready to proceed?

16         MS. BROWN:  Yes, Your Honor.  Thank you.

17         THE COURT:  Please return the jury.

18              (Discussion held off the record.)

19              (Jury present.)

20         THE COURT:  Please be seated.

21         Good morning, ladies and gentlemen.  I hope you had a good

22    ride home and a good ride in this morning and a peaceful

23    evening.  The weather here didn't get bad last night.  I hope

24    not too many of you experienced bad weather.

25         We've now completed the evidentiary phase of the trial,

1  and we're ready to move into the -- the -- to an ultimate

2  phase, which is oral argument of counsel, or final argument.

3       The attorneys will now have an opportunity to address you

4  and make those final arguments.  The arguments are not to be

5  considered by you as either evidence in the case or as your

6  instructions on the law.  Nevertheless, the arguments are

7  intended to help you understand the issues, the evidence, and

8  the applicable law, so you should give the attorneys your close

9  attention.

10       Government may proceed.  Mr. McWaters?

11       Oh, before you do that, I need to read -- I need to read

12  to you a stipulation.  This is a stipulation:  Identity of

13  M. V.  United States of America, represented by Chantelle Dial,

14  Assistant United States Attorney, and Defendant, Raymond Lee

15  Goldesberry, represented by Andrea Brown, hereby stipulate and

16  agree that any evidence to, quote, "M. V." in court documents

17  or filings means and is a reference to Kaitlyn Goldesberry, a

18  minor.

19       You may proceed.

20       **MR. MCWATERS:**  It should have been my responsibility to

21  wake him up.  When she was 11, Kaitlyn Goldesberry had a

22  nightmare and was scared.  Like she had routinely done before,

23  she went to her parents' room to feel safe.  She crawled into

24  bed looking for comfort and safety.  And she fell asleep.

25  Except this time, her mom wasn't there.

1     When Kaitlyn woke up facing the bedroom wall with her back

2   to her dad with her dad's arm around her and his fingers inside

3   his 11-year-old daughter's vagina, moving, stimulating, what

4   did Kaitlyn do?  Well, she told you.  She did what any sane

5   person would do.  She said, "Dad, what are you doing?"

6     And what did the defendant do?  Kaitlyn also told you

7   that.  He told me, I should have woken him up.  The defendant

8   made Kaitlyn feel like it was her fault what happened to her,

9   like she was to blame for his acts.

10    You heard her tell you herself, she feels partially

11  responsible for everything that has happened since then.  You

12  heard her tell you that they spoke for a while after it

13  happened.  And he said, "You should have woken me up."

14    To the defendant, it was Kaitlyn's fault for not waking

15  him up.  "It should have been my responsibility to wake him

16  up."

17    She believed him then, and she still believes that today.

18  But you heard the evidence.  It wasn't Kaitlyn's fault.  And

19  the defendant was not asleep.  In fact, when he was asked about

20  this incident three years later during the DHS report, he still

21  remembered in graphic detail what he did to Kaitlyn and what

22  happened that night.

23    Ladies and gentlemen, because of what Raymond Goldesberry

24  did, this man, what he did that night, he is charged with one

25  count of violating 18 U.S.C. 1151, 1153, 2241(c), which is

1    aggravated sexual abuse of a minor under 12 in Indian Country,

2    and one count of violating 18 U.S.C., Sections 1151, 1153,

3    2241(a), sexual abuse of a minor in Indian Country.

4         Now, let's break that down a little bit.  There are

5    elements for both of those crimes and -- and the elements are

6    virtually the same except for an age requirement.  For 2241(c),

7    the under 12 statute, there are four elements:

8         The defendant must knowingly engage or attempt to engage

9    in a sexual act with the minor victim, Kaitlyn;

10        At the time of the act, she had not -- she had to have not

11   yet attained the age of 12;

12        The defendant was an Indian;

13        And the act occurred in the Northern District of Oklahoma

14   in Indian Country.

15        2241(a), the over 12 statute, has the same requirements

16   except that, at the time of the act, the minor victim was 12

17   but had not yet attained 16, and the defendant was at least

18   four years older than the victim.

19        Now, many of these elements are not in dispute, and even

20   parts of others are not in dispute.  So let's take a second and

21   look over what is not in dispute today.  We've agreed to two

22   things:  First, the fact that the defendant is and was an

23   Indian, and that the act occurred in Indian Country in the

24   Northern District of Oklahoma.

25        Those have been stipulated to, and so those have been

1    proved beyond a reasonable doubt.  Those do not have to be part
2    of your deliberations.

3        There's also no dispute that a sexual act occurred.
4    There's been testimony in the prosecution's case -- case in
5    chief and in the defense's case that the defendant put his
6    fingers inside his 11-year-old daughter's vagina and moved
7    them.  Under the definition of a sexual act, that counts.  He
8    touched; he penetrated.

9        Kaitlyn told you that she woke up with his fingers inside
10   of her.  That's it.  You'll hear from the Judge what a sexual
11   act is.  Penetration, however slight, of the genital opening of
12   another -- of another by a hand or finger with intent to arouse
13   or gratify the sexual desire of any person.

14       With that in mind, there's one more thing that's not
15   really in dispute, the defendant's intent to arouse or gratify
16   the desire of any person.  Michelle told you that the
17   defendant, on more than one occasion while awake, would make
18   sexual advances that began with him manually stimulating her.

19       During the DHS investigation, the defendant told
20   Ms. Gusman that he was using his fingers to stimulate.  So was
21   the defendant engaged in or attempting to engage in a sexual
22   act?  Yes.  Absolutely.

23       As Ms. Dial told you in her opening, there are really only
24   two questions that you need to answer today:  How old was
25   Kaitlyn when this happened, and whether Defendant knew he was

1   penetrating his 11-year-old daughter.

2      You've heard support for Kaitlyn being 11 when this

3   happened.  When Kaitlyn went through her forensic interview in

4   2020 with Ms. Blevins, she said she couldn't remember exactly

5   what happened, that she's not good with dates.  You also heard

6   Kaitlyn testify a couple days ago that she wanted to protect

7   her dad.

8      Now, couple that with Ms. Blevins' testimony that

9   survivors of sexual abuse can have trouble remembering exact

10  timeframes and exact details of what happened due to the trauma

11  that they endure as a victim.

12     She also -- Ms. Blevins also talked about tentative

13  disclosures and some of the signs of tentative disclosures,

14  including minimizing.  And she talked that -- talked about how

15  Kaitlyn described -- or displayed some of those signs in her

16  interview and -- in her interview with -- with Kaitlyn.

17     Now, why is that important?  That's important because of

18  something else that Ms. Blevins told us.  She also said that

19  the victims of sexual abuse may actually protect the abuser

20  because they are afraid of what might happen if the abuse is

21  discovered.  And you heard Kaitlyn talk about that, too, on the

22  stand, that she thought all of this was her fault.

23     Ms. Blevins said that victims can like the relationship

24  that they have with the defendant, but they can not like the

25  abuse, also confirmed by Kaitlyn's testimony.

1        Now, the support for Kaitlyn being 11 that you heard was

2   that Ms. Gusman, the DHS worker, and Miss Ishem, the child

3   safety coordinator, both testified that the defendant told them

4   in separate instances that the incident happened three to four

5   years prior to the DHS investigation, which occurred in 2020.

6   Three to four years prior would make Kaitlyn 10 or 11.

7        You don't have to credit the testimony of a child who told

8   you that she was trying to forget what happened to her.

9   Instead, listen to the adult who remembered when it happened

10  and who remembered in explicit detail what he did that night.

11  He said it happened three to four years ago.  That makes

12  Kaitlyn 10 or 11.

13       Now, speaking of what the defendant did that night, that

14  brings us to the second question that must be answered, whether

15  the defendant knew that he penetrated Kaitlyn.  There are two

16  main ways that you can know that he knew what he was doing and

17  that he knew he didn't make a mistake: his actions that night

18  and his actions afterward.

19       Let's take a moment and go back to that night.  Kaitlyn

20  had a nightmare, and she awoke and was scared, and she wanted

21  to go to her parents' room.  So she went to her parents' room,

22  like she had done before, and got into bed.  And once she was

23  there, she fell asleep.

24       The defendant's actions then come into play, and we don't

25  have to rely on Kaitlyn's testimony.  We can rely on what the

1    defendant told Ms. Gusman.  There was testimony that he

2    remembered what he did, and he specifically told Ms. Gusman

3    what he did.

4         So what did he do?  He put his arm over Kaitlyn.  He moved

5    his hand past her shorts, past her underwear, past her pubic

6    hair, past her labia majora, and inside of her, moving and

7    stimulating.  At that point, Kaitlyn woke up with her back to

8    her father and jumped out and said, "Dad, what are you doing?"

9         Then, it was the defendant who told Kaitlyn that he made a

10   mistake.  He made Kaitlyn feel like it was her fault.  "You

11   should have woken me up when you got into bed."

12        That's what Kaitlyn believes.  She told you, "I should

13   have woken him up."

14        But Kaitlyn also said that nothing like this had ever

15   happened before.  She'd never had an experience like this in

16   her parents' bed.  So why should it be Kaitlyn's responsibility

17   to keep -- why should she be the one responsible for keeping

18   her father's fingers out of her vagina?

19        Once Meagan Bartlett made her report to DHS, the

20   Goldesberrys had a choice of what to do.  So now, we're moving

21   into the defendants's actions after that night.  They could --

22   the Goldesberrys could keep Kaitlyn in the home and send the

23   defendant away or keep the defendant in the home and send

24   Kaitlyn away while the investigation was ongoing.

25        You heard testimony to that effect.  And who did the

1    Goldesberrys choose?  They chose to send their daughter, who

2    had just disclosed all the things that were going wrong in her

3    life, the bullying, the body shaming, the death of her

4    grandparents, the death of some of her pets, the fact that she

5    was self-harming, the fact that she had woken up with her dad's

6    fingers inside of her vagina.

7         The girl that had just dis- -- disclosed all of that to

8    them, they decided to send her away from home, the only home

9    that she'd ever known, the home that she had taken her first

10   steps in.  And they sent her away.

11        Her father was supposed to protect her.  Instead, he

12   penetrated her.  He was supposed to shield her.  Instead, he

13   stuck his fingers inside her vagina.  He made her feel like his

14   actions were her fault, and then he sent her away from home so

15   he could come back.  "Dad, what are you doing?"  We know what

16   he was doing.  He was abusing her.

17        Now, the defendant also revealed his consciousness of

18   guilt in his conversation with his best friend, Mr. Bartlett,

19   and his questions to the DHS worker, Ms. Gusman.  You heard

20   that when Mr. Bartlett brought Faith home that night when

21   they'd found out about the DHS investigation, he went out and

22   he talked to Mr. Goldesberry.  And he found him crying,

23   sobbing.  He said, "I messed up."

24        And then he asked Mr. Bartlett, "Am I speaking to brother

25   Nathan or cop Nathan?"

1    Now, why would he need to ask that question?  Why would he

2    need to know if he was talking to a friend or a cop?  Later,

3    speaking with DHS, Ms. Gusman, he was very interested in what

4    the line was.  "Is it penetration if I only went past the labia

5    majora," is what he asked her.

6    There was no mistake.  The Government has shown beyond all

7    reasonable doubt that the defendant knowingly put his fingers

8    inside of his 11-year-old daughter's vagina.  He did it.  He

9    admitted to it.  Kaitlyn told you that he did it.  Not only

10   admitted to it, but specifically recounted in a interview that

11   he put his arm around Kaitlyn.

12   He remembered putting his arm around Kaitlyn, putting his

13   hands past her shorts, past her underwear, further and further

14   down past her genitals and inside of her, and he said that he

15   was stimulating.  And Kaitlyn told you that she woke up feeling

16   his fingers moving inside of her.

17   Is it reasonable to believe that the defendant, while

18   half-awake, did all of this without knowing what he was doing,

19   without being able to tell the difference between the genital

20   area of his 11-year-old daughter and his wife of 15 years,

21   who'd had two kids by this point?  No.

22   The Government has proven beyond a reasonable doubt that

23   the defendant knowingly committed a sexual act on his

24   11-year-old daughter.  And for that, the def- -- the Government

25   asks for you to find him guilty.  Thank you.

1      THE COURT:  Government's bifurcating their argument?

2      You're going to do rebuttal; is that correct?

3      MS. DIAL:  We are, Your Honor.

4      THE COURT:  Miss Brown?

5      MS. BROWN:  Thank you, Your Honor.

6      Good morning.  Kaitlyn Goldesberry experienced a

7   humiliation, an ultimate embarrassment at the cusp of teenhood.

8   Her dad didn't walk in on her bathing.  That would be

9   embarrassing.  Her dad didn't walk in on her masturbating.

10  That would be very embarrassing.  Her dad mistook her for her

11  mother and touched her.

12      There is nothing more embarrassing than that.  We aren't

13  talking here about the awkward moment when a father and a

14  daughter are watching an R rated movie together and discover

15  halfway through, and much to their dismay, that there is a sex

16  scene.  That's uncomfortable and awkward for sure.

17      This week, here in this grand federal courtroom, where the

18  law is the authority and the consequences couldn't be higher,

19  we are talking about the ultimate embarrassment, especially for

20  a private, preteen young lady.  A young lady who didn't want

21  her own mother to make a big deal about it when she started

22  menstruating.

23      A girl who has been bullied and body shamed by her friends

24  and peers, even after she switched schools repeatedly to avoid

25  the torment.  Everybody's different.  That concept seems so

1    obvious, and yet, I need to remind you, every girl is

2    different.  Every family is different.  We all have different

3    routines and different concepts of normal.

4        And we all react to traumatic events in very different

5    ways.  The Government's own expert, Kelsey Blevins, confirmed

6    that yesterday.  Kaitlyn didn't want anyone to know or make her

7    talk about what happened.  She's not stupid.  She knew that if

8    anyone, even or especially her mother, knew about what had

9    happened, it would be a whole thing and a big deal.

10       Something she would have to talk about again and again and

11   again.  Something that her mom and her dad and her counselor

12   and maybe even her big sister would want to keep asking her

13   about and checking in on.  That is exactly what Kaitlyn wanted

14   to avoid.  And you weren't here -- you weren't summoned here to

15   judge whether that was the right decision.

16       That's not what you're here for.  It's not what you're

17   charged with deciding.  Speaking of things you aren't here for,

18   you were not summoned here to judge or decide whether it was

19   appropriate or not for Kaitlyn's dad to agree to abide by his

20   12-year-old daughter's wishes that this never be discussed

21   again.

22       That's not what he's charged with, and it's not even a

23   crime.  How many men would be in -- in prison if keeping

24   something embarrassing from your wife was a federal offense?

25   I'm not asking you to agree that Kaitlyn's reaction is the

1    reaction you think you or your own daughter would have to a
2    situation like this.

3         Frankly, until you're faced with a situation like this,
4    there's no way to predict how you or your daughter might react.
5    I'd like to think that Mr. Goldesberry and his daughter Kaitlyn
6    would have sat Mrs. Goldesberry down and had a candid
7    conversation about what had happened, cleared the air, tell
8    Kaitlyn's therapist about the incident, and have a happy,
9    healthy, healing response to this terrible, horrible, no good,
10   very bad thing that happened.

11        But it's not a crime -- and obviously, if it was a crime,
12   it's certainly not one that Mr. Goldesberry is charged with
13   here -- to handle an embarrassing situation with his daughter
14   by respecting her wishes and not confessing this terrible,
15   horrible, no good, very bad thing that happened to his wife or
16   his brother or anybody else.

17        Should he have?  I think so.  You probably do too.  Would
18   it have been the end of the world to tell Mrs. Goldesberry and
19   then not let Kaitlyn know that he had not respected her wishes?
20   I don't know.  That depends.  Mr. Goldesberry had already
21   violated his daughter's privates -- privacy, albeit
22   unintentionally, by fondling her because he believed that
23   Kaitlyn was his wife.

24        And no matter who he was talking to, whether it was his
25   friend Nathan Bartlett when he said he messed up -- was he

1    talking about the accident with Kaitlyn in the bed?  Was he

2    talking about whether -- when he chose not to tell his wife?

3    We don't know.  But we know he was remorseful about the

4    incident itself and not sharing it with Michelle.

5        The Government made much, and will continue I believe to

6    make much, about the fact that he told Brenda Gusman what

7    happened voluntarily.  Without any qualms, he completely

8    admitted what had happened.  And consistently from the time

9    that he told the first person to the last person, it was always

10    the same story, that he didn't know that the person he was

11    touching was Kaitlyn.

12        That's what you're here to decide.  He had already

13    unintentionally violated Kaitlyn's privacy by fondling her when

14    he thought he -- she was his wife, and it's not that big of a

15    stretch to assume that the least he could do in return was

16    respect what his daughter begged him to do, which was not tell

17    anyone and never speak of the incident again.

18        If this is some big, horrible secret Mr. Goldesberry was

19    desperate to keep, why agree to send Kaitlyn to therapy for

20    years?  Why agree to let her see a therapist unless he was

21    aware, like his wife, that she was being bullied?  That she

22    watched, not one, but two grandparents she loved and adored die

23    right in front of her?

24        She'd lost a pet.  She's being body shamed.  She's

25    cutting.  Of course, she's seeing a therapist.  What

1    reasonable, rationable -- reasonable, rational man has begged

2    his daughter to keep this horrible secret and then sends her to

3    therapy and lets her speak to a therapist in confidence for

4    four years?

5        If he was so desperate to hide this secret, if he was so

6    intent on keeping from getting this out, why let a child speak

7    privately with, not one, but two separate therapists?  When Mr.

8    Goldesberry went to bed the night before this happened, his

9    wife, Michelle, was in bed with him.

10        **THE COURT:**  Excuse me one minute.

11        Ladies and gentlemen in the audience, you will not react

12    to arguments made by counsel by mouthing words or moving your

13    head or otherwise.  Okay?

14        You may proceed.

15        **MS. BROWN:**  Michelle was in bed with him.  The room, as

16    always, was dark with black plastic secured over the windows

17    and blackout curtains closed.  Mrs. Goldesberry had been a

18    labor and delivery nurse for 14 years.  She has worked nights.

19    She has worked days.  And she has been on-call, subject to

20    being called in to dis -- to assist with the unexpected

21    delivery of a baby or babies day or night.

22        It is clear from the photographs that the Government

23    admitted into evidence that in 2016 and 2017, Kaitlyn and

24    Mrs. Goldesberry were a lot closer in size and weight than they

25    are now.  Their hair was significantly more similar to one

1    another's than it is right now.

2        I direct your attention specifically, when you go back to

3    deliberate, to Government's Exhibit No. 5, the specific picture

4    that Kaitlyn Goldesberry told you triggered her memory when she

5    said, "Actually, now, that I'm looking at this picture, it was

6    right after the fair.  It was right after we went to the fair."

7        The Government made such a big deal yesterday with

8    Mrs. Goldesberry about how it appears that perhaps

9    Mrs. Goldesberry's breasts and Kaitlyn's breasts weren't

10   exactly the same size in their pictures, or how their tummies

11   might not appear to be exactly the same size in these pictures.

12       There is nothing in evidence to suggest Mrs. Goldesberry's

13   tummy is saggy or has stretchmarks just because she's had

14   children.  And it's offensive for the Government to suggest

15   that every woman who's had a baby has a flabby, stretched out

16   stomach.  After delivering two kids, I know I don't.  Guess

17   what?  None of that matters.

18       We aren't here because Mr. Goldesberry is accused of

19   comparing his wife's and his daughter's bra sizes.  There's not

20   even an allegation that he ever touched or grazed or came in

21   contact with Kaitlyn's chest at all when they were in bed that

22   morning.  We aren't here because their tummies may or may not

23   look different if you compared them side by side in the light

24   of day when Mr. Goldesberry is fully awake and conscious.

25       And common sense tells you that even a few inches one way

1    or the other height-wise in 2016 or 2017 wouldn't be obvious

2    while Mr. Goldesberry is lying horizontally in bed next to his

3    wife versus his daughter.  Do you wake up and measure your

4    significant other's height down to the inch before you open

5    your eyes and make sure that the person you went to bed with

6    last night is still the person that's in bed with you this

7    morning?  I doubt it.  That's not reasonable.

8        So when Mr. Goldesberry partially woke up or started to

9    wake up or even woke up, with his daughter who was similar in

10   size, stature, and hair to his wife, he attempted to initiate a

11   consensual sexual encounter with his wife, which wasn't

12   uncommon.  Something he did fairly regularly throughout his

13   marriage.

14       Something that Mrs. Goldesberry, had she been in bed with

15   him like he thought she was, wouldn't have been offended by.

16   Something that is clearly not a crime or even a matter for DHS

17   to get involved with.  Unfortunately, unbeknownst to Mr.

18   Goldesberry, his wife had gotten out of bed and gone off to

19   work.

20       Whether it was scheduled or she was called in, we can't

21   know.  She may have kissed him goodbye; she may not have.  We

22   don't know.  If she did kiss her husband goodbye while he was

23   still in bed sleeping or half-asleep, he may or may not have

24   even remembered because he went back to sleep.

25       But this night, or early morning, Kaitlyn had a nightmare,

1  and she crawled into her parents' bed without Mr. Goldesberry

2  being aware.  Kaitlyn had previously, on occasion, gotten into

3  her parents' bed after she had a nightmare because she felt

4  safe there.

5      But it wasn't something that happened so regularly that it

6  was normal or would have caused Mr. Goldesberry to be

7  specifically mindful of whether someone, other than his wife,

8  was in his marital bed with him.  And Kaitlyn fell back asleep.

9  Mr. Goldesberry remained asleep because Kaitlyn never woke him

10  up to tell him she was in bed with him or that Michelle wasn't.

11      And the undisputed evidence is that, at some point,

12  Kaitlyn awoke to her father's hand in her pants.  His eyes were

13  closed.  He was snoring.  Kaitlyn has never said anything

14  different than that.  Understandably, Kaitlyn was shocked, and

15  she exclaimed, "Dad, what are you doing?"

16      She turned around and looked at her dad and saw that his

17  eyes were still closed.  And when he woke up, he was just as

18  shocked, embarrassed, and horrified as Kaitlyn was because he

19  had no intention of fondling his daughter.  Kaitlyn testified

20  on Monday that her father was still very much out of it, but he

21  stopped snoring and opened his eyes after I spoke.

22      Kaitlyn said she didn't want to talk about it then any

23  more than she wanted to talk about it in court this week.  But

24  she acknowledged that she and her dad did have a conversation

25  right then and there about what had happened.  Mr. Goldesberry

1  kept trying to ensure that Kaitlyn was okay.  He wanted to talk

2  to his wife, Kaitlyn's mom, about what had happened.

3      But Kaitlyn didn't want to and insisted that she didn't

4  want him to.  She never wanted it mentioned again.  Since then,

5  even before then, Kaitlyn had been seeing a therapist, Stacia

6  Alsabrook, for years.  If she wanted to talk about the incident

7  with Miss Alsabrook, she could have and would have.  She didn't

8  want to.

9      No one told Kaitlyn to keep this a secret.  She made that

10 clear.  Kaitlyn testified on Monday that her father never told

11 her or asked her to keep the incident a secret.  You also heard

12 on Monday from Meagan Bartlett, who has known Kaitlyn her

13 entire life.  Miss Bartlett remarked at the end of her

14 testimony that, quote, "Nobody can make Kaitlyn do something

15 she doesn't want to do."

16     That's what Meagan said.  While Miss Bartlett was

17 testifying, some of you may have noticed that Mr. Goldesberry

18 fell asleep, completely upright in his chair, and began to

19 snore.  Ideally, my clients would never fall asleep in court,

20 especially when their liberty is on the line.

21     But Miss Bartlett herself admitted, while testifying, that

22 that actually happens quite frequently.  Miss Bartlett

23 testified that she has seen and experienced Mr. Goldesberry

24 fall asleep and begin to snore in the middle of a conversation

25 with her on more than one occasion.

1    Miss Bartlett testified that she has been in the midst of

2    a conversation with Mr. Goldesberry when he was fully awake one

3    minute, and sound asleep and snoring the next.  And she's even

4    had to wake him up to continue to talk to him on more than one

5    occasion.

6    Mrs. Goldesberry also testified yesterday that,

7    unfortunately, this is a frequent occurrence with her husband,

8    who has been diagnosed with sleep apnea.  He will be fully

9    awake and then fully asleep while still upright in his

10   recliner.  Why does any of that matter?

11   Because we're talking about one incident, an incident

12   wherein Mr. Goldesberry was fully asleep in his bed, and his

13   daughter crawled into bed with him.  And the Government is

14   trying to convince you with absolutely no evidence, none, to

15   support its theory that it's not reasonable to believe that Mr.

16   Goldesberry either never fully woke or briefly woke and fell

17   asleep or half-asleep while trying to initiate sexual activity

18   with a person in his marital bed who he believed to be his

19   wife.

20   As jan -- as Judge Antoon told you, he will be giving you

21   instructions on the law that applies in this case.  I

22   anticipate he will give you a copy -- each of you a copy of the

23   law, the law that you're not expected to know until he tells

24   you what it is.  But there's a couple of instructions I

25   anticipate he'll tell you that I want to highlight.

1        One of them is the same instruction that Mr. McWaters just
2    highlighted for you, and that is the elements.  The elements is
3    a list of things you have to believe beyond a reasonable
4    doubt -- each and every one of you, beyond a reasonable doubt
5    before you can convict my client.
6        And the only one that I think is really truly in
7    contention here that matters is No. 1.  No. 1.  The defendant
8    knowingly engaged in or attempted to engage in a sexual act
9    with Kaitlyn.
10        Specifically, the word "knowingly."  I'll get to that in a
11    second.  "Sexual act" is defined as the penetration, however
12    slight, of the genital opening of another by a hand or finger.
13        I don't think there's any dispute that that happened.
14    Kaitlyn said it happened, and Raymond said it happened.  But
15    the instruction that defines the word "knowingly" is very
16    important in this case.  "Knowingly" is defined as
17    follows:  Knowingly means that the act was done voluntarily,
18    intentionally, and not because of mistake or accident.
19        The Government and I agree on a number of things in this
20    case.  We agree that there are really only two things you need
21    to decide in this case.  We've made it easy on you.  No. 1,
22    what was Mr. Goldesberry's intention in the comfort of his own
23    bed the morning hours of the day his wife had left for work and
24    his daughter crawled into bed with him unbeknownst to him?
25    What was his intent?  What did he knowingly do, or did he

1    knowingly, without any mistake or accident, commit a crime?

2          And then No. 2, if and only if you get past the knowingly

3    and you believe beyond a reasonable doubt that Mr.

4    Goldesberry's intent was to commit a sex act specifically

5    against Kaitlyn, then the second question is:  Can you all

6    agree beyond a reasonable doubt how old she was at the time?

7          There is no dispute because there is no evidence at all to

8    dispute that this was not a knowing act.  Words matter.  The

9    word "knowingly" is defined very clear.  You cannot say, Well,

10   he did the act, doesn't really matter who it was or who he

11   thought it was.

12         You have to be convinced beyond any reasonable doubt that

13   this was knowingly, intentionally, voluntarily done, not by

14   mistake or accident.  The mistake or accident is who he was

15   touching.  Raymond -- the -- there's no evidence at all to

16   support that Raymond knew his wife had left.

17         There is no evidence at all to support that Raymond knew

18   Kaitlyn had joined him in his bed.  And there is no evidence at

19   all that Mr. Goldesberry had any motive or any reason at all or

20   any desire to fondle his own daughter.  It was a mistake, an

21   accident.  And that's where the law you are obligated to follow

22   comes in.

23         In order for you to find Mr. Goldesberry guilty of a

24   federal felony, you must all unanimously agree that Mr.

25   Goldesberry voluntarily, intentionally, and not because of any

1    mistake or accident, engaged in or attempted to engage in a sex
2    act with his daughter.

3        There is frankly no evidence, much less enough evidence to
4    convince you all beyond a reasonable doubt that Mr. Goldesberry
5    intentionally, and not because of a mistake or accident,
6    touched his daughter.  All of the evidence, all of the
7    testimony, everything you have that you can properly consider,
8    is that this was an unfortunate incident in the parents' bed
9    that happened because of Mr. Goldesberry's mistake or accident
10   in believing his wife, who he'd gone to sleep with, was still
11   there with him when he woke up.

12       As such, your verdict must be not guilty.  Kaitlyn told
13   you from the witness stand on Monday afternoon, nothing like
14   this has happened before, and nothing like this happened since.
15   I expect that the Government may make much of their expert,
16   Kelsey Blevins', testimony in an effort to convince you that
17   somehow you should leap to the conclusion that Kaitlyn is
18   lying, minimizing, or trying to protect her father.

19       But Miss Blevins was clear.  She gave you no opinion as to
20   Kaitlyn or the incident that brings us to court this week or
21   her forensic interview.  Frankly, Miss Blevins gave you-all a
22   very short crash course in what could possibly, maybe, but
23   under no circumstances definitely, happen in some but not all
24   confirmed cases of child sexual abuse.

25       Some children, but not all children who have actually been

1    sexually abused wet the bed or don't or act out or act totally

2    normal or self-harm or don't self-harm or have PTSD or don't

3    have PTSD or disclose or tentatively disclose or don't disclose

4    at all or minimize or don't minimize or recant or don't recant,

5    and on and on and on and on.

6        Miss Blevins didn't tell you anything concrete, and she

7    certainly didn't tell you anything about this case and this

8    situation.  She didn't tell you much that common sense and your

9    own experiences in life haven't already taught you; that when

10   bad things happen to kids, sometimes they keep it inside and

11   sometimes they let it all out.

12       Kelsey Blevins, in her limited experience having been a

13   nanny who got her first professional job just a year before she

14   interviewed Kaitlyn, has gone to some lectures and read some

15   other people's research, which she couldn't really articulate

16   for you, and testified two times as an expert in her young

17   career.

18       She is supposed to be neutral and unbiased, but she works

19   and offices alongside DHS investigator, Brenna Gusman, and

20   testifies as an expert for the Government in the very case she

21   claims she is required to remain neutral in.  Strangely, the

22   Government wants you to both believe and not believe Kaitlyn at

23   the same time.

24       They want you to believe that Kaitlyn is a victim, and so

25   they called her as their witness, but you shouldn't believe her

1    testimony.  The Government wants you to believe that they care

2    about Kaitlyn, even though no one from the Government would

3    even talk to Kaitlyn until after they repeatedly interviewed

4    their actual star witness, Meagan Bartlett.

5        The Government wants you to believe that they want to

6    protect Kaitlyn more than her own mother or her own family

7    does, but they refused and continue to refuse and ask you not

8    to listen to Kaitlyn.  The Government thinks they know best.

9    And all I'm asking you to do is the job that you all swore to

10    do on Monday, listen and pay attention to the evidence that was

11    presented in court, which I have seen you do.

12        And then follow the law and the instructions that Judge

13    Antoon is about to give you.  In those instructions, you will

14    see that you do indeed only have two decisions to make.  No. 1,

15    did Mr. Goldesberry knowingly, intentionally, and not because

16    of some mistake or accident, engage in a sex act with Kaitlyn?

17        If your answer is "no," then your verdict must be not

18    guilty as to both Counts 1 and Count 2.  The law and the

19    definitions for "knowingly" and "sexual act" are the same for

20    both charges because, you see, the Government has charged Mr.

21    Goldesberry with two crimes even though everyone, even the

22    Government, agrees there was ever only one incident.

23        The only reason my client stands charged with two counts

24    is because even the Government doesn't know how old Kaitlyn was

25    when this incident occurred.  So I expect your instructions

1  will, first, tell you to decide if you think Mr. Goldesberry is

2  guilty of knowingly, and not because of any mistake or

3  accident, engaging in a sex act with Kaitlyn when she was under

4  12.

5      If you do not all believe unanimously beyond a reasonable

6  doubt that the Government has convinced you, because the burden

7  of proof is on the Government, that he knowingly, and not

8  because of a mistake or accident, touched Kaitlyn while she was

9  under 12, then, and only then, do you continue to talk and

10 discuss whether all of you believe beyond a reasonable doubt

11 that he knowingly, and not because of a mistake or accident,

12 did it when she was younger than 12.

13     You see, the only distinction between the two charges is

14 Kaitlyn's age.  But in order to find Mr. Goldesberry guilty of

15 either one of these counts, you must first all agree that this

16 was no mistake or accident.  That he meant to intentionally

17 touch Kaitlyn specifically, and not his wife, Michelle.

18     You notice the Government, with its power to subpoena any

19 witness other than the defendant, didn't call law enforcement,

20 nobody from TPD, nobody from FBI, to the witness stand.  You

21 noticed they didn't call Mrs. Goldesberry to testify.  I had

22 to.  And then the Government berated her parenting.  DHS

23 wouldn't listen to Kaitlyn.

24     Tulsa Police Department never bothered to talk to Kaitlyn.

25 The Government ignored Kaitlyn.  And then while questioning

1  Mrs. Goldesberry yesterday, they attacked Mrs. Goldesberry for

2  giving me the opportunity to hear Kaitlyn out at her request.

3  All we're asking you to do is listen to the evidence.

4       Are each of you convinced beyond any reasonable doubt that

5  Mr. Goldesberry was acting knowingly and intentionally, and not

6  because of some mistake or accident, when he and Kaitlyn both

7  woke up that awful morning?

8       **THE COURT:**  Miss Dial?

9       **MS. DIAL:**  Thank you, Your Honor.

10      The least he could do was what his daughter asked?  No,

11  the least that he could do, if this truly was a mistake, was

12  not focus on keeping it quiet.  The least he could do is not

13  watch for years his child deteriorate in front of his eyes.

14  Watch his child keep this a secret for him.  He didn't have to

15  ask her to keep a -- keep it a secret.

16      He didn't have to threaten her.  He relied on her love,

17  her devotion, and his assertions to her that it was all just a

18  mistake.  The defendant says it was a mistake.  Of course, he

19  does.  Use your common sense because that's what he has to say

20  to keep himself out of trouble.  The defendant, there's --

21  there's something, I think, we need to clear up quickly on this

22  timeline.

23      Your memory of the testimony controls.  So rely on your

24  memory.  However, defense counsel laid out that Kaitlyn woke

25  up, she heard him snoring -- she woke up, his fingers were

1  inside of her.  She heard him snoring.  She turned around and

2  saw his eyes were still closed and then she reacted.

3      As I said, your memory controls, but that is not what

4  Kaitlyn said on the stand.  First off, you've heard defense

5  counsel make a big deal about how pitch black it was in the

6  room.  So Kaitlyn couldn't have turned around and seen that he

7  was sleeping.  And that's not what Kaitlyn said.  She said she

8  got into bed with him.

9      She heard him snoring.  She believed he was asleep.  And

10  she fell asleep.  She woke up with her back to him, his hands

11  inside her vagina, and she instantly reacted.  She didn't

12  testify that she turned around and looked at him to make sure

13  he was sleeping.  She did, as she said, what any sane person

14  would do, and she reacted instantly with her back to him.

15      She did not testify that she heard him snoring when the --

16  his fingers were inside of her.  She woke up to the fingers and

17  reacted.  And when she reacted, the defendant was caught.

18  Kaitlyn had caught him.  She had fallen asleep, and she had

19  woken up while his fingers were moving inside of her.  Kaitlyn,

20  the strong-willed, opinionated child that you've heard about.

21      So how could he keep this from blowing up?  How could he

22  keep this from happening?  Make it all a mistake?

23      **THE COURT:**  Would you -- could I interrupt you one second,

24  please?

25      **MS. DIAL:**  Yes, Your Honor.

1          THE COURT:  If you're here observing, that is fine.  But I

2     ask that you remain seated and not talk to one another while

3     counsel is arguing.  Thank you.

4          MS. DIAL:  He'd been caught.  The only evidence that you

5     have that it was a mistake is his own statements back then when

6     he was caught.  When he was caught by Kaitlyn, the

7     strong-willed, opinionated child that loves him, that wants to

8     protect him.  What was he supposed to do?  He wasn't -- he

9     couldn't tell Kaitlyn that he didn't -- that he meant to do

10    that.

11         He told Kaitlyn that it was all a mistake.  He counted on

12    her private nature.  He relied on her devotion to him.  And it

13    worked.  For three years, it worked.  Until finally, Kaitlyn,

14    as she said, let out all the pain.  She told what her dad did

15    to her.  But even then, she still tried to minimize.

16         Even then, she still reiterated the excuse that he had

17    given to her because, of course, he had to give that excuse.

18    What other explanation could he give Kaitlyn when he was

19    caught?  And then he kept it quiet.  This was not an

20    embarrassing moment.  This was a crime.  So, of course, he

21    didn't say anything else until he was caught again, until DHS

22    got involved.

23         Then, once caught again, what did he have to do?  He had

24    to maintain that this was a mistake.  There's a couple of other

25    points that I want to clarify.  First off, defense counsel said

1    that the defendant fell asleep in court, and that you saw that.

2    He falls asleep in conversations.  There's no testimony that he

3    was asleep, fully asleep, when he penetrated Kaitlyn.

4        In fact, he told Miss Gusman that he rolled onto his

5    stomach.  He put his hand over.  He is the one that recalls

6    putting his hands in Kaitlyn's underwear.  Kaitlyn doesn't

7    remember that.  Kaitlyn was asleep.  She was asleep for all of

8    that.  He is the one that remembers that.  He wasn't falling

9    asleep, as he may have done in court.

10       He was awake.  He recalled it.  He knew what had happened.

11   You also heard that the Government didn't call police officers

12   and other possible witnesses.  And we didn't, because nobody

13   else was in that room.  The two people in that room were the

14   child that was asleep when it started and the defendant.

15       And the defendant is the one that insists it was a mistake

16   after he was caught.  Use your common sense.  There are at

17   least seven reasons that it does not make sense that this was a

18   mistake.

19       First off, this requires you to believe that a man awake

20   enough to know what he's doing, to know where his hand is, to

21   know that his hand made it past her labia majora -- it requires

22   you to believe that he confused his 11-year-old's body with his

23   37-year-old wife's body, a woman he'd been married to in 2017

24   for over 15 years.

25       It doesn't make sense that this was a mistake, reason

1    number two, because he didn't tell his wife.  It was

2    embarrassing, and Kaitlyn asked him to keep it quiet so he kept

3    it quiet?  How does that make any sense?  He has made a

4    mistake.  He wants to protect his child.  If that's the case,

5    why do you watch your child deteriorate?  Why do you keep it

6    from your wife?

7        He never checked on Kaitlyn.  You heard Kaitlyn.  He never

8    brought it up again.  He never checked in on her.  He never

9    asked how she was doing, made sure she was okay, made sure that

10   she was recovering from this embarrassing moment because it

11   wasn't an embarrassing moment.  It was a crime.  If this was a

12   mistake, why was he so afraid of talking to his friend?

13       If this was a mistake -- it was not a mistake.  He

14   graphically described to Brenna Gusman -- Gusman three years,

15   at least three or four years later, what he had done.  He had

16   to have an explanation.  Kaitlyn said he'd done it.  He

17   couldn't then call Kaitlyn a liar.  So he stuck with the

18   explanation that gets him out of trouble.

19       And in all of that, he asked if it even counted.  Ladies

20   and gentlemen, you've heard the evidence.  You heard what he

21   did, what he recalled, how he kept it quiet, the 45-minute

22   conversation he had with his daughter, ensuring that she took

23   the blame, that she felt the guilt, and that she understood

24   that, of course, he didn't mean to do this.

25       His daughter was asleep.  And he took that opportunity.

1    Of course, he meant to do this.  This was not a mistake.  And

2    the only evidence to suggest it is, is the defendant's own

3    self-serving explanation after being caught.  Use your common

4    sense.  Find him guilty.

5        **THE COURT:**  Ladies and gentlemen, that concludes the final

6    phase of the trial that occurs here in the courtroom with the

7    exception of jury instructions.  I'm going to take a short

8    break.  This will be your mid-morning break.  It'll be no

9    longer than 15 minutes.

10       During that time, you still should not talk to one another

11   about the case.  You're not yet deliberating.  You will be

12   soon, but not yet.  Enjoy your break, and I will be back with

13   you soon.

14       **CSO:**  All rise.

15           (Jury out.)

16       **THE COURT:**  Please be seated.

17       Those of you in the audience may be here for various

18   reasons.  I understand that some of you who I -- those I

19   recognize are here because you are -- are supporting the

20   defendant in this case.  Others may be supporting the

21   Government.  Others of you just may be curious.  I don't know.

22   And that's not really my concern.

23       I think it's a great thing for people to be in our courts

24   to see what goes on.  I think it's a -- that that happens far

25   too often.  I think people, when they watch the courts,

1  generally go away with a confidence in their Government.  That

2  said, everything that happens in this courtroom is important,

3  and juries are not to be distracted nor are lawyers.

4      So I expect -- in fact, I insist on a level of decorum.  I

5  don't expect people to be going from row to row to talk to one

6  another.  I don't expect people to be getting up and leaving

7  the courtroom and coming back in during argument.  And I don't

8  expect people to register approval or disapproval with argument

9  of counsel or testimony of witnesses.  That's totally improper.

10     Whoever does that, now that I've given that warning, will

11  be ejected and not allowed to return.  I also appreciate not

12  chewing gum visibly during the course of a court proceeding.

13  So if you're doing that, please remove your gum.  It's not --

14  it's not appropriate.  When we come back, counsel will have a

15  full copy of the instructions.

16     I've made one more edit.  I want you to check it over and

17  check the verdict form quickly.  And then I will proceed with

18  instructions.  Thank you very much.

19     **CSO:**  All rise.

20        (A recess was taken.)

21     **THE COURT:**  This is my copy, Cody?

22     **THE LAW CLERK:**  Yes.

23     **THE COURT:**  Take a second to look at the verdict form.

24     **MS. BROWN:**  I don't have the verdict form, but everything

25  else looks good.

1    THE COURT:  Well, it hasn't changed.

2    MS. BROWN:  Okay.

3    THE COURT:  The verdict form hasn't changed.

4    MS. BROWN:  It looked --

5    THE COURT:  Please --

6    MS. BROWN:  -- good before.

7    Oh, I'm sorry, thank you.

8    THE DEPUTY COURT CLERK:  It's okay.

9    CSO:  Go ahead and bring the jury in, Judge?

10    THE COURT:  Yes.  Thank you.

11    (Jury present.)

12    THE COURT:  Ladies and gentlemen, please be seated.

13    Ladies and gentlemen, I'm about to read to you the

14    instructions in this case, your instructions on the law.  Now,

15    I notice that many of you, perhaps all of you at one time or

16    another, have been taking notes.  And you're free to take notes

17    during the instructions.  But at the conclusion of reading the

18    instructions, you're going to go back and begin your

19    deliberations.  And I'll provide each of you with a copy of

20    these instructions so you'll have a written copy with you.  You

21    may want to not take notes knowing that you'll have the

22    instructions with you.

23    Members of the jury:  In any jury trial, there are, in

24    effect, two judges.  I'm one of the judges, you're the other.

25    I'm the judge of the law.  You, as jurors, are the judges of

1    the facts.  I presided over the trial and decided what evidence

2    was proper for your consideration.  It's also my duty at the

3    end of the trial to explain to you the rules of law that you

4    must follow and apply in arriving at your verdict.

5        In explaining the rules of law that you must follow, I'll

6    give you some general instructions that apply in every criminal

7    case.  For example, instructions about burden of proof and

8    insights that may help you judge the believability of

9    witnesses.  I'll also give you some specific rules of law that

10   will apply in this -- to this particular case.  Finally, I'll

11   explain to you the procedures you should follow in your

12   deliberations and the possible verdicts you may return.  A

13   written copy of these instructions will be given to each of you

14   for your use in the jury room, so you need not take notes.

15       You, as jurors, are the judges of the facts.  But in

16   determining what actually happened, that is, in reaching your

17   decision as to the facts, it's your sworn duty to follow all

18   the rules of law that I -- as I explain them to you.

19       You have no right to disregard or give special attention

20   to any one instruction or to question the wisdom or correctness

21   of any rule I may state to you.  You must not substitute or

22   follow your own notion or opinion as to what the law is or

23   ought to be.  It is your duty to apply the law as I explain it

24   to you regardless of the consequences.  However, you should not

25   read into these instructions or anything else I may have said

1  or done any suggestion as to what your verdict should be.

2  That's entirely up to you.

3      It's also your duty to base your verdict solely upon the

4  evidence, without any prejudice or sympathy.  That was the

5  promise you made and the oath you took.

6      The Government has the burden of proving the defendant

7  guilty beyond a reasonable doubt.  The law does not require a

8  defendant to prove his innocence or produce any evidence at

9  all.  The Government has the burden of proving the defendant

10 guilty beyond a reasonable doubt, and if it fails to do so, you

11 must find the defendant not guilty.

12     Proof beyond a reasonable doubt is proof that leaves you

13 firmly convinced of the defendant's guilt.  There are few

14 things in this world that we know with absolute certainty, and

15 in criminal cases, the law does not require proof that

16 overcomes every possible doubt.  It only requires the

17 Government's proof exclude any reasonable doubt concerning

18 Defendant's guilt.  A reasonable doubt is a doubt based on

19 reason and common sense after careful and impartial

20 consideration of all the evidence in the case.  If based on

21 your consideration of the evidence, you're firmly convinced

22 that the defendant is guilty of the crime charged, you must

23 find him guilty.  If, on the other hand, you think there is a

24 real possibility that he's not guilty, you must give him the

25 benefit of the doubt and find him not guilty.

1    You must make your decision based only on the evidence

2    that you saw and heard here in court.  Do not let rumors,

3    suspicions, or anything else that you may have seen or heard

4    outside of court influence your decision in any way.

5    The evidence in this case includes only what the witnesses

6    said while they were testifying under oath, the exhibits that I

7    allowed into evidence, and the stipulations that the lawyers

8    have agreed to.

9    Nothing else is evidence.  The lawyers' statements and

10    arguments are not evidence.  Their questions and objections are

11    not evidence.  My legal rulings are not evidence.  And my

12    comments and questions are not evidence.

13    During the trial, I did not let you hear the answers to

14    some of the questions that the lawyers asked.  You must

15    completely ignore these things.  Do not even think about them.

16    Do not speculate on what a witness might have said or what an

17    exhibit might have shown.  These things are not evidence, and

18    you are bound by your oath not to let them influence your

19    decision in any way.

20    There are, generally speaking, two types of evidence from

21    what -- from which a jury may properly determine the facts of a

22    case.  One is direct evidence, such as the testimony of an

23    eyewitness.  The other is indirect or circumstantial evidence.

24    That is, the proof of a chain of facts which point to the

25    existence or nonexistence of certain other facts.

1          As a general rule, the law makes no distinction between

2     direct and circumstantial evidence.  The law simply requires

3     that you find the facts in accord with all the evidence in the

4     case, both direct and circumstantial.

5          While you must consider only the evidence in this case,

6     you're permitted to draw reasonable inferences from the

7     testimony and exhibits, inferences you feel are justified in

8     light of common experience.  An inference is a conclusion that

9     reason and common sense may lead you to draw from the facts

10    which have been proved.

11         By permitting such reasonable inferences, you may make

12    deductions and reach conclusions that reason -- reason and

13    common sense lead you to draw from the facts that have been

14    established by the testimony and evidence in this case.

15         I remind you that it's your job to decide whether the

16    Government has proved the guilt of the defendant beyond a

17    reasonable doubt.  In doing so, you must consider all the

18    evidence.  This does not mean, however, that you must accept

19    all the evidence as true or accurate.

20         You are the sole judges of the credibility or

21    believability of each witness and the weight to be given to the

22    witness's testimony.  An important part of your job will be

23    making judgments about the testimony of the witness --

24    witnesses who testified in this case.  You should think about

25    the testimony of each witness you have heard and decide whether

1  you believe all or any part of what each witness had to say and
2  how important that testimony was.

3  In making that decision, I suggest you ask yourself a few
4  questions:

5  Did the witness impress you as honest?

6  Did the witness have any particular reason not to tell the
7  truth?

8  Did the witness have a personal interest in the outcome of
9  the case?

10  Did the witness have any relationship with either the
11  Government or the defense?

12  Did the witness seem to have a good memory?

13  Did the witness clearly see or hear the things about which
14  he or she testified about?

15  Did the witness have the opportunity and ability to
16  understand questions clearly and answer them directly?

17  Did the witness's testimony differ from the testimony of
18  other witnesses?

19  When weighing the conflicting testimony, you should
20  consider whether the discrepancy had to do with a material fact
21  or with an unimportant detail.  And you should keep in mind
22  that innocent misrecollection, like failure of recollection, is
23  not uncommon.

24  The defendant did not testify, and I remind you that you
25  cannot consider his decision not to testify as evidence of

1  guilt.  I want you to clearly understand, please, that the
2  Constitution of the United States grants to a defendant the
3  right to remain silent.  That means the right not to testify or
4  call witnesses.  That is a Constitutional right in this
5  country.  It is very carefully guarded, and you should
6  understand that no presumption of guilt may be raised and no
7  inference of any kind may be drawn from the fact that a
8  defendant does not take the witness stand and testify or call
9  witnesses.

10      In reaching a conclusion on a particular point, or in
11  ultimately reaching a verdict in this case, do not make any
12  decisions simply because there were more witnesses on one side
13  than the other.

14      Under federal law, a child is presumed to be a competent
15  witness.  You should judge a child's testimony using the same
16  standards and in the same way you would any other witness.

17      During the trial, you heard the testimony of Kelsey
18  Blevins, who expressed opinions regarding child and adolescent
19  forensic interviews, sexual abuse disclosures, and victim
20  behavior in response to child abuse.  In some cases, such as
21  this one, scientific, technical, or other specialized knowledge
22  may assist you in understanding the evidence or in determining
23  a fact in issue.  A witness who has knowledge, skill,
24  experience, training, or education may testify and state an
25  opinion concerning such matters.

1    You're not required to accept such an opinion.  You should

2    consider opinion testimony just as you consider other testimony

3    in this trial.  Give opinion testimony as much weight as you

4    think it deserves, considering the education and experience of

5    the witness, the soundness of the reasons given for the

6    opinion, and other evidence in the trial.

7    Evidence has been presented about a statement attributed

8    to the defendant alleged to have been made after the commission

9    of the crime or crimes charged in this case but not made in

10    court.  Such evidence should always be considered by you with

11    caution and weighed with care.  You should give any such

12    statement the weight you think it deserves after considering

13    all the circumstances under which the statement was made.

14    In determining whether any such statement is reliable and

15    credible -- and credible, consider the factors bearing on the

16    voluntariness of the statement.  For example, consider the age,

17    gender, training, education, occupation, and physical and

18    mental condition of the defendant and any evidence concerning

19    his treatment while under interrogation if the statement was

20    made in response to questioning by Government officials and all

21    other -- and all the other circumstances in evidence

22    surrounding the making of the statement.

23    After considering all this evidence, you may give such

24    weight to the statement as you feel it deserves under all the

25    circumstances.  If you determine the statement is unreliable or

1    not credible, you may disregard the statement entirely.

2         You have been permitted to take notes during this trial.

3    Most of you, perhaps all of you, have taken advantage of that

4    opportunity.

5         You must use your notes only as a memory aid during

6    deliberations.  You must not give your notes precedence over

7    your independent recollection of the evidence.  You must not

8    allow yourself to be unduly influenced by the notes of other

9    jurors.

10        The defendant is charged in Count 1 of the superseding

11   indictment with violating 18 U.S.C., Sections 1151, 1153, and

12   2241(c).  Collectively, these laws make it a crime for an

13   Indian in Indian Country to knowingly engage in a sexual act

14   with another person who has not attained the age of 12 years.

15        To find the defendant guilty of this crime, you must be

16   convinced that the Government has proved each of the following

17   beyond a reasonable doubt:

18        First, the defendant knowingly engaged in or attempted to

19   engage in a sexual act with M. V;

20        Second, at the time, M. V. had not attained the age of 12

21   years;

22        Third, the defendant is an Indian; and

23        Fourth, the act occurred in Indian Country within the

24   Northern District of Oklahoma.

25        The term "sexual act" means either the penetration,

1  however slight, of the anal or genital opening of another by a

2  hand or finger or by any object with an intent to abuse,

3  humiliate, harass, degrade, or arouse or gratify the sexual

4  desire of any person.  Or it means the intentional touching,

5  not through the clothing, of the genitalia of another person

6  who has not attained the age of 16 years with intent to abuse,

7  humiliate, harass, degrade, arouse or gratify the sexual desire

8  of any person.

9      The Government and the defendant have stipulated and

10  agreed that the defendant is an Indian and that the location of

11  the alleged crime is in Indian Country.  You should therefore

12  treat these facts as having been proved.  You are not required

13  to do so, however, since you are the sole judges of the facts.

14      The defendant is charged in Count 2 of the superseding

15  indictment with violating 18 U.S.C., Sections 1151, 1153, and

16  2243(a).  Collectively, these laws make it a crime for an

17  Indian in Indian Country to knowingly engage in a sexual act

18  with another person who has attained the age of 12 years but

19  has not attained the age of 16 years and who is at least four

20  years younger than the other person.

21      To find the defendant guilty of this crime, you must be

22  convinced that the Government has proved each of the following

23  beyond a reasonable doubt:

24      First, the defendant knowingly engaged or -- engaged in or

25  attempted to engage in a sexual act with M. V;

1          Second, at the time, M. V. had attained the age of 12

2     years but had not attained the age of 16 years;

3          Third, at the time, M. V. was at least four years younger

4     than the defendant;

5          Fourth, the defendant is an Indian;

6          Fifth, the act occurred in Indian Country within the

7     Northern District of Oklahoma.

8          The term "sexual act" means either the penetration,

9     however slight, of the anal or genital opening of another, by a

10    hand or finger or by any object with intent to abuse,

11    humiliate, harass, degrade, or arouse or gratify the sexual

12    desire of any person, or it means the intentional touching, not

13    through the clothing, of the genitalia of another person who

14    has not attained the age of 16 years with intent to abuse,

15    humiliate, harass, degrade, or arouse or gratify the sexual

16    desire of any person.

17         The Government and the defendant have stipulated and

18    agreed that the defendant is an Indian and the location of the

19    alleged crime is in Indian Country.  You should therefore treat

20    these facts as having been proved.  You are not required to do

21    so, however, since you are the sole judges of the facts.

22         Where a statute specifies multiple alternative ways in

23    which an offense may be committed, the indictment may allege

24    the multiple ways in the conjunctive, that is, by using the

25    word "and."  If only one of the alternatives is proved beyond a

1  reasonable doubt, that is sufficient for conviction, so long as

2  you agree unanimously as to that alternative.

3       When the word "knowingly" is used in these instructions,

4  it means the act was done voluntarily, intentionally, and not

5  because of mistake or accident.  Although knowledge on the part

6  of the defendant cannot be established by demonstrating that

7  the defendant was negligent, careless, or foolish, knowledge

8  can be inferred if the defendant deliberately blinded himself

9  to the existence of a fact.  Knowledge can be inferred if the

10 defendant was aware of a high probability of the existence of

11 the fact in question unless the defendant did not actually

12 believe the fact in question.

13      You will note that the superseding indictment charges that

14 Count 1 was committed between in or about May 2017 and on or

15 about September 13th, 2017.  And that Count 2 was committed

16 between on or about September 14th, 2017, and on or about

17 December 31st, 2017.  The Government must prove beyond a

18 reasonable doubt that the defendant committed the crime

19 reasonably near the alleged dates.

20      You're here to decide whether the Government has proved

21 beyond a reasonable doubt that the defendant is guilty of the

22 crime charged.  The defendant is not on trial for any act,

23 conduct, or crime not charged in the indictment.

24      It is not up to you to decide whether anyone who is not on

25 trial in this case should be prosecuted for the crime charged.

1    The fact that another person may also be guilty is no defense
2    to the criminal charge.

3        The question of the possible guilt of others should not
4    enter your thinking as you decide whether this defendant has
5    been proved beyond -- has been proved guilty of the crime
6    charged.

7        If you find the defendant guilty, it will be my duty to
8    decide what the punishment will be.  You should not discuss or
9    consider the possible punishment in any way in deciding your
10   verdict.

11       In a moment, the bailiff will es- -- escort -- says
12   bailiff, but I've been referring to personnel working with the
13   marshals office as security officers -- will escort you to the
14   jury room and provide each of you with a copy of these
15   instructions that I've just read.  Any exhibit admitted into
16   evidence will also be placed in the jury room for your review.

17       When you go to the jury room, you should first select a
18   foreperson who will help you guide your deliberations and will
19   speak for you here in the courtroom.  The second thing you
20   should do is review the instructions.  Not only will your
21   deliberations be more productive if you understand the legal
22   principles upon which your verdict must be based, but for your
23   verdict to be valid, you must follow the instructions
24   throughout your deliberations.  Remember, you're the judges of
25   the facts, but you are bound by your oath to follow the law

1    stated in the instructions.

2        To reach a verdict, whether it is guilty or not guilty,

3    all of you must agree.  Your verdict must be unanimous.  Your

4    deliberations will be secret.  You will never have to explain

5    your verdict to anyone.

6        You must consult with one another and deliberate in an

7    effort to reach agreement if you can do so.  Each of you must

8    decide the case for yourself, but only after an impartial

9    consideration of the evidence with your fellow jurors.  During

10   your deliberations, do not hesitate to reexamine your own

11   opinions and change your mind if -- if convinced that you were

12   wrong.  But do not give up your honest belief solely because of

13   the opinion of your fellow jurors or for the mere purpose of

14   returning a verdict.

15       Remember at all times that you are judges, judges of the

16   facts.  You must decide whether the Government has proved the

17   defendant guilty beyond a reasonable doubt.

18       A form of verdict has been prepared for your convenience,

19   and I'll explain that to you now.

20       It's a two-page document.  It bears the title verdict,

21   following the style of this case.  Count 1 of the superseding

22   indictment, 1, as to the offense of knowingly engaging in a

23   sexual act with a minor under the age of 12 in Indian Country

24   in violation of 18 United States Code, Sections 1151, 1153, and

25   2241(c) as charged in Count 1 of the superseding indictment,

1  we, the jury, find the defendant, Raymond Lee Goldesberry --

2  and there are two possible answers there with a space to

3  indicate which you choose.  One says guilty; one says not

4  guilty.

5       There's a note following that that says, If you answered

6  guilty to Question 1, stop, and have your foreperson sign this

7  verdict form without answering Question 2.  If you answer not

8  guilty to Question 1, please proceed to Question 2.

9       Count 2 of the superseding indictment reads, 2, as to the

10  offense of knowingly engaging in a sexual act with a minor

11  between the ages of 12 and 16 in Indian Country in violation of

12  18 United States Code, Sections 1153, 11 -- I'm sorry; 1151,

13  1153, and 2243(a) as charged in Count 2 of the superseding

14  indictment, we, the jury, find the defendant, Raymond Lee

15  Goldesberry -- and it's the same two spaces for your possible

16  answers: one, guilty; and one not guilty.  And then it says, so

17  say we all, place for a date to be entered and a place for the

18  foreperson to sign the verdict form.

19       The foreperson will write the unanimous answer of the jury

20  in the space provided, either guilty or not guilty.  At the

21  conclusion of your deliberations, the foreperson should date

22  and sign the verdict.

23       If you need to communicate with me during your

24  deliberations, the foreperson should write a message and give

25  it to the security officer.  I will either reply in writing or

1   bring you back into the court to dis- -- to the courtroom to
2   respond to your message.  Under no circumstances should you
3   reveal to me the numerical division of the jury.
4       At this time, Miss XXXXX and Miss XXXXXXXXX, would you
5   mind stepping down and taking a chair on that front bench,
6   please.
7       Counsel, come forward.
8       Mr. Wiles, will you come forward as well?
9           (The following proceedings were had at the bench
10  outside the hearing of the jury:)
11      **THE COURT:**  I just noticed something as I was reading
12  this.  I -- I think that is probably not error to send it back
13  given the totality, but I think that should be removed.
14      **MS. BROWN:**  I agree, and I apologize I didn't notice that.
15      **THE LAW CLERK:**  Seven has been printed.
16      **THE COURT:**  So I'm going to ask Mr. Wiles to reprint page
17  7 and just insert it in the instructions.
18      **THE LAW CLERK:**  I had to do seven through nine 'cause
19  otherwise it messes up the pagination.
20      **THE COURT:**  That'll be good.
21      **THE LAW CLERK:**  But I have 12 of seven, so I can just
22  switch them out.
23      **THE COURT:**  Okay.
24      **THE LAW CLERK:**  Want me to do that now?
25      **THE COURT:**  Yeah, yeah.

1    Oh, counsel, come forward.  Are you satisfied with the
2    reading of the instructions?
3         **MS. DIAL:**  Yes, Your Honor.
4         **MS. BROWN:**  Yes, Your Honor.
5              (The following proceedings were had in open court,
6    within the presence and hearing of the jury:)
7         **THE COURT:**  Mr. Phorn, would you please remove the jury?
8         Ladies and gentlemen, it'll be just a minute before I get
9    you the -- the instructions.
10        **CSO:**  All rise.
11             (Discussion held off the record.)
12             (Jury out.)
13        **THE COURT:**  Mr. Phorn, do you solemnly swear that you will
14   keep the jury in some private and convenient place, that you
15   will not communicate with them until we've agreed upon a
16   verdict, and when so agreed, you will return them to the Court
17   or when so ordered by the Court, so help you God?
18        **CSO:**  I do.
19        **THE COURT:**  Well, that indicates to me that at sometime in
20   the history of the Northern District, there was a problem.
21        **MS. BROWN:**  Yeah.
22        **THE DEPUTY COURT CLERK:**  I don't know why we have that
23   oath, but...
24        **THE COURT:**  I have never seen that.
25        **MS. BROWN:**  You've never sworn a bailiff?

1          THE COURT:  No.  Isn't that interesting?

2          Ms. XXXXXX and Ms. XXXXXXXXXX, would you come forward a

3    little bit.  You know, my -- my job, in so many ways, is easier

4    than what the lawyers do.  I don't -- I don't -- please be

5    seated.

6          I don't have any interest in the case other than doing my

7    job correctly.  But one of the things that is always hard for

8    me is to tell the alternates that they're alternates and that

9    they don't go back.  The longer the trial, the more difficult

10   it is for me.  Now, you may have figured it out given where you

11   were seated in the sequence, that you were the alternates.  In

12   longer trials, I'll disperse the alternates among the others so

13   they don't know.  And I've had long trials.  I've had trials

14   that lasted, you know, eight -- one -- one for, I think, eight

15   months.  And others for months, six weeks, things like that.

16   And it's really hard to do it.  But it's hard to do it with you

17   because you've been so attentive.  You know, it's a very good

18   jury.  One of the members doesn't -- doesn't engage in eye

19   contact with anyone but listens intently.  I've not had to wake

20   a single one of you.  That's kind of unusual, to be honest.

21   You've been on time.  And I so appreciate your service and I --

22   believe me, I've relied on alternates many times in the past.

23   I'm going to ask that you not talk about the case until the

24   jury returns a verdict.  You're welcome to stay here.  But

25   you're also welcome to leave and go about your affairs.  But

<del>b</del>

1    until you know that there's a verdict -- and Miss Butler will

2    give you a number to call and check -- please don't discuss the

3    case.  There's a remote possibility that we may be inviting you

4    back.  Okay?  Thank you very much.

5        **JUROR:**  Thank you.

6        **JUROR:**  You're welcome.

7        **THE DEPUTY COURT CLERK:**  Judge -- so they can get their

8    purses out of the deliberation --

9        **THE COURT:**  Oh, yes.  We'll retrieve your personal

10   belongings.  I guess you would like those, wouldn't you?

11       **JUROR:**  Yes.

12       **JUROR:**  Yeah.  Appreciate it.

13           (Alternate jurors released.)

14       **THE COURT:**  Please be seated.

15       I'm not going to address your Rule 29 motion until the

16   jury makes a decision and I -- you know, I say that with some

17   humility because I -- I do believe that Judges should rule on

18   those things when they have time to take them under

19   consideration, but not necessarily wait for the jury to get

20   them off the hook.  In a prior life, I was a state judge and I

21   rarely took that under advisement, only when something happened

22   at the very last minute.  But the way we do -- at least I do

23   federal trials, it often makes it difficult to give the motion

24   the attention it deserves while also working with the jury and

25   working with counsel to get the case complete.  So I'll take it

1    up and give the State an opportunity to -- they probably didn't
2    get your authority any sooner than I did.  So give them a
3    chance to look at it.
4         MS. BROWN:  Thank you, Your Honor.
5         THE COURT:  I said the State.  Had me -- I was reverting
6    back, wasn't I?  The Government.
7         MS. BROWN:  I have accidentally said in a trial, the State
8    rests.
9         THE COURT:  Yeah, yeah.  Well...
10         MS. BROWN:  When I was no longer a prosecutor.  It's --
11    old habits die hard.
12         THE COURT:  Yeah, old habits die hard.
13         Is there anything I can do for you?
14         MS. DIAL:  No.  Thank you, Your Honor.
15         THE COURT:  Okay.  Miss Butler has your telephone numbers
16    if the jury has a question or comes back with a verdict.
17    Please don't go too far 'cause we'll be waiting for you to come
18    back.
19         MS. DIAL:  Yes, sir.
20         THE COURT:  Thank you very much.
21         MS. BROWN:  Absolutely.  Your Honor, our State court --
22    courthouse is -- is on the other side of this parking garage.
23    It's -- it's very short --
24         THE COURT:  I saw that, yeah.
25         MS. BROWN:  I have a filing that's due at five o'clock.  I

1  was going to run over and just take care of that so that I
2  could get that out of the way.  But I won't be any farther --
3  is that okay?
4       **THE COURT:**  Yeah, if you can do it --
5       **MS. BROWN:**  It's just a two-minute walk at most.
6       **THE COURT:**  Yeah.  No, that's fine.
7       **MS. BROWN:**  Okay.  Thank you.
8       **THE COURT:**  Takes me two minutes to get in from just next
9  door, so that's fine.
10      **CSO:**  All rise.
11           (A recess was taken while the jury deliberates.)
12      **THE COURT:**  Counsel's present.  Defendant is present.
13  Please be seated.  This is a really good jury, you know it?
14       "How much of our own common sense and life experiences can
15  we use to weigh when making our decision?"
16       Then after the question mark, there's the quote
17  "knowingly."  That is a question from the jury, and it's signed
18  by the foreperson, who is XXXXXXX XXXXXXXX --
19      **THE DEPUTY COURT CLERK:**  Yes.
20      **THE COURT:**  -- Juror No. 11.
21       My proposed response is you may rely on your life
22  experience and common sense in deciding issues of fact in
23  accordance with the instructions on the law I have given you.
24      **MS. DIAL:**  That works for the Government, Your Honor.
25      **MS. BROWN:**  Same for the defense.

1        THE COURT:  I'll address it to members of the jury.

2        THE DEPUTY COURT CLERK:  I'll take that back.

3        THE COURT:  Oh, the question?

4        THE DEPUTY COURT CLERK:  With a note that they -- is

5   that -- it's right there.  I'll just attach that response if

6   that's okay.

7        THE COURT:  Okay.  We -- again, a difference in procedure,

8   we usually make that note an exhibit for the record.

9        THE DEPUTY COURT CLERK:  And we do too.  There -- and I

10  should have --

11       THE COURT:  Oh, oh, I'm sorry.

12       THE DEPUTY COURT CLERK:  But I can attach it if you'd

13  rather, I mean.

14       THE COURT:  No.  I'll redo that.  I'm sorry.  I didn't see

15  that.

16       THE DEPUTY COURT CLERK:  No.  I should have pointed that

17  out to you.  I saw you writing.

18       THE COURT:  I have to print because if I did it in long

19  hand, they wouldn't be able to read it.

20       Today's the 30th; right?

21       THE DEPUTY COURT CLERK:  Yes, sir.

22       THE COURT:  And they're instructed to keep this?

23       THE DEPUTY COURT CLERK:  Yes, sir.

24       THE COURT:  Okay.  Thank you.

25       THE DEPUTY COURT CLERK:  Uh-huh.

1          (A recess was taken.)

2      **THE COURT:**  Defendant is present.  Counsel is present.

3  Attorneys are present.  Please be seated.  I understand the

4  jury has a verdict.  Please return the jury.

5      **CSO:**  All rise.

6          (Jury present.)

7      **THE COURT:**  Please be seated.

8      Miss XXXXXXXX, has the jury selected a foreperson?

9      **JUROR:**  Yes.

10     **THE COURT:**  Are you the foreperson?

11     **JUROR:**  Yes, I am.

12     **THE COURT:**  And has the jury reached a verdict in this

13  case.

14     **JUROR:**  Yes, we have.

15     **THE COURT:**  Would you please deliver the verdict to the --

16  to Mr. Phorn?

17     Thank you, sir.

18     **CSO:**  Yep.

19     **THE COURT:**  Madam Clerk, would you publish the verdict,

20  please.

21     **THE DEPUTY COURT CLERK:**  In the United States District

22  Court for the Northern District of Oklahoma, United States of

23  America versus Raymond Lee Goldesberry, Case No. 4:21-cr-450.

24  Verdict, Count 1 of the superseding indictment.

25     No. 1, as to the offense of knowingly engaging in a sexual

1   act with a minor under the age of 12 in Indian Country in

2   violation of 18 United States Code, Sections 1151, 1153, and

3   2241(c) as charged in Count 1 of the superseding indictment,

4   we, the jury, find the defendant, Raymond Lee Goldesberry,

5   guilty.

6       So say we all, this 30th day of March, 2022.  And it is

7   signed by the foreperson.

8       **THE COURT:**  Madam Clerk, would you poll the jury, please.

9           (Jury polled.)

10      **THE DEPUTY COURT CLERK:**  Thank you.

11      **THE COURT:**  Ladies and gentlemen, I want to thank you for

12  the time and consideration you gave this case.  And I want to

13  advise you of an important right that you have.  No juror can

14  ever be required to talk about what occurred in the jury room

15  except by a Court order.  For centuries, we've recognized the

16  importance of the jury's work and the importance of their work

17  remaining private.  Although you are at liberty to speak with

18  anyone about the -- the case at this point, it's up to you to

19  decide whether you want to do so.  Some may approach you

20  finding fault.  Others may simply be curious.  I'm not in any

21  way suggesting that anyone will approach you.  But if they do,

22  it'll be up to you to decide whether you wish to speak to them.

23  And if you don't mind, I'm going to ask you to return to the

24  jury room, and I will be with you in just a minute.  Thank you.

25      **CSO:**  All rise.

1                (Jury out.)

2        **THE COURT:**  Mr. Goldesberry, do you have any cause, or

3    does anyone have cause on your behalf to show why you should

4    not be adjudged guilty of the offense of knowingly engaging in

5    a sexual act with a minor under the age of 12 in Indian Country

6    in violation of 18 U.S.C., Sections 1151, 1153, and 2241(c) as

7    charged in Count 1 of the superseding indictment?

8        **MS. BROWN:**  No, Your Honor.

9        **THE COURT:**  There being no cause, you're hereby adjudged

10   guilty of that offense.  Do you or does anybody on your behalf

11   have -- have reason to show why you should not be remanded at

12   this time?

13       **MS. BROWN:**  No, Your Honor.

14       **THE COURT:**  The Government?

15       **MS. DIAL:**  The Government is moving for remand under 18

16   U.S.C. 3143, Your Honor.

17       **THE COURT:**  You're hereby remanded to the custody of the

18   United States marshal to await sentencing.  I can't give you a

19   sentencing date at this point because of the backlog of cases,

20   but I will -- I will get one as soon as I can.  Thank you very

21   much.

22               (Discussion held off the record.)

23       **MS. DIAL:**  Your Honor, is the Court going to issue a

24   written order on the Rule 29?

25       **THE COURT:**  I'm -- I'll get to that in a second.

1    **MS. DIAL:**  I apologize.

2    **MS. BROWN:**  Allow him some time --

3    **MARSHAL:**  Oh, yeah.  That won't be a problem at all.

4    **THE DEFENDANT:**  Have the ankle monitor on.

5    **MARSHAL:**  We'll take care of that.

6    **MS. BROWN:**  Thank you.

7    **MARSHAL:**  Lead the way.

8    **THE COURT:**  The motion pursuant to Rule 29 is denied.

9    Counsel, I know this is an awkward time for you,

10   perhaps -- well, maybe not.  You've been around for a while.

11   It's probably -- you're a professional.  I want to thank

12   counsel for the courtesy you've shown to the jury and to the

13   Court.  And it's been a pleasure working with you.  I probably

14   won't see you again, but I would be pleased if I did.  Thank

15   you.

16   **MS. DIAL:**  Thank you, Your Honor.

17   **MS. BROWN:**  Thank you for coming.

18          (Proceedings adjourned at 1:50 p.m.)

19          (End of proceedings.)

20

21                  **REPORTER'S CERTIFICATION**

22       I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

23   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

24

25

```
1          CERTIFIED:      s/Leslie K. Ruiz
                           Leslie K. Ruiz, CSR, RPR, RMR
2                          United States Court Reporter
                           333 W. 4th Street, Room 411
3                          Tulsa, OK  74103
                           (918)699-4794
4                          leslie_ruiz@oknd.uscourts.gov

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```